QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Claude M. Stern (Bar No. 96737)
  claudestern@quinnemanuel.com
  555 Twin Dolphin Drive # 560
  Redwood City, CA 94065
  (650) 801-5000 Tel.
  (650) 801-5100 Fax

  Ethan Glass (Bar No. 216159)
  ethanglass@quinnemanuel.com
  Michael D. Bonanno (DC Bar No. 998208, *pro hac vice forthcoming*)
  mikebonanno@quinnemanuel.com
  1300 I Street, NW # 900
  Washington, DC 20005
  (202) 538-8000 Tel.
  (202) 538-8100 Fax

Attorneys for Plaintiff SC Innovations, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| SC INNOVATIONS, INC., | CASE NO. |
| Plaintiff, | **COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| UBER TECHNOLOGIES, INC., RASIER, LLC, RASIER-CA, LLC, RASIER-PA, LLC, RASIER-DC, LLC, RASIER-NY, LLC, AND UBER USA, LLC, | |
| Defendants. | |

1

## NATURE OF ACTION

2    1.    Through an array of anticompetitive acts, Uber Technologies, Inc. ("Uber") has stifled

3    competition in the market for ride-hailing applications.  Those anticompetitive actions drove Sidecar

4    Technologies, Inc. ("Sidecar"), one of Uber's most significant competitors, out of business.  Uber is

5    now a monopolist, which has harmed both Sidecar and the consumers who previously benefitted from

6    the competitive pressure Sidecar placed on Uber.  This case is designed to compensate Sidecar for the

7    damages caused by Uber, bring an end to Uber's anticompetitive practices, and prevent future

8    anticompetitive acts so that consumers can once again enjoy the benefits of lower prices, higher

9    quality, and more options.

10    2.    In 2009, Uber launched its ride-hailing smartphone app.  Uber's app allowed

11    consumers to use their smartphones to arrange on-demand transportation in "black cars" and

12    limousines driven by licensed chauffeurs.

13    3.    In 2012, Sidecar debuted its own ride-hailing app.  Unlike Uber's app, which only

14    connected passengers to professional drivers, Sidecar's app could be used by passengers to arrange

15    rides with drivers who were using their personal cars, pioneering a new concept called "ridesharing."

16    4.    Sidecar's app was the first to offer many popular features that have become

17    commonplace in ride-hailing apps today.  For example, Sidecar's app was the first to provide

18    passengers with estimated fares and trip durations before booking their trip.  It also was the first ride-

19    hailing app capable of scheduling carpool rides between strangers heading in the same direction,

20    which could dramatically lower costs for passengers using that feature.

21    5.    Uber launched its own ridesharing service in 2013, which it called "UberX".  With the

22    launch of that service, Uber became hell-bent on stifling competition from competing ride-hailing

23    apps, including Sidecar.  But rather than compete on the merits, Uber engaged in a campaign of

24    anticompetitive tactics, orchestrated by its senior executives, that were designed to impair Sidecar

25    from serving as a check on Uber's quest for a monopoly.  Sidecar's superior functionality proved to be

26    no match for Uber's anticompetitive actions, and as a result, Sidecar went out of business in

27    December 2015.

28    6.    One of the anticompetitive practices that Uber employed was predatory pricing.  Uber

heavily subsidized payments to drivers, and at the same time, it subsidized the fares it charged to passengers.  As a result of these subsidies, the average price paid by a passenger was well below Uber's average variable cost for completing a transaction on its platform.

7.     Uber's most senior officers and executives specifically planned for this subsidized pricing strategy to foreclose competition.  Uber intentionally sustained near-term losses that were designed to drive Sidecar out of the market while Uber acquired a dominant market position.  When the market finally tipped in Uber's favor and Uber could leverage network effects to insulate itself from meaningful competition, it planned to raise prices.  By imposing higher prices while it was protected by the substantial barriers to entry created by network effects, Uber planned to recoup the losses it had incurred while pushing out its rivals.  This practice would have significant negative effects on consumers in the form of higher prices, lower quality, and fewer options.

8.     That plan has now come to fruition.  Since Sidecar wound down its operations in December 2015, Uber has increased passenger prices in each of the markets where it was facing competition from Sidecar, without offsetting those increased fares with higher payments to drivers.  Indeed, Uber has *reduced* driver payments at the same time it has raised passenger prices.  Without competition from Sidecar to keep its prices in check, Uber now is imposing its will on both passengers and drivers in the form of higher, supra-competitive prices.

9.     To obtain and protect its monopoly, Uber also intentionally interfered with the performance and quality of competing ride-hailing apps, including Sidecar's app.  Uber's senior officers and executives directed clandestine campaigns to submit fraudulent ride requests through its competitors' ride-hailing apps.  Those fraudulent requests were not submitted by real passengers, but instead were directly submitted by Uber (or persons working under Uber's direction).  Uber intended for those requests to undermine its competition, including by (a) inundating competitors with fraudulent ride requests that were cancelled before the driver arrived; or (b) using fraudulently requested trips as an opportunity to convince drivers to work exclusively with Uber instead of its competitors.

10.     Those tactics violated the terms of service for Sidecar's app and undermined the value of competing ride-hailing apps because they prevented drivers from being matched with legitimate

ride requests.  Because drivers were matched with fraudulent requests, they would be frustrated with Sidecar and, at the same time, real passengers who were looking for legitimate rides faced longer wait times.  Long wait times caused drivers and passengers to switch to alternative apps.  That triggered a vicious cycle that undermined the ability of Sidecar's app to challenge Uber in the marketplace.

11.     Through its anticompetitive actions, which continued at least up through when Sidecar went of business, Uber stifled competition and obtained a monopoly position in the market for ride-hailing apps.

12.     Those same anticompetitive actions drove Sidecar out of business.  Sidecar brings this action to recover the damages it sustained when it went out of business as a result of Uber's anticompetitive tactics, which tilted the playing field in Uber's favor and irrevocably damaged the competitive process.

## THE PARTIES

13.     Between 2012 and 2015, Sidecar Technologies, Inc. licensed and operated a ride-hailing smartphone application in the United States.  Its principal place of business was 360 Pine Street #7 San Francisco, CA 94104.

14.     SC Innovations, Inc. is a Delaware corporation with a principal place of business located at 912 Cole Street #182 San Francisco, CA 94117.  In September 2018, Sidecar Technologies, Inc. assigned to SC Innovations, Inc. "any and all claims and causes of action" including those for "any violation of the . . . Sherman Antitrust Act [and] the California Unfair Practices Act."  For simplicity, when used in this Complaint, Sidecar refers to both SC Innovations and Sidecar Technologies, Inc.

15.     Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business located at 1455 Market Street San Francisco, CA 94103.  Uber licenses and operates a ride-hailing smartphone application in the United States.

16.     Defendant Rasier, LLC is a Delaware limited liability company with its principal place of business located at 1455 Market Street San Francisco, CA 94103.  On information and belief, Rasier, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app.

17.     Defendant Rasier-CA, LLC is a Delaware limited liability company with its principal place of business located at 1455 Market Street San Francisco, CA 94103.  On information and belief, Rasier-CA, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app in California.

18.     Defendant Rasier-PA, LLC is a Delaware limited liability company.  On information and belief, Rasier-PA, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app in Pennsylvania.

19.     Defendant Rasier-DC, LLC is a Delaware limited liability company.  On information and belief, Rasier-DC, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app in the District of Columbia.

20.     Defendant Rasier-NY, LLC is a Delaware limited liability company.  On information and belief, Rasier-NY, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app in New York.

21.     Defendant Uber USA, LLC is a Delaware limited liability company.  On information and belief, Uber USA, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that licenses the Uber ride-hailing app to drivers and riders.

22.     When used in this Complaint, Uber refers to both Uber Technologies, Inc. and its wholly-owned subsidiaries, Rasier, LLC, Rasier,-CA, LLC, Rasier-PA, LLC, Rasier-DC, LLC, Rasier-NY, LLC, and Uber USA, LLC.  Uber undertook the actions described in this complaint directly and/or through its wholly-owned subsidiaries.

## JURISDICTION

23.     Sidecar brings federal antitrust claims against Uber under Section 4 of the Clayton Act (15 U.S.C. § 15), for damages caused by Uber's violations of Section 2 of the Sherman Act (15 U.S.C. § 2).  This Court has federal question jurisdiction over those claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1337.

24.     This Court has supplemental jurisdiction over the claims brought by Sidecar under the California Unfair Practices Act pursuant to 28 U.S.C. § 1367.

1

**VENUE**

2        25.      Uber has a regular and established place of business in this District.  Uber's corporate

3 headquarters is located at 1455 Market Street, San Francisco, CA 94103.

4        26.      Uber committed or directed the anticompetitive acts described in this Complaint from

5 within this District.  Accordingly, venue is appropriate in the Northern District of California pursuant

6 to 28 U.S.C. § 1391, 28 U.S.C. § 1404(a), and 15 U.S.C. § 22.

7        **INTRADISTRICT ASSIGNMENT**

8        27.      Pursuant to Civil Local Rule 3-2(c), this is an Antitrust Action to be assigned on a

9 district-wide basis.

10        **RIDE-HAILING APPS**

11        28.      Ride-hailing smartphone applications ("Ride-Hailing Apps") are software platforms

12 that facilitate transactions between operators of cars ("Drivers") and individuals that are looking to

13 obtain transportation ("Passengers").  Passengers use Ride-Hailing Apps on their smartphones to

14 arrange transportation with Drivers that are using the same Ride-Hailing App.  The user interface of a

15 Ride-Hailing App can be different for Passengers and Drivers, but Passengers and Drivers use the

16 same software platform, which is remotely hosted and delivered over the internet.  The companies that

17 license and operate Ride-Hailing Apps are commonly called transportation network companies

18 ("TNCs").

19        29.      To use a Ride-Hailing App, a Passenger opens the App and enters the address of his or

20 her destination.  After the destination is entered, the App will provide estimated wait times for

21 different types of cars (black cars, sedans, SUVs, etc.), the estimated time of arrival at the Passenger's

22 destination, and estimated total fare for the trip.  Once the Passenger confirms that he or she would

23 like to request a ride, the GPS receiver in the Passenger's smartphone relays his or her location to

24 Drivers using the same App.

25        30.      Drivers using the App near the Passenger's location will receive an alert and an

26 invitation to accept the ride request.  The Ride-Hailing App then matches the Passenger with a Driver

27 who has accepted the request, and the Passenger can track the Driver's route until he or she reaches

28 the Passenger's location.  Upon arrival, the Driver picks up the Passenger and takes him or her to their

selected destination.

31.     Following each ride, the Driver and Passenger are invited to "rank" each other on a scale of 1 to 5 stars.  A Driver's average rating is visible to Passengers in the App, and a Passenger's average rating is visible to Drivers.

32.     Before using a Ride-Hailing App, Passengers must download the App to their smartphone and create a profile that links a form of payment (*e.g.*, a credit card) to the App.

33.     Drivers must also download the App to their smartphones.  Before they can accept ride requests and start transporting passengers, Drivers typically must submit an application that provides proof they are a licensed driver, registers their automobile with the App, and includes the information necessary for the completion of the TNC's background check.  Once a Driver's application is approved, he or she can start using the App.

34.     The following images demonstrate this process for users of the Sidecar app:



**Figure 1: Sidecar Passenger App Screenshots**

  

**Figure 2: Sidecar Driver App Screenshots**

35.     Ride-Hailing Apps are free to download, but they are not free to use.  Passengers pay a fee at the end of each ride (usually a fixed booking fee, plus a variable fee based on distance and time traveled, subject to a prescribed minimum), the TNC retains a percentage of the Passenger's fare (as a commission for facilitating the transaction), and the balance of the passenger's payment is remitted to the Driver.   Payment is made electronically through the App, and the entire transaction occurs automatically upon completion of each ride.

36.     Ride-Hailing Apps have automated a number of functions to improve convenience and efficiency in ride-hailing.  As a few examples, when using a Ride-Hailing App, Passengers can easily and quickly:

a.     split fares with friends in the same car without using cash or a credit card;

b.     book "carpool" rides with strangers heading in the same direction;

c.     tip their drivers from the app without cash or a credit card;

d.     select a precise trip origin and destination on a map;

e.     determine the estimated cost of the ride and estimated time of arrival for their trip before booking;

f.     select the exact size and features of their desired automobile;

g.     rate the quality of their driver;

1            h.       share their location and estimated time of arrival with friends; and

2            i.       automate receipts and create expense reports for business trips.

3

4      37.      Ride-Hailing Apps also provide significant benefits and additional flexibility for

5 Drivers, including the ability to:

6            a.       choose their own hours and work schedule; and

7            b.       supplement their ordinary job with a second source of income from providing transportation services with their own personal cars.

8

9 **TRANSPORTATION NETWORK COMPANIES**

10      38.      Uber introduced its Ride-Hailing App in 2009.  At first, Uber's App only connected

11 Passengers to limousines and town cars operated by professional drivers.

12      39.      In 2012, Sidecar introduced its Ride-Hailing App, which could be used by Passengers

13 to arrange rides with Drivers who were using their personal cars.  This new concept was called

14 "ridesharing."

15      40.      Lyft, Inc., another TNC, launched a Ride-Hailing App focused on ridesharing that

16 same year.

17      41.      In the years that followed, Sidecar continued to innovate and develop new, cutting-

18 edge features that offered additional functionality beyond that which was available in Uber's App.

19      42.      Sidecar was the first company to allow Passengers to enter their destination before

20 booking a ride, so that its App could display the estimated price for the ride, as well as the expected

21 trip duration and arrival time.

22      43.      Sidecar also was the first TNC to roll out an automated carpooling feature to match

23 Passengers heading in the same direction and allow them to share the same car (and split the fare).

24      44.      Sidecar also was the first Ride-Hailing App to provide several key features for Drivers,

25 such as turn-by-turn directions within the App and the ability to link ride requests (known as

26 "queueing").

27      45.      Uber and Lyft have since copied these features and implemented them in their own

28 Ride-Hailing Apps, where they have become popular product features.  Today, for example, "shared

rides" account for around 50% of Uber's trips in San Francisco.

46.     Between 2012 and 2015, Sidecar's Ride-Hailing App could be used by Passengers and Drivers in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington, DC, New York, Seattle, San Diego, San Jose, and Boston.

47.     At the peak of its operations, Sidecar's Ride-Hailing App was facilitating more than 35,000 rides per week, and it had obtained a meaningful share of the market in several U.S. cities.  For example, as of late 2014, Sidecar estimated that it held between a 10% and 15% market share in the markets for Ride-Hailing Apps in San Francisco, Los Angeles, and Chicago.

48.     By mid-2014, Uber operated in all of the cities where Sidecar operated (San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston).

49.     From the moment Sidecar released its App, Uber recognized Sidecar was a real competitive threat.  With the introduction of ridesharing, Sidecar offered safe, reliable rides to Passengers at a lower price point than Uber's luxury black car service.  And Sidecar's App offered additional features and flexibility, including by allowing Drivers to use their own personal vehicles to provide transportation.

50.     Uber's CEO, Travis Kalanick, was not happy with the prospect of competition from new Ride-Hailing Apps, "most notably Lyft and Sidecar, whose goal [was] to offer incredibly low-cost transportation."  In a public "white paper," Kalanick announced that Uber would introduce its own ridesharing service in response to the new, "far cheaper product" offered by Sidecar and Lyft.

51.     By 2013, Uber launched its own ridesharing service, which it called UberX.

## RELEVANT PRODUCT MARKET

52.     Ride-Hailing Apps constitute a relevant antitrust product market.  A hypothetical monopolist that was the only present and future supplier of all Ride-Hailing Apps likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") for each transaction completed through Ride-Hailing Apps.  That SSNIP could be imposed by raising the prices paid by Passengers, reducing the payments made to Drivers, or both.

53.     Not enough Passengers would respond to a SSNIP by switching to other means of hailing transportation to render such a price increase unprofitable.  Ride-Hailing Apps are cheaper, more convenient, and offer greater functionality than other means of hailing transportation, such as hailing a taxi on a street corner or calling a taxi dispatcher.  Ride-Hailing Apps have automated a number of functions to improve convenience and efficiency in hailing transportation.  As a few examples, when using a Ride-Hailing App, Passengers can easily and quickly:

a.     split fares with friends in the same car without using cash;

b.     book carpool rides with strangers heading in the same direction;

c.     automatically pay and tip their drivers at the conclusion of a trip without using cash or credits;

d.     select a precise trip origin and destination from a map;

e.     determine the estimated cost of the ride and estimated time of arrival before booking the ride;

f.     select the exact size and features of their desired automobile;

g.     rate the quality of their driver;

h.     share their location and estimated time of arrival with others;

i.     see the name, photograph, and license of their driver; and

j.     receive automatic receipts and create expense reports for business trips.

54.     Other means of hailing transportation, such as hailing a taxi on a street corner or calling a taxi dispatcher, are not reasonably close substitutes for Passengers using Ride-Hailing Apps because of these differences.

55.     Likewise, not enough Drivers would respond to a SSNIP by switching to other means of arranging transportation services to render such a price increase unprofitable.  Anyone who has a license and passes the applicable background check can sign up as a Driver and use their personal car to fulfill rides booked through a Ride-Hailing App.  Ride-Hailing Apps offer flexibility to Drivers, who can work wherever and whenever they want, for as long as they want.  If Drivers wanted to provide transportation services outside of a Ride-Hailing App, their only real option would be to become a taxi or limousine driver.  Becoming a taxi driver requires a much greater upfront investment than serving as a Driver on a Ride-Hailing App (including, *inter alia*, buying a taxi and obtaining the

appropriate taxi license or affiliating with an existing taxi company), does not offer the same degree of flexibility as that which is available through a Ride-Hailing App, and does not offer payment terms that are as favorable as those available through Ride-Hailing Apps.

56.     Other means of arranging transportation services are not reasonably close substitutes for Drivers using Ride-Hailing Apps because of these differences.

57.     Ride-Hailing Apps are technology—they do not compete with other modes of transportation or transportation companies, like taxi cab companies.  By Uber's own admission, its Ride-Hailing App does not compete with taxi cabs or other transportation providers:

> a.    On January 28, 2013, Uber told the California Public Utilities Commission: "Uber is a software technology company with headquarters in San Francisco, California.  Uber is not a transportation company. It does not own vehicles, does not employ drivers and ***does not compete with taxicab or livery companies in providing transportation services to the public***."  (emphasis added).

> b.    On May 13, 2013, Uber told the Maryland Public Service Commission: "Uber does not own, lease or charter vehicles or employ drivers.  ***Uber does not compete directly with transportation providers.***  Rather, the App is a tool available to the existing transportation infrastructure.  Thus, Uber views itself as positioned at a different level from the actual transportation companies or providers."  (emphasis added).

58.     Taxi companies and TNCs are also subject to different government regulations.  For example:

> a.    In the District of Columbia, local regulations prohibit Drivers using a Ride-Hailing App from soliciting or accepting "street hails," D.C. CODE § 50–301.29e(a)(1), and impose different pricing regulations on taxis and TNCs, *id.* §§ 50–301.29f, 50-301.31(b)(1)-(2) (allowing ride-hailing companies to use method other than metered taxi rate to calculate fares); *id.* § 50–381(a) (requiring taxis to use meter system).

> b.    In New York, TNC Drivers "shall not solicit or accept street hails," NY VEH. & TRAF. LAW § 1692(7), and may not accept payment in cash, *id.* § 1692(8).  Taxi drivers may do both.  *See id.* § 1691(1)(c)(i), (6)(b)(ii) (excluding taxis from TNC definitions and thus from street-hail, payment, and other regulations governing only TNCs).

> c.    In Pennsylvania, likewise, TNC Drivers may not solicit or accept street hails or phone calls requesting transportation.  53 PA. STAT. AND CONS. STAT. § 57A16(b)(3).  Taxi drivers may do both.  *See id.* § 5701 (defining "taxicab service" as a "[l]ocal common carrier service for passengers, rendered on either an exclusive or nonexclusive basis, where the service is characterized by the fact that passengers normally hire the vehicle and its driver either by telephone call or by hail, or both. The term does not include transportation network service as defined in section 57A01").

59.     Other means of transportation besides taxi cabs are also not reasonable substitutes for Ride-Hailing Apps.  In contrast to driving, Passengers do not need to own and be able to operate a vehicle to arrange transportation using a Ride-Hailing App.  Unlike public transit, Ride-Hailing Apps allow Passengers to go anywhere they want without being limited by pre-set routes or schedules. And walking is not a reasonable substitute for rides arranged through Ride-Hailing Apps because it does not provide comparable speed or allow for transportation over comparable distances (*e.g.*, walking five miles is not a reasonable substitute for riding in a car over the same distance).

60.     Given the differences between these other modes of transportation and transportation that can be booked through Ride-Hailing Apps, they are not reasonable substitutes for Ride-Hailing Apps.

**RELEVANT GEOGRAPHIC MARKETS**

61.     The Sidecar App could be used in the following cities:  San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

62.     At all relevant times, Uber's App could be used in those same cities.  In fact, in terms of the number of riders, Washington, DC, New York, Chicago, Los Angeles, and San Francisco are Uber's largest markets in North America today.

63.     The cities of San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston each independently constitute a relevant geographic market for purposes of antitrust analysis.  Passengers looking for a ride in each of those cities can only use a Ride-Hailing App that is used by nearby Drivers.  Likewise, Drivers looking to use a Ride-Hailing App can only connect to nearby Passengers who are using the same App.

64.     A hypothetical monopolist that was the only present and future supplier of all Ride-Hailing Apps in each of those cities (San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston) would impose at least a SSNIP for each transaction completed through Ride-Hailing Apps.  That SSNIP could be imposed by raising the prices paid by Passengers, reducing the payments made to Drivers, or both.  Not enough

Passengers or Drivers would respond to a SSNIP by switching to other means of hailing transportation that are not available within the city limits to render such a price increase unprofitable.

## BARRIERS TO ENTRY

65.     There are high barriers to entry in the market for Ride-Hailing Apps.

66.     Ride-Hailing Apps connect two sets of consumers, Passengers and Drivers, and thus are two-sided platforms that exhibit indirect network effects.  Indirect network effects exist where the value of the two-sided platform to one group of customers depends on how many members of a different group of customers participate.

67.     In the case of Ride-Hailing Apps, the value of an App to Passengers depends on how many Drivers are using the same App near their location.  As more Drivers use a particular Ride-Hailing App, the value of that platform increases for Passengers because it becomes more likely that they will be matched quickly with a nearby Driver when trying to book a ride.  And as more Drivers join the platform, wait times decrease, making the Ride-Hailing App more valuable to Passengers.

68.     The same principle applies to Drivers.  The value of a Ride-Hailing App to Drivers depends on how many nearby Passengers are using the App.  As more Passengers use a particular Ride-Hailing App, the value of that platform increases for Drivers because it becomes more likely that they will be matched quickly with a nearby Passenger looking for a ride.  In other words, as more Passengers use a Ride-Hailing App, it becomes more valuable for Drivers because the amount of time Drivers spend waiting for ride requests declines and so does the distance to the pick-up point for their next ride.

69.     Uber and its senior executives and officers recognized that these network effects were vital to its business and its strategy for marginalizing its competitors.  In 2014, its former CEO and founder, Travis Kalanick, described "the network effects of [Uber's] business" this way:

> More cars and drivers mean better coverage and lower pickup times. Lower pickup times mean better economics for drivers, and thus more drivers and cars.

70.     Bill Gurley, a general partner at Benchmark Capital (an early Uber investor), wrote a blog post in 2014, when he was a member of Uber's board of directors, that discussed the importance of network effects to Uber's business:

COMPLAINT

Eighteen years ago, Brian Arthur published a seminal economic paper in the Harvard Business Review titled, "Increasing Returns and the Two Worlds of Business." If you have not read it, I highly recommend that you do. His key point is that certain technology businesses, rather than being exposed to diminishing marginal returns like historical industrial businesses, are actually subject to a phenomenon called known as "increasing returns." Gaining market share puts them in a better position to gain more market share. Increasing returns are particularly powerful when a network effect is present. According to Wikipedia, a network effect is present when "… the value of a product or service is dependent on the number of others using it." In other words, the more people that use the product or service, the more valuable it is to each and every user.

So the right questions are, "is Uber exposed to some form of network effect where the marginal user sees higher utility precisely because of the number of previous customers that have chosen to use it, and would that lead to a market share well beyond the 10% postulated by Damodaran?"

There are three drivers of a network effect in the Uber model:

(1) **Pick-up times.** As Uber expands in a market, and as demand and supply both grow, pickup times fall. Residents of San Francisco have seen this play out over many years. Shorter pickup times mean more reliability and more potential use cases. The more people that use Uber, the shorter the pick up times in each region.

(2) **Coverage Density.** As Uber grows in a city, the outer geographic range of supplier liquidity increases and increases. Once again, Uber started in San Francisco proper. Today there is coverage from South San Jose all the way up to Napa. The more people that use Uber, the greater the coverage.

(3) **Utilization.** As Uber grows in any given city, utilization increases. Basically, the time that a driver has a paying ride per hour is constantly rising. This is simply a math problem – more demand and more supply make the economical traveling-salesman type problem easier to solve. Uber then uses the increased utilization to lower rates – which results in lower prices which once again leads to more use cases. The more people that use Uber, the lower the overall price will be for the consumer.

71.     These network effects create a formidable barrier to entry that insulates incumbent TNCs from new competition or expansion by smaller rivals.  A new competitor trying to enter the market or an existing, smaller firm trying to expand will not be able to compete in a timely, likely, or sufficient basis with incumbent firms that already have established large networks of Drivers and Passengers using their Ride-Hailing Apps.  For example, without enough Drivers, a smaller rival will not be able to compete with the shorter wait times available on incumbent apps, and without enough Passengers, the upstart firm will not be able to attract Drivers to its platform.  And that is the case even if the new competitor offers better commercial terms or features.  The value of Ride-Hailing

Apps is derived from the number of Drivers and Passengers, giving incumbent firms, especially a monopolist like Uber, an inherent and insurmountable advantage.

72.     This chicken-or-egg problem has stifled new entrants and prevented competitors from imposing a true competitive constraint on Uber since Sidecar wound down its operations at the end of 2015.  Even in response to the wave of anticompetitive price increases Uber has imposed over the past two years, new rivals have not emerged to challenge Uber's market dominance.

73.     Economies of scale also are a major barrier to entry in the market for Ride Hailing Apps.  Uber's scale advantages are difficult, if not impossible, for a new entrant or smaller firm to overcome because of the dominant market position Uber has obtained through its anticompetitive actions.

74.     Uber now boasts a user base of over 40 million Passengers in cities around the United States.  When those Passengers travel to a new city, they can open their Uber App and know that they will be able to book a ride within a few minutes.  Likewise, Drivers know that if they relocate to another city, they will be able to turn on their Uber App and be matched with Passengers within a matter of minutes.

75.     These scale advantages have enabled Uber to expand more rapidly and effectively than its competitors into new markets.  Bill Gurley described Uber's scale advantages this way:

> Uber also enjoys economies of scale that span across city borders. Many people who travel have experienced Uber for the first time in another city. When the company enters a new city they have the stored data for users who have opened the application in that area to see if coverage is available. These "opens" represent eager unfulfilled customers. They also have a list of residents who have already used the application in another city and have a registered credit card on file. This makes launching and marketing in each additional city increasingly easier.

76.     Another barrier to entry created by Uber's scale relates to the volume of data that it collects from transactions completed on its platform.  (*e.g.*, most popular destinations, busiest times of day for ride requests, impacts of seasonality, traffic patterns, etc.).  Uber can use this data to improve its algorithms for matching Drivers and Passengers, allowing its App to more rapidly and effectively improve its matching and scheduling functions than is possible for an upstart competitor.

77.     A new entrant or fringe competitor in the market for Ride-Hailing Apps cannot leverage an existing customer base in the same way to effectively compete with Uber's scale.

78.     Uber did not have to overcome barriers to entry in the market for Ride-Hailing Apps that are created by network effects and economies of scale.   When Uber embarked on its anticompetitive crusade to obtain its monopoly position, there were no incumbent TNCs with an established network of Drivers and Passengers.   New firms competing with Uber today face substantial long-run costs that Uber did not need to incur to surmount the barriers to entry created by network effects and economies of scale.

79.     Other TNCs also recognize that network effects and scale are formidable barriers to entry that insulate incumbent providers from new competition.   For example, one of Lyft's co-founders, John Zimmer, has publicly acknowledged "very strong network effects" in the market for Ride-Hailing Apps.

## MARKET PARTICIPANTS & MARKET SHARES

80.     Due to the importance of network effects, the market today has effectively collapsed into a duopoly composed of Uber and its only real remaining competitor, Lyft.

81.     Uber and Lyft collectively account for nearly 100% of all rides booked through Ride-Hailing Apps in the United States.   On a national level, Uber's market share in the United States is approximately 70%.   Lyft's market share in in the United States is approximately 30%.

82.     In local markets, Uber has monopoly power in each city where it competed with Sidecar:

   a.   in San Francisco, at all times between 2014 and the present, Uber's market share has been at least 60%.

   b.   in Los Angeles, at all times between 2014 and the present, Uber's market share has been at least 60%.

   c.   in Chicago, at all times between 2014 and the present, Uber's market share has been at least 65%.

   d.   in Philadelphia, at all times between 2014 and the present, Uber's market share has been at least 70%.

   e.   in Washington, DC, at all times between 2014 and the present, Uber's market share has been at least 70%.

   f.   in New York, at all times between 2014 and the present, Uber's market share has been at least 75%.

g.   in Seattle, at all times between 2014 and the present, Uber's market share has been at least 65%.

h.   in San Diego, at all times between 2014 and the present, Uber's market share has been at least 65%.

i.   in San Jose, at all times between 2014 and the present, Uber's market share has been at least 65%.

j.   in Boston, at all times between 2014 and the present, Uber's market share has been at least 70%.

## **UBER'S ANTICOMPETITIVE TACTICS**

83.     Uber did not acquire and maintain its monopoly by offering a better product or competing on the merits.   Instead, Uber's senior executives and officers directed a series of anticompetitive tactics that were specifically designed to thwart true competition and allow Uber to institute anticompetitive pricing strategies in the long-run.

84.     Through the anticompetitive actions described below, among others, Uber marginalized its competitors, raised barriers to entry, and insulated itself from meaningful competition.

**Uber Engaged in Predatory Pricing and Increased Prices After Sidecar Exited the Market**

85.     With the introduction of UberX, Uber deployed a two-part predatory pricing strategy to build its network and push out the competition, including Sidecar.

86.     First, Uber offered sign-up bonuses and other subsidies to Drivers, allowing them to earn more on each ride than they would if Uber employed a profit-maximizing strategy.   Second, it offered heavily subsidized rates to encourage Passengers to use its App, allowing them to pay less on each ride than they would if Uber employed a profit-maximizing strategy.

87.     In combination, these tactics caused Uber to incur substantial short-run losses.   On information and belief, Uber planned to incur near-term losses on transactions conducted through its App until it obtained a dominant market position, at which point it could start raising prices to supra-competitive levels to recoup its losses.

88.     The variable costs associated with each transaction conducted through a Ride-Hailing App include at least the following categories of costs: (1) the payment made by the TNC to the Driver; (2) the subsidy or discount provided to the Passenger; (3) the marketing costs associated with attracting the Driver and Passenger to the App to complete the transaction; (4) customer service costs;

(5) payment processing fees; and (6) the cost of the computer servers necessary to run the software and process the transaction.

89.     Between 2013 and 2016, in the markets where Uber was competing with Sidecar, the average prices Uber charged Passengers were lower than Uber's average variable cost per transaction. Uber's prices were so low that the commission it received from each transaction, on average, was lower than its average variable cost for the transaction (accounting for at least Driver payments and subsidies, Passenger subsidies and discounts, marketing costs, customer service costs, payment processing fees, and server costs).  In other words, on average, Uber lost money on each transaction completed through its Ride-Hailing App.

90.     On information and belief, in July 2014, for example, Uber subsidized 20% of the prices charged to Passengers for UberX rides.  And by 2015, Passenger fees were only covering around 40% of Uber's costs for each transaction conducted through its App.

91.     Based on press reports, Uber has privately advised current and potential investors that Driver subsidies are responsible for the large losses it has historically recorded on its books.  Public reports estimate that these losses exceeded $9.9 billion between 2012 and 2017.

92.     Until Sidecar went out of business in December 2015, however, it was unclear whether Uber's predatory strategy would be successful and allow Uber to recoup its predatory losses by raising prices in the long-run.  Those doubts have now been erased.  Uber has in fact raised prices several times since Sidecar ceased operations.  Because Sidecar is no longer in the market exercising a competitive constraint on Uber, Uber has been able to steadily raise its prices in each market where it previously competed against Sidecar.

93.     Since January 2016, Uber has raised prices to supra-competitive levels.

94.     For example, Uber has imposed at least the following specific price increases in the markets where it previously competed against Sidecar since Sidecar exited the market in December 2015:

| UberX Fee Increases in San Francisco | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2016 | Minimum fare | $5.35 to $5.55 | 3.7% |
| February 2016 | Service fees | $1.35 to $1.55 | 14.8% |
| March 2016 | Minimum fare | $5.55 to $6.55 | 18.0% |
| February 2017 | Minimum fare | $6.55 to $6.75 | 18.3% |
| February 2017 | Service fee | $1.55 to $1.75 | 12.9% |
| July 2017 | Minimum fare | $6.75 to $7.00 | 3.7% |
| July 2017 | Service fee | $1.75 to $2.00 | 14.3% |
| September 2017 | Cost per mile | $1.15 to $1.21 | 5.2% |
| April 2018 | Base fare | $2.00 to $2.20 | 10.0% |
| April 2018 | Cost per mile | $1.21 to $1.33 | 9.9% |
| April 2018 | Service fee | $2.00 to $2.20 | 10.0% |

| UberX Fee Increases – Los Angeles | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2017 | Service fees | $1.65 to $1.85 | 12.1% |
| February 2017 | Minimum fare | $5.15 to $5.35 | 3.9% |
| July 2017 | Minimum fare | $5.35 to $5.60 | 4.7% |
| July 2017 | Service fees | $1.85 to $2.10 | 13.5% |
| September 2017 | Cost per mile | $0.90 to $0.96 | 6.7% |
| April 2018 | Minimum fare | $5.60 to $5.80 | 3.6% |
| April 2018 | Cost per minute | $0.15 to $0.17 | 13.3% |
| April 2018 | Cost per mile | $0.96 to $1.06 | 10.4% |
| April 2018 | Service fees | $2.10 to $2.30 | 9.5% |
| September 2018 | Minimum fare | $5.80 to $7.30 | 25.9% |
| September 2018 | Cost per minute | $0.17 to $0.24 | 41.2% |

| UberX Fee Increases – Chicago | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2017 | Minimum fare | $4.20 to $4.40 | 4.8% |
| February 2017 | Service fees | $1.20 to $1.40 | 16.7% |
| May 2017 | Cost per mile | $0.90 to $0.95 | 5.6% |
| July 2017 | Minimum fare | $4.40 to $4.60 | 4.5% |
| July 2017 | Service fees | $1.40 to $1.60 | 14.3% |
| May 2018 | Base fare | $1.70 to $1.79 | 5.3% |
| May 2018 | Minimum fare | $4.60 to $4.85 | 5.4% |
| May 2018 | Cost per minute | $0.20 to $0.21 | 5.0% |
| May 2018 | Cost per mile | $0.95 to $1.00 | 5.3% |
| May 2018 | Service fees | $1.60 to $1.85 | 15.6% |
| October 2018 | Cost per minute | $0.21 to $0.28 | 33.3% |

| UberX Fee Increases – Philadelphia | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| May 2016 | Minimum fare | $5.25 to $5.75 | 9.5% |
| February 2017 | Minimum fare | $5.75 to $5.95 | 3.5% |
| February 2017 | Service fees | $1.25 to $1.45 | 16.0% |
| May 2017 | Cost per mile | $1.10 to $1.15 | 4.5% |
| July 2017 | Minimum fare | $5.95 to $6.20 | 4.2% |
| July 2017 | Service fees | $1.45 to $1.70 | 17.2% |
| March 2018 | Base fare | $1.25 to $1.38 | 10.4% |
| March 2018 | Minimum fare | $6.20 to $6.50 | 4.8% |
| March 2018 | Cost per minute | $0.18 to $0.20 | 11.1% |
| March 2018 | Cost per mile | $1.15 to $1.27 | 10.4% |

COMPLAINT

| March 2018 | Service fees | $1.70 to $2.00 | 17.6% |
| October 2018 | Cost per minute | $0.20 to $0.32 | 60.0% |

| UberX Fee Increases – Washington, DC | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2017 | Minimum fare | $6.35 to $6.55 | 3.1% |
| February 2017 | Service fees | $1.35 to $1.55 | 14.8% |
| July 2017 | Cost per mile | $1.02 to $1.08 | 5.9% |
| July 2017 | Minimum fare | $6.55 to $6.80 | 3.8% |
| July 2017 | Service fees | $1.55 to $1.80 | 16.1% |
| July 2018 | Service fees | $1.80 to $2.00 | 11.1% |
| July 2018 | Cost per mile | $1.08 to $1.13 | 4.6% |
| July 2018 | Cost per minute | $0.17 to $0.18 | 5.9% |
| July 2018 | Minimum fare | $6.80 to $7.00 | 2.9% |
| July 2018 | Base fare | $1.15 to $1.21 | 5.2% |

| UberX Fee Increases – Seattle | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2016 | Minimum fare | $4.20 to $4.30 | 2.4% |
| February 2016 | Service fees | $1.20 to $1.30 | 8.3% |
| February 2017 | Minimum fare | $4.80 to $5.15 | 7.3% |
| February 2017 | Service fees | $1.30 to $1.65 | 26.9% |
| July 2017 | Minimum fare | $5.15 to $5.45 | 5.8% |
| July 2017 | Service fees | $1.65 to $1.95 | 18.2% |
| April 2018 | Cost per mile | $1.35 to $1.41 | 4.4% |
| March 2017 | Booking fee | $1.30 to $1.65 | 26.9% |
| May 2018 | Base fare | $1.35 to $1.42 | 5.2% |

| May 2018 | Cost per minute | $0.24 to $0.25 | 4.2% |
| May 2018 | Cost per mile | $1.41 to $1.48 | 5.0% |

| UberX Fee Increases – San Jose | | | |
| --- | --- | --- | --- |
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2016 | Minimum fare | $5.35 to $5.55 | 3.7% |
| February 2016 | Service fees | $1.35 to $1.55 | 14.8% |
| March 2016 | Minimum fare | $5.55 to $6.55 | 18.0% |
| February 2017 | Minimum fare | $6.55 to $6.75 | 3.1% |
| February 2017 | Service fees | $1.55 to $1.75 | 12.9% |
| July 2017 | Minimum fare | $6.75 to $7.00 | 3.7% |
| July 2017 | Service fees | $1.75 to $2.00 | 14.3% |
| September 2017 | Cost per mile | $1.15 to $1.21 | 5.2% |
| April 2018 | Cost per minute | $0.22 to $0.24 | 9.1% |
| April 2018 | Cost per mile | $1.21 to $1.33 | 9.9% |
| April 2018 | Service fee | $2 to $2.20 | 10.0% |

| UberX Fee Increases –  Boston | | | |
| --- | --- | --- | --- |
| *Date* | *Fee* | *$ Change* | *% Increase* |
| August 2015 | Cost per mile | $1.20 to $1.24 | 3.3% |
| August 2015 | Cost per minute | $0.16 to $0.21 | 31.3% |
| October 2015 | Minimum fare | $5.00 to $5.15 | 3.0% |
| October 2015 | Service fees | $1.00 to $1.15 | 15.0% |
| November 2015 | Cost per minute | $0.16 to $0.20 | 25.0% |
| May 2016 | Minimum fare | $5.15 to $6.15 | 19.4% |
| February 2017 | Minimum fare | $6.15 to $6.35 | 3.3% |
| February 2017 | Service fees | $1.15 to $1.35 | 17.4% |

| May 2017 | Cost per mile | $1.24 to $1.29 | 4.0% |
| July 2017 | Minimum fare | $6.35 to $6.60 | 3.9% |
| July 2017 | Service fees | $1.35 to $1.60 | 18.5% |
| April 2018 | Base fare | $2.00 to $2.10 | 5.0% |
| April 2018 | Minimum fare | $6.60 to $6.85 | 3.8% |
| April 2018 | Cost per minute | $0.20 to $0.21 | 5.0% |
| April 2018 | Cost per mile | $1.29 to $1.35 | 4.7% |
| April 2018 | Service fees | $1.60 to $1.85 | 15.6% |

| UberX Fee Increases – San Diego | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2017 | Minimum fare | $5.75 to $5.95 | 3.5% |
| February 2017 | Service fees | $1.75 to $1.95 | 11.4% |
| July 2017 | Minimum fare | $5.95 to $6.25 | 5.0% |
| July 2017 | Service fees | $1.95 to $2.25 | 15.4% |
| September 2017 | Cost per mile | $1.10 to $1.16 | 5.5% |
| April 2018 | Minimum fare | $6.25 to $6.65 | 6.4% |
| April 2018 | Service fees | $2.25 to $2.65 | 17.8% |

| UberX Fee Increases – New York | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| May 2016 | Minimum fare | $7.00 to $8.00 | 14.3% |

95.    Over the same time that Uber has been steadily increasing the prices paid by Passengers, it has been reducing the payments it makes to Drivers.

96.    Indeed, in May 2015, Uber implemented a tiered pricing schedule for UberX Drivers in San Francisco and San Diego, increasing the base "commission" it charged Drivers to 30% (up from the 20% levels that prevailed in 2014).

97.    Also in 2015, Uber raised the base commission it charged drivers in New York City and Boston from 20% to 25%.

98.    Moreover, booking and other fees have increased Uber's effective commission rate (the percentage of Passenger payments retained by Uber) to more than the advertised base commission charged to Drivers.  On information and belief, in San Francisco in 2016, for example, median effective commission were as high as 39%.  And in Austin beginning in early 2018, effective commissions rose to over 30%.

**Uber Intentionally and Tortiously Interfered with Sidecar's App and Its Relationships with Passengers and Drivers**

99.    By mid-2014, Uber operated in all of the cities where Sidecar operated (San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston).

100.    On information and belief, from that point in time, continuing through the time that Sidecar wound down its operations, Uber carried out a covert campaign to undermine the performance of its competitors' Ride-Hailing Apps, including Sidecar's App.

101.    Uber's senior executives and officers devised secret programs to submit fraudulent ride requests on competitors' Apps.  These fraudulent requests were submitted with two goals in mind: (a) to undermine the value of competitive Ride-Hailing Apps, for both Passengers and Drivers; and (b) to recruit Drivers to work exclusively with Uber (instead of its competitors).

102.    The fraudulent requests undermined the value of competitive Apps for Drivers because Drivers were matched with fraudulent ride requests instead of real Passengers.  Instead of earning money by completing rides, Drivers were sent on a wild goose chase or to pick up Uber contractors that were not true Passengers.

103.    The Passenger experience also was negatively impacted by this fraudulent activity. Because Drivers were busy chasing fraudulent ride requests, Passengers were met with longer wait

times for rides.  The reduction in available Drivers on competitive Apps, and the corresponding longer wait times, greatly diminished the value of the competitive Apps for Passengers.

104.    Because of the presence of network effects, these fraudulent ride requests triggered a vicious downward cycle:  Drivers who were disappointed with the number of rides they were able to complete through competitors' Apps switched to Uber.  With fewer Drivers on the platform, Passengers faced longer wait times, and likewise turned to Uber.  And with fewer Passengers available on a competitive App, it became even less attractive to Drivers, which caused even more Drivers to leave the App and perpetuated a downward spiral.

105.    Uber or persons acting under Uber's direction submitted such fraudulent ride requests on Sidecar's Ride-Hailing App.  Those fraudulent ride requests expressly violated Sidecar's terms of service.

106.    Between 2012 and 2015, to download and use Sidecar's Ride-Hailing App, Passengers had to agree to Sidecar's standard terms of service, which prohibited anyone using the App from:

      a.    attempting to interfere with the performance of Sidecar's App, including through automated ride requests;

      b.    placing a disproportionate load on the infrastructure supporting the App;

      c.    using the App for commercial purposes; or

      d.    submitting fraudulent requests through the App.

107.    Uber's fraudulently submitted ride requests violated Sidecar's terms of service because, among other things, they interfered with the performance of the App, conducted fraud through the App, or used the App for commercial purposes.

108.    These fraudulent and tortious activities allowed Uber to acquire and maintain a monopoly position without having to compete with other Ride-Hailing Apps, including Sidecar's App, on the merits.

## ANTITRUST INJURY

109.    Sidecar went out of business in December 2015 and sold its operating assets to GM.  At that time, Sidecar wound down its operations and shut down its Ride-Hailing App.

110.   Markets where Sidecar had previously competed against Uber usually had three Ride-Hailing Apps (those licensed and operated by Uber, Lyft, and Sidecar).  With Sidecar's failure, Passengers and Drivers in those markets were left with only two real alternatives (Uber and Lyft).

111.   Sidecar's failure therefore significantly reduced competition in each of those markets, harming the competitive process and the users of Ride-Hailing Apps (both Drivers and Passengers).

112.   Uber's anticompetitive and exclusionary acts also prevented Sidecar from expanding into additional geographic markets and competing with Uber in other cities.

113.   But for Uber's anticompetitive conduct and abuse of its monopoly position, Sidecar would have remained a viable competitor and served as a check on Uber's anticompetitive price increases.

114.   Competition has been harmed in the market for Ride-Hailing Apps as a result of Sidecar's failure.  Passengers and Drivers have both been harmed because Passenger are now paying higher prices, Drivers are being paid less, and both have fewer choices available (Passengers and Drivers are left with only two real alternatives instead of three).

115.   Sidecar also has suffered significant financial damages flowing from that harm to competition, including (at least) lost profits and/or the artificial suppression of the value of Sidecar's business.

## CAUSES OF ACTION

### COUNT 1: MONOPOLIZATION (15 U.S.C. § 2)

116.   Sidecar incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

117.   Uber possesses monopoly power in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

118.   Uber has the power to raise prices and exclude competition in each of those relevant markets.

119.   In San Francisco, Uber's share of the relevant market is at least 60%.

120.   In Los Angeles, Uber's share of the relevant market is at least 60%.

121.   In Chicago , Uber's share of the relevant market is at least 65%.

122.   In Philadelphia, Uber's share of the relevant market is at least 70%.

123.   In Washington, DC, Uber's share of the relevant market is at least 70%.

124.   In New York, Uber's share of the relevant market is at least 75%.

125.   In Seattle, Uber's share of the relevant market is at least 65%.

126.   In San Diego, Uber's share of the relevant market is at least 65%.

127.   In San Jose, Uber's share of the relevant market is at least 65%.

128.   In Boston, Uber's share of the relevant market is at least 70%.

129.   In Austin, Uber's share of the relevant market is at least 70%.

130.   Uber has willfully acquired and maintained monopoly power in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston through predatory pricing and other exclusionary, and anticompetitive conduct, as alleged herein.

131.   ***Predatory Pricing.***  Uber has excluded competition from the relevant market through a predatory pricing scheme.

132.   Between 2013 and 2016, on average, the prices for transactions conducted through Uber's Ride-Hailing App were below the average variable costs for those transactions.

133.   On average, Uber lost money on each transaction completed through its app.

134.   Sidecar was forced out of business by Uber's predatory pricing strategy.

135.   After Sidecar exited the market, Uber imposed price increases on Passengers and reduced the amount that it paid to Drivers.

136.   Through these price increases, Uber is likely to recoup the losses it sustained as a result of its predatory pricing strategy.

137.   ***Exclusionary Acts.***  Uber has reinforced its dominant market position through tortious conduct designed to undermine the functionality of Sidecar's Ride-Hailing App.

138.   Uber's tortious conduct included a systematic, pervasive, and sustained effort to submit fraudulent ride requests on Sidecar's Ride-Hailing App.

139.     These fraudulent ride requests were not a means of legitimate competition, but rather, were intended to and did undermine Sidecar's ability to effectively compete with Uber on the merits. As a result of the fraudulent ride requests, Sidecar's Ride-Hailing App became less attractive to Drivers and Passengers, and they moved off of Sidecar's platform.

140.     Uber's deceit enabled it to achieve and maintain monopoly power by undermining the functionality and value provided by Sidecar's App and steering Drivers and Passengers away from Sidecar's App and to Uber's App.

141.     Uber's conduct alleged above has had an anticompetitive effect in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

142.     Uber's conduct as alleged above has no legitimate business purpose or procompetitive effect.

143.     Uber's conduct as alleged above has had a substantial effect on interstate commerce.

144.     Sidecar was injured in its business or property as a result of Uber's conduct when it went out of business in December 2015.

145.     Sidecar has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.   Sidecar has been injured by the harm to competition as a result of Uber's conduct.

### COUNT 2: ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2)

146.     Sidecar incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

147.     Uber has engaged in predatory pricing and other exclusionary and anticompetitive conduct, as alleged herein in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

148.     Uber has engaged in that unlawful conduct with the specific intent of monopolizing the relevant markets.

COMPLAINT

149.    As a result of that unlawful conduct, competition has been harmed in each of those relevant markets, and Uber has a dangerous probability of monopolizing the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

150.    Uber's conduct alleged above has had an anticompetitive effect in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

151.    Uber's conduct alleged above has no legitimate business purpose or procompetitive effect.

152.    Uber's conduct has had a substantial effect on interstate commerce.

153.    Sidecar was injured in its business or property as a result of Uber's conduct when it went out of business in December 2015.

154.    Sidecar has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Sidecar has been injured by the harm to competition as a result of Uber's conduct.

## COUNT 3

### CALIFORNIA UNFAIR PRACTICES ACT

155.    Sidecar incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

156.    The California Unfair Practices Act makes it illegal for "any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."  CAL. BUS. & PROF. CODE § 17043.

157.    The California Unfair Practices Act also makes it illegal "to sell or use any article or product as a 'loss leader,'" defined as a "product sold at less than cost . . . [w]here the effect is to divert trade from or otherwise injure competitors."  CAL. BUS. & PROF. CODE §§ 17044, 17030.

158.    Uber was and is engaged in business in the state of California.

159.     Uber facilitated trips through its Ride-Hailing App by charging consumers less than the
price of facilitating the transaction.

160.     The purpose and effect of Uber's pricing scheme was and is to injure competitors,
including Sidecar, to gain greater market share and eventually raise prices.

161.     No exemption from the California Unfair Practices Act applies.

## DEMAND FOR JURY TRIAL

162.     Sidecar hereby demands a jury trial on all its claims.

## PRAYER FOR RELIEF

163.     Sidecar respectfully prays for the following relief:

   a.     a judgment finding that Uber violated the Sherman Act and California Unfair
          Practices Act;

   b.     a judgment and order requiring Uber to pay Sidecar damages in an amount
          adequate to compensate Sidecar for Uber's violations of the Sherman Act and
          California Unfair Practices Act;

   c.     treble damages, costs, and attorneys' fees, pursuant to 15 U.S.C. § 15;

   d.     treble damages, costs, and attorneys' fees, pursuant to CAL. BUS. & PROF.
          CODE § 17082;

   e.     a judgment and order requiring Uber to pay pre-judgment interest and post-
          judgment interest to the full extent allowed under the law; and

   f.     any further relief the Court may deem just and proper.

1    DATED:  December 11, 2018                    Respectfully submitted,

2                                                 QUINN EMANUEL URQUHART &
                                                  SULLIVAN, LLP
3

4

5                                                 By _____/s/ Ethan Glass_____

6                                                   Ethan Glass (Bar No. 216159)
                                                    1300 I Street, NW
7                                                   Washington, DC 20005
                                                    ethanglass@quinnemanuel.com
8
                                                  Attorneys for Plaintiff SC Innovations, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                       -31-                              COMPLAINT