QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Robert P. Feldman (Bar No. 69602)
  bobfeldman@quinnemanuel.com
  Claude M. Stern (Bar No. 96737)
  claudestern@quinnemanuel.com
  555 Twin Dolphin Drive # 560
  Redwood City, CA 94065
  (650) 801-5000 Tel.
  (650) 801-5100 Fax

  Ethan Glass (Bar No. 216159)
  ethanglass@quinnemanuel.com
  Michael D. Bonanno (DC Bar. No. 998208, *admitted pro hac vice*)
  mikebonanno@quinnemanuel.com
  1300 I Street, NW # 900
  Washington, DC 20005
  (202) 538-8000 Tel.
  (202) 538-8100 Fax

Attorneys for Plaintiff SC Innovations, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SC INNOVATIONS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC., RASIER, LLC, RASIER-CA, LLC, RASIER-PA, LLC, RASIER-DC, LLC, RASIER-NY, LLC, AND UBER USA, LLC,<br><br>Defendants. | CASE NO. 3:18-cv-07440-JCS<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br><br>Hearing Date:   April 26, 2019<br><br>Time:      9:30 a.m.<br><br>Location:   Courtroom G,<br>               450 Golden Gate Avenue<br>               San Francisco, CA |

# TABLE OF CONTENTS

Page

ISSUE TO BE DECIDED ...................................................................................................1

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ..................................................................................................5

    I.    Sidecar Was a Ride-Hailing App Company Until Uber Drove It Out of Business ...................................................................................................................5

    II.   Quinn Emanuel Previously Represented Uber in Cases Challenging Uber's Compliance With Local Government Taxicab Regulations ......................................6

    III.  Sidecar Retained Quinn Emanuel to Bring a Case Against Uber Based on Harm to Its Ride-Hailing App ..................................................................................7

ARGUMENT ......................................................................................................................8

    I.    Uber's First Argument Incorrectly Relies on the "Playbook Approach" to Disqualification That California Courts Have Rejected ...........................................8

    II.   Uber's Second Argument Cannot Succeed Under Rule 1.9 Because Sidecar's Ride-Hailing App Case Is Not the Same as or Substantially Related to Uber's Taxicab Cases................................................................................10

        A.   *Greater Houston Transportation Co. v. Uber* Is Not Substantially Related to Sidecar's Case .............................................................................12

        B.   *Boston Cab Dispatch v. Uber* Is Not Substantially Related to Sidecar's Case ...........................................................................................15

        C.   *Yellow Cab Co. v. Uber* Is Not Substantially Related to Sidecar's Case .........................................................................................................16

        D.   The Facts Here Show Less of a Potential Conflict Than Those in Recent Cases Where California Federal Judges Denied Motions to Disqualify ..............................................................................................19

        E.   Denial of Uber's Motion to Relate Illustrates Why Sidecar's Case Is Not Substantially Related to the Taxi Cases Identified by Uber.................22

    III.  Uber's Third Argument Cannot Succeed Under Rule 1.6 and Section 6068 Because Quinn Emanuel Has Not Accessed Confidential Uber Information That Is Material to Sidecar's Case and Adverse to Uber .........................................22

    IV.  Disqualification of Quinn Emanuel Would Unfairly Punish Sidecar .....................24

CONCLUSION ..................................................................................................................25

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Adams v. Aerojet-Gen. Corp.*,
    86 Cal. App. 4th 1324 (2001) ........................................................................................ 10

5

6

*Beachcomber Mgmt. Crystal Cove, LLC v. Superior Court*,
    220 Cal. Rptr. 3d 872 (Ct. App. 2017) ........................................................................ 10

7

*Beltran v. Avon Prods., Inc.*,
    867 F. Supp. 2d 1068 (C.D. Cal. 2012) ...................................................................... 17

8

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ...................................................................................................... 18

9

10

*In re Cty. of Los Angeles*,
    223 F.3d 990 (9th Cir. 2000) ....................................................................................... 24

11

*Concat LP v. Unilever, PLC*,
    350 F. Supp. 2d 796 (N.D. Cal. 2004) .......................................................................... 8

12

13

*Contratto v. Ethicon, Inc.*,
    227 F.R.D. 304 (N.D. Cal. 2005) ........................................................................... 4, 17

14

*DeSoto Cab Co. v. Uber Techs., Inc.*,
    No. 4:16-cv-06385-JSW (N.D. Cal. Dec. 31, 2018) ................................................. 22

15

16

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
    No. 18-CV-05546-EMC, 2019 WL 144589 (N.D. Cal. Jan. 9, 2019) .................... 9, 10

17

*Elliott v. McFarland Unified Sch. Dist.*,
    165 Cal. App. 3d 562 (1985) ....................................................................................... 12

18

19

*Faughn v. Perez*,
    51 Cal. Rptr. 3d 692 (Ct. App. 2006) .................................................................. 3, 8, 9

20

*Foster Poultry Farms v. Conagra Foods Refrigerated Foods Co.*,
    No. F 04-5810 AWI LJO, 2005 WL 2319186 (E.D. Cal. Sept. 22, 2005) .......... passim

21

22

*Fremont Indem. Co. v. Fremont Gen. Corp.*,
    143 Cal. App. 4th 50 (2006) .......................................................................................... 9

23

*Gen. Cigar Holdings, Inc. v. Altadis, S.A.*,
    144 F. Supp. 2d 1334 (S.D. Fla. 2001) ...................................................................... 14

24

25

*Hartford Cas. Ins. Co. v. Am. Dairy & Food Consulting Labs., Inc.*,
    No. 1:09-CV-0914-OWW-SKO, 2010 WL 3783715 (E.D. Cal. Sept. 27, 2010) ............ 3, 16, 18

26

*Human Longevity, Inc. v. J. Craig Venter Inst., Inc.*,
    No. 18-CV-1656-WQH-LL, 2018 WL 5840045 (S.D. Cal. Nov. 8, 2018) ............... 3, 16, 18, 20

27

28

*In-N-Out Burger v. In & Out Tire & Auto, Inc.*,
    No. 2:07-CV-01556-LRH-LRL, 2008 WL 2937294 (D. Nev. July 24, 2008) ........................ 12

*Jessen v. Hartford Cas. Ins. Co.*,
   3 Cal. Rptr. 3d 877 (Ct. App. 2003)……………………………………………….9

*Khani v. Ford Motor Co.*,
   155 Cal. Rptr. 3d 532 (Ct. App. 2013) ................................................................. passim

*Kirk v. First Am. Title Ins. Co.*,
   183 Cal. App. 4th 776 (2010)………………………………………….........24

*Lehman Bros. Holdings Inc. v. Direct Mortg. Corp.*,
   No. 2:09-CV-04170-CJC(RNBx), 2013 WL 12114447 (C.D. Cal. Feb. 4, 2013)............. passim

*United States v. Mogal*,
   No. 18-CR-00259-BLF-1, 2018 WL 4676956 (N.D. Cal. Sept. 26, 2018)....................... 8

*Nat'l Grange of Order of Patrons of Husbandry v. California Guild*,
   No.  2:14-676 WBS DB, 2017 WL 2021731 (E.D. Cal. May 12, 2017) ................................. 24

*Oaks Mgmt. Corp. v. Superior Court*,
   51 Cal. Rptr. 3d 561 (Ct. App. 2006) ................................................................. 25

*Oliver v. SD-3C, LLC*,
   No. C 11-01260 JSW, 2011 WL 13156460 (N.D. Cal. Aug. 4, 2011)……………………….9, 10

*Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.*,
   760 F.2d 1045 (9th Cir. 1985) ................................................................. 8, 14

*People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*,
   980 P.2d 371 (Cal. 1999) ................................................................. 25

*Rosenfeld Constr. Co. v. Superior Court*,
   235 Cal. App. 3d 566 (Ct. App. 1991) ................................................................. 24

*Tawnsaura Group, LLC v. Threshold Enters., Ltd.*,
   No. SA CV 12-01364-SJO(AGRx), 2012 WL 12892439 (C.D. Cal. Dec. 26, 2012) .............. 24

*TWiT, LLC v. Twitter Inc.*,
   No. 18-CV-00341-JSC, 2018 WL 2470942 (N.D. Cal. June 1, 2018) ............................... passim

*Visa U.S.A., Inc. v. First Data Corp.*,
   241 F. Supp. 2d 1100 (N.D. Cal. 2003) ................................................................. 24

## Rules and Regulations

Cal. Bus. & Prof. Code § 6068 ................................................................. 1, 4, 8

Cal. R. Prof. Conduct 1.9(a) ................................................................. 2, 10

Cal. R. Prof. Conduct 1.6(a) ................................................................. 1, 4, 8

Local Rule 3-12 ................................................................. 22

**ISSUE TO BE DECIDED**

Whether Plaintiff SC Innovations, Inc. ("Sidecar") should be deprived of its chosen counsel, Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), in a case concerning Uber's anticompetitive conduct regarding smartphone software programs that match drivers to passengers who are looking for rides ("Ride-Hailing Apps") because Quinn Emanuel previously defended Uber against allegations by taxicab companies that Uber violated local government taxicab regulations.

**PRELIMINARY STATEMENT**

Quinn Emanuel's prior representation of Uber in cases brought by taxicab companies does not bar clients such as Sidecar from retaining Quinn Emanuel in any and all antitrust cases against Uber. That would be the result, however, if Uber's kitchen-sink allegations and generic "playbook" arguments were accepted. With the benefit of the full record concerning Quinn Emanuel's work for Uber (and not just Uber's conclusory characterizations), it is clear Sidecar's case is neither "the same" as the prior taxicab matters nor "substantially related" to those matters under the ethical rule governing duties owed to former clients, California Rule of Professional Conduct 1.9(a). Nor has Quinn Emanuel been in possession of confidential Uber information that would bar its participation in this case under California Business & Professions Code § 6068 or California Rule of Professional Conduct 1.6(a). When the actual evidence is examined, the only reasonable conclusion is there is no basis to deprive Sidecar of its chosen counsel.

Sidecar's case is about how Uber put Sidecar out of business through anticompetitive conduct directed at it and other Ride-Hailing App competitors. Ride-Hailing Apps connect drivers and passengers through their mobile devices and provide supplemental services to make the transaction between the driver and passenger as easy and enjoyable as possible. For these unique services, the Ride-Hailing App provider is paid a commission. Uber engaged in anticompetitive conduct against other Ride-Hailing Apps, including charging prices on its Ride-Hailing App that were below its own cost and submitting fraudulent ride requests through its competitors' Ride-Hailing Apps. Those tactics enabled Uber to obtain a market share in excess of 60% in the cities where Uber previously competed against Sidecar. Once Uber put Sidecar out of business, Uber then increased prices on its Ride-Hailing App because it was protected by substantial barriers to entry

that prevented new Ride-Hailing Apps from meaningfully competing with Uber.

Quinn Emanuel represented Uber from 2012 to September 2016, primarily in lawsuits brought by taxicab associations that alleged Uber did not comply with various local government taxicab regulations.  A comparison of those taxicab cases and the Sidecar case shows that one would not expect that Quinn Emanuel obtained information in the taxicab regulation cases that would be material to Sidecar's Ride-Hailing App case.  *See* Cal. R. Prof. Conduct 1.9(a) cmt. 3 (directing that the "substantial risk" required for a disqualifying conflict depends on whether "the lawyer would be expected to use or disclose that information in the subsequent representation because it is material to the subsequent representation").

Instead of meeting its burden of proof to show that Sidecar should lose its counsel of choice, Uber's papers rely on generalized, conclusory assertions and mischaracterizations of the taxicab cases.  Uber first incorrectly claims that Quinn Emanuel cannot be adverse to Uber here because it was Uber's "trusted outside counsel and defend[ed] it in at least 20 cases."  But whether Quinn Emanuel previously represented Uber in a single case or one hundred cases does not matter.  The broad "playbook approach" to disqualification advanced by Uber has been definitively rejected.  Allegations of knowledge concerning "Uber's entry into new markets, competitive tactics, business strategy, pricing, and litigation strategies"—whatever Uber means by these broad statements—do not trigger disqualification.  The applicable law is the same regardless of the number of prior cases or how long Quinn Emanuel represented Uber.  Uber must show the prior cases are substantially related to Sidecar's case or that Quinn Emanuel actually received confidential information that is material to the Sidecar case.  Generalized claims about the nature of Quinn Emanuel's prior relationship with Uber do not meet either of those standards.

In its second argument, Uber essentially claims the taxicab cases are substantially related to the Sidecar case because some of the taxicab cases used the word "competition" (*Greater Houston*, *Boston Cab*, and *Yellow Cab*).  Here too Uber has failed to meet its burden.  Even "[t]he fact that both representations share a common area of law is insufficient." *Foster Poultry Farms v. Conagra Foods Refrigerated Foods Co.*, No. F 04-5810 AWI LJO, 2005 WL 2319186, at *7 (E.D. Cal. Sept. 22, 2005) (denying a motion to disqualify where both representations were "antitrust" matters)

1  (quotation omitted); *see also Human Longevity, Inc. v. J. Craig Venter Inst., Inc.*, No. 18-CV-1656-

2  WQH-LL, 2018 WL 5840045, at *3 (S.D. Cal. Nov. 8, 2018) ("Overlapping causes of action or

3  relevant facts between the former and present matters, without more, do not establish a substantial

4  relationship."); *Hartford Cas. Ins. Co. v. Am. Dairy & Food Consulting Labs., Inc.,* No. 1:09-CV-

5  0914-OWW-SKO, 2010 WL 3783715, at *8 (E.D. Cal. Sept. 27, 2010) ("[M]erely alleging

6  similarity between legal issues implicated in past and present cases is insufficient to satisfy a moving

7  party's burden . . . ."); *Lehman Bros. Holdings Inc. v. Direct Mortg. Corp.*, No. 2:09-CV-04170-

8  CJC (RNBx), 2013 WL 12114447, at *5 (C.D. Cal. Feb. 4, 2013) ("Such general legal similarities

9  are not sufficient to infer the possession of confidential information."); *Khani v. Ford Motor Co.*,

10  155 Cal. Rptr. 3d 532, 536 (Ct. App. 2013) ("The trial court abused its discretion in concluding that

11  the prior cases were substantially related to the current case just because they involved claims under

12  the same statute.   The substantial relationship test does not subject an attorney to automatic

13  disqualification on this ground alone.").

14      Nor do the factual allegations in the taxicab cases establish the required substantial

15  relationship.  The (publicly available) information regarding those cases shows how different they

16  are from the Sidecar case: they were about local government taxicab regulations and had nothing to

17  do with Ride-Hailing Apps or the specific allegations in Sidecar's complaint.   The conclusory

18  statements in Uber's declarations cannot obscure the truth; tellingly, Uber has not attempted to meet

19  its burden of proving a substantial relationship with any contemporaneous documents, *e.g.*,

20  memoranda, emails, pleadings, or billing records, from its own files.[1]

21      Uber's third argument fails because it has not met its burden to show that Quinn Emanuel

22  actually received confidential Uber information that is adverse to Uber and "directly in issue or of

23  critical importance" in the Sidecar case.  Indeed, it is telling that Uber failed to identify ***any*** specific

24  confidential information that was disclosed and has not submitted contemporaneous documents to

25  substantiate its claims.   *See Faughn v. Perez*, 51 Cal. Rptr. 3d 692, 699 (Ct. App. 2006)

---

27  [1]  One potential reason is that these records would show that Quinn Emanuel's work focused on
local government regulation issues, and not Ride-Hailing Apps.  Another potential reason is that

28  these records show that John Quinn billed less than 30 hours to Uber over a multi-year period,
contrary to the implications in Uber's motion papers regarding his involvement.  Quinn Decl. ¶ 5.

1    ("Sometimes, omitted facts become conspicuous by their omission, particularly where the motion

2    involved, like a motion to disqualify counsel, has the potential for tactical abuse.") (citations

3    omitted).  Uber's papers have not identified a single piece of confidential information that it actually

4    provided Quinn Emanuel that would be material to the Sidecar case, and Quinn Emanuel is unaware

5    of any.[2]  Notably, Uber filed its motion papers publicly, reflecting that Uber has not identified any

6    actual confidential information, let alone confidential information "directly in issue or of critical

7    importance" to the Sidecar case and adverse to Uber.  And Uber cannot submit such documents for

8    the first time in reply.  *See, e.g.*, *Contratto v. Ethicon, Inc.*, 227 F.R.D. 304, 308 n.5 (N.D. Cal. 2005)

9    ("Defendants' attempt to introduce new evidence in connection with their reply papers is

10   improper.").   Neither California Business & Professions Code § 6068 nor California Rule of

11   Professional Conduct 1.6(a) prevents Sidecar from having Quinn Emanuel as its counsel here.

12          In sum, Uber's motion is premised on the incorrect idea that Quinn Emanuel can never

13   represent another client against Uber if the client has an antitrust claim or a claim involving any

14   aspect of Uber's revenues, costs, or pricing (*i.e.*, any claim that seeks damages).  That of course is

15   not the law.  *See TWiT, LLC v. Twitter Inc.*, No. 18-CV-00341-JSC, 2018 WL 2470942, at *5 (N.D.

16   Cal. June 1, 2018) ("There is, however, no lifetime prohibition against representation adverse to a

17   former client. . . .") (quotation omitted); *Khani*, 155 Cal. Rptr. 3d at 535 (California courts have not

18   "create[d] a lifetime prohibition against representation adverse to a former client.") (quotation

19   omitted).  Uber must satisfy its burden of proving Quinn Emanuel's prior work is substantially

20   related to the Sidecar matter or that Quinn Emanuel actually received confidential information that

21   is material to the Sidecar matter and adverse to Uber.  Uber has done neither.  In fact, the

22   circumstances presented here provide less of a conflict concern than those in recent cases where the

23   federal district courts in California have denied motions for disqualification, which are discussed

24   more fully below.

---

25   [2]    Even though it does not believe it received any material, confidential Uber information, in an
26   abundance of caution Quinn Emanuel put in place an ethical wall at the outset of the Sidecar
     engagement, prohibiting attorneys who represented Uber from disclosing ***any*** Uber information to
27   the Sidecar team.  With the wall in place, the attorneys representing Sidecar did not communicate
     with Messrs. Swedlow and Quinn to prepare their declarations that accompany this brief; the firm's
28   internal Conflicts Counsel (Harry Olivar), assisted by other attorneys not working on the Sidecar
     case, was involved in those communications.  Quinn Decl. ¶ 3; Swedlow Decl. ¶ 5.

1    Sidecar respectfully submits that Uber's motion should be denied.

2    **STATEMENT OF FACTS**

3    **I.     Sidecar Was a Ride-Hailing App Company Until Uber Drove It Out of Business**

4    Between 2012 and 2015, Sidecar Technologies, Inc. licensed and operated a Ride-Hailing

5    App that was used in eleven metropolitan areas.[3]  Compl. (ECF 1) ¶¶ 13, 61.  Ride-Hailing Apps

6    are software; they serve as matchmakers that connect registered drivers and registered passengers

7    through their smartphones.  *Id*. ¶¶ 28, 30.  Ride-Hailing Apps themselves do not provide

8    transportation (the drivers do), just like travel agents themselves do not fly airplanes (that is done

9    by the airlines).  Simply put, as Uber explained to another federal district court in another taxicab

10   case (where Quinn Emanuel was not involved), Ride-Hailing Apps are operated by "software

11   companies" that are fundamentally different from transportation service providers, like taxi

12   companies.  Glass Decl., Ex. A (Mot. to Dismiss, *Albuquerque Cab Co. v. Lyft, Inc.*, No. 1:17-cv-

13   01006-SCY-KBM (D.N.M. Oct. 12, 2017), ECF 10, at 7-8) (Uber argued local government taxicab

14   regulations do not "make sense when applied to a technology company like Uber" because "Uber

15   does not offer or provide the transportation of persons by motor vehicle or carry passengers" and

16   "Uber is a software company that simply provides a tool for users to request rides from third party

17   drivers.") (quotations omitted).

18   Drivers and passengers use Ride-Hailing Apps differently.  Compl. ¶ 28.  A passenger opens

19   the Ride-Hailing App and enters the address of his or her origin and destination.  *Id*. ¶ 29.  The App

20   calculates estimated wait times for different types of vehicles, the estimated time of arrival at the

21   passenger's destination, and estimated total fare for the trip.  *Id*.  Once the passenger requests a ride,

22   the Ride-Hailing App relays his or her location to drivers.  *Id*.  Drivers using the Ride-Hailing App

23   near the passenger's location will receive an alert and an invitation to match with the passenger.

24   *Id*. ¶ 30.  Once matched, the Ride-Hailing App allows the passenger to track the driver's route on

25   the Ride-Hailing App until he or she reaches the passenger's destination.  *Id*.  Following each ride,

26   the passenger pays the Ride-Hailing App, the Ride-Hailing App pays the driver, and the passengers

27   and drivers are invited to rank each other on a scale of one to five stars.  *Id*. ¶¶ 31, 35.  The driver's

28   

---

[3]    As used herein, "Sidecar" refers to both Sidecar Technologies, Inc. and SC Innovations, Inc.

average ratings are visible to passengers of the Ride-Hailing App, and the passenger's average ratings are visible to drivers. *Id*. ¶ 31. Ride-Hailing Apps are free to download, but they are not free to use. *Id*. ¶ 35. The Ride-Hailing App owner receives a commission for its services. *Id*. ¶ 35.

Ride-Hailing Apps started by connecting passengers with professional drivers, like limousines and town cars. *Id*. ¶ 38. One of Sidecar's innovations was to invent a way to connect passengers with non-professional drivers using their personal cars, which is sometimes called "ridesharing." *Id*. ¶ 39. Sidecar created what has colloquially been called a "side-hustle," where non-professional drivers make additional money in their free time by driving passengers who do not need professional transportation services. *Id*. ¶ 37. In the years that followed, Sidecar continued to innovate and develop new, cutting-edge features that offered additional functionality in its Ride-Hailing App. *Id*. ¶ 41-44. Despite Sidecar's high-quality Ride-Sharing App, Uber's anticompetitive conduct put Sidecar out of business. *Id*. ¶ 12.

## II.     Quinn Emanuel Previously Represented Uber in Cases Challenging Uber's Compliance With Local Government Taxicab Regulations

Between 2012 and September 2016, Quinn Emanuel represented Uber in various matters, most of which involved lawsuits filed against Uber by taxicab companies. Decl. of Stephen Swedlow ("Swedlow Decl.") ¶ 4. None of those cases involved Ride-Hailing Apps or other software; rather, as shown by the three cases upon which Uber focuses (*Greater Houston*, *Boston Cab*, and *Yellow Cab*), those cases related to Uber's non-compliance with local taxicab regulations. *Id*.

Contrary to Uber's claims, Quinn Emanuel never represented Uber in any matter involving a competitive Ride-Hailing App company, and it never represented Uber in any case involving antitrust or similar claims based on the use of Uber's software or another company's software. *Id*. ¶ 6. Uber has made no showing that the firm provided legal advice to Uber concerning (1) whether ride-hailing software constitutes a relevant antitrust product market, *id*. ¶ 7; (2) whether the network effects associated with ride-hailing software are a meaningful barrier to entry, *id*. ¶ 8; (3) whether Uber has market power in the market for ride-hailing software, *id*. ¶ 9; (4) whether Uber engaged in predatory pricing, as that term of art is properly used in antitrust jurisprudence (*i.e.*,

1   pricing below the appropriate measure of the **defendant's** costs), *id*. ¶ 10; (5) whether Uber exercised

2   market power and harmed competition in the market for ride-hailing software by raising prices

3   starting in 2016, *id*. ¶ 11; or (6) whether Uber interfered with its competitors' software by submitting

4   fraudulent ride requests in order to acquire and preserve its dominant market position, *id*. ¶ 12.

5         Likewise, Uber has not shown Quinn Emanuel received confidential information concerning

6   Uber's pricing, costs, or competitive strategies that will be material to Sidecar's case. *Id*. ¶ 13.  In

7   particular, there is no showing that the firm provided antitrust advice concerning, or received

8   confidential information regarding: (a) pricing below Uber's **own** costs or the submission of

9   fraudulent ride requests; (b) Uber's market share; (c) the scope of the properly defined antitrust

10  product market in which Uber competes; (d) barriers to entry related to Uber's business;

11  (e) consumer substitution between Uber services and competitive services; (f) elasticity of supply

12  or demand in any market in which Uber competes; (g) market shares for Uber or any of its

13  competitors; or (h) Uber's profits or profit margins.  *Id*. ¶¶ 7-13, 21.

14        The principal decision-makers at Uber who served as Quinn Emanuel's primary points of

15  contact no longer work at Uber.  Ghaussy Decl. ¶ 2; Yoo Decl. ¶ 2.  Thus, even if "playbook"

16  arguments were a basis for disqualification, any playbook or strategy they provided to Quinn

17  Emanuel is now stale.

18  **III.**   **Sidecar Retained Quinn Emanuel to Bring a Case Against Uber Based on Harm to Its**
19         **Ride-Hailing App**

20        In November 2018, Sidecar approached Quinn Emanuel about retaining the firm for a

21  potential antitrust case against Uber.[4]  At the outset of the Sidecar matter, out of an abundance of

22  caution and in an effort to forestall this type of motion, Quinn Emanuel implemented an ethical wall

23  between the lawyers representing Sidecar and the lawyers who formerly represented Uber.  Decl. of

24  Ethan Glass ("Glass Decl.") ¶ 27.  On November 15, 2018, Quinn Emanuel first corresponded with

25  Uber's counsel about the Ride-Hailing App case.  *Id*. ¶ 28.  On December 5, 2018, Quinn Emanuel

26  shared a draft of Sidecar's complaint with Uber's Senior Director of Litigation.  *Id*. ¶ 29.  On behalf

27

28  [4]   Quinn Emanuel has not advised and will not advise or represent Sidecar in patent matters adverse to Uber, and there are no patent claims or patent-related allegations in this case.

1    of Sidecar, Quinn Emanuel filed the complaint on December 11, 2018, and an Uber spokesperson

2    provided an on-the-record comment regarding the case to the press that same day.  Decl. of Michael

3    Bonanno in Supp. of Opp. to Mot. for Administrative Relief (ECF 22-1), Ex. A.  Uber first raised a

4    conflict assertion regarding Quinn Emanuel on December 27, 2018, six weeks after it knew the firm

5    was representing Sidecar.  Glass Decl., ¶ 30.

6                                              **ARGUMENT**

7            Uber has not made the requisite showing to succeed on a motion to disqualify Quinn

8    Emanuel.  "[D]isqualification is a drastic measure, it is generally disfavored and should only be

9    imposed when absolutely necessary."  *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 814 (N.D.

10   Cal. 2004).  "Because of [the] potential for abuse, disqualification motions should be subjected to

11   particularly strict judicial scrutiny."  *Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.*,

12   760 F.2d 1045, 1050 (9th Cir. 1985) (quotations omitted).  Sidecar does not need "to prove the

13   negative," ***which is exactly what Uber is trying to compel here with its generalized and conclusory***

14   ***allegations***.  Rather, as the party seeking disqualification, Uber "bears the burden of establishing by

15   a preponderance of the evidence the existence of a disqualifying prior representation." *United States*

16   *v. Mogal*, No. 18-CR-00259-BLF-1, 2018 WL 4676956, at *3 (N.D. Cal. Sept. 26, 2018); *see also*

17   *Foster Poultry*, 2005 WL 2319186, at *7; *Faughn*, 51 Cal. Rptr. 3d at 705.  Because Uber has not

18   met that burden, its motion must be denied.

19           Uber makes three arguments, which are based on: (1) the so-called "playbook approach";

20   (2) the substantial relationship test under California Rule of Professional Conduct 1.9; and (3) the

21   material confidential information test under California Rule of Professional Conduct 1.6 and

22   Business and Professions Code Section 6068.  We address these in turn.

23   **I.     Uber's First Argument Incorrectly Relies on the "Playbook Approach" to**
24   **        Disqualification That California Courts Have Rejected**

25           Uber relies on repeated claims that Quinn Emanuel was one of Uber's "most trusted law

26   firms" and general assertions about the volume of work Quinn Emanuel performed for Uber.  *See,*

27   *e.g.*, Mot. 19 ("Uber viewed Quinn Emanuel as a trusted partner and advisor, and Quinn Emanuel

28   continuously sought to deepen and reaffirm that relationship."); *id*. at 20 ("Uber's in-house legal

---

OPPOSITION TO UBER'S MOTION TO                    -8-                    Case No. 3:18-cv-07440-JCS
DISQUALIFY QUINN EMANUEL

1  team was in regular—and sometimes daily—contact with Quinn Emanuel regarding the series of

2  unfair competition cases that Quinn Emanuel defended.").  But the ethical rules and case law make

3  clear that these types of broad characterizations are insufficient to disqualify the chosen counsel of

4  an opponent.  California courts have clearly rejected such "a 'playbook approach' to the substantial

5  relationship test."  *Khani*, 155 Cal. Rptr. 3d at 535 (quotations omitted).  Disqualification is not

6  required if an attorney previously performed a significant amount of work for a former client.  *Id.*

7  at 533-34 (representation of former client in 150 cases did not require disqualification); *see also*

8  *Faughn*, 51 Cal. Rptr. 3d at 705-06 (220 cases handled by former firm were not enough to trigger

9  disqualification).  "[A]cquiring information about a former client's 'litigation philosophy' does not

10  warrant disqualification unless the information is directly in issue or of critical importance to the

11  subsequent matter."  *TWiT*, 2018 WL 2470942, at *6; *see also id.* ("[T]he attorney's acquisition

12  during the first representation of general information about the first client's 'overall structure and

13  practices' would not of itself require disqualification unless it were found to be 'material'—i.e.,

14  directly in issue or of critical importance—in the second representation.").

15       In arguing otherwise, Uber mischaracterizes several cases.  Tellingly, Uber points to *Jessen*

16  *v. Hartford Cas. Ins. Co.*, 3 Cal. Rptr. 3d 877 (Ct. App. 2003), *Oliver v. SD-3C, LLC*, No. C 11-

17  01260 JSW, 2011 WL 13156460 (N.D. Cal. Aug. 4, 2011), and *Diva Limousine, Ltd. v. Uber Techs.,*

18  *Inc.*, No. 18-CV-05546-EMC, 2019 WL 144589 (N.D. Cal. Jan. 9, 2019) to argue that exposure to

19  litigation and settlement strategy can be grounds for disqualification "despite the lack of overlapping

20  identical factual or legal issues."  Mot. 20 n.14.  But courts have been clear: "*Jessen* did not adopt

21  the so-called playbook approach."  *Fremont Indem. Co. v. Fremont Gen. Corp.*, 143 Cal. App. 4th

22  50, 69 (2006).  And, contrary to Uber's suggestion, *Oliver* did not rely simply on the attorney's

23  exposure to general litigation strategy and settlement negotiations when he was working for the

24  former client.  In fact, *Oliver* relied on two factors not present in this case: first, that the lawyer's

25  previous representation involved the same licensing arrangements being challenged in the

26  subsequent case and, second, "notably" the challenged attorney reported to the same department of

27  the client in the prior representation that was involved in the subsequent case.  *Oliver*, 2011 WL

28  13156460, at *3. Based on those two factors, the court found the attorney had likely received

material, confidential information.  *Id.* at *4.  Here, there is nothing like *Oliver*, and the individuals to whom Quinn Emanuel reported at Uber have been replaced.  Finally, while Uber cites *Diva* for the proposition that "possible" exposure to formulation of strategy "can" support a showing of substantial relationship, in fact *Diva* did not rely on mere "possible" exposure.  Instead, the court recognized that any information from the first representation must be "directly at issue in, or have some critical importance to, the second representation," *Diva*, 2019 WL 144589 at *6, and found that the attorney's two cases involved the same "legal analyses and strategies."  *Id.* at *10.

## II.    Uber's Second Argument Cannot Succeed Under Rule 1.9 Because Sidecar's Ride-Hailing App Case Is Not the Same as or Substantially Related to Uber's Taxicab Cases

Under Rule 1.9, "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent."  Cal. R. Prof. Conduct 1.9(a).  To satisfy its burden of disqualifying the opponent's counsel under Rule 1.9, "the former client must demonstrate a 'substantial relationship' between the subjects of the antecedent and current representations."  *Beachcomber Mgmt. Crystal Cove, LLC v. Superior Court*, 220 Cal. Rptr. 3d 872, 881 (Ct. App. 2017) (quotations omitted).  That requires the former client to establish the factual and legal issues raised in the prior and subsequent representations are so closely related that it is likely the attorney obtained ***confidential*** information in the prior case that would be ***material*** ("directly in issue or of critical importance") in the subsequent case.  *See Khani*, 155 Cal. Rptr. 3d at 535; *see also TWiT*, 2018 WL 2470942, at *6 (defining "material" as "directly in issue or of critical importance—in the second representation"); *Foster Poultry*, 2005 WL 2319186, at *7 (requiring the relationship between the cases be "clear and direct"); *Adams v. Aerojet-Gen. Corp.*, 86 Cal. App. 4th 1324, 1332 (2001) ("The courts ask whether ***confidential*** information ***material*** to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation.") (emphasis added).

Uber has chosen to focus its motion on three cases in which Quinn Emanuel defended Uber: *Greater Houston*, *Boston Cab*, and *Yellow Cab*.  Those cases were each about claims brought by

taxicab companies based on Uber's alleged failure to comply with local government taxicab regulations.   While Uber cites pleadings from other cases in passing in its moving papers (in footnotes), those other matters likewise were about compliance with local government taxicab regulations.  *See, e.g.*, Mot. 4-5 n.6; Decl. of Kevin Yeh (ECF 30-1), Ex. A, at 7-8 ("Although Defendants Lyft and Uber claim to be outside the jurisdiction of the PRC . . . the PRC staff has opined that Lyft is a motor carrier subject to regulation under the Motor Carrier Act."); Ex. B, at ¶ 2 (Uber "has created an illegal transportation service that violates state laws, city ordinances and deceived consumers about the fares they must pay, the safety of the cars and drivers."); Glass Decl., Ex. B (Am. Compl., *Yellow Grp. LLC v. Uber Techs., Inc.*, No. 12 C 7967 (N.D. Ill. Dec. 20, 2012), ECF 17, ¶ 2) ("Uber gains the aura of legitimacy and avoids the costs and time necessitated by compliance with the laws and regulations in the City of Chicago governing established, legitimate transportation companies. At the same time, Uber commits outright violations of the laws and regulations governing legally operating transportation companies.").

As explained below, Uber's arguments distill down to the erroneous belief that once Quinn Emanuel defended Uber against "unfair competition claims" brought by taxi companies, the firm could never represent another client in a subsequent antitrust case against Uber, even though it involves different markets, different facts, different claims, different statutes, and different legal theories than those at issue in the taxicab cases.  That is not the law.  In fact, in *Foster Poultry*, the Court rejected a disqualification motion despite the presence of antitrust claims in the prior and subsequent matters.  2005 WL 2319186, at *7 ("The fact that both representations share a common area of law is insufficient.") (quotation omitted).  *Foster Poultry* makes clear there is no direct relationship between the taxicab cases and the Sidecar case merely because each may involve a review of competition or markets.  *Id*.  In *Foster Poultry*, the disqualification motion was denied where the "advice included an analysis of the proper definition of relevant antitrust market" because "the prior representation was largely focused on examining antitrust in the chicken market while this case concerns precooked turkey. . . [and] [t]he relationship between these two matters is not direct."  *Id*.  Here the taxicab cases are fundamentally different from the Sidecar case because the services provided by Ride-Hailing Apps are fundamentally different from the services provided by

transportation companies; Ride-Hailing Apps like Uber do not offer or provide the transportation of persons by motor vehicle or carry passengers. To the contrary, they are software companies "that simply provide[] a tool for users to request rides from third party drivers."  Glass Decl., Ex. A (*Albuquerque Cab Co. v. Lyft, Inc.*, No. 1:17-cv-01006-SCY-KBM (D.N.M. Oct. 12, 2017), ECF 10, at 7-8).

It was Uber's burden to come forward with more than superficial comparisons between this matter and the firm's prior work—it must explain, specifically, how Quinn Emanuel's prior representation of Uber would have exposed the firm to ***confidential*** information that will be ***material*** to the claims in this case.  It has not met that burden.  *See Elliott v. McFarland Unified Sch. Dist.*, 165 Cal. App. 3d 562, 572 (1985) (holding "conclusory statements," such as "I have confided, and members of the Board . . . have confided, in SLS and its attorneys information germane and vital to this lawsuit," are not sufficient).  Tellingly, Uber's characterizations of Quinn Emanuel's work are "uncorroborated by detailed time entries, correspondence, or any other material to directly substantiate [Uber's] disqualification claims."  *See In-N-Out Burger v. In & Out Tire & Auto, Inc.,* No. 2:07-CV-01556-LRH-LRL, 2008 WL 2937294, at *4 (D. Nev. July 24, 2008).  "A requirement that there be some showing of the nature of the communications or a statement of how they relate to the current representation without disclosing what was actually communicated cannot reasonably be regarded as burdensome or prejudicial."  *Elliott*, 165 Cal. App. 3d at 572.  Uber's evidence consists of nothing more than sweeping, high-level claims about the work that Quinn Emanuel performed, with what purports to be quotes from documents.  Uber has not, however, submitted those documents for the Court's consideration, which suggests, at minimum, they do not show what Uber claims.

### A.  *Greater Houston Transportation Co. v. Uber* Is Not Substantially Related to Sidecar's Case

In *Greater Houston*, a group of taxicab companies sued Uber for violating local taxi regulations and making certain misrepresentations in advertisements.  *See, e.g.*, Glass Decl., Ex. C (Compl., *Greater Houston Transp. Co. v. Uber Techs., Inc.*, No. 4:14-cv-00941 (S.D. Tex. Apr. 8, 2014), ECF 1, ¶ 1).  The plaintiffs' case is clearly set forth in its complaint: "Defendants Uber and

Lyft are operating 'for hire' vehicles in Houston, Texas as defined under Section 46-1 'For hire'; yet are doing so without obtaining licenses, without paying license fees, without proper insurance, without charging the regulated rates, surcharging as they choose, and without following the other extensive obligations that Chapter 46 imposes on all 'For hire' vehicle operators doing business in Houston, Texas." *Id*.  In ruling on Uber's motion to dismiss, the Court described the plaintiffs' claims as follows: "Plaintiffs are taxicab permit-holders in Houston and San Antonio, Texas, who claim that Uber and Lyft are unfairly competing with the taxicab industry ***by failing to comply with local regulations and misrepresenting the nature of their services to consumers.***"  Glass Decl., Ex. D (Order, ECF 95, at 1) (emphasis added); *see also* Glass Decl., Ex. E (Mot. to Dismiss, ECF 29, at 1) ("Plaintiffs' primary complaint is that Uber does not comply with Houston and San Antonio municipal ordinances that govern taxicabs and other vehicles for hire.").

Following the district court's ruling on that initial motion to dismiss, the plaintiffs amended their complaint to focus exclusively on their false advertising claims.  Glass Decl., Ex. F (SJ Mot., ECF 129, at 1) ("[T]he fourth version of Plaintiffs' complaint focuses exclusively on allegedly false advertising . . . ."); Ex. G (SJ Op., ECF 170, at 1) ("Plaintiffs are taxicab permit-holders in Houston and San Antonio, who claim that Uber is unfairly competing with the taxicab industry ***by misrepresenting the safety of its services to consumers***) (emphasis added).  Ultimately, the case the plaintiffs were prepared to take to the jury in *Greater Houston* was based on "(1) Uber's representations regarding the superiority of its background checks; (2) Uber's representations about the Safe Ride Fee; (3) Uber's representations regarding safety in interactions with the media."  Glass Decl., Ex. G (SJ Op., ECF 170, at 11).  The case was dismissed after the parties reached a settlement just days before jury selection, which was scheduled to commence on February 8, 2016.  Glass Decl., Ex. H (Order of Dismissal, ECF 197); Ex. I (Notice of Setting Trial Date, ECF 192).

Material distinctions—not material similarities—between the Sidecar case and the *Greater Houston* case are apparent from the face of the parties' filings.  The *Greater Houston* case had nothing to do with Ride-Hailing Apps, or even ride-hailing generally, whereas the Sidecar case has nothing to do with local government taxicab regulations, let alone the Houston and San Antonio municipal ordinances.  The Sidecar case has nothing to do with Uber's advertising, unlike *Greater*

*Houston.*  And the legal claims in *Greater Houston* do not overlap with Sidecar's.  *See Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 144 F. Supp. 2d 1334, 1340 (S.D. Fla. 2001) (denying motion for disqualification of counsel in a monopolization case based on law firm's previous representation of the defendant in a Lanham Act case relating to "advertising, retail display and labeling of tobacco products," even though both cases related to the "marketing of cigars").

While Uber now makes the generalized claim that pricing was a critical issue in *Greater Houston*, Mot. 6, Uber did not identify a single potential witness it planned to call to testify in the *Greater Houston* trial about Uber's pricing practices.  Glass Decl., Ex. J (Uber Witness List, ECF 183-4, Ex. D).  Rather, Uber identified two witnesses to testify about certain "public statements" it had made, and several others were designated to testify about Uber's background check policies. *Id*.  Again, none of those questions is material to Sidecar's case.

Uber's specific claims about the work performed by Quinn Emanuel in *Greater Houston* likewise do not establish that case is substantially related to Sidecar's case.  Uber references work performed by its expert in *Greater Houston* to suggest that Quinn Emanuel oversaw rigorous expert analyses that were intended to assess "the plaintiffs' decline," Mot. 16, and whether Uber's prices were maintained at a "profitable level." Mot. 6.  But the report prepared by Uber's expert, Dr. Jesse David (which was filed publicly on that docket, but, conspicuously, was not submitted by Uber in support of its motion), belies Uber's arguments.  The single paragraph from the report regarding "the plaintiffs' decline" that is selectively quoted by Uber in its motion merely rebutted claims about the cause of "a purported decline in permit prices," *i.e.*, the prices for taxi permits, which had been advanced by the plaintiffs' expert.  Glass Decl., Ex. K (Expert Report of Jesse David (Sept. 1, 2015), ECF 132-1, ¶ 20).  Taxicab permit prices, and the reasons that they allegedly declined in Houston, are irrelevant to Sidecar's case.  Nor did Dr. David provide opinions regarding whether Uber's prices were set at a "profitable level."  His report does not measure Uber's profit margins or offer any opinions at all regarding whether Uber's prices fell below a profitable level.

None of Uber's claims can withstand the "particularly strict judicial scrutiny" that applies to motions for disqualification.  *Optyl Eyewear*, 760 F.2d at 1050.  Tellingly, Dr. David's report— which, again, was filed on the public docket—provides no indication that he ever had access to

confidential Uber information concerning pricing or competitive strategies.  Dr. David wrote in his report that: "All materials which I have considered in the preparation of my opinions are cited in this report," *id*. ¶ 3, but his report does not contain a single citation to confidential information concerning Uber's actual prices, costs, or revenues or even a single document produced from Uber's files.  Thus, contrary to Uber's current contention, Dr. David's report shows that the *Greater Houston* case was ***not*** substantially related to any of the issues in the Sidecar case.  *See* Mot. 16. Stephen Swedlow, the lead Quinn Emanuel partner who represented Uber in the *Greater Houston* case, also has confirmed that neither Dr. David nor Quinn Emanuel had access to confidential Uber pricing information.  Swedlow Decl. ¶ 20.

### B.    *Boston Cab Dispatch v. Uber* **Is Not Substantially Related to Sidecar's Case**

Uber's reliance on *Boston Cab* is likewise misplaced.  In *Boston Cab*, another group of taxi companies alleged that Uber had engaged in unfair competition with taxis by failing to abide by local government taxicab regulations.  *See*, *e.g.*, Glass Decl., Ex. L (Compl., *Boston Cab Dispatch, Inc. v. Uber Techs., Inc.*, No. 1:13-cv-10769-NMG (D. Mass. Apr. 3, 2013), ECF 1-1, ¶ 14).  Again, the scope of the case is set forth in the complaint.  The plaintiffs alleged: "Uber's business plan cuts corners illegally and undermines critical safety provisions of ***Boston taxi laws***," *id*. ¶ 14; "Uber is violating nearly all substantive ***Boston taxi laws***, lying to its customers, forcing taxi drivers who sign up with Uber to violate licensing laws and contracts with taxi owners, and discriminating unlawfully against handicapped, elderly and less wealthy users of public transportation," *id*. ¶ 15; "Uber's business strategy is aimed directly at undermining the existing legal protections consumers received under ***Boston Taxi Rules***," *id*. ¶ 19; and "Uber violates the ***Taxi Rules*** by signing up black car and SUV drivers who have not met the Hackney License requirements . . . ," *id*. ¶ 25.

In reviewing the Magistrate Judge's recommendation concerning Uber's motion to dismiss the complaint in *Boston Cab*, the district court summarized the plaintiffs' claims in this way: "Uber . . . violates various federal and state false advertising and unfair competition laws and Boston taxicab ordinances ***by providing a private car service that allows users to call taxicabs associated with Boston Cab and other dispatch services without complying with Boston taxicab regulations***." Glass Decl., Ex. M (Order, ECF 43, at 1) (emphasis added); *see also* Glass Decl., Ex. N (Mot. to

1  Dismiss, ECF 6, at 1) ("Plaintiffs then seek to bootstrap these supposed regulatory offenses into two

2  Lanham Act claims, two Chapter 93A claims, two common law claims, and three RICO claims, all

3  on the underlying theory that Uber falsely represents that it is complying with these local

4  ordinances."); Glass Decl., Ex. O (Mot. to Compel, ECF 100, at 5) ("The gravamen of Plaintiffs'

5  Amended Complaint is that Uber fails to comply with rules with which Plaintiffs are required to

6  comply and fails to pay 'the substantial capital costs and ongoing expenses' Plaintiffs are required

7  to pay.").   The *Boston Cab* plaintiffs agreed their claims were based "on Uber's failure to follow

8  statutory and regulatory rules that the plaintiffs must abide by."  Glass Decl., Ex. P (Mot. to Compel,

9  ECF 98, at 14); *see also* Glass Decl., Ex. Q (Opp. to Motion to Dismiss, ECF 63, at 4) ("Here the

10  plaintiffs allege that when unlicensed Uber Black Cars, SUVs and UberX vehicles drive customers

11  in ***violation of state statutes, a Boston ordinance and the Taxi Rules***, Uber diverts revenue from

12  medallioned taxis.") (emphasis added).

13         Material distinctions between the Sidecar case and the *Boston Cab* case are thus apparent

14  from the face of the parties' filings.  The *Boston Cab* case had nothing to do with Ride-Hailing

15  Apps, whereas the Sidecar case has nothing to do with local government taxicab regulations, let

16  alone the Boston municipal ordinances; indeed, "the central liability question" in the *Boston Cab*

17  case was whether Uber was "conducting carriage for hire ***as defined by statute and the City of***

18  ***Boston's Taxi Regulation***, Rule 403."  Glass Decl., Ex. R (Mot. to Compel, ECF 124, at 5)

19  (emphasis added).  The legal claims in *Boston Cab* do not overlap at all with Sidecar's claims;

20  *Boston Cab* did not even involve an antitrust claim.  Thus, there are insufficient common material

21  legal or factual issues to justify disqualification.  *See Human Longevity*, 2018 WL 5840045 at *1,

22  *6 (denying motion to disqualify counsel in trade secret misappropriation action based on prior

23  representation in a trade secret case); *Hartford*, 2010 WL 3783715, at *5-10 (denying motion for

24  disqualification of counsel in denial of insurance coverage dispute where prior representation

25  involved bad faith, insurance claims, and coverage opinions).

26         **C.**    ***Yellow Cab Co. v. Uber* Is Not Substantially Related to Sidecar's Case**

27         As Uber concedes, the "nature and extent of the attorney's involvement in the cases" is one

28  of the three relevant factors that should be weighed in the "substantial relationship" inquiry.  Mot.

12 (quoting *Beltran v. Avon Prods., Inc.*, 867 F. Supp. 2d 1068, 1081 (C.D. Cal. 2012)).  The *Yellow Cab* case was filed in state court on July 3, 2014, it was removed to federal district court on August 28, 2014, it was remanded to state court on August 20, 2015, and it was dismissed without prejudice on September 18, 2015.  Glass Decl., Ex. S (Docket, *Yellow Cab Co. v. Uber Technologies, Inc.*, No. 24C14004064 (Cir. Ct. for Balt. City)).  Uber did not even respond to the complaint.  *Id.*  Indeed, Quinn Emanuel's lack of exposure to confidential information in the *Yellow Cab* engagement relevant to Uber's disqualification motion is confirmed by the conspicuous absence of any such claim from Uber's declarants.  *See, e.g.*, *Contratto*, 227 F.R.D. at 308 n.5 (new purported evidence may not be submitted for the first time on reply).

The factual allegations in *Yellow Cab,* moreover, confirm that case is not substantially related to Sidecar's case.  The plaintiffs, again a group of taxi companies, brought suit "to prevent Uber from dismantling decades of laws governing the vehicle transportation industry in the City of Baltimore and Montgomery County, Maryland."  Glass Decl., Ex. T (Compl., *Yellow Cab Co. v. Uber Techs., Inc.*, No. 1:14-cv-02754-RDB (D. Md. Aug. 28, 2014), ECF 2 ¶ 1).  That the *Yellow Cab* plaintiffs made "predatory pricing" allegations proves nothing relevant to this motion: unlike predatory pricing in the Sidecar case, where Uber is alleged to have priced below its own costs, the *Yellow Cab* plaintiffs' "predatory pricing" claim  alleged that Uber's prices were lower than allowed by local government taxicab regulations.  Unlike the allegations in this case, the *Yellow Cab* plaintiffs claimed Uber was "refus[ing] to comply with state and local vehicle transportation laws and regulations that are designed to ensure fair competition between competing transportation companies."  *Id.* ¶ 2; *see also id.* ¶ 103 ("Because Plaintiff Cab Companies, Plaintiff Drivers and Association Members comply with the laws and regulations governing the vehicle transportation industry in Baltimore, they cannot compete on a level playing field with Uber.").

Uber's suggestion that the "predatory pricing" allegations in the *Yellow Cab* case are substantially related to the allegations in the Sidecar case merely because both cases use the words "predatory" and "pricing," distorts the nature of the two cases.  "[P]redatory pricing under § 2 of the Sherman Act" has "two prerequisites":

First, a plaintiff seeking to establish competitive injury resulting from a rival's low

prices must prove that the prices complained of are below an appropriate measure of its rival's costs. . . .   The second prerequisite . . . is . . . that the competitor had . . . a dangerous probability[] of recouping its investment in below-cost prices.

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993).  The key elements, therefore, to a predatory pricing case under the Sherman Act are (1) pricing below the defendant's costs; and (2) prospective recoupment.  The alleged "predatory pricing" in the *Yellow Cab* case, however, had nothing to do with the offense of predatory pricing under the Sherman Act. In *Yellow Cab*, the plaintiffs claimed that Uber's fares were "predatory" because they were lower than regulated taxi fares—not Uber's own costs.   *See, e.g.*, Glass Decl., Ex. T (*Yellow Cab* Compl. ¶ 90) ("The rates for uberX services . . . are 6% below the rates Plaintiffs are allowed to charge pursuant to [Public Service Commission] approval."); *id*. ¶ 110 (alleging Uber's prices are "so far **below the market rate** as to constitute illegal predatory pricing with which Plaintiffs and the Association Members are unable to compete.") (emphasis added); *compare Brooke Group*, 509 U.S. at 223 ("[W]e have rejected elsewhere the notion that above-cost prices that are **below general market levels** or the costs of a firm's competitors inflict injury to competition . . . .").  And the *Yellow Cab* plaintiffs advanced no allegations regarding recoupment.  Thus, the plaintiffs in that case made no attempt to allege the facts necessary to establish the "two prerequisites" of the offense.

The legal theories in *Yellow Cab* were entirely distinct from those at issue here.  Distinctions between the legal issues in *Yellow Cab* and those asserted by Sidecar are important; two cases are not substantially related simply "because they involved claims under the same [type of] statute." *Khani*, 155 Cal. Rptr. 3d at 536; *see also Hartford,* 2010 WL 3783715, at *8 ("[M]erely alleging similarity between legal issues implicated in past and present cases is insufficient to satisfy a moving party's burden . . . ."); *Human Longevity*, 2018 WL 5840045, at *3 ("Overlapping causes of action or relevant facts between the former and present matters, without more, do not establish a substantial relationship."); *Foster Poultry*, 2005 WL 2319186, at *7 ("The fact that both representations share a common area of law is insufficient.") (quotation omitted); *Lehman*, 2013 WL 12114447, at *5 ("[B]eyond the general legal issues underlying all such cases, and the fact that both cases involve standing issues, LBHI points to no specific legal issue that was present in the Aurora cases that is also critical to this case.  Such general legal similarities are not sufficient to infer the possession of

1   confidential information.").

2   While the *Yellow Cab* plaintiffs alleged an antitrust claim (under the Maryland Antitrust

3   Act), it is not the same or similar to the claim that Sidecar has asserted here.  Again, just as in

4   *Greater Houston* and *Boston Cab*, the *Yellow Cab* plaintiffs' claims were based on Uber's alleged

5   non-compliance with local taxi regulations.  While Uber argues that "whether Uber engaged in a

6   strategy of pricing UberX ***below cost*** in order to achieve or maintain a monopoly position" was a

7   "legal problem" presented in *Yellow Cab*, Mot. 13 (emphasis added), Uber failed to provide a

8   citation to the complaint in support of that assertion—and none exists.  Again, the question in *Yellow*

9   *Cab* was whether Uber could lawfully charge prices below ***the taxicabs' regulated fares***, while

10  Sidecar's case is about whether Uber's pricing for its Ride-Sharing App was below ***Uber's own***

11  ***costs for its Ride-Sharing App***.[5]  *Compare* Glass Decl., Ex. T (*Yellow Cab* Compl.) ¶¶ 85, 90 *with*

12  Sidecar Compl. ¶ 89.  The *Yellow Cab* plaintiffs also alleged another claim that is unlike any claim

13  in this case:  that Uber orchestrated price-fixing among drivers by imposing uniform prices that were

14  not approved by the local government regulatory authority.  *Yellow Cab* Compl. ¶ 109 ("Uber's

15  imposition of the Uber Rates as uniform fares . . . constitutes horizontal price-fixing. . . .") (citations

16  omitted).  In contrast, Sidecar has not made any type of price-fixing allegations, making even clearer

17  the difference between this matter and the *Yellow Cab* case.

18
19          **D.      The Facts Here Show Less of a Potential Conflict Than Those in Recent Cases
            Where California Federal Judges Denied Motions to Disqualify**

20          Perhaps the best way to show how Uber has failed to prove a disqualifying conflict here is

21  to look at recent decisions by the four California federal district courts.  In each of these cases, a

22  party brought a disqualification motion based on allegations of a "substantial relationship," but the

23  courts found no basis for disqualification.  Each court held that mere similarity is not enough—that

24

25  [5]   For these same reasons, Uber's suggestion that *Greater Houston* is substantially related to
      Sidecar's case because in that case "the plaintiffs' expert charged . . . that  Uber unfairly competed
26  by undercutting taxicab fares in the Houston and San Antonio markets to unprofitable levels," is
      wrong.  In *Greater Houston*, the plaintiffs' expert, Mr. Chernow, contended that Uber's evasion of
27  local taxi regulations allowed it to "undercut fares in a market."  Glass Decl., Ex. U (Chernow
      Report, ECF 136-1. Ex. B, at 12).  Mr. Chernow did not evaluate Uber's profitability in rendering
28  his opinion, nor could he have done so, because he did not even obtain access to confidential Uber
      financial information through discovery.  *Id*. at 4, 6-7.

1   the moving party must show that the similarities are material to the subsequent case.  These cases

2   show how far Uber is from meeting its burden of proving a conflict because the similarities claimed

3   by Uber are fewer, less specific, and less intrusive than was presented in these cases in which the

4   courts denied motions to disqualify.

5     ***Human Longevity (HLI)***.  The Southern District of California denied a motion to disqualify

6   a firm that sued HLI for trade secret misappropriation ***less than four months after it represented***

7   ***HLI in a trade secret case***.  *Human Longevity*, 2018 WL 5840045, at \*1, \*6.   The court found no

8   conflict even though the law firm obtained allegedly confidential information in the prior matter

9   regarding business plans, financial condition, valuation, and other trade secrets, and the subsequent

10  matter involved witnesses and policies, procedures, and proprietary and trade secret information that

11  was relevant to the prior matter.  *Id*. at \*4, \*6.   In fact, HLI submitted a declaration similar to the

12  ones submitted by Uber here, wherein its General Counsel stated that in the prior matter the law

13  firm "drafted discovery requests, analyzed discovery responses, prepared a detailed meet and confer

14  letter regarding discovery issues, and strategized regarding future handling of the matter to ensure

15  the protection of HLI's Trade Secrets."  *Id*. at \*4.   The declaration continued, "To properly represent

16  HLI, prosecute the matter, and evaluate the merits" of the prior matter, the law firm "was required

17  to educate itself about HLI's business, proprietary information, and trade secrets, the HLI PIIA [a

18  relevant document], HLI's confidential training materials, business, plans, sales, strategies, pricing

19  lists, and financial condition."  *Id*.  The law firm also "was further required to consult with and learn

20  HLI's litigation and settlement strategies" and "strategized and communicated directly with [HLI's

21  General Counsel] about HLI confidential information."   *Id*.   While each of these exceeds the

22  showing that Uber has made here, the court still denied the motion to disqualify.

23    ***TWiT.***  The Northern District of California denied a motion to disqualify, even though the

24  court found (1) both representations concerned audio and video streaming—"a fact relevant to both

25  matters (indeed, nearly any matter in which TWiT is a party)"; (2) "TWiT is essentially a two-person

26  entity"; (3) the law firm "necessarily ha[d] access to confidential information regarding how the

27  [owners] think and operate, as well as an advantage to the extent to which either of the [owners]

28  would likely be witnesses in this action"; (4) the law firm received "financial information . . . in the

prior representation"; and (5) the law firm knew the company's business organization history and the company's "views about litigation as well as its financial viability to engage in and sustain litigation." *TWiT*, 2018 WL 2470942, at *5-6.  In fact, the Court denied the motion to disqualify even though—in contrast to Uber's conclusory assertions here—"Plaintiffs have taken the unusual step of disclosing all of their communications with [the law firm] in an attempt to demonstrate that the firm received confidential information that is material to its representation here while also maintaining that disqualification is warranted under the substantial relationship test." *Id*. at *3.

**Lehman (LBHI).**  The Central District of California denied LBHI's motion to disqualify a law firm from a case about breach of a loan repurchase agreement even though that law firm previously represented an LBHI entity in loan repurchase cases.  *Lehman*, 2013 WL 12114447, at *1.  In that prior work, the law firm was privy to LBHI's nationwide strategy for litigating loan repurchase cases; received an LBHI memorandum containing suggestions as to "which courts to file new cases, what parties to name as plaintiffs, what claims to bring and when, how quickly to litigate the cases, and how to limit disclosure and discovery;" coordinated efforts "to prepare pleadings, discovery responses, and to discuss strategy overall;" received a "Loan Document Checklist" that contained a list of several documents that LBHI thought are often relevant to loan repurchase cases; the cases involved similar Agreements and Seller's Guides; the loans traveled through the same transactional channels with many of the same entities; and the cases involved the same witnesses. *Id*. at *1-2, *4.  The Court also recognized that "[b]ecause both cases are essentially breach of contract cases, there will, no doubt, be similar legal issues throughout" and that "both cases involve standing issues."  *Id*. at *5.  In addition to the far greater showing than Uber made here, in *Lehman*, LBHI actually submitted documents that the law firm was provided by LBHI and billing records, neither of which Uber has done.  *Id*. at *4 n.1.  Nevertheless, the Court refused to disqualify counsel.

**Foster Poultry**.  The Eastern District of California denied a motion to disqualify a law firm from an antitrust case about competition among turkey sellers, even though that firm previously advised the moving party on antitrust issues relating to the turkey market in its representation of the company in a merger involving the sale of chicken products.  *Foster Poultry*, 2005 WL 2319186, at *7-9.  The law firm previously reviewed the various submarkets involved in the poultry business

and the law firm was exposed to "strategic planning information including ConAgra's internal views of what constitutes relevant markets," "supply agreements," "strategic plans for ConAgra poultry unit," and other "strategic business plans." *Id.* at *7. Further, the moving party pointed to a specific billing entry which showed that the law firm had a "telephone conference with Mr. Wright [at the moving party] re turkey business." *Id*. Nevertheless, the Court refused to disqualify counsel.

### E.   Denial of Uber's Motion to Relate Illustrates Why Sidecar's Case Is Not Substantially Related to the Taxi Cases Identified by Uber

While not binding, it is informative to note that another Judge in this District has already rejected the crux of Uber's arguments in denying Uber's attempt to relate the Sidecar case to *DeSoto Cab*, another Uber case about local government taxicab regulations (where neither party is represented by Quinn Emanuel). In *DeSoto Cab*, Uber filed a motion to relate that case to Sidecar's case under Civil Local Rule 3-12. The standard under that Local Rule is "[t]he actions concern substantially the same parties, property, transaction or event," which, while not identical, is similar to the "substantially related" test for disqualification. Before Judge White, who presides over the *DeSoto Cab* case, Uber argued that the *DeSoto* case should be related to Sidecar's case because "[t]he plaintiffs are similarly situated in that they are both competitors of Uber" and "***the allegations leveled by the plaintiffs are fundamentally the same: both plaintiffs claim that Uber's pricing practices and competitive conduct*** employed during approximately the same time period injured each of them such that they and others are unable to effectively compete." Glass Decl., Ex. W, (Mot. to Relate, *DeSoto Cab Co. v. Uber Techs., Inc.*, No. 4:16-cv-06385-JSW (N.D. Cal. Dec. 31, 2018), ECF 74, at 2-3) (emphasis added). Judge White denied Uber's motion, holding: "Though there is some overlap (the Sherman Act claims, for example), the cases concern different plaintiffs, contain different factual allegations, address dissimilar scopes, and, for the most part, entail different claims." Glass Decl., Ex. X (Order, ECF 76, at 1). The same logic applies here.

### III.   Uber's Third Argument Cannot Succeed Under Rule 1.6 and Section 6068 Because Quinn Emanuel Has Not Accessed Confidential Uber Information That Is Material to Sidecar's Case and Adverse to Uber

Uber has failed to submit or identify any specific confidential information that Quinn Emanuel allegedly received that would be material to the Sidecar case. In addition to making

1   arguments about the prior litigation matters discussed above, Uber generally cites Quinn Emanuel's

2   work related to the California Public Utilities Commission ("CPUC"), Quinn Emanuel's analysis of

3   a patent obtained by one of Sidecar's founders, and Quinn Emanuel's advice on document retention

4   issues.  But Uber has not even attempted to identify the information it claims was disclosed to Quinn

5   Emanuel in those contexts that might be material to the Sidecar matter.

6          Uber has not identified how discussions about patents would be **material** to Sidecar's Ride-

7   Hailing App case.  Nor is anything about "document retention policies" substantiated as a "prime

8   example" of Quinn Emanuel's "valuable knowledge" concerning Uber.  *Compare* Mot. 22 *with*

9   *Lehman*, 2013 WL 12114447, at *2 (disqualification not warranted even though firm received a

10  memorandum containing suggestions as to "which courts to file new cases, what parties to name as

11  plaintiffs, what claims to bring and when, how quickly to litigate the cases, and how to limit

12  disclosure and discovery" and coordinated efforts "to prepare pleadings, discovery responses, and

13  to discuss strategy overall").  Uber does not even argue that document retention policies are **material**

14  to the claims asserted by Sidecar or that the same policies remain in place today that existed at the

15  time Quinn Emanuel represented Uber.  Again, Uber's generalized assertions would mean that a

16  law firm is subject to a lifetime ban from all subsequent cases against a former client merely because

17  it had been involved with the client's document retention policy.

18         Finally, the scope of Quinn Emanuel's work related to the CPUC was limited to analyzing

19  published CPUC regulations to respond to claims asserted by plaintiffs in certain cases filed in

20  California.  Swedlow Decl. ¶ 19.  The firm never served as Uber's regulatory counsel before the

21  CPUC, *id.*, and Uber has failed to explain what work Quinn Emanuel performed relating to the

22  CPUC that allowed it to access confidential Uber information that would be both adverse to Uber

23  and material in Sidecar's case.[6]

24

25

26  _____

27  [6]  Almost as a throw-away, Uber also asserts that "Quinn Emanuel has a current representation
    through which it continues to have access to Uber's confidential information that is of relevance to
    Sidecar's lawsuit."  Mot. 8.  The representation Uber refers to is a non-litigation matter that has no

28  factual relationship to the Sidecar action, involves no relevant confidential information, and in any
    event is being handled by attorneys who are walled off from the Sidecar litigation team.

1    **IV.    Disqualification of Quinn Emanuel Would Unfairly Punish Sidecar**

2          "The purpose of a disqualification order is prophylactic, not punitive."  *Kirk v. First Am.*

3    *Title Ins. Co.*, 183 Cal. App. 4th 776, 815 (2010).  The critical question "is whether there is a genuine

4    likelihood that allowing the attorney to remain on the case will affect the outcome of the proceedings

5    before the court."  *Id.*  There is no such risk here.

6          As discussed above, this case presents no conflict.  Nonetheless, to avoid any conceivable

7    risk that Uber's confidential information could be used in this matter, Quinn Emanuel erected an

8    ethical wall at the outset of the Sidecar engagement.  Glass Decl. ¶ 27.  Specifically, a memorandum

9    was "circulated warning the legal staff to isolate the tainted individual[s] from communications on

10   the matter and to prevent access to the relevant files." *Kirk*, 183 Cal. App. 4th at 810; Glass Decl. ¶

11   27.  The wall prohibits the Quinn Emanuel attorneys who performed work for Uber from disclosing

12   Uber information to the attorneys working on the Sidecar case.  Glass Decl. ¶ 27.  Consistent with

13   the wall's requirements, the attorneys representing Sidecar have not received or reviewed

14   confidential Uber information.  Decl. of Robert Feldman ("Feldman Decl.") ¶ 3; Decl. of Claude

15   Stern ("Stern Decl.") ¶ 4; Glass Decl. ¶ 27; Bonanno Decl. ¶ 3.

16         The ethical wall's elimination of any conceivable prejudice to Uber is a factor that weighs

17   in favor of denying Uber's motion.  *See, e.g.*, *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d

18   1100, 1110 (N.D. Cal. 2003) (denying a motion to disqualify, in part, "because Heller has

19   demonstrated that it immediately put an ethical wall in place as soon as Heller was retained as Visa's

20   counsel in this action"); *Nat'l Grange of Order of Patrons of Husbandry v. California Guild*, No.

21   2:14-676 WBS DB, 2017 WL 2021731, at *4 (E.D. Cal. May 12, 2017) (denying motion to

22   disqualify because the law firm imposed ethical wall that, although imperfect, prevented the sharing

23   of confidences); *Tawnsaura Group, LLC v. Threshold Enters., Ltd.*, No. SA CV 12-01364-SJO

24   (AGRx), 2012 WL 12892439, at *10 (C.D. Cal. Dec. 26, 2012) (an effective ethical wall is a factor

25   weighing against disqualification).  The Ninth Circuit has expressly recognized that "[a]n ethical

26   wall, when implemented in a timely and effective way, can rebut the presumption that a lawyer has

27   contaminated the entire firm." *In re Cty. of Los Angeles*, 223 F.3d 990, 996 (9th Cir. 2000); *but see*,

28   *e.g.*, *Rosenfeld Constr. Co. v. Superior Court*, 235 Cal. App. 3d 566, 577 (Ct. App. 1991) (rejecting

1   the notion that an ethical wall alone would preclude disqualification).  Quinn Emanuel's timely

2   implementation of an ethical wall in this case confirms there is no risk of unfair prejudice to Uber.

3       By contrast, disqualification of Quinn Emanuel would severely prejudice Sidecar. "[A]

4   disqualification motion may involve such considerations as a client's right to chosen counsel, an

5   attorney's interest in representing a client, the financial burden on a client to replace disqualified

6   counsel, and the possibility that tactical abuse underlies the disqualification motion."  *People ex rel.*

7   *Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 980 P.2d 371, 377-78 (Cal. 1999).  Every one of

8   those considerations applies to Sidecar here.  One of Sidecar's principals has had a long-standing

9   relationship with one of the lead counsel at Quinn Emanuel in this case.  And, given the number of

10  law firms that Uber uses as counsel, Sidecar's options are limited with respect to experienced trial

11  and antitrust counsel capable of bringing a case of this magnitude and importance against a

12  behemoth company like Uber.  And Uber's persistence in this motion notwithstanding the timely

13  ethical wall at Quinn Emanuel shows it is motivated not by concerns about its confidential

14  information but with strategically disadvantaging Sidecar.

15      "Under the circumstances, disqualification would serve no legitimate purpose and would

16  unfairly deprive the plaintiff[] of trial counsel of [its] choice." *Oaks Mgmt. Corp. v. Superior Court*,

17  51 Cal. Rptr. 3d 561, 564 (Ct. App. 2006).  Uber has failed to show this case is substantially related

18  to Quinn Emanuel's prior work, or that the firm actually received material confidential information

19  from Uber, and the ethical wall eliminates the risk that Uber's confidential information will be

20  disclosed to Sidecar's counsel.  Thus, there is no need to disqualify Sidecar's attorneys as a

21  prophylactic measure, and there is no reason to believe Quinn Emanuel's prior relationship with

22  Uber will have any impact on the outcome of these proceedings.

23                              **<u>CONCLUSION</u>**

24      For the reasons stated herein, Uber's motion should be denied.

25

26

27

28

1    DATED:  March 15, 2019                  Respectfully submitted,

2                                            QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
3

4

5                                            By          /s/ Ethan Glass
                                                  Ethan Glass (Bar No. 216159)
6                                                   1300 I Street, NW
                                                    Washington, DC 20005
7                                                   ethanglass@quinnemanuel.com

8                                               Attorneys for Plaintiff SC Innovations, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28