UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SC INNOVATIONS, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>    Defendants. | Case No. 18-cv-07440-JCS<br><br>**ORDER REGARDING MOTION TO DISQUALIFY COUNSEL**<br><br>Re: Dkt. No. 30 |

## I.   INTRODUCTION

Plaintiff SC Innovations, Inc. ("Sidecar"[1]) brings this action against Defendants Uber Technologies, Inc. and several of its subsidiaries (collectively, "Uber") asserting claims under the Sherman Act and California's Unfair Practices Act. Sidecar is represented by the law firm Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), which previously represented Uber from 2012 to 2016, including the defense of several antitrust cases. Uber now moves to disqualify Quinn Emanuel from representing Sidecar. The Court held a hearing on April 26, 2019. For the reasons discussed below, Uber's motion is GRANTED.[2]

## II.   BACKGROUND

### A.   Sidecar's Complaint

Sidecar and Uber both offered smartphone applications allowing passengers to arrange for transportation, or to use the term favored by the parties, "ride-hailing apps." Compl. (dkt. 1) ¶¶ 2–3. Uber entered this market first in 2009, originally offering only rides with licensed limousine

---

[1] SC Innovations is the assignee of all causes of action of Sidecar Technologies, Inc., a defunct former competitor of Uber. This order, like Sidecar's complaint, uses the term "Sidecar" to refer to both SC Innovations and Sidecar Technologies.

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

drivers. *Id.* ¶ 2. Sidecar's competing product, which debuted in 2012, allowed drivers to use their personal vehicles without special licensing. *Id.* ¶ 3. Uber offered a similar product under the name "UberX" beginning in 2013. *Id.* ¶ 5. Sidecar alleges that Uber was able to dominate the market and drive Sidecar out of business by subsidizing both its payments to drivers and the fares it charged passengers, such that "the average price paid by a passenger was well below Uber's average variable cost for completing a transaction on its platform," with the intention of raising prices to recoup those losses after competitors exited the market. *Id.* ¶¶ 6–7. According to Sidecar, Uber in fact "raised prices to supra-competitive levels" after Sidecar went out of business in December of 2015. *Id.* ¶¶ 92–93. Since Sidecar left the market for ride-hailing apps, the only two remaining participants have been Uber and Lyft, Inc. *Id.* ¶ 110.

Sidecar also alleges that Uber maliciously disrupted the operations of its competitors, including Sidecar, by submitting fake requests for rides through competitors' services and canceling them before drivers reached the locations where they expected to pick up passengers, thus "inundating competitors with fraudulent ride requests," "using fraudulently requested trips as an opportunity to convince drivers to work exclusively with Uber instead of its competitors," and frustrating competitors' passengers with longer wait times. *Id.* ¶¶ 9–10, 101–08. Sidecar contends that such conduct caused both passengers and drivers to switch from Sidecar's product to Uber. *Id.* ¶ 104.

Based on the alleged conduct described above, Sidecar asserts claims for monopolization under the Sherman Act, *id.* ¶¶ 116–45, attempted monopolization under the Sherman Act, *id.* ¶¶ 146–54, and sales below cost for the purpose of injuring competitors under the California Unfair Practices Act, *id.* ¶¶ 155–61. Sidecar alleges that the relevant markets for its claims are the cities in which it formerly operated: "San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston." *Id.* ¶ 61.

### B. Quinn Emanuel's Previous Representations of Uber

Uber relies primarily on several cases in which Quinn Emanuel defended Uber from claims by local taxi operators. Although Uber cites at least nine such cases, it addresses only four of them in detail. *See* Mot. (dkt. 30) at 4–7, 12–19 & nn.6, 7; *see also* Yoo Decl. (dkt. 30-2) ¶ 9 ("I

2

am informed that Uber's records reflect that Quinn Emanuel represented Uber in approximately 16 U.S. lawsuits that alleges violations of antitrust and unfair competition laws, as well as a litigation matter in Germany."). Quinn Emanuel ceased representing Uber in 2016 due to a dispute regarding fee structures. Allen Decl. (dkt. 30-4) ¶ 12.

In *Yellow Group LLC v. Uber Technologies, Inc.*, No. 12-cv-7967 (N.D. Ill.), the plaintiff Chicago-area taxi and limousine operators alleged that Uber wrongfully implied a partnership with the plaintiffs by dispatching vehicles bearing the plaintiffs' colors and trademarks, violated ordinances granting taxis the exclusive right to respond to street hails, violated ordinances requiring flat rates for livery transportation, exceeded the rates permitted for taxi services, and made false representations regarding the quality of its services, among other claims. *See generally Yellow Group*, ECF Doc. No. 1 (Compl.). The *Yellow Group* plaintiffs initially brought claims under the Lanham Act, the Illinois Deceptive Trade Practices Act, and the Illinois Consumer Fraud and Deceptive Business Practices Act, as well as a claim for tortious interference with contractual relations. *Id.* ¶¶ 86–111. After Uber, represented by Stephen Swedlow[3] of Quinn Emanuel, moved to dismiss, the plaintiffs filed an amended complaint based on similar allegations, and after that complaint was dismissed in part, they filed a second amended complaint again asserting similar claims. *See generally* Glass Decl. (dkt. 32-3) Ex. B (*Yellow Group* 1st Am. Compl.); *Yellow Group*, ECF Doc. No. 77 (2d Am. Compl.). The plaintiffs voluntarily dismissed their complaint in 2015. *Yellow Group*, ECF Doc. No. 138.

Salle Yoo, who was Uber's only in-house attorney at the time the *Yellow Group* case was filed, states that it was the first case naming Uber as a defendant and that Uber retained Quinn Emanuel with the expectation that Quinn Emanuel "could defend potentially similar cases filed elsewhere," "provide advice on compliance with state and federal antitrust and unfair competition laws," and serve as "an important strategic partner to Uber in these matters." Yoo Decl. ¶¶ 5–6. According to Yoo, Quinn Emanuel initially served "as Uber's primary outside litigation counsel

---

[3] Swedlow was "the primary Quinn Emanuel partner who managed [the] firm's work for Uber." Swedlow Decl. (dkt. 32-2) ¶ 4; *see also* Quinn Decl. (dkt. 32-1) ¶ 5. According to Uber's in-house attorneys, Swedlow and Quinn Emanuel touted their familiarity with "every nuance of Uber's business." Ghaussy Decl. (dkt. 30-3) ¶ 19; Allen Reply Decl. (dkt. 33-1) ¶ 7.

3

and later as a member of [Uber's] 'Preferred Counsel' program," during which time it "advised Uber on many of [Uber's] most sensitive and high-profile litigation matters and legal issues." *Id.* ¶ 7. Yoo states that Uber sought antitrust compliance advice from attorneys at Quinn Emanuel, including managing partner John Quinn, and that Uber and Quinn Emanuel's collaborative "analysis of competitors and the competitive landscape in various geographic areas, market conditions, pricing, confidential business strategies, and confidential data" included consultation with Swedlow regarding proposed price changes in the Chicago market during the *Yellow Group* litigation. *Id.* ¶¶ 8, 10. Quinn disputes having provided antitrust compliance advice to Uber, Quinn Decl. (dkt. 32-1) ¶ 6, and Swedlow states that Quinn Emanuel was only involved in discussions of "how best to present the 'split' of the total cost to the ride between the driver and Uber," not "how much Uber charged in total for transportation to riders or the competitive price for Ride-Hailing App services," Swedlow Decl. (dkt. 32-2) ¶¶ 17–18. Uber's former in-house counsel Jennifer Ghaussy states that Quinn Emanuel attorneys reviewed confidential discovery documents regarding the Chicago market during the *Yellow Group* case. Ghaussy Decl. (dkt. 30-3) ¶ 11.

In a similarly named but separate case filed in 2014, *Yellow Cab Co. v. Uber Technologies, Inc.*,[4] Maryland taxi operators asserted antitrust, unfair competition, and tortious interference claims against Uber under Maryland law, alleging that Uber imposed uniform rates both above and below the allowed taxi meter rates, depending on the tier of service. *See* Glass Decl. Ex. T (*Yellow Cab* Compl.). Uber removed the case to federal court, the plaintiffs successfully moved to remand to Maryland state court, and the parties ultimately stipulated to dismiss the case. *See* Glass Decl. Ex. S (*Yellow Cab* state court docket sheet). In its unsuccessful opposition to the plaintiffs' motion to remand, Uber—represented by Quinn Emanuel attorneys Stephen Swedlow and Ben O'Neil, among others—argued that several individual drivers named as defendants were fraudulently joined because the plaintiffs could not state an antitrust claim against them based on

---

[4] This case was assigned case number 24C14004064 in Maryland Circuit Court for Baltimore City where it was initially filed, and case number 1:14-cv-02764-RDB upon removal to the U.S. District Court for the District of Maryland.

the test for predatory pricing under the Sherman Act. *Yellow Cab*, No. 1:14-cv-02764-RDB, ECF Doc. No. 18 at 15 (D. Md. Oct. 17, 2014) (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993), for the rule that "a plaintiff competitor must show defendant had a reasonable probability of later recouping losses from predatory pricing in the form of monopoly profits"). Stephen Swedlow's declaration does not address the *Yellow Cab* case, nor does the declaration of any other Quinn Emanuel attorney, with the exception that Ethan Glass's declaration attaches documents publicly filed in the case. *See* Swedlow Decl.; Quinn Decl.; Feldman Decl. (dkt. 32-4); Stern Decl. (dkt. 32-5); Bonanno Decl. (dkt. 32-6); Glass Decl. Exs. S–T. Sidecar has not filed a declaration by Ben O'Neil, a Quinn Emanuel attorney whose signature appears on most if not all of Uber's filings in *Yellow Cab*.

In *Boston Cab Dispatch v. Uber Technologies, Inc.*, taxi dispatchers and operators in the Boston area sued Uber for violations of the Lanham Act, Massachusetts unfair competition laws, and the Racketeer Influenced and Corrupt Organizations ("RICO") Act, based primarily on allegations that Uber provided de facto taxi dispatch services without complying with the local regulatory scheme for such services. *See* Glass Decl. Ex. L (*Boston Cab* Compl.). The parties litigated a motion to dismiss (filed by an attorney at Littler Mendelson, P.C., with Swedlow and other Quinn Emanuel attorneys listed as "of counsel"), a motion to compel brought by Uber and signed by Swedlow, and multiple motions to compel brought by the plaintiffs. Glass Decl. Exs. M–R. Discovery included issues related to Uber's pricing strategy in the Boston area, and Quinn Emanuel defended a Rule 30(b)(6) deposition of Uber addressing topics including revenue, pricing, and the competitive landscape in Boston. Ghaussy Decl. ¶ 17. As with the *Yellow Group* case, Swedlow states that to the best of his recollection, any discussion of pricing only concerned the characterization of how Uber divided riders' payments between itself and drivers. Swedlow Decl. ¶¶ 17–18. Swedlow also states that although Quinn Emanuel produced documents related to Uber's revenue in certain geographic markets to the plaintiffs in some of the taxi cases, Quinn Emanuel merely "acted as a conduit for information regarding revenue" that Uber provided for production, without itself analyzing such information or providing advice related to it. *Id.* ¶¶ 14–15.

Finally, in *Greater Houston Transportation Company v. Uber Technologies*, No. 14-941 (S.D. Tex.), Texas taxi operators accused Uber of violating local regulations in Houston and San Antonio governing passenger transportation for hire, and brought claims under the RICO Act, the Lanham Act, and Texas unfair competition law, as well as a claim for declaratory relief. Glass Decl. Ex. C (*Greater Houston* Compl.). The parties litigated the case through a motion for summary judgment, which some of the plaintiffs' claims survived, and settled less than a week before trial was set to begin in February of 2016. *See* Glass Decl. Exs. D–K. Quinn Emanuel represented Uber, and Uber's former in-house counsel Ghaussy states that Quinn Emanuel received confidential information regarding pricing and other topics in the course of discovery, including in preparing for and defending a Rule 30(b)(6) deposition. Ghaussy Decl. ¶ 13. Swedlow states in his declaration that, to the best of his recollection, Quinn Emanuel attorneys were not exposed to "how competitive pricing was determined" in the course of preparing for the Rule 30(b)(6) deposition, and that Quinn Emanuel served only as a "conduit" in producing revenue information during discovery. Swedlow Decl. ¶¶ 14–15, 17.

Swedlow's declaration also includes a number of relatively narrow and specific denials "to the best of [his] recollection," such as that "Quinn Emanuel did not provide Uber with legal advice regarding whether Uber's market share indicates it has market power in the market for ride-hailing software" or "whether Uber exercised market power and harmed competition in the market for ride-hailing software by raising prices starting in 2016," as well as the broader assertion, again to the best of Swedlow's recollection, that "Quinn Emanuel was not exposed to confidential information concerning Uber's pricing, costs, or competitive strategies that would be material to the issues raised in the current Sidecar matter." Swedlow Decl. ¶¶ 7–13.

Aside from the litigation matters discussed above, Uber also argues that Quinn Emanuel should be disqualified based on its representation of Uber in certain non-litigation matters, as well as a current Quinn Emanuel representation that, Uber cryptically asserts, grants Quinn Emanuel access to relevant confidential information but cannot be disclosed on the record in this case. *See* Mot. at 8–9, 21–23. Because, as discussed below, Quinn Emanuel's work for Uber in the *Yellow Cab* taxi litigation matter is sufficient to require disqualification, this order does not address in

1  detail the non-litigation matters cited by Uber or the parties' arguments concerning them.

2  **III.  ANALYSIS**

3      **A.  Legal Standard**

4  This Court's local rules require attorneys to "comply with the standards of professional conduct required of members of the State Bar of California."  Civ. L.R. 11-4(a)(1).  The Ninth Circuit has recognized that, where a district court has adopted such rules, "California law governs questions of conflicts of interest and disqualification."  *Radcliffe v. Hernandez*, 818 F.3d 537, 541 (9th Cir. 2016).  Rule 3-310(E) of the State Bar's Rules of Professional Conduct provides that an attorney "shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the [attorney] has obtained confidential information material to the employment."

"Where the potential conflict is one that arises from the *successive* representation of clients with potentially adverse interests, [California] courts have recognized that the chief fiduciary value jeopardized is that of client *confidentiality*."  *Flatt v. Superior Court*, 9 Cal. 4th 275, 283 (1994).  There is no "'lifetime prohibition against representation adverse to a former client.'"  *Khani v. Ford Motor Co.*, 215 Cal. App. 4th 916, 921 (2013) (quoting *Farris v. Fireman's Fund Ins. Co.*, 119 Cal. App. 4th 671, 680 (2004)); *see also TWiT, LLC v. Twitter Inc.*, No. 18-cv-00341-JSC, 2018 WL 2470942, at *5 (N.D. Cal. June 1, 2018).  Nor does an "attorney's acquisition of general information about the former client's 'overall structure and practices,'" "'litigation philosophy' or 'key decision makers'" *necessarily* disqualify the attorney from future adverse representations, although such knowledge may be grounds for disqualification where the information at issue is "'found to be "material"—i.e., directly in issue or of critical importance—in the second representation.'"  *Khani*, 215 Cal. App. 4th at 921 (quoting *Farris*, 119 Cal. App. 4th at 680).

A party that has not consented to a conflict of interest may disqualify its former counsel from representing an adversary in one of two ways.  First, counsel will be disqualified if the former client establishes that "the former attorney actually possesses [material] confidential

7

information adverse to the former client." *H. F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal. App. 3d 1445, 1452 (1991). Confidential information is "material," and thus disqualifying, if it is "directly at issue in, or ha[s] some critical importance to, the second representation." *Farris*, 119 Cal. App. 4th 671, 680 (2004). As an alternative, "it is well settled actual possession of confidential information need not be proved in order to disqualify the former attorney," and "it is enough to show a 'substantial relationship' between the former and current representation." *H. F. Ahmanson*, 229 Cal. App. 3d at 1452. This "substantial relationship" test is rooted in the need to avoid even the "appearance of the possibility[] that the attorney may have received confidential information during the prior representation," as well as in the expectation "that the lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client." *Trone v. Smith*, 621 F.2d 994, 998–99 (9th Cir. 1980).

Whether there is a substantial relationship for the purpose of this test "turns on two variables: (1) the relationship between the legal problem involved in the former representation and the legal problem involved in the current representation, and (2) the relationship between the attorney and the former client with respect to the legal problem involved in the former representation." *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698, 709 (2003). Where matters "turn on the same issue," they are substantially related. *See Farris*, 119 Cal. App. 4th at 684. In other words, an attorney will be disqualified where the available record "supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." *Jessen*, 111 Cal. App. 4th at 713.

As part of this test, "courts ask whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation." *H. F. Ahmanson*, 229 Cal. App. 3d 1445, 1454 (1991). Nevertheless, the inquiry into the actual attorney-client relationship under the second prong of the test is not searching: so long as "the relationship between the attorney and the former client is shown to have been direct—

that is, where the lawyer was personally involved in providing legal advice and services to the former client—then it must be presumed that confidential information has passed to the attorney and there cannot be any delving into the specifics of the communications between the attorney and the former client in an effort to show that the attorney did or did not receive confidential information during the course of that relationship." *Jessen*, 111 Cal. App. 4th at 709. The precise nature of the former attorney-client relationship only comes into play as a factor to be balanced against the similarity of issues if the relationship "was not direct." *City & Cty. of San Francisco v. Cobra Sols., Inc.*, 38 Cal. 4th 839, 847 (2006).

"Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm." *Flatt*, 9 Cal. 4th at 283. "[D]isqualification of the firm is required, even if the firm erects an ethical wall around the attorney who possesses the opponent's confidences . . . ." *Pound v. DeMera DeMera Cameron*, 135 Cal. App. 4th 70, (2005) (citing *Henriksen v. Great Am. Savings & Loan*, 11 Cal. App. 4th 109 (1992)); *see also, e.g.*, *Genentech, Inc. v. Sanofi-Aventis Deutschland GMBH*, No. C 08-04909 SI, 2010 WL 1136478, at *7 (N.D. Cal. Mar. 20, 2010) ("Further, California law rejects the use of ethical walls to prevent disqualification by imputed conflicts."); *Meza v. H. Muehlstein & Co.*, 176 Cal. App. 4th 969, 978 (2009) ("[A]n 'ethical wall' between an attorney with confidential information and his or her firm will generally not preclude the disqualification of the firm. . . . Instead, there is a presumption that each member of the firm has imputed knowledge of the confidential information."); *but see Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776 (2010) (discussing circumstances where an ethical wall may be sufficient to avoid imputed conflicts from attorneys moving between law firms, a circumstance not at issue in the present case).[5]

---

[5] Even if California law permitted the use of ethical walls to limit conflicts from being imputed to lawyers working at the same firm throughout both representations, which it does not appear to,

9

The Ninth Circuit has noted—albeit in the context of disqualification where an attorney may serve as a witness at trial, not disqualification based on adversity to a former client—that "disqualification motions should be subjected to 'particularly strict judicial scrutiny'" due to the potential for tactical abuse. *Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985). Nevertheless, in determining whether to disqualify counsel based on a prior representation, "the paramount concern must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar." *State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1422, 1428 (1999) (citing *Comden v. Superior Court*, 20 Cal. 3d 906, 915 (1978)); *see also People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1145 (1999).

### B.   Judge White's Decision Regarding *DeSoto Cab*

As a starting point, the Court rejects Sidecar's argument that the present motion is informed in any way by Judge White's decision that this case is not related to another case between Uber and local taxi companies, *DeSoto Cab Co. v. Uber Techs, Inc.*, No. 16-cv-06385-JSW (N.D. Cal.). *See* Opp'n (dkt. 32) at 22. Under this Court's local rules, cases are related only if: "(1) The actions concern substantially the same parties, property, transaction or event; *and* (2) It appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." Civ. L.R. 3-12(a) (emphasis added). Neither element of that test is the same as the test for whether cases are "substantially

---

Quinn Emanuel's establishment of such a wall at the recent outset of its representation of Sidecar would not be effective, because no such wall was in place over the years in which it represented Uber, and there is no reason to believe that the attorneys who worked on those matters would have had any reason at that time to hesitate before sharing information with their colleagues. The scope of Quinn Emanuel's ethical wall is also unclear, with no information in the record addressing, for example, any measures put in place to prevent access to documents or efforts to determine whether attorneys other than those who "performed work for Uber" obtained information before the wall was imposed. *See, e.g.*, Glass Decl. ¶ 27 ("The wall has prevented me from having any substantive communication regarding this case or Quinn Emanuel's prior work for Uber with anyone at Quinn Emanuel who performed work for Uber."); *cf. Kirk*, 183 Cal. App. 4th at 810–11 ("The typical elements of an ethical wall are: [1] physical, geographic, and departmental separation of attorneys; [2] prohibitions against and sanctions for discussing confidential matters; [3] established rules and procedures preventing access to confidential information and files; [4] procedures preventing a disqualified attorney from sharing in the profits from the representation; and [5] continuing education in professional responsibility." (citation omitted)).

related" for the purpose of disqualification as discussed above. Moreover, Uber has not argued that any connection between this case and the *DeSoto Cab* case, which does not involve Quinn Emanuel, would be grounds for disqualification. The decision not to find the cases related is irrelevant to the issue at hand.

### C. Substantial Relationship to Adverse Representations

Sidecar's opposition brief makes much of the distinction between ride-hailing apps and "transportation companies," arguing that this case does not materially overlap with Quinn Emanuel's previous representations of Uber because all of those cases involved litigation with traditional taxi companies, while this case is between two ride-hailing companies that—at least nominally[6]—do not themselves provide transportation. According to Sidecar, this case "involves different markets, different facts, different claims, different statutes, and different legal theories than those at issue in the taxicab cases." Opp'n at 11.

Sidecar analogizes this case to the Eastern District of California's decision in *Foster Poultry Farms v. ConAgra Foods Refrigerated Foods Co., Inc.*, No. F 04-5810 AWI LJO, 2005 WL 2319186 (E.D. Cal. Sept. 22, 2005). Opp'n at 11–12. In that case, the court affirmed a magistrate judge's decision denying a motion to disqualify counsel from representing plaintiff Foster Poultry in an antitrust case involving "the market for browned and smoked turkey," despite counsel having previously represented defendant ConAgra in a different antitrust case concerning the market for chicken. *Foster Poultry*, 2005 WL 2319186, at *2, *7. "The Magistrate Judge determined as a factual matter that ConAgra neither provided [counsel] with detailed information about the turkey market nor gave it information that would be pertinent in determining whether the various chicken businesses impacted the turkey businesses under relevant market analysis." *Id.* at *9. Sidecar argues that, just as the chicken and turkey markets were distinct in *Foster Poultry*, the taxi market asserted in the earlier cases is separate from the ride-hailing market asserted in this case. *See* Opp'n at 12 ("Ride-Hailing Apps like Uber do not offer or provide the transportation of

---

[6] The nature of such companies' business has been and continues to be widely litigated in, for example, disputes regarding drivers' status as employees or independent contractors. The Court need not and does not reach such questions on the present motion.

persons by motor vehicle or carry passengers.").

Unlike in *Foster Poultry*, however, this case and the taxi cases all relate to the same services provided by Uber, even if the competitors might be in different markets. Regardless of whether Sidecar is correct as to how the market for those operations should be defined, the earlier cases required at least some degree of discovery into and analysis of the same Uber operations at issue in this case—the provision or facilitation of ride-hailing for passenger transportation. That remains true even if Sidecar is correct that Uber did not participate in the same markets as the taxi companies that previously sued it. *Foster Poultry* might be on point if, say, earlier cases addressed Uber's "Uber Eats" food delivery service while the current case addressed its passenger services.[7] With all of the cases at issue addressing the same class of Uber products, however, *Foster Poultry* has little bearing on this case. *Cf. also Human Longevity, Inc. v. J. Craig Venter Inst.*, No. 18cv1656-WQH-LL, 2018 WL 5840045, at *6 (S.D. Cal. Nov. 8, 2018) (declining to disqualify a law firm from defending a client in a trade secrets case where it had previously opposed the same party in another trade secrets case involving different types of information, a different former employee with a different position, and a different alleged method of misappropriation). Sidecar's assertion that the taxi cases "had nothing to do with Ride-Hailing Apps," Opp'n at 16, is incorrect, because the cases related to Uber.

That is not the end of the inquiry. As Uber correctly notes, many of the claims at issue in the taxi cases, such as claims for false advertising and failure to comply with local taxi regulations, do not directly relate to the subject matter of this case. *See, e.g.*, Opp'n at 12–14. To the extent that Quinn Emanuel would have been called upon to litigate whether, for example, Uber was required to obtain taxi medallions for its drivers, or whether Uber's advertising regarding its drivers' background checks was accurate, such issues do not substantially overlap with the predatory pricing and tortious interference claims here. At least one of the prior cases, however,

---

[7] Conversely, the circumstances of this case might be analogous to a counterfactual version of *Foster Poultry* where the company only sold turkey but had been sued previously by a chicken seller who argued that the two products were part of the same market. If that had been the case, the Eastern District likely would have found the first lawsuit, concerning both chicken and turkey, to be substantially related to a subsequent lawsuit concerning only turkey.

12

bears a sufficient resemblance to the claims at issue here to warrant concern.

In *Yellow Cab*, Maryland taxi operators alleged, among other claims and theories, that Uber violated Maryland antitrust law by setting "uniform prices so far below the market rate as to constitute illegal predatory pricing with which Plaintiffs . . . are unable to compete." Glass Decl. Ex. T ¶ 110. Sidecar's first argument against disqualification based on *Yellow Cab* is that Quinn Emanuel had only limited involvement because the case only lasted slightly over a year before voluntary dismissal and Uber never responded to the complaint. Opp'n at 16–17. But while the extent of an attorney's involvement with a case may be relevant in some circumstances, that factor only comes into play "[w]hen the attorney's contact with the prior client was not direct." *Cobra Sols.*, 38 Cal. 4th at 847; *see also Jessen*, 111 Cal. App. 4th at 709. Quinn Emanuel appeared as Uber's lead counsel in *Yellow Cab* and performed substantive work on Uber's behalf, including removing the case to federal court, filing an unsuccessful opposition to the plaintiffs' motion to remand, and preparing to file a motion to dismiss. *See, e.g.*, Glass Decl. Ex. S; Allen Reply Decl. (dkt. 33-1) ¶ 9. Sidecar cites no case where the factor addressing the nature of the attorney-client relationship prevented disqualification for a law firm that served as the former client's lead counsel in the earlier representation at issue.

Somewhat similarly, Sidecar asserts that "Quinn Emanuel's lack of exposure to [material] confidential information in the *Yellow Cab* engagement . . . is confirmed by the conspicuous absence of any such claim from Uber's declarants." Opp'n at 17. But "the former client need not prove that the attorney possesses actual confidential information" under the "substantial relationship" test. *Cobra Sols., Inc.*, 38 Cal. 4th at 847. It is enough that the former and current matters are substantially similar, and that the attorney had a direct relationship with the former client, with no "'inquiry into the actual state of the lawyer's knowledge' acquired during the lawyers' representation of the former client." *Jessen*, 111 Cal. App. 4th at 710–11 (quoting *Ahmanson*, 229 Cal. App. 3d at 1453).

Sidecar also argues that the theory of predatory pricing asserted in *Yellow Cab* is distinct from Sidecar's Sherman Act predatory pricing claim here, because unlike the Maryland plaintiffs' claim based on Uber undercutting regulated taxi fares, the Sherman Act requires a competitor

bringing such a claim to show that the defendant set a price below the defendant's own costs and posed a dangerous threat of recouping that loss through higher prices after market consolidation. Opp'n at 17–18 (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222–24 (1993)). As Uber notes in its reply, however, Quinn Emanuel itself specifically argued on behalf of Uber that the Maryland plaintiffs were required to show antitrust injury as that term is defined under federal law, as well as market power as defined in *Brooke Group*, including a "reasonable probability of later recouping losses from predatory pricing in the form of monopoly profits." *Yellow Cab*, ECF Doc. No. 18 (Opp'n to Remand) at 14–15;[8] *see* Reply (dkt. 33) at 6–7. Uber's brief in *Yellow Cab*, authored by Quinn Emanuel, quoted *Brooke Group* for the proposition that "'The plaintiff must demonstrate that' the predators will 'obtain enough market power to set higher than competitive prices, and then sustain those prices long enough to earn in excess profits what they earlier gave up in *below-cost prices*.'" *Yellow Cab*, ECF Doc. No. 18 (Opp'n to Remand) at 15 (quoting *Brooke Grp.*, 509 U.S. at 225) (emphasis added).

      Accordingly, at least in Quinn Emanuel and Uber's view at the time—presumably the most relevant perspective from which to determine the expected scope of attorney-client communications—claims at issue in the Maryland case turned on the issue of whether Uber could be expected to recoup its losses from offering low, purportedly below-cost predatory prices by raising its prices after obtaining a dominant market position. The plaintiffs in that case also alleged that such an outcome was likely. Glass Decl. Ex. T (*Yellow Cab* Compl.) ¶ 116(b) (alleging that "the Uber Rates [will] become unaffordable even for consumers of average means" after Uber "forces taxicab companies out of the market"). Sidecar alleges similarly in this case, as it must to support a predatory pricing claim under the Sherman Act. Compl. ¶¶ 134–36 (alleging that "[a]fter Sidecar exited the market [due to predatory pricing], Uber imposed price increases on

---

[8] As noted above, Quinn Emanuel presented this argument in an unsuccessful effort to establish diversity jurisdiction by showing that certain individual driver defendants were fraudulently joined. The District of Maryland held that Uber had not established fraudulent joinder because the plaintiffs had met their very low burden to show "a 'glimmer of hope' that their price-fixing claim [would] succeed." *The Yellow Cab Co. v. Uber Techs., Inc.*, No. RDB-14-2764, 2015 WL 4987653, at *5 (D. Md. Aug. 19, 2015). The court did not contradict Quinn Emanuel's position that the plaintiffs' claims required antitrust injury, market power, and a danger of recouping losses through later price increases. *See id.*

Passengers" and reduced payments to drivers such that it was "likely to recoup the losses it sustained").

The question of whether Uber set below-cost prices and employed a strategy in which it expected to recoup losses by raising prices after establishing a dominant position in the market constitutes at least one issue material to both the claims at issue in *Yellow Cab* and those asserted by Sidecar here. Uber argues that the markets in the two cases differ because this case concerns ride-hailing apps while *Yellow Cab* concerned taxis, but both cases implicate the same prices offered by Uber to customers seeking transportation. Moreover, the scope of the market is itself a common material issue—whether Uber competed against traditional transportation companies would have been a central dispute of *Yellow Cab* had the case proceeded further, and might well be at issue in defining the relevant market for this case. As counsel for Uber noted at the hearing on the present motion, the software-only market definition on which Sidecar relies to distinguish *Yellow Cab* was a legal strategy that Quinn Emanuel pioneered for Uber in the years in which it served as Uber's litigation counsel.

While certain other aspects of the claims differ, "[t]he substantial relationship test does not require that the issues in the two representations be identical." *Trone*, 621 F.2d at 1000. The Court concludes that the two cases are substantially related, and that Quinn Emanuel must be disqualified. *See Jessen*, 111 Cal. App. 4th at 713 ("[S]uccessive representations will be 'substantially related' when . . . information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation . . . .").[9]

---

[9] Other aspects of Quinn Emanuel's past representations of Uber also raise concern. As one example, it seems likely that the revenue information disclosed to Quinn Emanuel in the *Boston Cab* and *Greater Houston* cases would be material to the present antitrust claims concerning the same geographic markets, and Quinn Emanuel cites no authority adopting its "conduit" theory of excusing confidential information actually disclosed to counsel so long as the attorneys who received it state that they did not "analyze" such information or provide advice. *See* Swedlow Decl. ¶¶ 14–15; Ghaussy Decl. ¶ 16. The Court also hesitates to allow attorney declarations attesting to only a limited exchange of information "[t]o the best of [the attorney's] recollection" to trump a former client's declaration that the attorney had access to more extensive information. *See* Swedlow Decl. ¶¶ 7–13, 15–17; Ghaussy Decl. ¶¶ 7, 24. Because the *Yellow Cab* representation satisfies the "substantial relationship" test for disqualification, however, the Court does not reach these other issues.

Other cases on which Sidecar primarily relies are not analogous to the present circumstances. In *TWiT, LLC v. Twitter Inc.*, Judge Corley denied a motion to disqualify where the law firm Durie Tangri, serving as defense counsel in a trademark dispute brought by TWiT, had previously advised TWiT in connection with a third party's threat of patent litigation, and "[a]ny confidential communications Durie Tangri would have had with [TWiT] regarding the patent litigation threat would be immaterial to the issues in [the trademark] case." *TWiT, LLC v. Twitter Inc.*, No. 18-cv-00341-JSC, 2018 WL 2470942, at *4 (N.D. Cal. June 1, 2018). That case stands for the noncontroversial rule that familiarity with a former client's approach to litigation and similarly general knowledge is not disqualifying without a showing that such knowledge is specifically material to the new adverse representation. *See id.* at *5–6. Similarly, in a case where the Central District of California declined to disqualify counsel, the court determined that each of the former and current representations "involve[d] distinct circumstances regarding the loans at issues, the borrowers who procured the loans, the loan officers who made the loans, the locations of the loans, the defendants who sold the loans . . . , the circumstances constituting the alleged breaches, and the resulting damages," and each of the material disputed issues "turn[ed] on the unique factual circumstances surrounding the individual loans." *Lehman Bros. Holdings Inc. v. Direct Mortg. Corp.*, No. 2:09-cv-04170-CJC(RNBx), 2013 WL 12114447, at *4 (C.D. Cal. Feb. 4, 2013). The party seeking disqualification identified "no specific legal issue that was present in the [earlier] cases that is also critical to [the current adverse representation]." *Id.* at *5. Neither *TWiT* nor *Lehman Brothers* conflict with disqualification in this case, where a necessary element of Sidecar's claims was also at issue in *Yellow Cab* with respect to the same Uber product or products, an overlapping time period, and an overlapping (or at least immediately neighboring) geographic market.[10]

---

[10] The various plaintiffs in *Yellow Cab* are described as providing taxi services "in the State of Maryland," "in the City [of Baltimore]," and "in Montgomery County, Maryland." *See* Glass Decl. Ex. T ¶¶ 9–40. Portions of Maryland, including Montgomery County, are suburbs of Washington, DC, which is one of the geographic markets asserted in Sidecar's present complaint. *See* Compl. ¶ 61. Although, as discussed above, Sidecar disputes other aspects of the relationship between this case and *Yellow Cab*, it does not argue that the geographic markets of the two cases are a relevant difference between them. *See* Opp'n at 16–19.

16

## IV. CONCLUSION

A lawyer can be expected over time to represent zealously and fairly a wide range of clients whose interests might sometimes be at odds with positions that the lawyer has previously taken. As discussed above, California recognizes that reality by declining to impose a "lifetime prohibition against representation adverse to a former client." *Khani*, 215 Cal. App. 4th at 921. Here, however, it is reasonable for Uber to expect that Quinn Emanuel would not now serve as counsel to a plaintiff bringing antitrust claims based on Uber's alleged conduct during the same time that Quinn Emanuel served as Uber's sole outside litigation counsel and defended Uber against unfair competition and antitrust claims—including at least some claims turning on factual questions underlying the case at hand. While the Court has no reason to doubt the veracity of the Quinn Emanuel attorneys who have declared their lack of exposure to confidential information, allowing this case to proceed while Uber is left to speculate what information its former attorneys shared with their colleagues would undermine "the public trust both in the scrupulous administration of justice and in the integrity of the bar." *See State Farm*, 72 Cal. App. 4th at 1428.

The motion is GRANTED. Quinn Emanuel is disqualified from representing Sidecar in this action, and Sidecar is instructed to retain new counsel.

A case management conference will occur on June 7, 2019 at 2:00 PM. The parties shall file an updated joint case management statement no later than May 31, 2019. The deadline for Uber to respond to the complaint remains stayed pending further order of the Court.

**IT IS SO ORDERED.**

Dated: May 2, 2019

JOSEPH C. SPERO
Chief Magistrate Judge