THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

CYNTHIA E. RICHMAN, SBN 492089
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  11101
Telephone: 202.955.8500
Facsimile:  202.467.0539

Attorneys for Uber Technologies, Inc, Rasier LLC,
Rasier-CA LLC, Rasier-PA LLC, Rasier-DC LLC,
Rasier-NY LLC, Uber-USA LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SC Innovations, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Uber Technologies, Inc; Rasier LLC; Rasier-CA LLC; Rasier-PA LLC; Rasier-DC LLC; Rasier-NY LLC; Uber-USA LLC, <br><br> Defendants. | CASE NO. 3:18-CV-07440-JCS <br><br> **DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** <br><br> **Hearing:** <br> Date:    January 17, 2020 <br> Time:    9:30 a.m. <br> Place:   Courtroom G, 450 Golden Gate Avenue, San Francisco, CA <br> Judge:  Honorable Joseph C. Spero |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 17, 2020, at 9:30 a.m., before the Honorable Joseph C. Spero, in Courtroom G of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc; Rasier LLC; Rasier-CA LLC; Rasier-PA LLC; Rasier-DC LLC; Rasier-NY LLC; and Uber-USA LLC ("Defendants" or "Uber") will and hereby do move this Court to dismiss, with prejudice, the claims brought by Plaintiff SC Innovations Inc. ("SCI") pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants' motion is based on the grounds that the amended complaint fails to state any claim upon which relief can be granted because (1) the Sherman Act § 2 claims fail to plead valid relevant markets, the possession (or a dangerous probability) of monopoly power, and a specific intent to monopolize; (2) the predatory pricing claims under Section 2 are implausible and fail to allege the requisite elements of predatory pricing (below-cost pricing, exclusion of competition, dangerous probability of recoupment); (3) the "tortious interference" claims under Section 2 are conclusory and lack any factual support, plead no injury to competition, and are based on lawful and justified conduct; (4) the California Unfair Practices Act claims fail by reason of the exemption in CAL. BUS. & PROF. CODE § 17024(1), the lack of jurisdiction over pricing outside of California, and SCI's failure to plead the requisite intent or purpose; and (5) the applicable statutes of limitations bar SCI's claims in whole or in part.

This motion is based on this Notice of Motion and Motion, the concurrently filed Memorandum of Points and Authorities, the pleadings and papers on file, and the argument received by the Court.

THEODORE J. BOUTROUS JR.
DANIEL G. SWANSON
CYNTHIA E. RICHMAN
GIBSON, DUNN & CRUTCHER LLP


By:   */s/ Daniel G. Swanson*

Attorneys for Uber Technologies, Inc, Rasier LLC, Rasier-CA LLC, Rasier-PA LLC, Rasier-DC LLC, Rasier-NY LLC, Uber-USA LLC

1

**TABLE OF CONTENTS**

2

Page

3   I.      INTRODUCTION ................................................................................................ 1

4   II.     FACTUAL BACKGROUND ............................................................................... 3

5   III.    LEGAL STANDARD ......................................................................................... 4

6   IV.     SCI FAILS TO PLEAD A CLAIM UNDER SHERMAN ACT § 2 ....................................... 5

7          A.     SCI Fails to Plead a Valid Predatory Pricing Claim ........................... 5

8                 1.     SCI's Predatory Pricing Theory is Wholly Implausible ................. 5

9                 2.     SCI Does Not Satisfy the Threshold Burden of Pleading that
                          Competition was Driven from the Market ........................................ 8

10

11                3.     SCI Does Not Plead a Dangerous Probability of Recoupment ...................... 13

12         B.     SCI Fails to Plead an Antitrust Claim for Alleged Tortious Interference ................. 16

13  V.      SCI FAILS TO PLEAD AN UNFAIR PRACTICES ACT CLAIM ....................................... 19

14         A.     Uber is Exempt from the Unfair Practices Act ........................................... 19

15         B.     SCI's UPA Claim is Barred by the Statute of Limitations ........................... 20

16         C.     The Unfair Practices Act Does Not Apply to Conduct Outside of California ............ 22

17         D.     The Complaint Fails to Plead that Uber had the Purpose of Injuring
                  Competitors or Destroying Competition ............................................... 23

18  VI.     CONCLUSION ................................................................................................ 24

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A White and Yellow Cab, Inc. v. Uber Techs., Inc.*,
   No. 15-cv-05163 (N.D. Cal. Mar. 5, 2018) ............................................................................20

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
   881 F. 2d 1396 (7th Cir. 1989) ........................................................................6, 14, 16

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F. 3d 1171 (9th Cir. 2016) ........................................................................5, 9, 13

*Am. Academic Suppliers v. Beckley-Cardy*,
   922 F.2d 1317 (7th Cir. 1991) ..................................................................................6

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,
   108 F.3d 1147 (9th Cir. 1997) ...............................................................5, 12, 17, 18

*Apple Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...................................................................11

*Aryeh v. Canon Bus. Sols., Inc.*,
   55 Cal. 4th 1185 (2013) ...........................................................................................21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................4, 10

*Axiom Advisers & Consultants, Inc. v. Sch. Innovations and Advocacy, Inc.*,
   NO. CIV. 2:05-CV-02395-FCD-PAN, 2006 U.S. Dist. LEXIS 11404 (E.D. Cal.
   Mar. 20, 2006) ........................................................................................................12

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ....................................................................................1

*Barry Wright Corp. v. ITT Grinnell Corp.*,
   724 F. 2d 227 (1st Cir. 1983) .....................................................................................9

*Bay Guardian Co. v. New Times Media LLC*,
   187 Cal. App. 4th 438 (2010) ...................................................................................23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................4, 5, 6

*Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ...........................................................................2, 5, 9, 13, 14, 16

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ..........................................................................................2, 10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ...................................................................................................16

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) .........................................................................................5

*Cel-Tech Commun., Inc. v. Los Angeles Cellular Telephone Co.*,
    20 Cal. 4th 169 (1999) ......................................................................................2, 23, 24

*Copperweld Corp. v. Ind. Tube Corp.*,
    467 U.S. 752 (1984) ...................................................................................................16

*Crawford v. Uber Techs., Inc.*,
    No. 17-CV-02664-RS, 2018 WL 1116725 (N.D. Cal. Mar. 1, 2018) ...........................22

*Dial A Car Inc. v. Transp., Inc.*,
    82 F. 3d 484 (D.C. Cir. 1996) ....................................................................................10

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
    No. 18-cv-05546-EMC, 2019 WL 2548459 (N.D. Cal. June 20, 2019) ........................20

*Elecs. For Imaging, Inc. v. Coyle*,
    No. C 01-4853MJJ, C 05-0619 MJJ, 2005 WL 1661958 (N.D. Cal. July 14, 2005) .....................12

*G.H.I.I., et al. v. MTS, Inc.*,
    147 Cal. App. 3d 256 (1983) .................................................................................20, 21

*Gentges v. Trend Micro Inc.*,
    No. C 11-5574 SBA, 2012 WL 2792442 (N.D. Cal. July 9, 2012) ...............................22

*Glob. Servs. v. Ikon Office Sols.*,
    No. 10-05974, 2011 WL 6182425 (N.D. Cal. Dec. 13, 2011) ......................................21

*Hennegan v. Pacifico Creative Serv., Inc.*,
    787 F.2d 1299 (9th Cir. 1986) ....................................................................................21

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ...............................................................................10, 11

*Hladek v. City of Merced*,
    69 Cal. App. 3d 585 (1977) .........................................................................................20

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989) ...............................................................................14, 15

*Joe Sanfelippo Cabs, Inc. v. City of Milwaukee*,
    839 F.3d 613 (7th Cir. 2016) .............................................................................6, 10, 11

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...............................................................................5, 17

Gibson, Dunn &
Crutcher LLP

*Loyd's Material Supply Co. v. Regal Beloit Corp.*,
   No. 16-8027, 2017 WL 5172206 (C.D. Cal. June 27, 2017) ......................................21

*Malden Transp. v. Uber Techs.*,
   321 F. Supp. 3d 174 (D. Mass. 2018) .............................................................7, 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................6, 7

*McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc.*,
   No. 08-00080 JMS/BMK, 2008 WL 2437739 (D. Haw. June 17, 2008) ........................12

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008).......................................................................10

*North Alaskan Salmon Co. v. Pillsbury*,
   174 Cal. 1 (1916) ....................................................................................22

*Norwest Mortgage, Inc. v. Superior Court*,
   72 Cal. App. 4th 714 (1999).........................................................................22

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013).....................................................................17

*nSight, Inc. v. Peoplesoft, Inc.*,
   No. C-04-3836 MMC, 2005 U.S. Dist. LEXIS 24847 (N.D. Cal. Aug. 5, 2005),
   *aff'd* 296 Fed. Appx. 555 (9th Cir. 2008) ........................................................12

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988).....................................................................16, 19

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
   886 F.3d 332 (3d Cir. 2018)..........................................................1, 7, 10, 18

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995).......................................................2, 8, 12, 14, 15

*Rebel Oil Co. v. Atlantic Richfield Co.*,
   146 F.3d 1088 (9th Cir. 1998).......................................................................8, 14

*See Desoto Cab Co., Inc. v. Uber Techs., Inc.*,
   No. 16-cv-06385 (N.D. Cal. Sept. 24, 2018) .......................................................20

*Stearns Airport Equip. Co., Inc. v. FMC Corp.*,
   170 F.3d 518 (5th Cir. 1999)........................................................................2, 8

*Sullivan v. Oracle Corp.*,
   51 Cal. 4th 1191 (2011) ............................................................................22

Gibson, Dunn & Crutcher LLP

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008)..................................................................................................23

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998).........................................................................................................2

*Townshend v. Rockwell Int'l Corp.*,
    No. C 99-0400 SBA, 2000 U.S. Dist. LEXIS 5070 (N.D. Cal. Mar. 28, 2000) ............................12

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
    No. 07-05634, 2011 WL 1753738 (N.D. Cal. May 9, 2011)........................................................21

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)...................................................................................................................5

*Van Slyke v. Capital One Bank*,
    No. C 07-00671 WHA, 2007 WL 3343943 (N.D. Cal. Nov. 7, 2007) ........................................22

*Vess v. Ciba-Geigy Corp. USA*,
    317 F. 3d 1097 (9th Cir. 2003).................................................................................................17

*W. Union Fin. Servs., Inc. v. First Data Corp.*,
    20 Cal. App. 4th 1530 (1993)...................................................................................................23

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*,
    668 F.2d 1014 (9th Cir. 1981)....................................................................................................6

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009)......................................................................................................5

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971).................................................................................................................21

*Zf Meritor, LLC v. Eaton Corp.*,
    696 F. 3d 254 (3d Cir. 2012)......................................................................................................1

## Statutes

15 U.S.C. § 15b......................................................................................................................................9

15 U.S.C. § 26........................................................................................................................................1

CAL. BUS. & PROF. CODE § 17000 *et seq.*...........................................................................................19

CAL. BUS. & PROF. CODE § 17001 .......................................................................................................2

CAL. BUS. & PROF. CODE § 17024(1)..............................................................................................19, 20

CAL. BUS. & PROF. CODE § 17030......................................................................................................19

CAL. BUS. & PROF. CODE § 17043..................................................................................................19, 23

Gibson, Dunn &
Crutcher LLP

CAL. BUS. & PROF. CODE § 17043-44 .............................................................................19

CAL. BUS. & PROF. CODE § 17044 ...............................................................................23

CAL. BUS. & PROF. CODE § 17200 *et seq.* ...................................................................22

CAL. PUB. UTIL. CODE § 5440(a) ................................................................................20

**Other Authorities**

3 P. Areeda & D. Turner, Antitrust Law ¶ 7381 (1978) ...............................................19

ABA Section of Antitrust Law, *Antitrust Law Developments* 295 (8th ed. 2017).................9

Decision Adopting Rules and Regulations to Protect Public Safety While Allowing
    New Entrants to the Transportation Industry, Cal. P.U.C. Decision No. 13-09-045
    (Sept. 19, 2013), *available at* 2013 WL 10230598 .........................................................19

Herbert Hovenkamp, *Federal Antitrust Policy* (5th ed. 2016) ...........................5, 8, 9, 12, 13

Philip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* §7.08[A]
    (4th ed. 2019) .......................................................................................................2, 17

Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under
    Sherman Act*, 88 *§ 2* HARV. L. REV. 697 (1975) .........................................................6

W. Kip Viscusi et al., *Economics of Regulation and Antitrust* (5th ed. 2018) .....................6

**STATEMENT OF REQUESTED RELIEF**

Uber requests that the Court dismiss all of Plaintiff's claims with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiff SC Innovations, Inc. ("SCI") is a litigation vehicle that has no function other than to sue Uber for treble damages to enrich SCI's investors.  Amended Complaint ("Compl.") ¶ 14.  SCI was recently formed to monetize litigation rights assigned to it late last year by Sidecar Technologies ("Sidecar").  *Id.*  Sidecar itself is now an empty shell that has not competed with Uber—nor engaged in any business activities—since it cashed out and sold its ride-hailing technology and operating assets to General Motors in late 2015.  *Id.* ¶ 111.  SCI asserts that this case is designed to "prevent future anticompetitive acts so that consumers can once again enjoy the benefits of lower prices," *id.* ¶ 1, but it lacks standing to pursue injunctive relief and indeed seeks nothing other than money for itself.[1]  *See id.* ¶ 165.  In fact, the treble damage payout that SCI desires is designed to compensate it for Sidecar's purported losses "from *lower prices*—just the opposite of the consumers' interest."  *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986) (emphasis added).  Indeed, the relief sought by SCI would result in increased prices to riders taking trips with Uber.  SCI "urge[s] the application of antitrust laws for the express *opposite* purpose of antitrust laws: to compensate for [Sidecar's] loss of profits due to increased competition from Uber.  However, harm to [a competitor's] business does not equal harm to competition."  *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 344 (3d Cir. 2018) (original emphasis).  When, as here, "the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust."  *Ball Mem'l Hosp.*, 784 F.2d at 1334.

---

[1]  To seek an injunction under the antitrust laws, a plaintiff must face "threatened loss or damage."  *See* 15 U.S.C. § 26.  SCI, however, faces no such threat.  It is neither a consumer nor a competitor in any market in which Uber participates.  Whatever rights it holds from Sidecar relate to past conduct.  And Sidecar, as a defunct operation holding no rights to its former technology, could not sue for an injunction itself.  *See, e.g., Zf Meritor, LLC v. Eaton Corp.*, 696 F. 3d 254, 300-03 (3d Cir. 2012) (defunct plaintiffs lacked Article III standing to obtain injunction in antitrust case).

SCI's two legal theories—below-cost (predatory) pricing and "tortious interference"—are disfavored under the antitrust laws. As the Ninth Circuit has recognized, "below-cost pricing is not anticompetitive in itself because . . . it brings lower aggregate prices in the market." *Rebel Oil Co., Inc. v. Atl. Richfield Co*., 51 F.3d 1421, 1433 (9th Cir. 1995) (citing *Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)). The Supreme Court has emphasized that "predatory pricing schemes are rarely tried, and even more rarely successful, and the costs of an erroneous finding of liability are high." *Brooke Grp.*, 509 U.S. at 226 (internal quotation marks and citation omitted). SCI scorns this authority as "simply outdated in the modern economy," Compl. ¶ 88, but no court has accepted this view. Given that "[t]he Supreme Court has expressed extreme skepticism of predatory pricing claims, . . . the standard for inferring an impermissible predatory pricing scheme is high." *Stearns Airport Equip. Co., Inc. v. FMC Corp*., 170 F.3d 518, 527-28 (5th Cir. 1999). Extreme skepticism is particularly appropriate where, as here, plaintiff has abandoned any plausible theory of actual or theoretical recoupment. Far more is required than the grievances of a single competitor since the antitrust laws are for the benefit of *competition*, not *competitors*. *Brooke Grp.*, 509 U.S. at 224 ("That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (original emphasis))).[2]

Claims that "tortious" actions violate the antitrust laws are similarly suspect since "[p]roof of harm to a specific competitor, which is all that tort law typically requires, is almost never sufficient to meet the antitrust concern." Philip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* §7.08[A] 7-146 (4th ed. 2019); *see also id*. at 7-145 – 146 ("the objects, history, and dynamics of tort law are generally not responsive to the concerns of Sherman Act § 2"); *Tops Mkts., Inc. v. Quality*

---

[2]  This principle applies as well to SCI's claim under California's Unfair Practices Act. *See Cel-Tech Commun., Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 169, 186 (1999) ("Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws") (citing, *inter alia*, CAL. BUS. & PROF. CODE § 17001 (the purpose of the Unfair Practices Act is "to foster and encourage competition" by prohibiting "practices by which fair and honest competition is destroyed or prevented")).

Gibson, Dunn & Crutcher LLP

*Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) ("routine disputes between business competitors" should "not escalate to the status of an antitrust action").

As outlined in Uber's initial motion to dismiss, *see* Defendants' Motion to Dismiss, ECF No. 57 (July 10, 2019), SCI's grievances present a classic case of alleged injury to a competitor rather than to competition or consumers, and they cannot sustain the disfavored and implausible legal theories SCI invokes.  Effectively conceding that its complaint was deficient, SCI elected to amend rather than oppose Uber's motion.  Its amended complaint, however, has moved even further into the realm of implausibility and remains irredeemably defective.  SCI's lawsuit has hit a dead end and is now ripe for dismissal with prejudice.

## II.     FACTUAL BACKGROUND[3]

Uber is a "Transportation Network Company" ("TNC") that connects drivers with passengers using a mobile phone app, which is sometimes called a "ride-hailing app."  Compl. ¶¶ 28, 38.  Sidecar, also a TNC, launched its ride-hailing app in 2012.  *Id*. ¶¶ 3, 39.  The Sidecar app could be used by passengers to arrange rides with drivers who were using their personal cars.  *Id*.  This concept is called "ridesharing."  *Id*.  Lyft, another TNC, also launched its ride-hailing app in 2012 focused on ridesharing.  *Id*. ¶ 40.  In 2013, Uber launched its own ridesharing service, UberX, "in response to the new, far cheaper product offered by Sidecar and Lyft."  Compl. ¶¶ 5, 50 (internal quotation marks omitted).

By mid-2014, Uber operated in the eleven cities where Sidecar was present.  *Id*. ¶¶ 48, 101.  Uber continued to grow explosively, "expand[ing] more rapidly and effectively than its competitors into new markets" in "cities around the United States."  *Id*. ¶¶ 74-75.  Uber "now boasts a user base of over 40 million Passengers."  *Id*. ¶ 74.  Because ride-hailing is subject to "network effects," each new user "sees higher utility precisely because of the number of previous customers."  *Id*. ¶ 70 (internal quotation marks omitted).  As more passengers use the app, drivers make more money because they will find more passengers looking for rides and thus will have less idle downtime between the end of one ride and the beginning of another.  *Id*. ¶ 68.  "Basically, the time that a driver has a paying ride per

---

[3] Solely for purposes of this motion to dismiss, Uber assumes the truth of the well-pled factual matter—but not the conclusions—alleged in SCI's amended complaint.

Gibson, Dunn &
Crutcher LLP

hour is constantly rising." *Id.* ¶ 70 (internal quotation marks omitted). As more drivers use the app, the app becomes more useful to passengers because they will have a shorter wait time and are more likely to find a ride no matter where they are in a given metropolitan area. *Id.* ¶ 67. Uber "uses the increased utilization to lower rates—which results in lower prices which once again leads to more use cases. The more people that use Uber, the lower the overall price will be for the consumer." *Id.* ¶ 70 (internal quotation marks omitted).

Sidecar went out of business in December 2015 and sold its operating assets to GM. *Id.* ¶ 111. "At that time, Sidecar wound down its operations and shut down its Ride-Hailing App." *Id.* According to SCI, "[w]ith Sidecar's failure," passengers and drivers in the 11 cities where Sidecar operated were left with "two real alternatives (Uber and Lyft)." *Id.* ¶¶ 112, 116. Three years later, SCI filed this lawsuit, alleging that Uber (but not Lyft) drove Sidecar out of business.

## III.   LEGAL STANDARD

The Supreme Court has held that a complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The "well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct." *Id.* Adherence to this standard is particularly important in antitrust cases. *Twombly*, 550 U.S. at 559 (explaining discovery burden in antitrust cases; allowing such cases to proceed absent meritorious pleadings will be wasteful and "push cost-conscious defendants to settle even anemic cases before reaching [summary judgment] proceedings"). Therefore, antitrust claims that "fail[] to plead the necessary evidentiary *facts*" are ripe for dismissal "because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to

1   extort large settlements even where he does not have much of a case." *Kendall v. Visa U.S.A., Inc.*,

2   518 F.3d 1042, 1047-48 (9th Cir. 2008) (emphasis added).

3   **IV.   SCI FAILS TO PLEAD A CLAIM UNDER SHERMAN ACT § 2**

4            SCI asserts claims under Section 2 of the Sherman Act.   To plead a claim for actual

5   monopolization under Section 2, SCI must allege that Uber: (i) possessed monopoly power in the

6   relevant markets; and (ii) willfully acquired or maintained its monopoly power through anticompetitive

7   conduct. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).   To plead a claim for attempted

8   monopolization under Section 2, SCI must plead that Uber: (i) engaged in anticompetitive conduct with

9   (ii) a specific intent to monopolize and (iii) a dangerous probability of achieving monopoly power in

10  the relevant markets. *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008).   In

11  either case, SCI must plead causal antitrust injury. *See, e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,

12  836 F. 3d 1171, 1186-87 (9th Cir. 2016); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich*

13  *Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997).   As discussed below, the many flaws

14  in the amended complaint undermine all of these elements, leading SCI's Section 2 claims to fail.

15            **A.   SCI Fails to Plead a Valid Predatory Pricing Claim**

16                 **1.   SCI's Predatory Pricing Theory is Wholly Implausible**

17            "On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim

18  is 'plausible' in light of basic economic principles." *William O. Gilley Enters., Inc. v. Atl. Richfield*

19  *Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (citing *Twombly*, 550 U.S. at 556).   SCI's theory, that in 2013

20  Uber implemented a predatory pricing scheme to drive its competitors out of business and obtain a

21  monopoly—a type of conduct the Supreme Court itself has described as rarely attempted and even

22  more rarely successful, *Brooke Grp.*, 509 U.S. at 226—is inherently *implausible* on the face of SCI's

23  complaint.   This alone compels dismissal.

24            As SCI alleges, both Sidecar and Lyft entered the ridesharing business in 2012, *preceding* Uber

25  by a year.   Compl. ¶¶ 39-40, 51.   On SCI's theory, in 2013, Uber launched its predatory pricing scheme

26  at the exact same time it launched its rideshare business—*from a position of zero sales*. *Id*. ¶¶ 51, 90.

27  However, "[p]redatory pricing and other pricing strategies are generally plausible only for firms that

28  are *already* dominant in their markets."   Herbert Hovenkamp, *Federal Antitrust Policy* 469 (5th ed.

2016) (original emphasis); *see also Am. Academic Suppliers v. Beckley-Cardy*, 922 F.2d 1317, 1320 (7th Cir. 1991) ("Firms found guilty of attempting to monopolize are typically, and in predatory pricing cases must always be, monopolists").  Uber was as far as it is possible to be from dominance when it launched UberX in 2013.  Indeed, at that time, taxicab companies were the entrenched and dominant incumbents.[4]  *See, e.g.*, *Joe Sanfelippo Cabs, Inc. v. City of Milwaukee*, 839 F.3d 613, 615 (7th Cir. 2016) (Posner, J.) ("an oligopoly of taxi service" had "faced little competition under the ancien régime" before the entry of "taxi substitutes (sometimes called 'ridesharing' companies, more precisely app-based such companies) such as Uber and Lyft").  As such, "the [alleged] predatory pricing scheme . . . is one that makes no practical sense: it calls for [defendants] to destroy companies larger and better established than themselves."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986).  By contrast with SCI's implausible predation theory, the dominance of established taxi interests readily explains why ridesharing was introduced as a "'far cheaper product,'" Compl. ¶¶ 49-50, since "[i]t is commonplace for new entrants to use deep discounts to persuade customers to switch from established firms."  *Am. Academic Suppliers,* 922 F. 2d at 1322; *see also A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F. 2d 1396, 1400 (7th Cir. 1989) ("Often a price below cost reflects only the sacrifice necessary to establish a presence in a competitive market (for example, new magazines lose money for years as they try to increase circulation and attract advertising revenue, without creating the tiniest risk of monopoly)").

SCI itself pleads a further "obvious alternative explanation," *Twombly*, 550 U.S. at 567, for a new ridesharing entrant to charge low prices: network effects and economies of scale.[5]  *See* Compl.

---

[4]  SCI's relevant market definition, which excludes taxi competition, is legally defective and compounds the implausibility of its claim.  *See* Section IV.A.2., below.

[5]  Even if prices are below cost, the Ninth Circuit has recognized that "a defendant may be allowed to prove nonpredatory and acceptable business reasons for [such conduct]."  *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1032-33 (9th Cir. 1981) (internal quotation marks and citation omitted).  Such reasons include realizing scale economies and network effects.  *See, e.g.*, Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 HARV. L. REV. 697, 717-18 (1975) ("The primary nonpredatory justification for prices below average variable cost is that the firm is just starting up and has not yet reached expected production levels"); W. Kip Viscusi et al., *Economics of Regulation and Antitrust* 344-45 (5th ed. 2018) (network effects are included among legitimate business justifications for pricing "below that which maximizes short-run profit").

¶¶ 69-75.  These phenomena create a virtuous cycle by which lower prices stimulate higher demand, leading to better driver utilization and scale economies.  "Uber then uses the increased utilization to lower rates—which results in lower prices which once again leads to more use cases.  The more people that use Uber, the lower the overall price will be for the consumer."  *Id*. ¶ 70 (internal quotations marks omitted).  SCI admits that pricing low to generate business and "fill out" capacity is "classic" business conduct.[6]  Compl. ¶ 6.  It concedes that a motivating reason for Uber's low pricing in this environment was to gain scale and "build its network."  Compl. ¶¶ 85, 162.  "But cutting prices in order to increase business often is the very essence of competition."  *Matsushita*, 475 U.S. at 594; *see also Malden Transp. v. Uber Techs.*, 321 F. Supp. 3d 174, 180 (D. Mass. 2018) (dismissing predatory pricing complaint; "[l]ow prices are a reasonable way [for Uber] to achieve [higher sales and market share] goals").  SCI's own allegations thus negate its conclusory assertion that Uber had a specific intent to monopolize.  *See Phila. Taxi Ass'n, Inc.*, 886 F.3d at 341 ("Uber's alleged competitive strategy of creating a vehicle-for-hire business model, presumably to acquire customers, does not reflect specific intent to monopolize.").

Further, SCI has now retracted the central premise of its lawsuit—that predatory pricing was plausible because Uber was able to commence recouping its losses years ago, coinciding with Sidecar's exit.  In its original complaint, SCI alleged that "[s]ince January 2016, Uber has raised prices to supra-competitive levels."  Original Compl. ¶ 93.  Now, SCI's amended complaint asserts the *exact opposite*: that after "Sidecar [exited] from the market in late 2015, Uber . . . continued to price below cost."  Compl. ¶ 8.  This *presto chango* transformation casts profound doubt on SCI's entire case.  If "the bruising price war has continued apace," *id*. ¶ 8, this undermines the very rationality of the alleged predatory scheme in the first place.[7]  SCI elevates understatement to an art form when it declares that

---

[6]  SCI asserts that "[t]his case is far removed from the case of a classic manufacturing business, where a market entrant may have excess capacity," *id*., but this is a spurious distinction since the issue is not whether Uber is a "manufacturer" but whether low prices can promote growth and stimulate greater utilization of driver capacity, which SCI admits is the case: "As Uber grows in any given city, utilization increases.  Basically, the time that a driver has a paying ride per hour is constantly rising."  *Id*. ¶ 70 (internal quotation marks omitted).

[7]  It also undermines the premise that Uber's prices are even below-cost, since SCI has not explained how prices that were previously alleged to be *so far above cost* as to be "supra-competitive" could

"[t]he path to recoupment has not been as quick as Uber originally envisioned," *id.* ¶ 87, since SCI pleads *no basis* for asserting that Uber *ever* envisioned reaping *monopoly profits*, much less doing so "quickly."

SCI's theory of monopoly recoupment has simply evaporated, leaving in its place a wholly conclusory claim that Uber "*intends* to recoup its predatory losses by raising prices to supra-competitive levels *in the long-run*." *Id.* ¶ 93 (emphasis added); *see also id.* ¶ 6 ("*the long run* will *eventually* financially reward the successful platform" (emphasis added)). But such a wispy dream of "eventual" "long run" recoupment makes it acutely *im*plausible that Uber's conduct was predatory in the first place. "If there is no likelihood of recoupment, it would seem improbable that a scheme would be launched. Given the high error cost of finding companies liable for cutting prices to the consumer, the court should thus refuse to infer predation." *Stearns,* 170 F.3d at 528. Indeed, "it seems quite inconceivable that a firm would embark on a strategy of loss selling for as much as two years, if it anticipates that this duration will be needed to dispatch the victim." Herbert Hovenkamp, *Federal Antitrust Policy* 485 (5th ed. 2016). SCI's theory that Uber has been absorbing mounting billions in predatory losses for *more than six years* in service of a predatory plan launched in 2013 with recoupment deferred indefinitely simply makes no economic sense and should be rejected.

### 2. SCI Does Not Satisfy the Threshold Burden of Pleading that Competition was Driven from the Market

Even setting aside the issue of rank implausibility, SCI's complaint does not plead the necessary elements of a predatory pricing claim. The fact that Sidecar alleges it "suffer[ed] financial losses or [was] eliminated as a result of the below-cost pricing . . . is of no concern to the antitrust laws" unless a predatory pricing scheme poses a dangerous probability of harm to consumers. *Rebel Oil*, 51 F.3d at

---

now be *so far below cost* as to satisfy "*any* relevant legal [cost] standard." *Id.* ¶ 89 (emphasis added). In its initial motion, Uber pointed out that SCI's below-cost pricing theory relied on aggregated loss figures and conclusory allegations rather than on *facts* specific to the pricing and cost of UberX service in the specific geographic markets identified in the complaint. Defendants' Motion to Dismiss, ECF No. 57 at 8 n.7 (July 10, 2019). SCI's amendments do not remedy these flaws. Losses reported in "Uber's financials," Compl. ¶ 6, or Uber's S-1, *id.* ¶ 92, do not suffice to show below-cost pricing. *See Rebel Oil Co. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1096 (9th Cir. 1998) ("[income] statements alone are not sufficient to show that below-cost sales were made"). SCI also cites (but does not quote) a supposed admission "that Uber intentionally prices its rides in *certain* markets below the costs paid to drivers for the ride," *id.* ¶ 6 (emphasis added), but it does not identify the markets or time period to which the allegation applies.

1433.  To avoid the risk of erroneous liability findings based on pro-consumer low pricing, the Supreme Court has imposed "prerequisites to recovery [that] are not easy to establish, but [that] . . . are essential components of real market injury."  *Brooke Grp.*, 509 U.S. at 226.   One such prerequisite is that "below-cost pricing must be capable, as a threshold matter, of producing the intended effects on the firm's rivals [by] driving them from the market."  *Id.* at 225; *see also, e.g.*, *Aerotec*, 836 F. 3d at 1186 (defendant must be shown to have "successfully extinguished its competitors through artificially low prices"); ABA Section of Antitrust Law, *Antitrust Law Developments* 295 (8th ed. 2017) ("To establish a predatory pricing claim, the plaintiff must first show that the below-cost pricing was capable of driving rivals from the market").  SCI's complaint fails to plead this threshold element.

Even assuming (wrongly) that SCI has properly alleged below-cost pricing for UberX, the complaint alleges nothing more than the exit of Sidecar, an *individual competitor*, rather than the exclusion of *competition*.[8]  While SCI makes the assertion that Uber's conduct was calculated to "push out the *competition*, including Sidecar," Compl. ¶ 85 (emphasis added), it admits that Lyft was *not* driven out and remains a major and very "real" competitor.  *Id.* ¶¶ 80-81.  That Uber was incapable of driving Lyft out of business despite supposedly "targeting" it for over half a decade, *id.* ¶¶ 9, 93, belies any claim of a rational scheme to "cut prices deeply enough to outlast and to drive away all competitors."  *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F. 2d 227, 231 (1st Cir. 1983) (Breyer, J.).  The plausibility of such a theory is fatally undermined when rivals "prove tenacious and stay in the market, so the monopoly [recoupment] period will never materialize."[9]  Herbert Hovenkamp, *Federal Antitrust Policy* 468-69 (5th ed. 2016).

---

[8]  Sidecar itself never pursued a predatory pricing claim while it was in operation, making it highly dubious that its exit was caused by Uber's pricing as opposed to its own failed business model.  In any event, SCI has filed the claim belatedly.  Under the four-year statute of limitations applicable to antitrust claims, 15 U.S.C. § 15b, SCI cannot recover for damages sustained before August 28, 2014 given that the Complaint was filed on December 11, 2018, and, by prior agreement with SCI, applicable statutes of limitations were temporarily tolled between August 28 and December 10.

[9]  To the extent that SCI's new story is that the recoupment will be accomplished through an Uber-Lyft *duopoly*, SCI fails to state a claim for actual or attempted *monopoly* under Section 2.  *See infra* at IV.A.3.

Gibson, Dunn & Crutcher LLP

Lyft is not the only rival that did not succumb to the alleged below-cost pricing. The premise that Lyft is Uber's "*only* real remaining competitor," Compl. ¶ 80 (emphasis added), hinges on willful blindness to continuing competition from taxi cab companies.[10] In fact, taxis were the dominant form of on-demand transportation prior to Sidecar and Uber's entry and continue to be a substitute today. "[J]udicial experience and common sense," *Iqbal*, 556 U.S. at 679, teach that competition from taxis cannot be ignored. *See, e.g., Joe Sanfelippo Cabs*, 839 F.3d at 615 (describing "'ridesharing' companies, more precisely app-based such companies" as "taxi substitutes"); *Phila. Taxi Ass'n*, 886 F.3d at 342 (rejecting § 2 allegation that Uber had the power to raise price in light of competition from taxis and Lyft); *Dial A Car Inc. v. Transp., Inc.*, 82 F. 3d 484, 488 (D.C. Cir. 1996) (allegation that defendants could attempt to monopolize Blue Car luxury sedan service disproved by fact that "there are other taxicab and Blue Car providers poised to take business away from any company . . . raising rates").

SCI seeks to define taxis out of the relevant market but economic reality governs market definition, *see Brown Shoe*, 370 U.S. at 336-337 ("the definition of the relevant market" must "'correspond to the commercial realities' of the industry" (citation omitted)), and antitrust plaintiffs cannot draw up contrived and artificial markets "'contorted to meet their litigation needs.'"[11] *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (quoting the district court's opinion with approval). "While plaintiffs need not plead a relevant market with specificity, '[t]here are … some legal principles that govern the definition of an antitrust "relevant market" and a complaint may be dismissed under Rule 12(b)(6) if the complaint's "relevant market" definition is facially unsustainable.'" *Id.* at 1120 (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th

---

[10] It also ignores SCI's own concession that there are other rideshare competitors. Compl. ¶ 81 (Uber and Lyft do not account for 100% of rides).

[11] SCI's prior counsel resisted disqualification in large part based on the "distinction between ride-hailing apps and 'transportation companies,' arguing that this case does not materially overlap with Quinn Emanuel's previous representations of Uber because all of those cases involved litigation with traditional taxi companies, while this case is between two ride-hailing companies that—at least nominally—do not themselves provide transportation." Order Regarding Motion To Disqualify Counsel, ECF No. 41 at 11 (May 2, 2019).

DEFENDANTS' MOTION TO DISMISS – CASE NO. 3:18-CV-07440-JCS

Gibson, Dunn & Crutcher LLP

Cir. 2008)).   A proposed product market cannot "omit [] economic substitutes" that defy "judicial experience and common sense."  *Id.* at 1121-23.  But this is exactly what SCI has done here.

Nothing that SCI pleads justifies excluding taxi competition.  Taxi service and ride sharing do not need to be identical to be close substitutes.  *Joe Sanfelippo Cabs*, 839 F.3d at 614 (companies such as Uber "provide close though not identical substitutes for conventional taxi services").  Taxis may be "subject to different government regulations," Compl. ¶ 58, but no cited regulation prevents taxis from competing against ride-hailing services for rides.  SCI's assertion that "Ride-Hailing Apps are technology"[12] does not imply that rideshare companies "do not compete with other modes of transportation or transportation companies, like taxi cab companies."  *Id*. ¶ 57.  The product that SCI actually claims is relevant in this case is not technology or apps but *rides* provided by drivers using Uber's technology—and it is the price of those rides that SCI contends is predatory and that would be the object of any recoupment effort.  Taxi companies obviously compete in providing rides.

Nor can the disregard of taxi competition be justified by SCI's allegation that if a hypothetical "present and future supplier of all Ride-Hailing Apps" imposed a "small but significant increase" for each transaction, "[n]ot enough Passengers would respond . . . by switching to other means of hailing transportation to render such a price increase unprofitable."  *Id*. ¶¶ 52-53, 64.  This is no more than "a legal conclusion veiled as a factual allegation."  *Hicks*, 897 F.3d at 1122-23 (rejecting conclusory formulation of "small but significant" price increase test); *see also, e.g.*, *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) ("conclusory allegations [regarding SSNIP test] offers no support for Psystar's claims; they merely restate a commonly used test for market definition without providing any factual basis for the claim").  It also addresses the wrong legal question since the relevant test for recoupment does not ask whether taxi companies could prevent Uber *and* Lyft from *jointly* raising prices by a small amount.  Rather, the test asks whether Uber alone could hike its own prices to supra-competitive levels and recoup billions in alleged losses in the face of competition from Lyft *and*

---

[12]  SCI quotes Uber's statements in 2013 to public utility regulators, Compl. ¶ 57, but these statements do not address market definition under the Sherman Act.

taxi companies, among others.  *See* Section IV.A.3 below.  Nothing that SCI alleges suggests this is plausible.

It is thus obvious from the face of the complaint that the alleged predatory scheme has not excluded *competition* from the market.[13]  SCI's complaint, moreover, alleges no facts making it plausible that Lyft and taxi companies could not expand their own output in response to monopoly-level pricing.  *See Rebel Oil*, 51 F.3d at 1439 (in an alleged predatory pricing case, when addressing recoupment, plaintiff "*must* show that . . . *existing competitors* lack the capacity to expand their output to challenge the predator's high price" (emphasis added)); *accord Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997).[14]  SCI makes the conclusory assertion that a "*fringe* competitor in the market for Ride-Hailing Apps cannot … effectively compete with Uber's scale," Compl. ¶ 77 (emphasis added), but Lyft is no fringe competitor: SCI pleads that it has 33% of all rideshare transactions.  *Id.* ¶ 81.  Indeed, SCI alleges that "incumbent firms that already have established large networks of Drivers and Passengers using their Ride-Hailing Apps"—a category into which Lyft falls—occupy an advantageous competitive position.  *Id.* ¶ 71.  Such advantages are of the sort that permit an incumbent to "expand more rapidly and effectively."  *Id.* ¶ 75.  In short, SCI has misdefined the relevant market by excluding taxi competition[15] and has failed to meet even the threshold test for recoupment—proof that the defendant has

---

[13] Further, the supposedly superior Sidecar technology is now in the hands of General Motors, *id.* ¶ 111, a formidable player with the ability to re-enter the market in the event of monopoly pricing. Herbert Hovenkamp, *Federal Antitrust Policy* 471 (5th ed. 2016) (noting that exit of a competitor can end up creating "a stronger rival than . . . before" because "when a firm goes out of business its plant passes into the hands of a successor" more often than not).

[14] This is a burden that must be met at the pleading stage.  *See, e.g.*, *McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc.*, No. 08-00080 JMS/BMK, 2008 WL 2437739, at *9 (D. Haw. June 17, 2008); *Axiom Advisers & Consultants, Inc. v. Sch. Innovations and Advocacy, Inc.*, NO. CIV. 2:05-CV-02395-FCD-PAN, 2006 U.S. Dist. LEXIS 11404, at *21-22 (E.D. Cal. Mar. 20, 2006); *nSight, Inc. v. Peoplesoft, Inc.*, No. C-04-3836 MMC, 2005 U.S. Dist. LEXIS 24847, at *3-4 (N.D. Cal. Aug. 5, 2005), *aff'd* 296 Fed. Appx. 555, 557-58 (9th Cir. 2008); *Elecs. For Imaging, Inc. v. Coyle*, No. C 01-4853MJJ, C 05-0619 MJJ, 2005 WL 1661958, at *5 (N.D. Cal. July 14, 2005); *Townshend v. Rockwell Int'l Corp.*, No. C 99-0400 SBA, 2000 U.S. Dist. LEXIS 5070, at *35-36 (N.D. Cal. Mar. 28, 2000).

[15] One consequence of the exclusion of taxi companies is that the purported Uber "market shares" alleged in Compl. ¶ 82 are necessarily inflated and unreliable and therefore cannot support the assertion that Uber has monopoly power or a dangerous probability of gaining such power.

Gibson, Dunn & Crutcher LLP

"successfully extinguished its competitors through artificially low prices." *Aerotec*, 836 F. 3d at 1186. All of these flaws warrant dismissal.

### 3.   SCI Does Not Plead a Dangerous Probability of Recoupment

Even setting aside the threshold failure to plead the exclusion of competition as opposed to the exit of a single competitor, SCI has failed to make the requisite "demonstration that [Uber] had . . . a dangerous probability[] of recouping its investment in below-cost pricing." *Brooke Grp.*, 509 U.S. at 224-25 ("If circumstances indicate that below-cost pricing could likely produce its intended effect on the target, there is still the further question whether it would likely injure competition in the relevant market."). Here, SCI alleges that Uber purportedly incurred enormous losses from below-cost pricing. *See, e.g.*, Compl. ¶ 6 ("Uber has lost billions of dollars"); *id*. ¶ 92 ("Uber has lost more than $9 billion Dollars"). For that investment "to be rational," the defendant must reasonably expect to "recover[], in the form of later monopoly profits, more than the losses suffered." *Brooke Grp.*, 509 U.S. at 224 (citation and internal quotation marks omitted). A mere "reasonable prospect" of recoupment does not suffice under § 2 of the Sherman Act, which requires "a dangerous probability, of recouping [defendant's] investment in below-cost prices." *Brooke Grp.*, 509 U.S. at 224. That is, SCI "must demonstrate" a dangerous probability "that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it." *Id*. at 225. "The recoupment requirement as the Supreme Court has articulated it requires something close to dollars-and-cents proof that the predatory strategy could be reasonably predicted to have a positive payoff." Herbert Hovenkamp, FEDERAL ANTITRUST POLICY 469 (5th ed. 2016). SCI's allegations simply do not pass muster under this exacting test.

In the first place, SCI cannot rest its case on contrived allegations of *intent*. SCI asserts that Uber "*intends* to recoup its predatory losses by raising prices to supra-competitive levels in the long-run." Compl. ¶ 93 (emphasis added); *see also id*. ¶ 8 ("Uber now *intends* to impose its will on both passengers and drivers in the form of higher, supra-competitive prices" (emphasis added)); *id*. ¶ 87 ("The path to recoupment has not been as quick as Uber originally envisioned, but Uber has continued to stay the course *with the intention of recouping* its losses . . ." (emphasis added)). But "intent cannot

substitute for the required element of recoupment." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1097 (9th Cir. 1998).  Even non-conclusory allegations of intent "could not help the court determine whether recoupment is possible, and unless recoupment lies in store even the most vicious intent is harmless to the competitive system." *A.A. Poultry Farms*, 881 F.2d at 1401.

SCI has pled no valid grounds to conclude that recoupment lies in store here.  No plausible *factual* basis exists for SCI to allege *any* probability of supra-competitive pricing, much less a *dangerous* sustained probability of monopoly profits in an amount sufficient to recoup billions in alleged losses.  As already noted, SCI has abandoned the contention that Uber has been recouping alleged predatory losses since January 2016.  The alleged UberX fee changes over 2016-2018 that SCI previously decried as "supra-competitive" price increases, *compare* Compl. ¶¶ 93-94 *with* Original Compl. ¶¶ 93-94, are rechristened in its amended pleading as "modest" efforts to mitigate continuing losses.[16]  Compl. ¶ 94.  SCI's current position is that after Sidecar's exit in late 2015, "Uber simply turned its guns toward . . . Lyft, and continued to price below cost.  This has contributed to continuing losses for both entities as the bruising price war has continued apace."  Compl. ¶ 8.  Of course, those accumulating "losses" raise the bar on recoupment ever higher.

To plead a dangerous probability of recoupment, SCI must show that Uber will be able to raise future prices *above* the competitive level and reap *monopoly* (not just competitive) profits, yet SCI's amended complaint gives no hint as to when or how this will occur.  Further, "[s]upracompetitive pricing entails a restriction in output," *Brooke Grp.*, 509 U.S. at 233, but SCI alleges no mechanism by which Uber could effectively restrict market output.  As SCI concedes, Uber is a "software platform" that helps passengers "arrange transportation with Drivers."  Compl. ¶ 28.  Uber does not own cars, employ drivers or provide transportation.  Rather, drivers "provid[e] transportation services with their own personal cars."  *Id*. ¶ 37.  But absent "control of the productive assets in the business," Uber lacks the "ability to curtail total market output."  *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989); *see also Rebel Oil*, 51 F.3d at 1442 (since "gasoline stations do not produce

---

[16] In any event, "[e]ven in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of . . . supracompetitive pricing.  Where, as here, output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand."  *Brooke Grp.*, 509 U.S. at 237.

gasoline" and "are merely retail distribution outlets," a "would-be monopolist must control market output at the *wholesale* supply level in order to pose any threat of monopolizing the *retail* market" (original emphasis)).  That is, the ready availability of taxis, rideshare cars and drivers means that "competitors would not need to build new productive assets or otherwise take a long time to supply customers' wants" so that Uber "or any competitor would probably have little success in attempting to curtail total market output."  *Indiana Grocery*, 864 F.2d at 1414.

Indeed, effectively conceding that Uber lacks the power to restrict output or impose monopolistic prices, SCI's amended complaint spins a "duopoly" theory speculating that recoupment might be accomplished *jointly* by both Uber and Lyft.  *See* Compl. ¶ 8 ("recently Uber has transitioned toward classic duopoly behavior"); *id.* ¶ 80 ("the market today has effectively collapsed into a duopoly"); *id*. ¶ 93 ("Uber is now transitioning to a more classic duopoly market strategy").  According to SCI, Uber will pursue this "duopoly" strategy by "signaling price increases to Lyft," *id*. ¶ 100, and Lyft, "in need of the financial umbrella to be provided by Uber pricing," will be compelled to follow.  *Id*. ¶ 8.  Even if this theory was not invented out of thin air (not to mention its glaring disregard of taxi competition), it simply "does not implicate section 2 of the Sherman Act.  At best, it poses the danger that [the alleged predatory pricing] could result in diminished price competition in . . . a duopolistic market.  Section 2, however, does not govern single firm anticompetitive conduct aimed only at creating an oligopoly*." Indiana Grocery,* 864 F.2d at 1416 (rejecting theory that defendant would "recoup any losses incurred during its period of predation by charging consumers supracompetitive prices in a post-predation oligopoly or duopoly"); *accord Rebel Oil*, 51 F.3d at 1442-43 ("To pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition.  *Indiana Grocery*, 864 F.2d at 1415.  An oligopolist lacks this unilateral power." (original emphasis)).  SCI has simply not pled a viable theory of recoupment.

* * *

SCI's predatory pricing claim thus fails for multiple independent reasons:  It is rooted in an inherently implausible theory.  It rests on an erroneous market definition and therefore a defective assertion of actual or probable monopoly power.  It fails to plead essential prerequisites to predatory

pricing liability, including the exclusion of competition and a dangerous probability of recoupment via monopoly profits. It pleads no specific intent to monopolize. And it pleads no harm to consumers or competition. Not one of these failings can be remedied by further amendment. As such, "'ordinary' antitrust standards suggest giving [Uber] a medal rather than requiring it to pay . . . damages." *A.A. Poultry Farms*, 881 F.2d at 1405. SCI's claim should be dismissed with prejudice.

### B.    SCI Fails to Plead an Antitrust Claim for Alleged Tortious Interference

The only other basis that SCI alleges for its antitrust claims is purported "tortious conduct."[17] Compl. ¶¶ 139-40, *see also id*. ¶ 101 (heading) ("Uber Intentionally and Tortiously Interfered with Sidecar's App and Its Relationships with Passengers and Drivers"). SCI claims that Uber devised a "covert campaign" to "submit fraudulent ride requests on competitors' Apps" and that the alleged requests "expressly violated Sidecar's terms of service." *Id*. ¶¶ 102-03, 107. Alleged tortious activity, however, is at best a feeble basis for antitrust liability since the "[antitrust] laws do not create a federal law of unfair competition," *Brooke Grp.*, 509 U.S. at 225, and plaintiffs should not obtain "treble damages" for "tort suits masquerading as antitrust actions." *Copperweld Corp. v. Ind. Tube Corp.*, 467 U.S. 752, 777 (1984). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Grp.*, 509 U.S. at 225. As the Ninth Circuit has explained, "[t]he goal of the antitrust laws, . . . unlike that of business tort or unfair competition laws, is to safeguard general competitive conditions, rather than to protect specific competitors." *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 370 (9th Cir. 1988) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)). SCI's allegations are nothing more than the contrived complaints of a single failed competitor.[18]

---

[17]   Tellingly, however, SCI asserts no tort claim under state law.

[18]   As with SCI's predatory pricing claims, its "tortious interference" claim also suffers from an erroneous definition of the relevant market, unsubstantiated allegations of actual or probable monopoly power and the failure to plead any specific intent to monopolize.

When, as here, a plaintiff challenges tortious conduct as an antitrust violation—particularly when it alleges fraud or deceit[19]—it must show that the defendant's actions "are so widespread and longstanding and practically incapable of refutation that they are capable of injuring both consumers and competitors." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079-80 (10th Cir. 2013) (Gorsuch, J.); *see also* Philip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* §7.08[A] at 7-146 ("The antitrust court must . . . insist on a preliminary showing of significant and more-than-temporary harmful effects on competition (and not merely upon a competitor or customer) before considering a tort as an exclusionary practice."). Indeed, the Ninth Circuit holds that such a plaintiff must overcome a presumption that such alleged conduct has a *de minimis* effect on competition. *See Am. Prof'l Testing Serv.,* 108 F.3d at 1152 (requiring proof, *inter alia,* that the alleged conduct "continued for prolonged periods" and was "not readily susceptible of neutralization or other offset by rivals"). SCI has pled nothing that meets these requirements or rebuts this presumption.

SCI's allegations are wholly conclusory, offered on "information and belief." Compl. ¶ 102. The complaint does not identify the cities (*i.e.*, alleged relevant markets) involved or even if more than one alleged market was affected. There is no allegation as to the absolute number of alleged "fraudulent" requests in any given market much less any indication of their relative significance in comparison to the total number of rides in the market. There is no non-conclusory allegation regarding the timing or frequency of the alleged requests—whether they were occasional, episodic or continuous. More fundamentally, the undefined concept of "fraudulent" requests makes no sense. Indeed, there is no indication as to how many alleged "fraudulent" requests resulted in an *actual paid transaction* as distinct from requests that were cancelled (and, if so, whether a cancellation fee nevertheless was collected). None of these failings was remedied in SCI's amended complaint despite being noted in Uber's initial motion to dismiss. Antitrust claims like this one that "fail[] to plead the necessary evidentiary *facts*" are ripe for dismissal. *Kendall*, 518 F.3d at 1047-48 (emphasis added).

---

[19] Further, when allegations sound in fraud and deceit, as SCI's do, *see* Compl. ¶¶ 9-10, 102-10, 140-42, pleading with particularity is required under F.R.C.P. 9(b). As discussed below, SCI has failed to meet this requirement. "[I]f particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or 'strip' them from the claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F. 3d 1097, 1105 (9th Cir. 2003).

Gibson, Dunn &
Crutcher LLP

The few facts that are alleged confirm that SCI has pled no threat to *competition*.  The alleged "scheme" was not longstanding or prolonged but rather limited in time, lasting from mid-2014 to late 2015.[20]  Compl. ¶¶ 101-02.  While SCI did amend its complaint to add the allegation that Uber "targeted" Lyft as well as Sidecar, Compl. ¶ 107, this actually supports the *de minimis* presumption since Lyft was not excluded from the market by the alleged conduct.  Further, the alleged conduct involved only "requests on competitors' Apps," *id*. ¶ 103, and not requests to taxi dispatchers.  Indeed, SCI itself does not even plead that the alleged conduct excluded Sidecar itself from the market.  To the contrary, SCI alleges that "Sidecar was forced out of business by Uber's . . . pricing strategy," *id*. ¶ 136, which was *lawful* as already established.

Moreover, SCI avers that a goal motivating Uber in submitting the alleged ride requests was "to recruit Drivers to work exclusively with Uber (instead of its competitors)."  *Id.* ¶ 103.  Such requests entailed payment to the Drivers for transporting the "Uber contractors" who sought to recruit them.  *Id*. ¶¶ 103-04.  Recruiting drivers to improve Uber's network, a process that SCI admits lowered prices for consumers and improved service quality, *id.* ¶¶ 67-70, is a legitimate business justification that precludes liability whether or not the "contractors" making the "fraudulent" requests were "real passengers."  *See, e.g.*, *Am. Prof'l Testing Serv.*, 108 F.3d at 1153.  In *Phila. Taxi Ass'n*, for example, the Third Circuit rejected a Section 2 claim based in part on the allegation that "Uber 'flooded' the Philadelphia taxicab market by improperly luring drivers away from medallion companies."  886 F.3d at 340.  The court held that such allegations do "not give rise to an inference of anticompetitive or exclusionary conduct" where the "drivers that Uber recruited did not remain idle, but rather they drove for Uber."  *Id.* at 340-41; *accord Malden Transp.*, 321 F. Supp. 3d at 180 (dismissing Section 2 claim based on reasoning of *Phila. Taxi Ass'n*).  SCI similarly alleges that the Sidecar drivers were recruited not to remain idle but "to *work* exclusively with Uber."  Compl. ¶ 103 (emphasis added).  Such conduct does not violate Section 2.[21]

---

[20]  Because of the four-year statute of limitations, SCI's claim cannot even reach back to mid-2014.

[21]  The allegation that the conduct breached Sidecar's contractual terms of service, *see* Compl. ¶¶ 107-09, changes nothing.  As the Ninth Circuit has emphasized: "'Buying an employee away from a rival, for example, does not impair competition any more when that employee was under  a long

SCI's "tortious interference" allegations thus fail to state a claim under the Sherman Act and should be dismissed with prejudice.

## V.  SCI FAILS TO PLEAD AN UNFAIR PRACTICES ACT CLAIM

SCI's claim under the Unfair Practices Act ("UPA"), CAL. BUS. & PROF. CODE §§ 17000 *et seq.*, fails as a matter of law and should be dismissed with prejudice because Uber is statutorily exempted from UPA liability.  Even absent this exemption, the UPA claim cannot be sustained: it is time-barred, the statute is inapplicable to pricing conduct wholly beyond California's borders, and SCI fails to allege (as the UPA requires) that Uber had the "purpose of injuring competitors or destroying competition." *Id*. § 17043.

### A.  Uber is Exempt from the Unfair Practices Act

The UPA makes it illegal in certain circumstances for "any person engaged in business within this State" to "sell any article or product at less than the cost thereof to such vendor" or to "sell or use any article or product as a 'loss leader.'" *Id*. §§ 17030, 17043-44.  But by express exemption, the UPA does not apply "[t]o any service, article or product for which rates are established under the jurisdiction of the Public Utilities Commission of this State and sold or furnished by any public utility corporation, or installation and repair services rendered in connection with any services, articles or products." *Id*. § 17024(1).  Under SCI's allegations, Uber falls within this exemption.

SCI alleges that Uber is one of several "transportation network companies" ("TNCs").  Compl. ¶¶ 28, 40.  In 2013, the California Public Utilities Commission ("CPUC") recognized and exercised its jurisdiction over TNCs as a subset of charter-party carriers.  *See* Decision Adopting Rules and Regulations to Protect Public Safety While Allowing New Entrants to the Transportation Industry, Cal. P.U.C. Decision No. 13-09-045 (Sept. 19, 2013), *available at* 2013 WL 10230598, *14 ("we find that TNCs are charter-party passenger carriers, and therefore we will exercise our existing jurisdiction pursuant to Article XII of the California Constitution and the Passenger Charter-party Carriers' Act, PU Code §§ 5351, *et seq*.").  The CPUC's authority over TNCs was further supported by legislation,

---

term contract than when he was not. The competitive effect, if any, results from the transfer of resources or patronage away from the rival and to the monopolist. . . . If there is a tort, so be it.  *But antitrust law should not make liability depend upon the existence or nonexistence of contracts which do not affect the competitive results*.'" *Oahu*, 838 F.2d at 370-71 (quoting 3 P. Areeda & D. Turner, Antitrust Law ¶ 7381 (1978)) (emphasis added).

Gibson, Dunn & Crutcher LLP

effective January 1, 2015, explaining that the CPUC had "already initiated regulation of transportation network companies as a new category of charter-party carriers" and that the Commission "continues to develop appropriate regulations for this new service." CAL. PUB. UTIL. CODE § 5440(a). Although SCI asserts that "no exemption from the California Unfair Practices Act applies," Compl. ¶ 163, its amended complaint does not substantiate this *conclusion* and SCI makes no claim that the rates at issue for Uber services are outside the jurisdiction of the CPUC.

SCI pleads in its amended complaint that the CPUC "has established no rates for any service, article or product sold by Uber." *Id*. ¶ 163. In *Diva Limousine, Ltd*. *v. Uber Techs., Inc.*, No. 18-cv-05546-EMC, 2019 WL 2548459 (N.D. Cal. June 20, 2019), another case alleging Uber violated the UPA, Plaintiff similarly sought to avoid application of the § 17024(1) exemption on the basis that the CPUC has never actually set Uber's rates. In a carefully reasoned decision, Judge Chen rejected this "narrow" interpretation, finding that "[t]he applicability of § 17024(1) does not turn on whether the CPUC has actually set rates." *Id*. at *6.

Judge Chen found support for his conclusion in the case law as well, explaining that "courts that have addressed the issue have so concluded that the CPUC is not required to actually establish rates in order for § 17024(1) to apply." *Id*. at *8; *see also Hladek v. City of Merced*, 69 Cal. App. 3d 585, 590 (1977) (providing an analysis of §17024(2) and finding that "[t]he pivotal issue is whether the Public Utilities Commission *would have the jurisdiction* to establish the rates for such service" (emphasis added)). Judge White has also dismissed with prejudice UPA claims brought in two cases against Uber. *See Desoto Cab Co., Inc. v. Uber Techs., Inc*., No. 16-cv-06385, Dkt. No. 64 at 17 (N.D. Cal. Sept. 24, 2018) ("California courts have determined that the section 17024(1) exemption… applies where the CPUC has the jurisdiction to establish a utility's rates"); *A White and Yellow Cab, Inc. v. Uber Techs., Inc*., No. 15-cv-05163, Dkt. No. 114 at 11-12 (N.D. Cal. Mar. 5, 2018) (same).

Thus, the UPA claim should be dismissed with prejudice.

**B.      SCI's UPA Claim is Barred by the Statute of Limitations**

There are other grounds compelling the dismissal of SCI's UPA claim. SCI's lawsuit, which was filed on December 11, 2018, "shows on its face" that Plaintiffs' claims are time-barred. *G.H.I.I.*, *et al. v. MTS, Inc.*, 147 Cal. App. 3d 256, 277 (1983).

DEFENDANTS' MOTION TO DISMISS – CASE NO. 3:18-CV-07440-JCS

Gibson, Dunn &
Crutcher LLP

1    The UPA contains no express statute of limitations.  However, the California Court of Appeals

2  has held that, because the UPA is penal in nature, it is subject to a one-year statute of limitations for

3  treble damages, and a three-year statute of limitations for compensatory damages, the default

4  limitations periods set out in the California Code of Civil Procedure.  *See id.* at 279.  A UPA claim

5  accrues—and the statute of limitations begins to run—when the defendant commits an act that is

6  alleged to violate the law and injure the plaintiff.  *See id.* at 279 n.16 (citing *Zenith Radio Corp. v.*

7  *Hazeltine Research, Inc.*, 401 U.S. 321, 339 (1971)).

8    SCI alleges that Uber became "hell-bent on stifling competition from competing ride-hailing

9  apps" with the launch of UberX in 2013 and that between "2013 and 2016, on average, the prices for

10  transactions conducted through Uber's Ride-Hailing App were below the average variable costs for

11  those transactions."  Compl. ¶¶ 5, 134.  According to SCI, "Sidecar went out of business in December

12  2015 and sold its operating assets to GM."  *Id.* ¶ 111.  Thus, on the face of the complaint, SCI's claim

13  for "treble damages" pursuant to Cal. Bus. & Prof. Code § 17082, which is subject to a 1-year statute

14  of limitations, must be dismissed.  *See* Compl. ¶ 165(d).  And even if SCI alleges anticompetitive acts

15  within the statute of limitations, recovery for conduct or damages predating August 28, 2015 should be

16  prohibited.[22]  *See, e.g.*, *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th  1185, 1192 (2013) ("[A] suit for

17  relief may be partially time-barred as to older events but timely as to those within the applicable

18  limitations period."); *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1302 (9th Cir. 1986);

19  *Glob. Servs. v. Ikon Office Sols.*, No. 10-05974, 2011 WL 6182425, at *5 (N.D. Cal. Dec. 13, 2011)

20  (granting motion to dismiss and holding that "Plaintiffs shall not be permitted to recover damages

21  premised on conduct that occurred prior to December 30, 2006"); *In re Transpacific Passenger Air*

22  *Transp. Antitrust Litig.*, No. 07-05634, 2011 WL 1753738, at *23 n.25 (N.D. Cal. May 9, 2011)

23  ("claims based on conduct prior to August 6, 2005 must be dismissed"); *Loyd's Material Supply Co.*

24  *v. Regal Beloit Corp.*, No. 16-8027, 2017 WL 5172206, at *5 (C.D. Cal. June 27, 2017) ("to the extent

25

26

27

28

---

[22]  This is the limitations date under the three-year statute of limitations given that the original complaint was filed on December 11, 2018, and, by prior agreement with SCI, applicable statutes of limitations were temporarily tolled between August 28 and December 10.

that Plaintiffs' antitrust and UCL claims are based on [conduct in 2010 and 2011], such conduct falls outside the statute of limitations and is therefore not actionable.").

### C.    The Unfair Practices Act Does Not Apply to Conduct Outside of California

As with the federal claims discussed above, SCI's UPA claim rests on allegations of unlawful conduct and anticompetitive effects in various alleged geographic markets around the country: San Francisco, Austin, greater Los Angeles, Chicago, Philadelphia, Washington D.C., New York, Seattle, San Diego, San Jose, and Boston.  Compl. ¶¶ 61-63, 113.  Only a subset of these geographic areas are in California and the Court should therefore dismiss with prejudice SCI's UPA claim to the extent it is based on extraterritorial conduct.

"California has a strong presumption against extraterritorial application of its laws."  *Crawford v. Uber Techs., Inc*., No. 17-CV-02664-RS, 2018 WL 1116725, at *4 (N.D. Cal. Mar. 1, 2018) (citing *North Alaskan Salmon Co. v. Pillsbury*, 174 Cal. 1, 4 (1916)).  Although California courts have not ruled on the extraterritorial application of the UPA, it is well settled that "the presumption against extraterritoriality applies . . . in full force" to companion antitrust laws, namely the Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200 *et seq.  Sullivan v. Oracle Corp*., 51 Cal. 4th 1191, 1207 (2011); *see also Van Slyke v. Capital One Bank*, No. C 07-00671 WHA, 2007 WL 3343943, at *14 (N.D. Cal. Nov. 7, 2007) (citing *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 714, 725 (1999)) ("California courts have been highly critical of attempts to apply the unfair competition law outside California borders for transactions that do not affect California residents and did not take place within the state."); *Gentges v. Trend Micro Inc*., No. C 11-5574 SBA, 2012 WL 2792442, at *6 (N.D. Cal. July 9, 2012) (rejecting extraterritorial application of UCL due to "little, if any nexus, between Plaintiffs and their claims and California").

The case *against* extraterritorial application of the UPA is even stronger given the language of the statute and overall statutory scheme.  "The intention to make [a California statute] operative with respect to occurrences outside the state will not be declared to exist unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject-matter, or history."  *Crawford*, 2018 WL 1116725, at *4 (internal citations omitted).  The UPA contains no suggestion that its protections should be extended to conduct in other states and to injuries that took

place outside of California.  To the contrary, the UPA explicitly prohibits "any person engaged in business *within this State* to sell any article or product at less than the cost thereof to such vendor . . . ." CAL. BUS. & PROF. CODE § 17043 (emphasis added).  It also makes it illegal for "any person engaged in business *within this State* to sell or use any article or product as a 'loss leader.'" *Id.* § 17044 (emphasis added).  Other aspects of the statutory scheme make clear that the UPA was intended to regulate business activities occurring within the state of California.  Most significantly, the exemption of § 17024(1), discussed above, precludes application of the UPA to "any service, article or product for which rates are established under the jurisdiction of the Public Utilities Commission of this State . . . ."  This exemption would make little sense in the context of extraterritorial conduct.

Accordingly, the Court should dismiss with prejudice SCI's UPA claim to the extent it is based on conduct occurring in Austin, Chicago, Philadelphia, Washington, D.C., New York, Seattle or Boston.

### D.  The Complaint Fails to Plead that Uber had the Purpose of Injuring Competitors or Destroying Competition

California's Unfair Practices Act requires that the defendant act with the "purpose of injuring competitors or destroying competition."  CAL. BUS. & PROF. CODE §§ 17043, 17044; *Cel-Tech Commun.*, 20 Cal. 4th at 178  (holding that both sections "require the same mental state").  As explained, SCI's allegations here describe the exact opposite motivations for Uber's conduct: it sought to compete by introducing new products and low price points in order to expand its business and advance its own legitimate interests.  For that reason, SCI's claim fails to state a violation of the UPA.

"The intent requirement imposed by section 17043 is an especially stringent one," *Bay Guardian Co. v. New Times Media LLC*, 187 Cal. App. 4th 438, 456 (2010), and requires "injurious intent (a specific intent to injure or destroy) and not just an intent to divert customers from a competitor." *W. Union Fin. Servs., Inc. v. First Data Corp.*, 20 Cal. App. 4th 1530, 1540 n.10 (1993).  To state a claim under the UPA requires much more than knowledge that the pricing complained of will disadvantage a competitor (indeed, this is the object of competition): "a generalized understanding or intent that particular conduct will injure competition is insufficient to state a claim; instead, the violator must act with the specific purpose of injuring its competition." *Sybersound Records, Inc. v.*

Gibson, Dunn & Crutcher LLP

1  *UAV Corp.*, 517 F.3d 1137, 1153-54 (9th Cir. 2008) (citing *Cel-Tech Commun.*, 20 Cal. 4th at 172).

2  Purpose "requires a culpability beyond the knowledge of a result's near certainty." *Cel-Tech Commun.*,

3  20 Cal. 4th at 173 (internal quotation marks and citations omitted).

4  SCI's allegations fall short of this exacting standard.  The amended complaint merely recites

5  the statutory elements of the UPA, averring that "Uber intentionally sustained near-term losses that

6  were designed to drive Sidecar and other competing ride-hailing apps out of the market while Uber

7  acquired a dominant market position" and "[t]he purpose and effect of Uber's pricing scheme was and

8  is to injure competitors, including Sidecar, to gain greater market share and eventually raise prices."

9  Compl. ¶¶ 7, 162.

10  These conclusory allegations are insufficient to allege that the *purpose* of Uber's alleged

11  conduct was to destroy competition or a specific competitor.  As described in more detail in Section

12  IV above, SCI's amended complaint demonstrates that the *purpose* of the alleged conduct was to meet

13  competition by "respon[ding] to the new, 'far cheaper product' offered by Sidecar and Lyft," Compl.

14  ¶ 50, and to gain the benefit of network effects and economies of scale.  As SCI fails to contend that

15  Uber acted with the purpose of injuring competitors or destroying competition, its UPA claim must be

16  dismissed.

17  **VI.    CONCLUSION**

18  For the reasons set forth above, SCI's amended complaint should be dismissed with prejudice.

19  Dated: October 14, 2019

20                                              THEODORE J. BOUTROUS JR.
                                               DANIEL G. SWANSON
21                                              CYNTHIA E. RICHMAN
                                               GIBSON, DUNN & CRUTCHER LLP
22

23

24                                              By:   */s/ Daniel G. Swanson*
                                                     Theodore J. Boutrous Jr.
25                                                   Daniel G. Swanson
                                                     Cynthia E. Richman
26
                                               Attorneys for Uber Technologies, Inc, Rasier LLC,
27                                              Rasier-CA LLC, Rasier-PA LLC, Rasier-DC LLC,
                                               Rasier-NY LLC, Uber-USA LLC

28