Lewis T. LeClair (SBN 77036)
lleclair@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone:     (214) 978-4000
Facsimile:     (214) 978-4044

Kirk D. Dillman (SBN 110486)
kdillman@mckoolsmithhennigan.com
**MCKOOL SMITH HENNIGAN, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:     (213) 694-1200
Facsimile:     (213) 694-1234

Judith A. Zahid (SBN 215418)
jzahid@zelle.com
**ZELLE LLP**
44 Montgomery Street, Suite 3400
San Francisco, California 94104
Telephone:     (415) 693-0700
Facsimile:     (415) 693-0770

James R. Martin (SBN 173329)
jmartin@zelle.com
**ZELLE LLP**
1775 Pennsylvania Ave. NW, Suite 375
Washington, D.C. 2006
Telephone:     (202) 899-4100
Facsimile:     (612) 336-9100

*Attorneys for Plaintiff, SC Innovations, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SC INNOVATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UBER TECHNOLOGIES, INC., RASIER, LLC, RASIER-CA, LLC, RASIER-PA, LLC, RASIER-DC, LLC, RASIER-NY, LLC, AND UBER USA, LLC, <br><br> Defendants. | Case No.  3:18-cv-07440-JCS <br><br> **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** <br><br> **Hearing:** <br> Date:     January 17, 2020 <br> Time:     9:30 a.m. <br> Place:    Courtroom G, 450 Golden Gate Avenue, San Francisco, CA <br> Judge:    Hon. Joseph C. Spero |

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1

2

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................... 1

II.     Factual Allegations ................................................................................................... 1

III.    Argument .................................................................................................................. 3

    A.      Sidecar's Allegations Plausibly Plead that Uber Violated the Sherman Act ................ 3

        1.      Sidecar's Market Definition Allegations Are Plausible and Must Be Taken as True .................................................................................................. 4

        2.      Sidecar's Predatory Pricing Claim Is Plausible ........................................... 7

        3.      The Amended Complaint Alleges a Dangerous Probability of Recoupment .......................................................................................... 10

        4.      Uber's Predatory Pricing Harmed Competition ......................................... 14

        5.      Uber's Tortious Activities to Stifle and Eliminate Competition Are Actionable Under the Antitrust Laws ................................................ 15

    B.      Sidecar Properly Pled an Unfair Practices Act Claim ................................................ 18

        1.      Uber's Predatory Pricing Is Not Exempt from UPA Scrutiny ...................... 18

        2.      Sidecar's UPA Claims Are Timely ............................................................... 19

        3.      Because Uber Does Business in California, the UPA Applies to All of Uber's Conduct ...................................................................................... 19

        4.      Uber Cut Prices for the Purpose of Injuring Competitors or Destroying Competition ........................................................................................... 20

IV.     CONCLUSION ....................................................................................................... 21

McKool Smith Hennigan, P.C.
Los Angeles, CA

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aryeh v. Canon Business Solutions, Inc.*,
    55 Cal. 4th 1185 (2013) ............................................................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................1, 3, 21

*In re ATM Fee Antitrust Litig.*,
    2010 U.S. Dist. LEXIS 61160 (N.D. Cal. June 21, 2010) ........................................................12

*Bay Guardian Co. v. New Times Media LLC*,
    187 Cal. App. 4th 438 (2010) ...................................................................................................20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................................1, 3

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)...........................................................................................................8, 12

*Brown Shoe v. United States*,
    370 U.S. 294 (1962)..................................................................................................................4

*Cal. Motor Transport Co. v. Trucking Unltd.*,
    404 U.S. 508 (1972) ................................................................................................................16

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*,
    148 F.3d 1080 (D.C. Cir. 1998) ..............................................................................................16

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) .................................................................................................15

*City of Mishawaka, Ind. v. Am. Elec. Power Co.*,
    616 F.2d 976 (7th Cir. 1980) ...................................................................................................15

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ................................................................................................................15

*Conwood Co. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) .............................................................................................16, 17

*Covad Communc'ns Co. v. Bell Atl. Corp.*,
    398 F.3d 666 (D.C. Cir. 2005) ................................................................................................16

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS

McKool Smith Hennigan, P.C.
Los Angeles, CA

*Datel Holdings Ltd. v. Microsoft Corp.*,
712 F. Supp. 2d 974 (N.D. Cal. 2010) ........................................................4, 6

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) ................................................................................9

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ................................................................................7

*FTC v. Whole Foods Mkt.*,
548 F.3d 1028 (D.C. Cir. 2008) ..............................................................6, 7

*G.H.I.I. v. MTS, Inc.*,
147 Cal. App. 3d 256 (Cal. Ct. App. 1983) ............................................19

*Hurst Int'l, LLC v. Sinclair Sys. Int'l, LLC*,
2018 U.S. Dist. LEXIS 224964 (C.D. Cal. May 18, 2018) ....................9

*Image Tech. Servs. v. Eastman Kodak*,
125 F.3d 1195 (9th Cir. 1997) ................................................................4

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) ..........................................................13, 14

*LePage's, Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003)....................................................................16

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ..................................................................20

*Momento, Inc. v. Seccion Amarilla USA*,
2009 U.S. Dist. LEXIS 85295 (N.D. Cal. Sept. 16, 2009) ................10, 11

*Newcal Indus. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ..............................................................4, 5

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d (9th Cir. 1995) ............................................................................7

*Ryko Mfg. Co. v. Eden Serv.*,
823 F.2d 1215 (8th Cir. 1987) ................................................................7

*Sabry Lee, Inc. v. Genera Corp.*,
2009 U.S. Dist. LEXIS 135698 (C.D. Cal. Apr. 20, 2009) ....................10

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015)....................................................................15

*Solyndra Residual Trust v. Suntech Power Holdings Co.*,
62 F. Supp. 3d 1027, 1042 (N.D. Cal. 2014) ........................................10

-iii-

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS

McKool Smith Hennigan, P.C.
Los Angeles, CA

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ...........................................................................................3

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008) ......................................................................................4, 5, 7

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) ...........................................................................................4

*United States v. Anthem, Inc.*,
  236 F. Supp. 3d 171, 216 (D.D.C. 2017) ........................................................................14

*Verizon Communc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ..........................................................................................................16

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965) (Sherman Act claim alleging enforcement of patent procured
  by fraud) ...........................................................................................................................16

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
  668 F.2d 1014 (9th Cir. 1981) ..............................................................................10, 12, 14


**Statutes**

Cal. Bus. & Prof. Code § 17024(1) ..........................................................................................18

Cal. Bus. & Prof. Code § 17030 ........................................................................................18, 20

Cal. Bus. & Prof. Code § 17043 ........................................................................................18, 20

Cal. Bus. & Prof. Code § 17044 ........................................................................................18, 20


**Other Authorities**

ABA, *Model Jury Instructions in Civil Antitrust Cases* (2016 ed.) .......................................8, 14

Federal Rule of Civil Procedure 8(a)(2) .....................................................................................3

Federal Rule of Civil Procedure 12(b)(6) .................................................................................3, 4

Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 2.1.5 (2010) ................12, 13, 14, 15

Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 6 (2010) ..........................14

Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 7.1 (2010) .....................12

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

-iv-

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS

Plaintiff SC Innovations, Inc. ("Sidecar") responds as follows to the Motion to Dismiss Amended Complaint filed by Defendants Uber Technologies, Inc., Raiser LLC, Raiser-PA LLC, Raiser-DC LLC, Raiser-NY LLC, and Uber USA LLC ("Defendants" or "Uber").

## I.    INTRODUCTION

Although presented as a motion to dismiss, Uber's motion is premised largely on a bevy of facts, many of which are hotly contested, presenting a view of the world from the perspective of a monopolist that does not relish the prospect of being called to account for its conduct. Uber indisputably undercharged Passengers and overpaid Drivers for years. It started a years-long war of attrition with competitors, which it was able to bankroll with a massive war chest of funds raised from investors. Uber eventually won that war. Its actions drove Sidecar out of business in December 2015, and left another competitor (Lyft) seriously crippled. Uber amassed monopoly power in the market for Ride-Hailing Apps, and is now using that power to begin to raise prices to supra-competitive levels. Sidecar brought this suit to hold Uber responsible for its actions.

Uber's criticisms, at best, raise factual disputes inappropriate for consideration on a motion to dismiss. Uber may disagree with Sidecar regarding market definition, the reason for Uber's below-cost pricing, and the likelihood of recoupment (among other things). But, at the stage of a motion to dismiss, Sidecar need only state a *plausible* claim. The standard for addressing a motion to dismiss has certainly evolved under *Twombly* and *Iqbal*, but it remains a pleading standard, not a choice of Plaintiff's facts versus Defendants' purported facts. Uber's complaints are for another day. The Court should deny the Motion to Dismiss.

## II.   FACTUAL ALLEGATIONS

In 2009, Uber launched its ride-hailing smartphone app, allowing passengers to use smartphones to arrange on-demand transportation in black cars and limousines driven by licensed chauffeurs. Am. Compl. ¶ 38. It was enormously successful, and Uber quickly accumulated significant capital from investors. *Id.* ¶¶ 5, 38. In 2012, however, Sidecar launched its ridesharing app, a Ride-Hailing App that allows passengers to arrange on-demand transportation in a driver's personal vehicle. *Id.* ¶ 3. Lyft also introduced a Ride-Hailing App that year. *Id.* ¶ 40. Sidecar's entry

McKool Smith Hennigan, P.C.
Los Angeles, CA

threatened Uber's success. Sidecar's app was the first to offer many popular features, such as estimated fares and trip durations, carpools, and allowing drivers to set their own proposed fares. *Id.* ¶ 4. Additionally, Sidecar and Lyft offered a "far cheaper product," as Uber's own CEO, Travis Kalanick, acknowledged. *Id.* ¶ 50.

In the face of this new competition, Uber launched its own ridesharing offering, called UberX, in 2013. *Id.* ¶ 51. But Uber was not content to compete fairly. It wanted to destroy its competition. Given Uber's head start and the enormous war chest of capital it had collected, it started a price war with Sidecar and Lyft. First, Uber "overpaid" Drivers by offering sign-up bonuses and other subsidies that allowed Drivers to earn more than they would under normal competitive market conditions. *Id.* ¶ 86. Second, Uber heavily subsidized the rates it charged Passengers. *Id.* Because Uber intentionally charged Passengers less than its direct payments to Drivers, and certainly less than the average variable cost for its services, Uber incurred substantial losses. *Id.* ¶¶ 87, 89-90. Uber's prices were so low, in fact, that "Uber lost money on most or all of the transactions through its app." *Id.* ¶ 90.

Uber acted unlawfully in other ways in an attempt to drive its new competitors out of the market. For example, high-level Uber executives devised "Project Hell" and "SLOG," schemes to submit fraudulent ride requests through competitors' apps. *Id.* ¶¶ 101-10. By submitting fraudulent requests, Uber prevented its competitors' Drivers from serving actual customers, thereby decreasing Drivers' earnings and increasing Passengers' wait times. *Id.* ¶¶ 104-06. Uber's actions diminished the viability and artificially increased the costs of its competitors, such as Sidecar and Lyft, who were trying to build a network. *See id.*

Because of the network effects characteristic of Ride-Hailing Apps—an app is more valuable the more people who use it—Uber's actions started a vicious cycle that would cement Uber's monopoly power. Once Uber collected enough market power to create a tipping point, other Ride-Hailing Apps would be unable to compete effectively. *Id.* ¶ 7.

Sidecar's innovative offerings allowed it to compete on the merits, but it could not compete with Uber's financial war of attrition. In December 2015, Sidecar closed its doors. *Id.* ¶ 111.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

Case No. 3:18-cv-07440-JCS                                   PLAINTIFF'S RESPONSE TO DEFENDANTS'
                                                                        MOTION TO DISMISS

Sidecar's departure from the market harmed competition. It removed an innovative competitor, and left only two real alternatives (Uber and a weakened Lyft). *Id.* ¶¶ 112-13. Uber then turned its guns on Lyft. *Id.* ¶ 8. Lyft has proven more resilient than Sidecar, but it has not escaped unscathed. It has been weakened after years of the Uber-initiated price war. *Id.* Now that Uber comfortably holds the dominant market position, it has started increasing Passenger prices and reducing Driver payments. *Id.* ¶¶ 8, 93-98. It intends to continue its march to profitability as it implements its new strategy. *Id.* ¶ 93. Without Sidecar or a healthy Lyft as an effective check, Uber is able to reap supracompetitive profits and recoup the losses incurred through its predatory scheme. *Id.* Uber's actions harmed competition and consumers, as Passengers are paying more, and Drivers are being paid less. *Id.* ¶ 116. Sidecar brought this action to hold Uber responsible for its harmful actions.

## III.    ARGUMENT

Federal Rule of Civil Procedure 8(a)(2) requires that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint need contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of misconduct. *Id.* at 556. In assessing whether the alleged facts state a plausible claim for relief, the "court should assume the[] veracity" of all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Additionally, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible.*" *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### A.    Sidecar's Allegations Plausibly Plead that Uber Violated the Sherman Act

Uber contends that Sidecar's Sherman Act claims should be dismissed because Sidecar's allegations are implausible, competition has not been harmed, and Sidecar has not pled recoupment adequately. Each of these arguments falls flat.

McKool Smith Hennigan, P.C.
Los Angeles, CA

1

2

**1.      Sidecar's Market Definition Allegations Are Plausible and Must Be Taken as True**

A central premise underlying most of Uber's Motion to Dismiss is a disagreement with Sidecar's market definition of "Ride-Hailing Apps," which excludes taxis. But "the validity of the 'relevant market' is typically a factual element rather than a legal element." *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008); *see Image Tech. Servs. v. Eastman Kodak*, 125 F.3d 1195, 1203 (9th Cir. 1997) ("Ultimately what constitutes a relevant market is a factual determination for the jury."); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982) ("The definition of the relevant market is basically a fact question dependent upon the special characteristics of the industry involved . . . ."). Thus, "alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Newcal*, 125 F.3d at 1203. Dismissal is appropriate only "if the complaint's 'relevant market' definition is facially unsustainable." *Id.* "[T]he question of whether the market should include other products is better resolved at the summary judgment stage, rather than on a motion to dismiss." *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 997 (N.D. Cal. 2010) (collecting cases).

Sidecar's market definition easily satisfies the motion to dismiss standard for pleading a relevant market. "A relevant market is identified by considering 'commodities reasonably interchangeable by consumers for the same purposes.' Put another way, the relevant market includes all sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008) (citation omitted); *see also Brown Shoe v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."). Additionally, "although the general market must include all economic substitutes, it is legally permissible to premise antitrust allegations on a submarket. That is, an antitrust claim may, under certain circumstances, allege restraints of trade within or monopolization of a small part of the general market of substitutable products." *Newcal*, 513 F.3d at 1045. The plaintiff need only "show (but

-4-

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS

McKool Smith Hennigan, P.C.
Los Angeles, CA

need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market." *Id.* "'[P]ractical indicia' of an economically distinct submarket" include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* (quoting *Brown Shoe*, 370 U.S. at 325).

Sidecar's Amended Complaint pleads facts explaining why Ride-Hailing Apps are not "reasonably interchangeable" with other forms of transportation. For example, Sidecar alleged that "Ride-Hailing Apps are cheaper, more convenient, and offer different and greater functionality than other means of hailing transportation, such as hailing a taxi on a street corner or calling a taxi dispatcher." Am. Compl. ¶ 53. Some of the features distinguishing Ride-Hailing Apps from taxis are the ability to easily and quickly:

- split fares with friends in the same car without using cash;
- book carpool rides with strangers heading in the same direction;
- automatically pay and tip their drivers at the conclusion of a trip without using cash or credits;
- select a precise trip origin and destination from a map;
- determine the estimated cost of the ride and estimated time of arrival before booking the ride;
- select the exact size and features of their desired automobile;
- rate the quality of their driver;
- share their location and estimated time of arrival with others;
- see the name, photograph, and license of their driver; and
- receive automatic receipts and create expense reports for business trips.

*Id.* Evidence that a particular product has unique benefits can show a relevant market. *See Theme Promotions*, 546 F.3d at 1002 (pointing to testimony that "inserts have unique benefits" to uphold jury's finding). The Amended Complaint explains that "[o]ther means of hailing transportation, such as hailing a taxi on a street corner or calling a taxi dispatcher, are not reasonably close substitutes for

1  Passengers using Ride-Hailing Apps *because of these differences*." Am. Compl. ¶ 54 (emphasis

2  added). At a minimum, these features are "practical indicia of an economically distinct submarket."

3  *See FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1041, 1049 (D.C. Cir. 2008) (opinions of Brown and

4  Tatel, JJ.) (holding the FTC had shown a likelihood of success on proving a submarket for premium

5  natural and organic supermarkets).

6  Sidecar further explained that Ride-Hailing Apps constitute a relevant market for Drivers

7  because a Driver's only real option to provide transportation services outside of Ride-Hailing Apps

8  is to become a taxi or limousine driver, but "[b]ecoming a taxi or limousine driver typically requires

9  a much greater upfront investment than serving as a Driver on a Ride-Hailing App, does not offer the

10  same degree of flexibility as that which is available through a Ride-Hailing App, and does not offer

11  payment terms that are as favorable as those available through Ride-Hailing Apps." *Id.* ¶ 55. Uber

12  ignores all of these factual allegations in its motion.

13  The distinction between taxis and Ride-Hailing Apps makes sense, because "Ride-Hailing

14  Apps are technology—they do not compete with other modes of transportation or transportation

15  companies, like taxi cab companies." *Id.* ¶ 57. The relevant product in this case is not simply "rides,"

16  but rides with certain features that are important to customers, including those listed above. Just like

17  a "ride" on a city bus is far different than a "ride" in a private limo, a ride organized through a Ride-

18  Hailing App is different than a taxi ride—the two are not "reasonably interchangeable." Notably,

19  Uber itself has repeatedly taken the position that it is a technology company that does not compete

20  with taxi companies.[1] *Id.* Additionally, regulators apply different rules that *prevent* Ride-Hailing

21  Apps from competing with taxis in particular ways. For example, in Washington, D.C., New York,

22  and Pennsylvania, transportation network company drivers cannot accept street hails, but taxis can.

23  *Id.* ¶ 58. These "alleged differences regarding [taxis] . . . plausibly exclude them from the relevant

24  market," and therefore are sufficient to defeat a motion to dismiss. *Datel Holdings*, 712 F. Supp. 2d

25  at 997.

26

27  ────────────
[1] The fact that those statements were not made in the context of the Sherman Act does not undercut

28  the fact that Uber shamelessly changes who it considers its "competitors" depending on which argument it is trying to defeat.

-6-

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    Uber did not engage with Sidecar's factual allegations about the important differences

2    between Ride-Hailing Apps and other forms of transportation. Instead, it criticized Sidecar's

3    allegation that not enough passengers would respond to a small but significant nontransitory increase

4    in price ("SSNIP") by switching to other means of hailing transportation to render the increase

5    unprofitable, calling it "a legal conclusion veiled as a factual allegation." *See* Mot. at 11. That

6    allegation, however, is based on the facts laid out above, which Uber ignored. And in any event,

7    SSNIP evaluation is "a complicated economic analysis," *Theme Promotions*, 546 F.3d at 1002,

8    which often requires expert testimony, *see Whole Foods*, 548 F.3d at 1038 (opinion of Brown, J.),

9    and does not lend itself to determination in the context of a motion to dismiss.

10          **2.     Sidecar's Predatory Pricing Claim Is Plausible**

11    Uber incorrectly asserts that Sidecar's predatory pricing claim is implausible. The necessary

12    allegation for a successful predatory pricing scheme is market power. If Uber had sufficient market

13    power, then it is entirely plausible to allege a predatory pricing scheme, and that is exactly what

14    Sidecar alleges here. Market power may be demonstrated through either of two types of proof. One

15    type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth

16    evidence of restricted output and supracompetitive prices, that is direct proof of the injury to

17    competition which a competitor with market power may inflict, and thus, of the actual exercise of

18    market power. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d, 1421, 1433-34 (9th Cir. 1995); *FTC*

19    *v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986). But, "the more common type of proof is

20    circumstantial evidence pertaining to the structure of the market. To demonstrate market power

21    circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a

22    dominant share of that market, and (3) show that there are significant barriers to entry and show that

23    existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at

24    1434; *see also Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215, 1232 (8th Cir. 1987); *Ball Memorial*

25    *Hosp.*, 784 F.2d 1325, 1335 (7th Cir. 1986). Sidecar defined the relevant market and further alleged

26    Uber's dominance of the relevant market, barriers to entry, and why the only remaining significant

27    competitor lacks the ability to restrain Uber's pricing.

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

Uber claims that Sidecar's theory is implausible because Uber first offered ridesharing—arranging rides in private vehicles—in 2013, *after* Sidecar and Lyft first offered ridesharing in 2012. Uber therefore argues that because it was the new entrant, it could not possibly have had enough market power to predatorily price.[2] Uber can make this argument, however, only by ignoring that it had offered ride-*hailing*—arranging for rides in black cars and limousines driven by licensed chauffeurs (but not in private vehicles)—since 2009. Am. Compl. ¶ 2. By virtue of the enormous success of Uber's app, it had enormous advantages as an incumbent transportation network company, with a vast network of Passengers who were already on its platform. Thus, Uber was nothing like a new entrant struggling for market share in the developing ridesharing market; it was positioned to take advantage of its network and could grow rapidly and dominate the fledgling ridesharing market with little effort.

Furthermore, a new entrant can leverage its power in a related market segment to engage in predatory pricing. The Model Jury Instructions for predatory pricing, for example, explain that a defendant acts anticompetitively if it acquires *or* maintains monopoly power through predatory pricing. ABA, *Model Jury Instructions in Civil Antitrust Cases* 135 (2016 ed.). If the defendant already had to be a monopolist in order to engage in predatory pricing, then there would be no need to instruct that a defendant may not use predatory pricing to *acquire* monopoly power. Case law supports that interpretation. For example, in *Brooke Group*, the plaintiff had pioneered the "economy" segment of the market and had 97% of that segment before the defendant entered that segment and began pricing predatorily. *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 212-13 (1993). Even though the defendant was a new entrant to the relevant market segment, the Court noted that the plaintiff's theory of liability was "within the reach of the statute." *Id.* at 230.[3] That is similar to what Uber did in this case. Uber's ride-hailing service was "enormously successful." *Id.* ¶ 38. When it began offering a ridesharing service in 2013, Uber

---

[2] This argument again shows the disingenuousness of Uber's market definition arguments. In one breath, Uber implies that the market is limited to ride*sharing*, where it had zero sales. Mot. at 5. In the next, it argues that taxi companies were the dominant, incumbent competitor. *See id.* at 6.

[3] The Court ultimately held that summary judgment should have been granted in the defendant's favor due to lack of evidence of ability to recoup. As explained below, in this case, Sidecar satisfied its burden of pleading a dangerous probability of recoupment.

1   capitalized off of that prior success. It became "the dominant ridesharing platform in the United

2   States[,] was estimated to have grown at a rate of 364%," and had collected significant capital by

3   2013. *Id.* ¶ 5.

4          Second, Uber argues that there potentially are alternative explanations for its below-cost

5   pricing, but pretextual justifications for predatory behavior cannot shield Uber from liability. Uber's

6   proferred motives are, at best, questions of fact for the jury. *See Eastman Kodak Co. v. Image Tech.*

7   *Servs.*, 504 U.S. 451, 484-85 (1992) (finding triable issues of fact with respect to Kodak's preferred

8   justifications); *Hurst Int'l, LLC v. Sinclair Sys. Int'l, LLC*, 2018 U.S. Dist. LEXIS 224964, at *10-11

9   (C.D. Cal. May 18, 2018) (denying a motion to dismiss where the defendant argued "the facts

10  alleged in the FAC are consistent with 'free trials' and competitive behavior, rather than below-cost

11  pricing"). Sidecar "sets forth allegations regarding [Uber's] below-cost pricing strategy . . . and

12  describes how these pricing strategies are being used to drive [Sidecar] from the market." *Hurst*,

13  2018 U.S. Dist. LEXIS 224964, at *12. Those allegations are sufficient to state a claim. *Id.*

14         In any event, the Amended Complaint's allegations make it plain that Uber's intent was

15  nefarious, not merely a procompetitive attempt to build economies of scale. Uber claims that its low

16  prices could just be a "new ridesharing entrant" trying to take advantage of network effects. Mot. at

17  6. But when Uber began offering a ridesharing service in 2013, it already "was the dominant

18  ridesharing platform in the United States and was estimated to have grown at a rate of 364%." Am.

19  Compl. ¶ 5. It did not need to lose money purportedly building economies of scale because it already

20  was the largest competitor. Moreover, Uber's "Project Hell" and "SLOG," programs devised to

21  submit fraudulent ride requests to competitors' Apps to interfere with the competitors' ability to

22  succeed, are indicative of Uber's bad faith. *See id.* ¶¶ 101-10. Finally, the Amended Complaint

23  alleges that Uber priced below its average variable cost per transaction, meaning that it lost money

24  every time it facilitated a ride booking—in other words, it would have saved money by shutting its

25  app down. *Id.* ¶¶ 6, 89-91, 134. Uber suggests that "'fill[ing] out' capacity is 'classic' business

26  conduct," Mot. at 7, but "Uber is *never* going to grow its way to profitability with its pricing below

27  the variable cost of each individual ride." Am. Compl. ¶ 6. The allegations of below-variable-cost

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

-9-

pricing shift the burden to Uber to provide a non-predatory justification: "[I]f the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1035 (9th Cir. 1981). "[P]ricing below average variable costs," as alleged in the Amended Complaint, "is sufficiently questionable to support the inference that the prices were designed to eliminate competition." *Id.* at 1036.

### 3.   The Amended Complaint Alleges a Dangerous Probability of Recoupment

Uber next argues that Sidecar failed to plausibly plead recoupment. But Sidecar has no obligation to plead recoupment. *See Solyndra Residual Trust v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1042 (N.D. Cal. 2014) ("Even if Plaintiff were required to plead recoupment . . . ."). To the extent Sidecar bears any burden at all, it is a small one. It need only plausibly allege that Uber has a "dangerous probability" of recoupment, not that it actually has recouped any money. *See id.* at 1042-43 (holding it is sufficient to allege that competitors had been driven from the market, making the market more concentrated and less competitive and allowing defendants' revenues to increase exponentially); *Sabry Lee, Inc. v. Genera Corp.*, 2009 U.S. Dist. LEXIS 135698 (C.D. Cal. Apr. 20, 2009) (denying motion to dismiss and holding plaintiff adequately pled recoupment where plaintiff pled it was *in danger* of being driven from the market, even though other facts made that allegation suspect).

Whether a defendant has a dangerous probability of recoupment is a highly fact intensive inquiry, inappropriate for determination on a motion to dismiss. *See Sabry Lee*, 2009 U.S. Dist. LEXIS 135698, at *7-8 ("[T]he plausibility of [the plaintiff's] recoupment allegations is one that 'awaits factual development' . . . ."). "Determining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and condition of the relevant market." *Momento, Inc. v. Seccion Amarilla USA*, 2009 U.S. Dist. LEXIS 85295, at *16-18 (N.D. Cal. Sept. 16, 2009). Factors to consider include "a defendant's market share, whether defendant is a multi-market firm, the

-10-

1  number and strength of other competitors, market trends, and entry barriers." *Id.* (quoting *Multistate*

2  *Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 63 F.3d 1540,

3  1554 (9th Cir. 1995)). Additionally, "the defendants [sic] financial strengths and ability to absorb

4  losses are also relevant." *Id.* (quoting *Multistate Legal Studies*, 63 F.3d at 1554).

5       All of these factors weigh in favor of finding that a dangerous probability of recoupment is

6  plausible in these circumstances. Uber has significant market share in the relevant markets, ranging

7  from 60-75% depending on the city. Am. Compl. ¶¶ 121-31. Additionally, Uber is a multi-market

8  firm. It "boasts a user base of over 40 million Passengers in cities around the United States,"

9  allowing Passengers and Drivers to use Uber when they travel to a new location, thereby increasing

10  its market power in each individual geographic market. *Id.* ¶ 74. Its national market share is

11  approximately 70%. *Id.* ¶ 81. Once Uber's anticompetitive actions eliminated Sidecar, Lyft became

12  the only remaining rival. *Id.* ¶ 8. Market trends are also favorable for Uber. It began its predatory

13  pricing when the market was smaller, in its infancy. *See id.* ¶ 5. The market for Ride-Hailing Apps

14  has grown significantly since that time, and likely will continue to grow. *See id.* Given the market

15  growth, Uber underpriced while the market was relatively small (losing money on a smaller number

16  of transactions), so that it can drive out competitors and *over*price when the market is large (reaping

17  supra-competitive profits from a larger number of transactions). Entry barriers are high because of

18  network effects—Drivers want to affiliate with a Ride-Hailing App only if it attracts Passengers

19  (which is how the Drivers earn money), but Passengers will use a Ride-Hailing App only if it has a

20  significant number of Drivers (to minimize wait times). "These network effects create a formidable

21  barrier to entry that insulates [Uber] from new competition or expansion by smaller rivals." *Id.* ¶ 71.

22  Finally, Uber has significant financial strength and ability to absorb losses, as it is "enormously

23  capitalized, with the ability to outlast its competitors in the ride-sharing market in a bruising price

24  war." *Id.* ¶ 5.

25       Uber faults Sidecar for not alleging a "mechanism by which Uber could effectively restrict

26  market output," meaning that other competitors purportedly could increase output to prevent any

27  harm to competition. Mot. at 12, 14. To begin, Sidecar adequately alleged restricted output. It

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

-11-

McKool Smith Hennigan, P.C.
Los Angeles, CA

claimed that "Uber is now transitioning to a more classic duopoly market strategy and intends to steadily raise its prices in each market." Because Uber is the dominant market player, it can control prices. Am. Compl. ¶ 93. Uber "signal[s] price increases to Lyft," and then Lyft follows because it is "in need of the financial umbrella to be provided by Uber pricing." *Id.* ¶¶ 8, 100. "A predatory pricing scheme designed to preserve or create a stable oligopoly, if successful, can injure consumers in the same way, and to the same extent, as one designed to bring about a monopoly." *Brooke Grp.*, 509 U.S. at 229.[4] "[B]ecause price and output are inversely correlated," the allegation that Uber will charge supra-competitive prices, *see* Am. Compl. ¶¶ 93-98, "implies that marketwide output . . . has been lower than it would have been" absent anticompetitive conduct. *In re ATM Fee Antitrust Litig.*, 2010 U.S. Dist. LEXIS 61160 (N.D. Cal. June 21, 2010).

Moreover, the Amended Complaint alleges facts demonstrating that other Ride-Hailing Apps, such as Lyft, could not expand their own output. Lyft continues to exist (in a weakened form) only with Uber's permission. Uber has disciplined it such that it dare not try to compete with Uber in any substantial way. *See Inglis*, 668 F.2d at 1035 (contemplating the possibility that a defendant could "discipline . . . competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power"). Eliminating Sidecar was critical, because it was a maverick competitor with cutting edge features and a different pricing model. *See* Am. Compl. ¶¶ 4, 99. Importantly, Sidecar allowed Drivers to set their own fares, creating competition among Drivers. *Id.* With Sidecar out of the picture, Uber can now extract monopoly rents from both Passengers *and* Drivers, as it reduces Driver pay while increasing Passenger fares. *See id.* ¶¶ 95-99. "An acquisition eliminating a maverick firm . . . in a market vulnerable to coordinated conduct is likely to cause adverse coordinated effects." U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 7.1 (2010).[5]

---

[4] *Brooke Group* interpreted the Robinson-Patman Act, rather than the Sherman Act. But its teaching that recoupment is possible, even where an oligopoly exists, applies just the same to the Sherman Act.

[5] A "maverick firm" is one "that plays a disruptive role in the market to the benefit of customers," such as by providing "a new technology or business model." U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 2.1.5 (2010). Other indicators of a "maverick firm" include "hav[ing] the incentive to take the lead in price cutting or other competitive conduct or to resist increases in industry prices," or "a firm that has often resisted otherwise prevailing industry

1

2

3

4

5

6

7

Additionally, new entrants cannot compete because of barriers to entry, particularly network effects. Uber effectively "control[s] . . . the productive assets in the business," Mot. at 14 (quoting *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989))—Drivers— because the amount of "transportation with Drivers" Uber can arrange depends on its number of affiliated Drivers. Thus, a Ride-Hailing App's "output" is determined by its number of Drivers, so an App can expand output only by attracting more Drivers (or encouraging existing Drivers to drive more). But

8

9

10

11

> [t]he value of a Ride-Hailing App to Drivers depends on how many nearby Passengers are using the App. As more Passengers use a particular Ride-Hailing App, the value of that platform increases for Drivers because it becomes more likely that they will be matched quickly with a nearby Passenger looking for a ride. In other words, as more Passengers use a Ride-Hailing App, it becomes more valuable for Drivers because the amount of time Drivers spend waiting for ride requests declines and so does the distance to the pick-up point for their next ride.

12

13

14

15

16

Am. Compl. ¶ 68. In other words, a Ride-Hailing App cannot expand output without attracting more Drivers, but it cannot attract more Drivers unless it attracts more Passengers first, but it cannot attract more Passengers without more Drivers. *See id.* ¶¶ 69-71. "These network effects create a formidable barrier to entry that insulates [Uber] from new competition *or expansion by smaller rivals.*" *Id.* ¶ 71 (emphasis added).

17

18

19

20

21

22

23

24

25

Finally, Sidecar does not concede that Uber lacks the power to restrict output or impose monopolistic prices. *Contra* Mot. at 15. Sidecar's Amended Complaint repeatedly alleges that Uber has monopoly power. *See, e.g.*, Am. Compl. ¶¶ 1, 5, 9, 11, 71, 78, 82-83, 88, 99, 110, 115. Sidecar also alleged Uber's market share in the relevant markets, ranging from 60-75%. *Id.* ¶ 82. "Monopoly power has long been defined in the courts as the power to exclude competition or to control price . . . ." *Ind. Grocery*, 864 F.2d at 1414. The Amended Complaint alleges that Uber has the power to control prices (especially in setting fares, as eliminating Sidecar eliminated the only competitor that allowed Drivers to set their own fares), and has done so. *See* Am. Compl. ¶¶ 8, 93-94, 99-100. This case therefore differs from *Indiana Grocery*, where the plaintiff conceded that the

26

27

28

norms to cooperate on price setting or other terms of competition." *Id.* Sidecar fits this definition. It was the first to offer many now-popular features, *see* Am. Compl. ¶ 4, and its feature allowing Drivers to set their own fares, *see id.* ¶ 99, incentivized price cutting (so Drivers could attract more Passengers), and made "cooperat[ing] on price setting" with other Ride-Hailing Apps impossible.

**-13-**

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    defendant (which had a 35-50% market share) "could never obtain monopoly power." 864 F.2d at

2    1414-15. Sidecar has not made the same concession here.

3              **4.    Uber's Predatory Pricing Harmed Competition**

4              Because the Sherman Act is intended to protect competition, not competitors, a plaintiff can

5    recover only if there has been harm to competition. Uber contends that Sidecar has not satisfied that

6    standard, because only Sidecar has been driven from the market. Yet a plaintiff need not show that

7    the defendant's anticompetitive acts drove *all* competitors from the market to prove harm to

8    competition. It need only allege "that the below-cost pricing scheme was capable of driving

9    defendant's competitors, *or at least the object of the predatory pricing*, from the relevant market."

10   ABA, *Model Jury Instructions in Civil Antitrust Cases* 138 (2016 ed.) (emphasis added). Because

11   Sidecar was the maverick competitor in the market—offering features that no other Ride-Hailing

12   Apps did, such as the ability for Drivers to set their own fares, *see* Am. Compl. ¶ 4—Sidecar was the

13   primary target of Uber's anticompetitive conduct. Its elimination harmed competition. *See United*

14   *States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 216 (D.D.C. 2017) (finding that proposed merger would

15   have anticompetitive effects by reducing the number of national competitors from four to three);

16   U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 6 (2010) (explaining

17   that harm to competition is "by no means limited" to situations of "merger to monopoly"). While

18   Lyft was not eliminated, Uber's conduct was anticompetitive if it "*discipline[d]* or eliminate[d]"

19   competition." *Inglis*, 668 F.2d at 1035 (emphasis added). Uber's predatory pricing adequately

20   disciplined Lyft such that it has been "weakened" and now is "in need of the financial umbrella to be

21   provided by Uber pricing in order to recover from its own bruising losses." Am. Compl. ¶ 8.[6]

22             The starkest example of the harm to competition is the elimination of the only competitor

23   that permitted Drivers autonomy in setting their own fares. Sidecar "disrupt[ed] market conditions

24   with [its] new technology [and] business model," U.S. Dep't of Justice & Fed. Trade Comm'n,

25   *Horizontal Merger Guidelines* § 2.1.5 (2010). Allowing Drivers to set their own fares created yet

26   another layer of competition, as Drivers competed with one another. *See* Am. Compl. ¶¶ 4, 99.

27   

28   ---
     [6] Uber's argument about competition from taxis is irrelevant, because taxis are not part of the relevant market, as explained above.

McKool Smith Hennigan, P.C.
Los Angeles, CA

Eliminating Sidecar caused "the loss of actual or potential competition." U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 2.1.5 (2010). Without the competition from Drivers setting their own fares, Uber can now facilitate oligopoly price increases, which have started. Am. Compl. ¶ 8.

### 5. Uber's Tortious Activities to Stifle and Eliminate Competition Are Actionable Under the Antitrust Laws

Uber improperly attempts to isolate its anticompetitive activities, contending that its tortious activities to impede rivals, standing alone, cannot serve as the basis of an antitrust claim. This argument fails out of the gate because it is well settled that a monopolist's conduct must be considered as a whole. Uber's tortious activities—Projects "Hell," "SLOG," and any other tortious activities aimed at diminishing rival networks and raising their costs—must be considered in context as a complement to its predatory scheme. "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* (quoting *United States v. Patten*, 226 U.S. 525, 544 (1913)).[7] This is particularly true here where the predatory pricing and tortious conduct had synergistic effects. Uber's tortious conduct artificially increased its competitors' costs by flooding their systems with fraudulent ride requests, while at the same time engaging in predation that effectively capped its competitors' revenues. *See* Am. Compl. ¶¶ 104-06. Thus, Uber's tortious conduct cannot be considered in isolation; Uber's tortious bad acts must be analyzed together with and in the context of Uber's predatory pricing. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (explaining that it is "not [] proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect"); *see also New York ex rel. Schneiderman v. Actavis PLC,* 787 F.3d 638, 653, 654 (2d Cir. 2015) (considering "the overall effect" of a monopolist's conduct); *City of Mishawaka, Ind. v. Am. Elec. Power Co.*, 616 F.2d 976,

---

[7] While this quotation refers to "conspiracy," because it was quoting a conspiracy case, *Continental Ore* involved both conspiracy (Section 1) and monopolization (Section 2) claims. *Id.* at 693.

**-15-**

986 (7th Cir. 1980) (describing anticompetitive acts combined into a "monopoly broth" that produced an "unsavory flavor").

Anyway, Uber's tortious interference standing alone is actionable. "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998). "[M]erely because a particular practice might be actionable under tort law does not preclude an action under the antitrust laws as well." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002). Courts have repeatedly allowed antitrust claims alleging fraud, misrepresentations, and misuse of processes. *See Caribbean Broad.*, 148 F.3d at 1087 (Sherman Act claim alleging fraudulent representations to customers); *Conwood*, 290 F.3d at 784 (Sherman Act claim alleging removal of display racks, misrepresentations to retailers, and exclusive agreements); *Cal. Motor Transport Co. v. Trucking Unltd.*, 404 U.S. 508 (1972) (Clayton Act claim alleging conspiracy to misuse state legal and regulatory processes); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965) (Sherman Act claim alleging enforcement of patent procured by fraud); *Verizon Communc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (explaining that the means of illegal exclusion are manifold); *Covad Communc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 672 (D.C. Cir. 2005) ("Whether a particular allegation states a [monopolization] claim under the Sherman Act depends entirely upon the competitive significance of the conduct alleged."); *LePage's, Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003).

Uber's tortious conduct is actionable. "Uber's senior executives and officers devised programs, including 'Project Hell' and 'SLOG', to, among other things, submit fraudulent ride requests on competitors' Apps." Am. Compl. ¶ 103. Uber's actions were not isolated or temporary. These projects lasted from at least mid-2014 to December 2015—over a year. *Id.* ¶¶ 101-02. They were official company projects, devised at Uber's highest levels, and were later discovered and well-covered by the press. *Id.* ¶¶ 101-03. Moreover, Uber's actions expressly violated Sidecar's terms of

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  service, including prohibitions on interfering with the performance of the App, conducting fraud

2  through the App, and using the App for commercial purposes.[8] *Id.* ¶¶ 107-09.

3  Uber's actions undermined the value of Sidecar's App for both Drivers and Passengers.

4  Drivers "were sent on a wild goose chase or to pick up Uber contractors" "[i]nstead of earning

5  money by completing rides." *Id.* ¶ 104. Meanwhile, "Passengers were met with longer wait times for

6  rides" as Drivers were pursuing fraudulent ride requests. *Id.* ¶ 105. Thus, Uber raised its rivals' costs

7  and degraded their quality of service, precisely at the crucial juncture when the competitors were

8  trying to build their networks. Because of the network effects described above, "these fraudulent ride

9  requests triggered a vicious downward cycle," as both Drivers and Passengers fled to Uber. *Id.*

10 ¶ 106. Uber targeted not only Sidecar, but also Lyft. *Id.* ¶ 107. By driving Sidecar out of the market

11 and increasing Uber's market share of both Drivers and Passengers, Uber harmed competition

12 through its tortious actions. *Id.* ¶ 110.[9]

13 Uber complains that Sidecar did not allege "the absolute number of alleged 'fraudulent'

14 requests in any given market," or "the timing or frequency of the alleged requests." Mot. at 17. To

15 begin, it is unfair for Uber to make such criticisms given that these were secretive programs that it

16 attempted to hide. In any event, the *Conwood* Court rejected a similar argument, explaining that the

17 parties did not need "to investigate activity at specific retail establishments" because doing so

18 "would have been so costly as to have effectively ended this suit, despite substantial evidence of

19 anti-competitive activity." 290 F.3d at 784. Similarly here, Sidecar need not identify specific

20 fraudulent ride requests (especially at the pleading stage). It is enough that Sidecar named and

21 alleged the existence of Uber's secretive, fraudulent projects designed to tortiously interfere with

22 competitors. High-level company executives do not generally create codename projects for conduct

23 that is "isolated" or "occasional."

24 Finally, Uber justifies its tortious conduct by arguing that it simply recruited Drivers to work

25 exclusively with Uber, which is a legitimate business justification. Mot. at 18. The problem with

26

27 _____
   [8] This fact alone may not establish antitrust liability, but it is instructive regarding Uber's intent.
28 [9] While Uber's actions did not drive Lyft out of the market, they weakened Lyft, thereby cementing
   Uber's monopoly position. *See* Am. Compl. ¶¶ 107, 110.

-17-

Uber's argument is twofold. First, it ignores the allegation that another purpose of Uber's actions was "to undermine the value of competitive Ride-Hailing Apps, for both Passengers and Drivers." Am. Compl. ¶ 103. Second, it ignores the later effects of Uber's anticompetitive, tortious conduct. After Uber drove its competition—like Sidecar—out of the market, Uber used its monopoly power to "reduce[] the amount that it paid to Drivers." *Id.* ¶¶ 8, 137. Sidecar's exclusion was particularly pernicious given that it was the only App that allowed "private drivers to set their own proposed fare rates, competing with one another." *Id.* ¶¶ 4, 44, 99. Recruiting Drivers from Sidecar to Uber therefore had a negative effect on the market, both by removing the Drivers' ability to set their own fares, and by ultimately giving Uber the power to reduce the amount it paid to Drivers and the price it charged Passengers.

## B.    Sidecar Properly Pled an Unfair Practices Act Claim

Besides being illegal under federal law, Uber's bad acts also violate California's Unfair Practices Act ("UPA") which prohibits, among other things, below-cost pricing for the purpose of harming competitors or competition. Cal. Bus. & Prof. Code §§ 17030, 17043, 17044. None of Uber's attacks on Sidecar's state law claim is well-founded.

### 1.    Uber's Predatory Pricing Is Not Exempt from UPA Scrutiny

The UPA precludes certain below-cost pricing. Cal. Bus. & Prof. Code §§ 17030, 17043, 17044. While the UPA exempts "any service, article or product for which rates are established under the jurisdiction of the Public Utilities Commission," Cal. Bus. & Prof. Code § 17024(1), that exemption does not apply here. While Uber is subject to the jurisdiction of the California Public Utilities Commission, the Commission has not "established" rates for any Uber service, article, or product. Am. Compl. ¶ 163. It would make little sense to shield Uber's rates from antitrust scrutiny when the Commission has not actually exercised its discretion to "establish" Uber's rates. While other courts have found otherwise, those decisions conflict with the plain language and purpose of the statute, and no binding authority requires this Court to reach the same conclusion.

-18-

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS

## 2.     Sidecar's UPA Claims Are Timely

"The limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues." *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1191 (2013). For the purposes of the UPA claim, "damages accrue from the date they are suffered and certain." *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 279 n.16 (Cal. Ct. App. 1983); *see Aryeh*, 55 Cal. 4th at 1196 ("The common law last element accrual rule is the default . . . ."). Thus, if a defendant commits unlawful acts that do not cause damages until years later—such as the damage incurred "when [plaintiff] went out of business"—"the latter date is when the applicable period of limitations begins to run." *G.H.I.I.*, 147 Cal. App. 3d at 279 n.16. Applied here, Uber began committing unlawful acts (predatory pricing) in 2013, but Sidecar's claim accrued in December 2015, when Uber's anticompetitive actions finally succeeded in driving Sidecar out of business. Because the statute of limitations did not otherwise begin to run until December 2015 (and, as Uber acknowledges, was tolled between August 28, 2018 and December 10),[10] Sidecar's December 11, 2018 Complaint was timely.

To the extent there is any question about the timeliness of Sidecar's claims, the continuing violations doctrine resolves it. "Allegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period." *Aryeh*, 55 Cal. 4th at 1198. Sidecar has alleged such a pattern. Am. Compl. ¶¶ 5, 9, 11. 90-98. Uber's predatory pricing scheme involved repeatedly undercharging Passengers and overpaying Drivers on a daily basis for years. This "series of small harms" eventually drove Sidecar out of business. *Aryeh*, 55 Cal. 4th at 1197-98.

## 3.     Because Uber Does Business in California, the UPA Applies to All of Uber's Conduct

The UPA applies to Uber's conduct at issue in this case. First, half of the relevant geographic markets are in California (San Francisco, greater Los Angeles, San Diego, and San Jose), so Uber's arguments miss the mark with respect to at least those markets. Second, the UPA applies to Uber's

---

[10] Motion to Dismiss, p. 9 n.8.

Case No. 3:18-cv-07440-JCS                                        PLAINTIFF'S RESPONSE TO DEFENDANTS'
                                                                              MOTION TO DISMISS

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

pricing in non-California markets because Uber is "engaged in business within" California. Cal. Bus. & Prof. Code §§ 17043-17044; *see* Am. Compl. ¶¶ 15-17 (alleging that Uber Technologies, Inc. and several of its subsidiaries have a principal place of business in San Francisco). The UPA provides that "[i]t is unlawful for any person engaged in business *within this State*" to engage in certain conduct (such as below-cost pricing). *See* Cal. Bus. & Prof. Code §§ 17043-17044 (emphasis added). The structure of the sentence indicates that "within this state" applies to "person engaged in business," not the prohibited conduct. Thus, the plain language shows that the statute regulates California entities wherever they act, regardless of whether the conduct occurs in California. This interpretation is consistent with California's interests. "California has an interest in regulating those who do business within its state boundaries . . . ." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012).[11] Accordingly, the entirety of Sidecar's UPA claim is proper and should not be dismissed.

### 4.    Uber Cut Prices for the Purpose of Injuring Competitors or Destroying Competition

Sidecar does not dispute that the UPA requires that Uber priced below cost for the purpose of harming competitors or competition. But the Amended Complaint alleges precisely that: "The purpose and effect of Uber's pricing scheme was and is to injure competitors, including Sidecar, to gain greater market share and eventually raise prices." Am. Compl. ¶ 162; *see also, e.g., id.* ¶¶ 1, 8, 9, 12, 85, 102-06. And even if it did not, "evidence of an injury due to a below-cost pricing scheme may establish the rebuttable statutory inference of unlawful purpose." *Bay Guardian Co. v. New Times Media LLC*, 187 Cal. App. 4th 438, 457 (2010). The Amended Complaint alleges that Uber's predatory pricing harmed Sidecar. For example, Sidecar alleges that Uber's "actions drove Sidecar out of business." Am. Compl. ¶ 12; *see also, e.g., id.* ¶¶ 1, 117, 136, 146, 155. Accordingly, the allegations establish a presumption that Uber had the requisite statutory intent to harm competitors or competition. *See Bay Guardian*, 187 Cal. App. 4th at 461-67 (affirming jury verdict based on jury instruction that "[i]f you find that any defendant sold advertising space below cost, and any below-

---

[11] Unlike in *Mazza*, the plaintiff here is also a California resident, so there is no concern about applying California law to the claims of foreign residents.

-20-

cost sales injured the Bay Guardian as a competitor, it is presumed that defendants' purpose was to injure competitors and destroy competition").[12] The Amended Complaint's allegations also establish Uber's unlawful purpose even in the absence of the presumption. For example, Uber's fraudulent ride requests were intended "to undermine the value of competitive Ride-Hailing Apps," and violated Sidecar's terms of service. Am. Compl. ¶¶ 103-04, 107-09. Those fraudulent actions are indicative of Uber's purpose to harm competitors and competition.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Uber's Motion to Dismiss.

McKool Smith Hennigan, P.C.
Los Angeles, CA

---

[12] While the presumption is rebuttable, any rebuttal from Uber creates a fact issue inappropriate for a motion to dismiss, where review is limited to the facts alleged in the complaint, all of which must be taken as true. *Iqbal*, 556 U.S. at 679.

-21-

DATED: November 11, 2019                    **MCKOOL SMITH, P.C.**


                                   By:    /s/ *Lewis T. LeClair*
                                          Lewis T. LeClair (SBN 77036)
                                          **MCKOOL SMITH, P.C.**
                                          300 Crescent Court, Suite 1500
                                          Dallas, Texas 75201
                                          Telephone:    (214) 978-4000
                                          Facsimile:    (214) 978-4044

                                          Kirk D. Dillman (SBN 110486)
                                          kdillman@mckoolsmithhennigan.com
                                          **MCKOOL SMITH HENNIGAN, P.C.**
                                          300 South Grand Avenue, Suite 2900
                                          Los Angeles, California 90071
                                          Telephone:    (213) 694-1200
                                          Facsimile:    (213) 694-1234

                                          Judith A. Zahid (SBN 215418)
                                          jzahid@zelle.com
                                          **ZELLE LLP**
                                          44 Montgomery Street, Suite 3400
                                          San Francisco, California 94104
                                          Telephone:    (415) 693-0700
                                          Facsimile:    (415) 693-0770

                                          James R. Martin (SBN 173329)
                                          jmartin@zelle.com
                                          **ZELLE LLP**
                                          1775 Pennsylvania Ave. NW, Suite 375
                                          Washington, D.C. 2006
                                          Telephone:    (202) 899-4100
                                          Facsimile:    (612) 336-9100

                                          ***Attorneys for Plaintiff, SC Innovations, Inc.***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Civil L.R. 5.4, and will be served upon all counsel of record for the parties who have consented to electronic service in accordance with Civil L.R. 5-5 via the Court's ECF system.

Dated:  November 11, 2019                              By:  _/s/ Lewis T. LeClair_
                                                             Lewis T. LeClair

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

-23-

**Case No. 3:18-cv-07440-JCS**                        PLAINTIFF'S RESPONSE TO DEFENDANTS'
                                                                  MOTION TO DISMISS
4833-2915-4987