UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SC INNOVATIONS, INC., | Case No. 18-cv-07440-JCS |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION TO DISMISS AMENDED COMPLAINT** |
| UBER TECHNOLOGIES, INC., et al., | Re: Dkt. No. 64 |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff SC Innovations, Inc. ("Sidecar") is a defunct "transportation network company" that offered services matching passengers with drivers for on-demand transportation, also known as "ride-hailing," through a smartphone app.  Sidecar claims that it was driven out of business by Defendants Uber Technologies, Inc. and a number of its subsidiaries (collectively, "Uber").[1]  The Court held a hearing on January 17, 2020.  For the reasons discussed below, Uber's motion is GRANTED.  Sidecar's Sherman Act claims are DISMISSED with leave to amend, and its claim under California's Unfair Practices Act is DISMISSED with prejudice.[2]

## II.   BACKGROUND

### A.   Procedural History

Sidecar filed this action on December 11, 2018.  On May 2, 2019, the Court granted a

---

[1] The remaining defendants are Raiser, LLC; Rasier-CA, LLC; Rasier-PA, LLC; Rasier-DC, LLC; Rasier-NY, LLC; and Uber USA, LLC.  The parties do not suggest that there is any distinction between the various defendants relevant to the present motion, except perhaps with respect to the scope of California's Unfair Practices Act.  The Court does not reach that issue, because to the extent that some or all of the defendants fall within the geographic scope of that statute, they are nevertheless exempt from its requirements as utility corporations regulated by the California Public Utilities Commission.

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1   motion by Uber to disqualify Sidecar's then-attorneys, the law firm of Quinn Emanuel Urquhart &

2   Sullivan, LLP.  *See* Order Re Mot. to Disqualify Counsel (dkt. 41).[3]  Uber moved to dismiss

3   Sidecar's initial complaint on July 10, 2019 (dkt. 57), Sidecar elected to file its operative first

4   amended complaint (dkt. 60) rather than oppose the motion, and the Court denied that first motion

5   to dismiss as moot on September 25, 2019 (dkt. 63).  Uber now moves to dismiss the amended

6   complaint.  *See generally* Mot. (dkt. 64).

7           **B.    Allegations of the First Amended Complaint**

8           Because the allegations of a complaint are generally taken as true in resolving a motion to

9   dismiss under Rule 12(b)(6), this section summarizes the allegations of Sidecar's complaint as if

10  true.  Nothing in this order should be construed as resolving any issue of fact that might be

11  disputed at a later stage of the case.

12          Ride-hailing apps allow passengers to request a ride to a particular destination, match them

13  with nearby drivers who will pick up the passengers, and then charge the passengers a fare for the

14  ride.  1st Am. Compl. ("FAC," dkt. 60) ¶¶ 28–30, 35.  The company operating the ride-hailing app

15  typically retains a percentage of the fare and transmits the remainder to the driver.  *Id.* ¶ 35.

16          Uber launched the first version of its ride-hailing app in 2009, which "allowed consumers

17  to use smartphones to arrange on-demand transportation in 'black cars' and limousines driven by

18  licensed chauffeurs," and "focused on airport trips and traditional business car service customers."

19  *Id.* ¶¶ 2, 38.  Sidecar introduced its own app in 2012, which allowed passengers to arrange for

20  transportation with drivers who used their own personal vehicles,[4] and which introduced features

21  including allowing passengers to input destinations before booking trips, providing estimated fares

22  and trip durations before booking, allowing unaffiliated passengers heading in the same direction

23  to share rides, and allowing drivers to set their own prices.  *Id.* ¶¶ 3–4, 41–44.  Another company,

24  Lyft, launched a somewhat similar product the same year.  *Id.* ¶ 40.  According to Sidecar, Uber

25

26  _____

27  [3] *SC Innovations, Inc. v. Uber Techs., Inc.*, No. 18-cv-07440-JCS, 2019 WL 1959493 (N.D. Cal. May 2, 2019).

28  [4] Sidecar's complaint refers to this concept as "ridesharing."  FAC ¶ 3.  In the interest of clarity, this order avoids that term, which has been used to mean a number of different things in different contexts.

United States District Court
Northern District of California

1  recognized Sidecar's product as a competitive threat to its business as a result of Sidecar offering

2  lower prices and more flexibility. *Id.* ¶¶ 49–50. In 2013, Uber launched its "UberX" service,

3  which—like Sidecar's product—allows passengers to arrange for transportation in drivers' private

4  cars. *Id.* ¶¶ 5, 50–51. As of that year, "Uber was the dominant ridesharing platform in the United

5  States," having become "enormously capitalized" and experiencing significant growth. *Id.* ¶ 5.

6  Lyft and Uber have since implemented many features pioneered by Sidecar. *Id.* ¶ 45.

7       During Sidecar's years of operation from 2012 through 2015, its service was available in

8  San Francisco, Austin, Los Angeles, Chicago, Philadelphia, New York, Seattle, San Diego, San

9  Jose, and Washington, DC. *Id.* ¶ 46. Sidecar asserts that each of those cities constitutes a relevant

10  geographic market for the purpose of its antitrust claims. *Id.* ¶¶ 63–64. It had "a meaningful share

11  of the market in several U.S. cities," including at one time an estimated share of between ten and

12  fifteen percent of the market in San Francisco, Los Angeles, and Chicago. *Id.* ¶ 47.

13       By mid-2014, Uber operated in all of Sidecar's geographic markets. *Id.* ¶ 48. "Uber's

14  CEO has publicly admitted in security filings that Uber intentionally prices its rides in certain

15  markets below the costs paid to drivers for the ride." *Id.* ¶ 6; *see also id.* ¶¶ 85–92. In the time

16  period and geographic markets where Uber competed against Sidecar, the prices that Uber charged

17  passengers were lower than its variable costs. *Id.* ¶ 90. Uber cannot achieve profitability while

18  paying its drivers more than it receives for rides, and has in fact lost billions of dollars, but

19  continues to attract financing because "network effects" inherent in the ride-hailing industry "will

20  eventually financially reward the successful platform for its elimination of competition." *Id.* ¶ 6;

21  *see also id.* ¶¶ 87, 89. According to Sidecar, Uber's leadership "specifically planned for this

22  subsidized pricing strategy to foreclose competition," sustaining losses in the short term "designed

23  to drive Sidecar and other competing ride-hailing apps out of the market" in the expectation that

24  Uber could later recoup those losses by charging higher prices. *Id.* ¶ 7. Sidecar alleges that

25  network effects would serve as a barrier to entry protecting Uber from meaningful competition

26  after it consolidated the market, *id.*, analogizing Uber's approach to that of Amazon.com, Inc.,

27  which weathered significant losses for many years before dominating its market and reaping large

28  rewards, *id.* ¶ 88.

In 2015, Sidecar left the ride-hailing market, driven out of business by Uber's purportedly anticompetitive conduct. *Id.* ¶¶ 8, 12.  Sidecar's exit reduced competition to just Uber and Lyft in the markets where Sidecar previously operated. *Id.* ¶¶ 112–13.  Uber continued to price below costs, targeting the only significant competitor left in the market, Lyft. *Id.* ¶¶ 8, 93.  Sidecar alleges that more recently, however, Uber and Lyft have "transitioned toward classic duopoly behavior with Uber holding the dominant position in the market and Lyft holding on to a position as a weakened competitor," and Uber has started to increase the prices it charges passengers while decreasing the amounts that it pays drivers. *Id.* ¶ 8; *see also id.* ¶¶ 93–98.  According to Sidecar, Lyft—weakened by competition with Uber at prices below costs—will defer to Uber's pricing to recover its own losses as well, and Uber has signaled its price increases to Lyft by announcing a shift to no longer focusing on "incentives." *Id.* ¶¶ 8, 99–100.

Sidecar alleges that in addition to engaging in predatory pricing, Uber also launched "clandestine campaigns" to interfere with its competitors' operations, submitting "fraudulent ride requests" by Uber personnel intended "to undermine its competition and raise their costs, including by (a) inundating competitors with fraudulent ride requests that were cancelled before the driver arrived; or (b) using fraudulently requested trips as an opportunity to convince drivers to work exclusively with Uber instead of competitors." *Id.* ¶ 9; *see also id.* ¶¶ 101–10.  Such tactics increased the waiting time for drivers and passengers using the competing apps to be matched with legitimate rides, causing them to abandon those apps. *Id.* ¶¶ 10, 106.  The fraudulent requests also violated Sidecar's terms of service. *Id.* ¶¶ 108–09.

According to Sidecar, ride-hailing apps are "a relevant antitrust product market" in which a hypothetical monopolist could impose a "small but significant non-transitory increase in price," or "SSNIP," both by raising prices for passengers and by reducing the payments made to drivers, without enough passengers or drivers switching to other methods of transportation to render such a pricing strategy unprofitable. *Id.* ¶¶ 52–53.  Sidecar cites conveniences including the ability to split fares with friends, book carpool rides with strangers, automatically pay and tip drivers, select the origin and destination of a ride on a map, determine estimated cost and travel time in advance, rate and see information about the driver, and select particular features of the vehicle as reasons

United States District Court
Northern District of California

1   why passengers would not respond to a price increase by switching to other forms of

2   transportation like taxis. *Id.* ¶¶ 53–54. Sidecar also alleges that walking, driving a passenger's

3   own vehicle, and public transit are not reasonable substitutes. *Id.* ¶¶ 59–60. The flexibility of

4   ride-hailing and lack of need for special licensing or up-front investment are reasons why drivers

5   would not switch to the taxi or limousine industry if payouts from ride-hailing companies

6   decreased. *Id.* ¶¶ 55–56. Sidecar notes that ride-hailing is subject to different government

7   regulation than taxi companies, including often a prohibition against picking up "street hails," and

8   that Uber has in the past asserted that it does not compete with taxis. *Id.* ¶¶ 57–58.

9        Sidecar alleges that "network effects" serve as a significant barrier to entry to a

10   consolidated ride-hailing market. *Id.* ¶¶ 65–79. As a particular ride-hailing network becomes

11   more established with more drivers and passengers using it, the waiting time for passengers and

12   drivers to be matched with one another decreases, as does the typical distance that drivers need to

13   travel to pick up the passengers they are matched with. *Id.* ¶¶ 67–68. That reduces the

14   inconvenience to passengers of waiting for rides, and increases the value to drivers as a result of

15   being able to spend more of their time with paying customers in their cars. *Id.* A new entrant to

16   the market would not be desirable to passengers while the number of participating drivers was

17   smaller than more established rivals, nor would it be desirable to drivers without a large user base

18   of passengers. *Id.* ¶ 71. Uber itself and market observers have recognized these market dynamics.

19   *Id.* ¶¶ 69–70, 75, 79. No significant competitors have entered the market since Sidecar ceased

20   operations, and Sidecar asserts that it would be "difficult, if not impossible, for a new entrant or

21   smaller firm to overcome" Uber's entrenched advantages. *Id.* ¶¶ 72–73.

22        Uber now has more than forty million passengers using its service. *Id.* ¶ 74. At all times

23   since 2014, it has controlled at least 60% of the market in San Francisco and Los Angeles; 65% of

24   the market in Chicago, Seattle, San Diego, and San Jose; 70% of the market in Philadelphia,

25   Boston, and Washington, DC; and 75% of the market in New York. *Id.* ¶ 82. Sidecar asserts that

26   these market shares are sufficient for Uber to "ha[ve] monopoly power" in each of those cities. *Id.*

27   Uber's national market share is around 70% and Lyft's national market share is around 30%, with

28   the two companies "collectively account[ing] for nearly 100% of all rides booked through Ride-

1    Hailing Apps in the United States." *Id.* ¶ 81.

2        Sidecar asserts claims for monopolization in violation of section 2 of the Sherman Act, *id.*

3    ¶¶ 118–47, attempted monopolization in violation of section 2 of the Sherman Act, *id.* ¶¶ 148–56,

4    and below cost pricing intended to harm competition in violation of California's Unfair Practices

5    Act, *id.* ¶¶ 157–63.

6        **C.  Parties' Arguments**

7            **1.   Uber's Motion**

8        Uber moves to dismiss Sidecar's Sharman Act claim, arguing that it is implausible that

9    Uber engaged in predatory pricing when it entered the non-limousine ride-hailing market a year

10   after Lyft and Sidecar, and also competing, in Uber's view, against the long-established taxi

11   industry.  Mot. at 5–6.  Uber argues that Sidecar's market definition, which excludes taxis, is

12   facially implausible.  *Id.* at 10–12.  Uber also contends that its low prices served the legitimate

13   purpose of gaining business in a new market and had the procompetitive effect of lowering prices

14   for consumers, *id.* at 6–7, and that Sidecar has not plausibly alleged a dangerous probability of

15   Uber recouping its losses, *id.* at 13–15.  According to Uber, the plausibility of Sidecar's claim is

16   undercut by Sidecar's amendment of its complaint to replace allegations that Uber is now

17   recouping earlier losses with allegations that it continues to price below cost in competition with

18   Lyft.  *Id.* at 7–8.  Uber also argues that Sidecar does not allege monopolization because Lyft and

19   taxi companies continue to compete against Uber, *id.* at 8–13, and that Sidecar cannot base an

20   antitrust claim on allegations of mere tortious interference that would not have harmed

21   competition more broadly than merely harming Sidecar—allegations that Uber contends are too

22   conclusory to be credited, even if they could support an antitrust claim, *id.* at 16–19.

23       Uber argues that Sidecar's claim under California's Unfair Practices Act (the "UPA")

24   should be dismissed with prejudice because Uber is exempt from the UPA as a "transportation

25   network company" subject to regulation by the California Public Utilities Commission ("CPUC").

26   *Id.* at 19–20.  Uber also moves to dismiss Sidecar's UPA claim as barred by the statute of

27   limitations, *id.* at 19–22, inapplicable to conduct outside California, *id.* at 22–23, and unsupported

28   by sufficient allegations of intent to harm competitors or competition, *id.* at 23–24.

United States District Court
Northern District of California

6

United States District Court
Northern District of California

2.      **Sidecar's Opposition**

Sidecar argues that its proposed market definition is plausibly supported by allegations that consumers and drivers differentiate between taxis and ride-hailing companies, and that the Court must therefore accept that market definition at the pleading stage.  Opp'n (dkt. 67) at 4–7.  Sidecar also contends that its allegations of predatory pricing are plausible, using the standard that the Ninth Circuit and other courts have accepted of circumstantial evidence based on market definition, the defendant controlling a dominant share of the market, significant barriers to entry, and the inability of existing competitors to increase their output quickly.  *Id.* at 7 (citing, *e.g.*, *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)).  Sidecar argues that Uber's late entry to the non-limousine ride-hailing market does not negate a claim for monopolization, particularly given Uber's established business as a platform for hailing limousines, and that the legitimate competitive reasons that Uber asserts for its low prices are matters for a jury to consider, not grounds for dismissal under Rule 12(b)(6).  *Id.* at 8–10. According to Sidecar, its allegations of predatory pricing and harm to competition are also sufficient at this stage.  *Id.* at 10–15.  Sidecar further contends that allegations of tortious conduct support a conclusion that Uber's course of conduct as a whole was anticompetitive and had the purpose and effect of harming competitors.  *Id.* at 15–18.

Sidecar argues that Uber is not exempt from the UPA because the CPUC has not actually regulated Uber's prices, and asks the Court to depart from past decisions holding actual regulation unnecessary (so long as the CPUC would have authority to regulate prices) and instead rely on the plain language of the statute.  *Id.* at 18.  Sidecar contends that its UPA claim is timely because the statute of limitations should run from when Sidecar was actually driven out of the market, and that even if that were not the case, the continuing violations doctrine would allow Sidecar to base its claim on the full course of Uber's alleged conduct.  *Id.* at 19.  Sidecar also argues that it may bring a UPA claim for all of the geographic markets at issue because Uber does business in California, but at the very least may base its claim on the markets at issue within California, and that its allegations of the intent and effects of Uber's conduct are sufficient.  *Id.* at 19–21.

### 3.   Uber's Reply

Uber argues in its reply that Sidecar wrongfully seeks to minimize the standard for showing a dangerous probability of recoupment, and that Sidecar's failure to meet that standard warrants dismissal of its Sherman Act claim. Reply (dkt. 68) at 2–7. Uber also argues that Sidecar's claim defies "basic economic logic" in that Lyft was not driven from the market, in that Uber was a new entrant to the non-limousine ride-hailing market when it began its alleged predatory pricing, and in Sidecar's exclusion of taxis from the alleged market definition. *Id.* at 7–11. Uber argues again that alleged tortious interference does not support a Sherman Act claim, and contends that Sidecar's allegation that Uber representatives hailed rides on other platforms (including Sidecar) in order to recruit drivers for Uber demonstrates a legitimate business purpose. *Id.* at 11–13.

Uber briefly renews each of its arguments for dismissing Sidecar's UPA claim. *Id.* at 13–15. With respect to the geographic scope of that statute, Uber contends that applying it to conduct outside of California would conflict with legislative intent and California's presumption against extraterritorial application of its laws. *Id.* at 14–15.

## III.   ANALYSIS

### A.   Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a claimant's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory.

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, the claim must be "'plausible on its face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### B.   Sherman Act

Section 2 of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. Under the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor," and may recover treble damages. 15 U.S.C. § 15(a). "Simply possessing monopoly power and charging monopoly prices does not violate § 2; rather, the statute targets 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

> In order to state a claim for monopolization under [section 2 of the Sherman Act], a plaintiff must prove that: (1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury. *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (citations omitted).
>
> In order to state a claim for attempted monopolization, a plaintiff must

1    |    prove: (1) specific intent to control prices or destroy competition; (2)
2    |    predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury. *Id.* (citations omitted).

3    *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949–50 (9th Cir. 1996) (footnote

4    omitted; line break added).

5          One means of monopolization recognized by the courts—albeit with skepticism—is

6    predatory pricing, in which an aspiring monopolist sets "below-cost prices that drive rivals out of

7    the market and allow the monopolist to raise its prices later and recoup its losses." *Pac. Bell*, 555

8    U.S. at 448; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589 (1986)

9    ("[T]here is a consensus among commentators that predatory pricing schemes are rarely tried, and

10   even more rarely successful."). Such a claim requires the plaintiff to show both pricing below

11   costs and a probability of recoupment:

12   |    "[C]utting prices in order to increase business often is the very
13   |    essence of competition." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). In cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are
14   |    "especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Ibid.*; see also *Brooke Group* [*Ltd. v.*
15   |    *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993)]; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 121–122, n. 17
16   |    (1986). To avoid chilling aggressive price competition, we have carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low. Specifically,
17   |    to prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) "the prices complained of are below an appropriate measure
18   |    of its rival's costs"; and (2) there is a "dangerous probability" that the defendant will be able to recoup its "investment" in below-cost prices.
19   |    *Brooke Group*, *supra*, at 222–224. "Low prices benefit consumers
20   |    regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atlantic Richfield*
21   |    *Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990).

22   *Pac. Bell*, 555 U.S. at 451. "That below-cost pricing may impose painful losses on its target is of

23   no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws

24   were passed for 'the protection of *competition,* not *competitors*.'" *Brooke Grp.*, 509 U.S. at 224

25   (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

26         **1.**      **Sidecar Alleges a Plausible Market**

27         "In order to state a valid claim under the Sherman Act, a plaintiff must allege that the

28   defendant has market power within a 'relevant market.'" *Newcal Indus., Inc. v. Ikon Office Sol.*,

United States District Court
Northern District of California

513 F.3d 1038, 1044 (9th Cir. 2008).  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe*, 370 U.S. at 325.  A common test for such interchangeability "is to find whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' ('SSNIP') in the proposed market" without causing enough consumers to switch to products outside the market definition to render the price increase unprofitable.  *See St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) (considering geographic market definition).

Uber argues that Sidecar's alleged market of app-based ride-hailing services, excluding taxis, defies common sense.  It is certainly possible that ride-hailing companies like Uber compete against taxi companies—as a number of taxi companies have argued in lawsuits against Uber.  *See, e.g.*, *Phila. Taxi Ass'n Inc. v. Uber Techs., Inc.*, 886 F.3d 332 (3d Cir. 2018); *Desoto Cab Co. v. Uber Techs, Inc.*, No. 16-cv-06385-JSW, 2018 WL 10247483 (N.D. Cal. Sept. 24, 2018); *Malden Transp., Inc. v. Uber Techs., Inc.*, 321 F. Supp. 3d 174 (D. Mass. 2018).  At this stage of the case, however, the Court takes Sidecar's factual allegations as true.

Sidecar alleges that consumers distinguish between ride-hailing companies and taxi companies such that a price increase for ride-hailing services meeting the "SSNIP" standard would not cause consumers to switch to taxis.  To the extent such an assertion might, alone, be a conclusion not entitled to be taken as true, Sidecar supports it with allegations that consumers base that decision on conveniences that taxis do not share, such as the ability to rate and review drivers, arrange for shared rides with strangers, and receive fare quotes in advance.  FAC ¶¶ 53–54.  Taking those allegations of consumer preferences as true, it is plausible that ride-hailing services constitute a distinct market.  While Uber of course remains free to attack this premise of Sidecar's case on its factual merits at summary judgment or trial if the case advances beyond the pleading stage, the Court accepts Sidecar's market definition for the purpose of the present motion.[5]

---

[5] The Court does not reach Sidecar's alternative argument that its proposed market definition is cognizable as a distinct submarket.  *See* Opp'n at 6.

United States District Court
Northern District of California

### 2.    Sidecar Alleges Below-Cost Pricing

Uber suggests in a footnote, and in passing in other parts of its motion, that Sidecar has not sufficiently alleged below-cost pricing. *See* Mot. at 7 n.7 (faulting Sidecar for relying on financial statements and on allegations that do not identify particular geographic markets); *id.* at 9 ("Even assuming (wrongly) that [Sidecar] has properly alleged below-cost pricing for UberX . . . ."). Among other relevant allegations, Sidecar alleges that "[b]etween 2013 and 2016, in the markets where Uber was competing with Sidecar, the average prices Uber charged Passengers were lower than Uber's average variable cost per transaction." FAC ¶ 20. Uber has presented no reason why the Court should not take that factual allegation as true in resolving the present motion under Rule 12(b)(6). The Court concludes that Sidecar has sufficiently alleged below-cost pricing.

### 3.    Sidecar Does Not Allege Market Power

In order to state a claim for monopolization, Sidecar must plausibly allege monopoly power, which "the Supreme Court has defined . . . as the power to 'control prices or exclude competition.'" *Cost Mgmt. Servs.*, 99 F.3d at 950 (quoting *Grinnell Corp.*, 384 U.S. at 571). "Whether monopoly power exists depends on a variety of factors," with market share relevant to that analysis but not the only factor; depending on market conditions, courts have found both market power and a lack of market power when a defendant's market share is in the sixty to seventy percent range. *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980). The typical way in which an incomplete monopolist—a defendant with less than full control of the market—can nevertheless exert monopoly power is when that party controls enough of the market that "by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices." *Rebel Oil*, 51 F.3d at 1434. "Prices increase marketwide in response to the reduced output because consumers bid more in competing against one another to obtain the smaller quantity available." *Id.*

Uber is correct that, in asserting a Sherman Act claim, Sidecar cannot rely on allegations that an oligopoly made up of Uber and Lyft has the power to control prices. Although the Supreme Court held in *Brooke Group* that a defendant might recoup losses not only by "driving [rivals] from the market" but also by "causing them to raise their prices to supracompetitive levels

12

within a disciplined oligopoly," that case considered claims under the Robinson-Patman Act,

which the Court noted was broader than "the provisions of the Sherman Act, which speak only of

various forms of express agreement and monopoly." *Brooke Grp.*, 509 U.S. at 225. The Ninth

Circuit addressed the viability of "disciplined oligopoly" claims under the Sherman Act in detail

in *Rebel Oil*:

> Although oligopoly pricing cannot be ruled out as a plausible means to recoup predatory losses, oligopoly pricing standing alone does not prove that [defendant] ARCO has market power, at least not the degree of market power to raise the concerns of the Sherman Act. "The fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or any sinister domination," and does not violate the Sherman Act. The reason for this rule is clear. To pose a threat of monopolization, one firm alone must have the power to control market output and exclude competition. An oligopolist lacks this unilateral power. By definition, oligopolists are interdependent. An oligopolist can increase market price, but only if the others go along.
>
> In *Indiana Grocery*, the Seventh Circuit rejected an argument similar to [plaintiff] Rebel's. The plaintiff, Indiana Grocery, claimed that the defendant's predatory pricing "disciplined" rivals to the extent that the defendant and his rivals had engaged in oligopoly pricing. The court rejected the plaintiff's argument that oligopoly pricing indicated market power, stating
>
>> Indiana Grocery's theory does not implicate section 2 of the Sherman Act. At best, it poses the danger that [the defendant's] anticompetitive conduct could result in diminished price competition in an oligopolistic . . . market. Section 2, however, does not govern single-firm anticompetitive conduct aimed only at creating an oligopoly . . . . ["]Congress authorized scrutiny of single firms only when they pose a danger of monopolization."
>
> *Indiana Grocery* [*Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1416 (7th Cir. 1989)] (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)) (citations omitted). We recognize that a gap in the Sherman Act allows oligopolies to slip past its prohibitions, but filling that gap is the concern of Congress, not the judiciary.

*Rebel Oil*, 51 F.3d at 1442–43 (some alterations in original; some citations omitted without

ellipses).

Sidecar does not allege that Uber has the power to raise market prices above competitive

levels simply by reducing its own output, or that Lyft could not respond to such a reduction by

13

increasing its own output. Instead, Sidecar alleges that Uber has disciplined Lyft to the point that Lyft chooses not to compete against Uber in price, and that Lyft will respond to Uber's signals regarding increased prices in order to recoup its own losses. *See* FAC ¶¶ 8, 99–100. Such allegations are indistinguishable from the "disciplined oligopoly" that *Brooke Group* addressed under the Robinson-Patman Act, and that the Ninth Circuit held insufficient to support a claim under the Sherman Act in *Rebel Oil*.

Even if the Court accepts Sidecar's allegations that Uber can raise prices above competitive levels by disciplining Lyft, this Court is not free to depart from the Ninth Circuit's holding that, without action by Congress, such oligopoly power must "slip past" the Sherman Act's prohibitions. *See Rebel Oil*, 51 F.3d at 1443. Uber's motion to dismiss Sidecar's monopolization claim is GRANTED. Because it is conceivable that Sidecar could allege that Uber can unilaterally raise market prices by restricting its output, however, the Court grants Sidecar leave to amend.[6]

### 4. Sidecar Does Not Allege a Cognizable Probability of Recoupment

Uber contends that Sidecar has not sufficiently alleged a dangerous probability of recoupment, but errs in conflating an *evidentiary* standard—and, for that matter, a standard as described by a commentator rather than by any court—for the pleading standard applicable to Sidecar's allegations. *See* Mot. at 13 (quoting a treatise for the rule that "'[t]he recoupment requirement as the Supreme Court has articulated it requires something close to dollars-and-cents *proof* that the predatory strategy could reasonably be predicted to have a positive payoff'" (emphasis added)).

Regardless, however, the same flaw discussed above in the context of Sidecar's monopolization claim also warrants dismissal of its attempted monopolization claim. *Rebel Oil*, in which the Ninth Circuit held that a theory of oligopoly rather than true monopoly power to control prices was not sufficient, concerned a claim for attempted monopolization. *See Rebel Oil*, 51 F.3d

---

[6] The Court further notes, but does not rely on, Sidecar's failure to allege that Uber has in fact set prices at profitable and supracompetitive levels, which might call into question the plausibility of allegations that Uber currently has the power to do so.

United States District Court
Northern District of California

1   at 1442 ("Rebel's evidence cannot, as a matter of law, be the basis for inferring market power in

2   its attempted monopolization claim.").

3          In *Rebel Oil*, the Ninth Circuit required a showing of market power not only for an actual

4   monopolization claim, but also an attempted monopolization claim, albeit with a somewhat lower

5   standard for showing such power.  *See id.* at 1438 ("We agree with Rebel that the minimum

6   showing of market share required in an attempt case is a lower quantum than the minimum

7   showing required in an actual monopolization case.").  Even in the context of attempted

8   monopolization, "[m]arket power cannot be inferred solely from the existence of entry barriers and

9   a dominant market share.  The ability to control output and prices—the essence of market power—

10  depends largely on the ability of existing firms to quickly increase their own output in response to

11  a contraction by the defendant."  *Id.* at 1441.[7]  As noted above, Sidecar does not allege that Lyft

12  lacks the ability to increase output.  Instead, Sidecar alleges that Lyft will follow Uber in setting

13  supracompetitive prices because Lyft, like Uber, has sustained massive losses from below-cost

14  pricing that it must now recoup.  Such coordinated action by an oligopoly of two dominant firms

15  does not meet the standard set by the Ninth Circuit for attempted monopolization through

16  predatory pricing under the Sherman Act.  *See id.* at 1443 ("To pose a threat of monopolization,

17  one firm alone must have the power to control market output and exclude competition.").

18  Sidecar's attempted monopolization claim is therefore DISMISSED.

19         As discussed above in the context of the monopolization claim, it is possible Sidecar might

20  be able to amend its complaint to allege that Uber has market power because it can raise prices by

21  restricting output and that Lyft could not respond by increasing its own output.  Sidecar conceded

22  at oral argument, however, that Lyft could increase output "in theory," and instead argued

23  primarily that Sidecar could amend to allege that Lyft cannot increase output without facing

24

25  [7] *Rebel Oil* does not clearly address whether an attempted monopolization claim might lie where a
    defendant lacks market power in the traditional sense of rivals having limited ability to increase
26  output in response to the defendant's efforts to recoup, but poses a real threat of driving *all*
    competitors out of the market through predatory pricing, and could at that point recoup losses,
27  protected from new competition by significant structural barriers to entry.  In this case, however,
    Sidecar has not alleged that Uber seeks to or is likely to drive Lyft out of the ride-hailing market,
28  and the Court therefore need not address whether such a theory is viable under Ninth Circuit
    precedent.

United States District Court
Northern District of California

1   devastating retaliation from Uber, which would presumably take the form of renewed predatory

2   pricing.  It is not clear that such a theory would meet the standard of *Rebel Oil*.  The Ninth Circuit

3   in that case rejected an argument that ARCO had market power "because Las Vegas marketers had

4   been 'disciplined' by ARCO's previous predation and refused to challenge ARCO's

5   supracompetitive prices," or in other words, that the market at issue was "a 'disciplined' oligopoly

6   in which each oligopolist shares in the supracompetitive profits." *Id.* at 1432; *see also id.* at 1443.

7   At the hearing, however, Uber's counsel declined the Court's invitation to argue that Sidecar's

8   theory is not viable as a matter of law, instead focusing on questions of plausibility more

9   appropriate for resolution on an evidentiary record.  The Court therefore reserves a final ruling on

10  the viability of Sidecar's theory and grants Sidecar leave to amend.

                                              * * *

12      Although Sidecar's failure to allege cognizable market power, or a dangerous probability

13  of obtaining such power, is enough to warrant dismissal of its Sherman Act claims, the Court also

14  addresses some of the parties' other arguments regarding those claims below, in order to ensure

15  that leave to amend would not be futile and to avoid duplicative briefing in the event that Sidecar

16  amends its complaint.

17              **5.      UberX's 2013 Debut Does Not Negate Sidecar's Claims**

18      Uber contends that Sidecar's allegations are implausible because they rely on Uber's

19  purported intent "'to destroy companies larger and better established than [it]sel[f].'" *See* Mot. at

20  6 (quoting *Matsushita*, 475 U.S. at 597).  According to Uber, the most "entrenched and dominant

21  incumbents" were taxi companies.  *Id.*  Given that, as discussed above, the Court accepts at this

22  stage Sidecar's proposed ride-hailing market excluding taxis, the entrenchment of preexisting taxi

23  companies has no bearing on the viability of Sidecar's claims.

24      Uber also suggests that it started from a disadvantage as compared to Sidecar and Lyft,

25  which introduced their non-limousine ride-hailing apps in 2012, the year before Uber debuted its

26  similar UberX service in 2013.  *See id.* at 5.  It is not clear whether that timing is particularly

27  significant—Sidecar alleges a market of ride-hailing generally, not limited to those using drivers'

28  private vehicles, and Uber pioneered that market in 2009 with its original limousine-based service.

                                              16

United States District Court
Northern District of California

1     Regardless, even if the Court looked only to non-limousine services, Sidecar and Lyft's one-year

2 head start is not comparable the facts in *Matsushita*.  There, the collective market share held by the

3 defendants—"a large number of firms"—reached only fifty percent two decades after the

4 commencement of an alleged conspiracy, and the two largest market participants, who were not

5 part of the alleged conspiracy but rather targets of it, maintained their approximately forty percent

6 market share throughout that period with no appreciable change.  *Matsushita*, 475 U.S. at 590–92.

7 Here, in contrast, Sidecar alleges that Uber sought to monopolize a newly emerging product

8 market—not one with long-established incumbents—and that rather than failing to dislodge

9 dominant incumbents as in *Matsushita*, Uber quickly became "the dominant ridesharing platform

10 in the United States."  *See* FAC ¶ 5.

11     While a finder of fact could perhaps conclude that Sidecar and Lyft's earlier start in non-

12 limousine ride-hailing weighs against an intent to monopolize or a likelihood of recoupment, Uber

13 cites no authority holding that a defendant's late entry into a particular segment of the alleged

14 relevant market bars a monopolization claim as a matter of law, and the Court declines to so hold.

15             **6.**       **Asserted Pro-Competitive Purposes Do Not Warrant Dismissal**

16     Uber argues that Sidecar's Sherman Act claims should be dismissed because the

17 allegations of the complaint allow for an inference that Uber's goal was simply to enter a new

18 market rather than to monopolize it.  *See* Mot. at 7 (citing, *e.g.*, *Malden Transp.*, 321 F. Supp. 3d

19 at 180 (citing *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 612 n.1 (1977))).  In the

20 Ninth Circuit, however, if "the plaintiff proves that the defendant's prices were below average

21 variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden

22 shifts to the defendant to prove that the prices were justified without regard to any anticipated

23 destructive effect they might have on competitors."  *William Inglis & Sons Baking Co. v. ITT

24 Cont'l Baking Co.*, 668 F.2d 1014, 1036 (9th Cir. 1981).  Having alleged that Uber set prices

25 below its variable costs, FAC ¶ 90, Sidecar's complaint need not negate the possibility that Uber

26 could show that it had a permissible purpose in doing so—particularly where Sidecar has alleged

27 actual harm to competition in that one of only three competitors in the market exited as a result of

28 Uber's conduct, and prices thereafter increased.

1    Uber is of course correct that—if Sidecar amends its complaint to resolve the defects

2    above—Uber "may be allowed to *prove* 'nonpredatory and acceptable business reasons' for prices

3    that are below even marginal or average variable cost," *see William Inglis*, 668 F.2d at 1033

4    (emphasis added; citation omitted); Mot. at 6 n.5, and the allegations on which Uber relies—for

5    example, that network effects drive down costs as Uber expands, Mot. at 7 (citing FAC ¶ 70)—

6    may be relevant to such a showing.  But those allegations do not in themselves establish that Uber

7    was motivated primarily by realizing such efficiencies rather than by eliminating competition, or

8    that consumers are on balance better off in a monopolized market benefiting from network effects

9    than in a competitive market benefiting from competition.  Taking Sidecar's allegation of below-

10   variable-cost pricing as true, it is Uber's burden to prove acceptable business reasons for its

11   pricing.  Sidecar's failure to preclude such a defense is not grounds for dismissal.

12                                              * * *

13   Although not all of Uber's arguments present grounds for dismissal, Sidecar fails to allege

14   to allege cognizable market power or a dangerous probability of Uber obtaining such power.

15   Sidecar's Sherman Act claims are therefore DISMISSED with leave to amend.

16   **C.    California's Unfair Practices Act**

17   California's Unfair Practices Act prohibits, among other things, "for any person engaged in

18   business within this State to sell any article or product at less than the cost thereof to such vendor,

19   or to give away any article or product, for the purpose of injuring competitors or destroying

20   competition."  Cal. Bus. & Prof. Code § 17043.  By its terms, however, the UPA does not apply

21   "[t]o any service, article or product for which rates are established under the jurisdiction of the

22   [CPUC] and sold or furnished by any public utility corporation." *Id.* § 17024(1).  The statute uses

23   the term "public utility corporation" to refer to a *privately*-owned corporation that provides public

24   utility services.  *See Actions v. Uber Techs.*, No. CJC-17-004925, 2018 Cal. Super. LEXIS 1913,

25   at *5 (Jan. 30, 2018).[8]

26

27   _____

28   [8] The version of this January 30, 2018 order sustaining a demurrer with leave to amend that is
     available on Lexis appears as an attachment to a March 2, 2018 order dismissing the action with
     prejudice after the plaintiffs declined to amend their complaints.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Sidecar concedes that "Uber is subject to the jurisdiction of the California Public Utilities

2    Commission," Opp'n at 18, but alleges that the CPUC "has established no rates for any service,

3    article, or product sold by Uber," Compl. ¶ 163.  The parties dispute whether that exception

4    applies only where the CPUC has itself actually set rates, or more broadly where the CPUC has

5    jurisdiction to set rates.  Two decisions from this district, and one decision by a California trial

6    court, have previously sided with Uber, holding that it is exempt from the Unfair Practices Act

7    because it is subject to regulation by the CPUC.  *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F.

8    Supp. 3d 1074, 1085–89 (N.D. Cal. 2019); *Desoto Cab Co., Inc. v. Uber Techs., Inc.*, No. 16-cv-

9    06385-JSW, 2018 WL 10247483 (N.D. Cal. Sept. 24, 2018); *Actions*, 2018 Cal. Super. LEXIS

10   1913, at *4–8.

11   All three of those cases rely on the California appellate decision *Hladek v. City of Merced*,

12   69 Cal. App. 3d 585 (1977), where a court interpreted the second subpart of section 17024, which

13   governs exceptions for "publicly owned public utilities" rather than privately-owned "public

14   utility corporations."  That exception encompasses "any service, article or product sold or

15   furnished by a publicly owned public utility and upon which the rates would have been established

16   under the jurisdiction of the Public Utilities Commission of this State if such service, article or

17   product had been sold or furnished by a public utility corporation."  Cal. Bus. & Prof. Code

18   § 17024(2).  In *Hladek*, the owner of a private transportation company sued the city of Merced

19   under the UPA for establishing a competing public transportation service and operating it at a loss.

20   69 Cal. App. 3d at 588.  The Court of Appeal affirmed the trial court's decision to sustain a

21   demurrer, holding it "obvious that the allegations in appellants' complaint concerning unfair

22   competition [were] inadequate to state a cause of action against respondent" where they failed to

23   show "that the Public Utilities Commission would not have had jurisdiction to set rates for

24   respondent's transportation service if the service were provided by privately owned public utility

25   corporation," which, according to the court, "in turn determines whether respondent's business

26   activity is outside the exemption."  *Id.* at 591.  As the more recent UPA cases involving Uber have

27   noted, the *Hladek* court did not look to whether the CPUC would in fact have set rates for the

28   city's transportation service if it had been run by a private entity, but rather whether it would have

19

had *jurisdiction* to do so. *See Diva Limousine*, 392 F. Supp. 3d at 1088; *Actions*, 2018 Cal. Super. LEXIS 1913, at *6–7.

Judge Chen's decision in *Diva Limousine* not only examined *Hladek*, but also considered the language and context of the statutory exception. According to Judge Chen, the use of the passive voice without explicitly specifying an actor to establish the rates—addressing products "for which rates are established under the jurisdiction of the Public Utilities Commission," rather than, perhaps, "rates *established by* the Public Utilities Commission"—permits a reading in which "the rates established by a public utility which are merely subject to the CPUC's jurisdiction are 'rates are established under the jurisdiction of' [the] CPUC irrespective of whether the CPUC actually exercises its rate setting authority." *Diva Limousine*, 392 F. Supp. 3d at 1085–86. Judge Chen held that the CPUC's discretion to decline to set rates for public utility corporations within its jurisdiction, as well as "the fact that the statutory scheme allows the CPUC to consider anticompetitive concerns when regulating public utility corporations like Uber," support the broader reading in which the exemption turns on the scope of CPUC jurisdiction rather than the exercise of that jurisdiction. *Id.* at 1086–87 ("That the CPUC retains authority to address anticompetitive behavior in regulating charter-party carriers suggests that the legislature intended to leave to the CPUC the field of regulating and monitoring prices of utilities under its jurisdiction.").

Sidecar's opposition brief does not address the reasoning of any of the decisions holding that Uber falls within the exception of section 17024(1), asserting only that they "conflict with the plain language and purpose of the statute" and are not binding on this Court. Opp'n at 18. As Judge Chen explained in *Diva Limousine*, however, neither the statutory language nor any presumption of a logical statutory purpose compels the narrower reading that Sidecar proposes. Prices set by Uber may be considered "rates . . . established under the jurisdiction of the Public Utilities Commission" to the extent that the CPUC would have authority to regulate those rates, and exempting such prices from the UPA does not insulate them from antitrust scrutiny so long as

the CPUC could step in if it sees fit to do so.[9]  The broader reading is also more consistent with *Hladek*, which—as a decision by a state intermediate court addressing an issue not yet resolved by the California Supreme Court—this Court is bound to follow "'unless there is convincing evidence that the highest court of the state would decide differently.'"  *Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983) (quoting *Andrade v. City of Phoenix*, 692 F.2d 557, 559 (9th Cir. 1982) (per curiam)).  Sidecar has offered no such evidence.

This Court follows the unanimous consensus of decisions addressing the issue, and holds that Uber is exempt from the UPA because it falls within the jurisdiction of the CPUC.  Sidecar's UPA claim is DISMISSED with prejudice.

## IV.    CONCLUSION

For the reasons discussed above, Sidecar's Sherman Act claims are DISMISSED with leave to amend, and its UPA claim is DISMISSED with prejudice.  If Sidecar believes that it can cure the defects in its Sherman Act claims, it may file a second amended complaint no later than February 4, 2020.

**IT IS SO ORDERED.**

Dated: January 21, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

[9] If the CPUC were primarily concerned with shielding consumers from excessive utility pricing, its decision not to interfere with Uber setting low prices might be a rational approach to that goal: consumers at least arguably benefited from those prices, and if Uber attempted to use the dominant market position that it obtained as a result to set supracompetitive prices in the future, the CPUC could exercise its regulatory authority at that time to prevent Uber from doing so.

United States District Court
Northern District of California