1    Lewis T. LeClair (SBN 77036)
     lleclair@mckoolsmith.com
2    **MCKOOL SMITH, P.C.**
     300 Crescent Court, Suite 1500
3    Dallas, Texas 75201
     Telephone:     (214) 978-4000
4    Facsimile:      (214) 978-4044

5    Kirk D. Dillman (SBN 110486)
     kdillman@mckoolsmithhennigan.com
6    **MCKOOL SMITH HENNIGAN, P.C.**
     300 South Grand Avenue, Suite 2900
7    Los Angeles, California 90071
     Telephone:     (213) 694-1200
8    Facsimile:      (213) 694-1234

9    Judith A. Zahid (SBN 215418)
     jzahid@zelle.com
10   **ZELLE LLP**
     44 Montgomery Street, Suite 3400
11   San Francisco, California 94104
     Telephone:     (415) 693-0700
12   Facsimile:      (415) 693-0770

13   James R. Martin (SBN 173329)
     jmartin@zelle.com
14   **ZELLE LLP**
     1775 Pennsylvania Ave. NW, Suite 375
15   Washington, D.C. 2006
     Telephone:     (202) 899-4100
16   Facsimile:      (612) 336-9100

17   *Attorneys for Plaintiff, SC Innovations, Inc.*

18

19                     **UNITED STATES DISTRICT COURT**

20                   **NORTHERN DISTRICT OF CALIFORNIA**

21                        **SAN FRANCISCO DIVISION**

22   SC INNOVATIONS, INC.,                    Case No.  3:18-cv-07440-JCS

23                     Plaintiff,

24             v.                              **SECOND AMENDED COMPLAINT**

25   UBER TECHNOLOGIES, INC., RASIER, LLC,    **DEMAND FOR JURY TRIAL**
     RASIER-CA, LLC, RASIER-PA, LLC, RASIER-
26   DC, LLC, RASIER-NY, LLC, AND UBER USA,
     LLC,
27
                      Defendants.
28

*(vertical left margin)* McKool Smith Hennigan, P.C. Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

## NATURE OF ACTION

1.      Through an array of anticompetitive acts, Uber Technologies, Inc. ("Uber") has stifled competition in the market for ride-hailing applications. Those anticompetitive actions drove Sidecar Technologies, Inc. ("Sidecar"), a maverick, innovator, and one of Uber's most significant competitors, out of business. Uber is now a monopolist, which has harmed both Sidecar and the consumers who previously benefitted from the competitive pressure Sidecar placed on Uber.

2.      The ride-hailing market is a two-sided market. Uber can exercise its monopoly power by controlling both the prices it charges to consumers (riders), and the prices it pays to drivers.  In other words, Uber has both monopoly power over the customer side of the market and monopsony power over the driver side of the market.  Both sides of the two-sided market are subject to substantial network effects—the more riders Uber has, the more drivers it is able to attract, and the increased driver availability attracts even more riders. These network effects raise substantial barriers to entry and obstacles for other competitors to compete effectively against Uber, allowing Uber to exercise monopoly power.  Uber exploited these barriers to entry with a "winner takes all" strategy it has pursued since its inception of predatorily pricing below its costs. Because of the unique nature of platforms such as this one that furnishes connections between two groups, Uber was able through its "winner takes all" strategy to capture the overwhelming power over the market while enjoying the protections afforded by the barriers to entry.

3.      Uber's predatory pricing strategy has significantly weakened competition in the ride-hailing applications market by eliminating or substantially weakening its competitors. Uber is able to recoup its losses on its ride-hailing application business by charging supra-competitive prices, above the level that would prevail in a market in which Uber faced strong competition. Uber's predatory pricing strategy is consistent with Uber's stated business strategy as understood by its more sophisticated investors. As explained in an article predating Uber's IPO presciently titled: "Uber is Basically Promising Investors it will become a Monopoly":

> The other thing to note is that a big part of why Uber is unprofitable is
> that it pays drivers too much and charges too little for fares. Under the
> status quo, there's no way for it [to] grow into profitability simply by
> claiming a bigger market share. All of which gets us back to the
> question of why investors keep throwing gobs of money at the

**SECOND AMENDED COMPLAINT**

company. The simple story about how it's just better than its rivals doesn't scan. Something else is going on. The point about Uber's fares being too low for it to make enough money is telling. Most likely, Uber is making a long-game effort to price out all its rivals. "[Uber's] IPO documents show that it plans to keep spending heavily to win market share, even if it continues to rack up multi-billion dollar annual losses," the *Financial Times* reported. "It amounts to a forceful reminder of the company's founding mantra that ride-hailing is a business with strong network effects and a winner-takes-most, if not all, market.[1]"

4.      Such a strategy would be unprofitable unless Uber knew it could recoup its losses from below-margin pricing in a market in which it was able to set supra-competitive prices due to substantially reduced competition. Uber's anticompetitive conduct has resulted in significant harm to consumers through long-term higher prices, lower quality, reduced innovation, reduced control over personal information and privacy, and reduced choice. This case is designed to compensate Sidecar for the damages caused by Uber, bring an end to Uber's anticompetitive practices, and prevent future anticompetitive acts so that consumers can once again enjoy the lasting benefits of lower prices, higher quality, more innovation, improved data and personal information privacy protections, and greater options.

5.      In 2009, Uber launched its ride-hailing smartphone app. Uber's app allowed consumers to use their smartphones to arrange on-demand transportation in "black cars" and limousines driven by licensed chauffeurs. Uber viewed any app-based ride hailing as its exclusive domain, and was determined to do whatever was necessary to stamp out any threatening innovation related to its business.

6.      In 2012, Sidecar debuted its own ride-hailing app. Unlike Uber's app, which only connected passengers to professional drivers, Sidecar's app could be used by passengers to arrange rides with drivers who were using their personal cars, pioneering a new concept called "ridesharing."

7.      Sidecar's app was the first to offer many popular features that since have become commonplace in ride-hailing apps today. For example, Sidecar's app was the first to provide

---

[1] Spross, *Uber is Basically Promising Investors it will become a Monopoly* (The Week, April 15, 2019)

**SECOND AMENDED COMPLAINT**

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    passengers with estimated fares and trip durations before booking their trip. It also was the first ride-

2    hailing app capable of scheduling carpool rides between strangers heading in the same direction,

3    which could dramatically lower costs for passengers using that feature. In addition, the Sidecar App

4    provided an easy means of ensuring price-competition by private drivers, to the benefit of customers.

5    It allowed those private drivers to set their own proposed fare rates, competing with one another.

6         8.      In response to such competitive ride-sharing offerings from Sidecar and others, Uber

7    extended its offerings in the ride-hailing market by launching its own "UberX" ridesharing service in

8    2013, as an addition to its "Uber Black" limousine service. At the time, Uber was growing in rides

9    and revenue at a staggering pace. In 2013 alone, Uber was the dominant ridesharing platform in the

10   United States and was estimated to have grown at a rate of 364%. In addition, Uber was enormously

11   capitalized, the result of Uber's pitch to its investors of its "winner-take-all" strategy, with the ability

12   to outlast its competitors in the ride-hailing market in a bruising price war. To be clear, neither

13   growth nor financial strength, nor price cuts, are in and of themselves anti-competitive. Indeed, price

14   cutting can be entirely pro-competitive. But, when a company with a substantial and growing share

15   of rides is intent on eliminating competition and uses predatory, below-cost price cuts as a means of

16   wielding its enormous financial strength to eliminate competition, that conduct plainly contravenes

17   the Sherman Act and injures competition. With the launch of its UberX service, Uber became hell-

18   bent on stifling competition from competing ride-hailing apps, including Sidecar. But rather than

19   compete on the merits, Uber engaged in a campaign of anticompetitive tactics, orchestrated by its

20   senior executives, a campaign designed to impair Sidecar and other competing ride-hailing apps

21   from serving as a check on Uber's quest for a monopoly. Sidecar's superior functionality proved to

22   be no match for Uber's anticompetitive actions, and as a result, Sidecar went out of business in

23   December 2015.

24        9.      There is no dispute that Uber has and continues to price below cost, however cost

25   may be measured. Uber's CEO has publicly admitted in security filings that Uber intentionally

26   prices its rides in certain markets below the costs paid to drivers for the ride. Thus, Uber has

27   admittedly engaged in classic predatory pricing. This case is far removed from the case of a

28   traditional manufacturing business, where a market entrant may have excess capacity in early market

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

-3-

**SECOND AMENDED COMPLAINT**

McKool Smith Hennigan, P.C.
Los Angeles, CA

penetration and thus may be pricing below some measures of cost during growth that it plans to fill out its excess capacity.  Here, Uber could *never* grow its way to profitability with its pricing below the variable cost of each individual ride.  Uber heavily subsidized payments to drivers, and at the same time, it subsidized the fares it charged to passengers.  As a result of these subsidies, the average price paid by a passenger was well below Uber's average variable cost for completing a transaction on its platform. A cursory look at Uber's financials shows the results of this predatory conduct: Uber has lost billions of dollars, but as it expected, it has not outrun its ability to attract equity and financing because in the unusual economic world of platforms with significant network effects, the long run will eventually financially reward Uber's platform for its elimination of competition.

10.     Uber's most senior officers, directors, and executives specifically planned for this subsidized pricing strategy to foreclose competition.  Uber intentionally sustained near-term losses that were designed to drive Sidecar and other competing ride-hailing apps out of the market while Uber acquired a dominant market position.  When the market finally tipped in Uber's favor and Uber could leverage network effects to insulate itself from meaningful competition, it planned to raise prices to consumers and reduce compensation to drivers.  By imposing higher prices on consumers and reducing driver compensation while it was protected by the substantial barriers to entry created by network effects, Uber planned to recoup the losses it had incurred while pushing out its rivals.  This practice will have significant negative effects on consumers in the form of long-run higher prices, lower quality, reduced innovation, reduced control over personal information and privacy, and fewer options.

11.     Uber's plan has now reached the second act.  Initially, even after Uber successfully eliminated Sidecar from the market in late 2015, Uber continued to price below cost in an ongoing effort to weaken the only remaining significant US competitor, Lyft. This contributed to continuing losses for both entities. The two-sided nature of the ride-hailing market provided Uber with the incentive and ability to engage in predation on both sides of the market: (i) paying initially high prices to drivers (mostly in the form of incentives), with reduced payments later as Uber moves to the recoupment phase, and (ii) charging low prices to customers early, and higher prices during the

-4-

**SECOND AMENDED COMPLAINT**

recoupment phase. The net effect of these actions during the predation phase is that the net price received by Uber for its ride-hailing service in a large number of transactions has been less than its cost of providing the service (the price paid by the customer less the payments to the driver for the ride).

12.     Recently, Uber has begun to increase passenger prices in each of the markets where it was previously facing competition from Sidecar, without offsetting those increased fares with higher payments to drivers. Indeed, Uber has begun reducing driver payments at the same time it has raised passenger prices. Given the two-sided nature of the market, Uber can achieve recoupment from either side of the market for which it has monopoly power. Uber now faces no competition from Sidecar to keep its prices in check. In addition, because of the network effects resulting from Uber's size and dominance on both the customer and driver side, and because of and because of Uber's discriminatory pricing, Lyft is unable to respond effectively or to increase its own share of rides as a restraint on Uber's pricing. Further, Lyft's current status as a public company requires it to recoup its own massive losses through higher prices. Thus, Lyft has not been willing, even if it were able to do so, to respond to Uber's price discrimination strategy by expanding its output or seizing significant additional market share through price competition. Uber now is able to impose its will on both passengers and drivers in the form of higher, supra-competitive prices. Indeed, drivers are now receiving reduced compensation; and passengers must endure discriminatory pricing tactics, such as surge pricing, and more recently, "dynamic pricing." Uber has begun to reap supra-competitive profits in ways that have become increasingly difficult for any competitor or customer to address or constrain Uber's monopoly power.

13.     To obtain and protect its monopoly, Uber also intentionally interfered with the performance and quality of competing ride-hailing apps, including Sidecar's app.  Uber's senior officers and executives directed clandestine campaigns, including "Project Hell" and "SLOG," to, among other things, submit fraudulent ride requests through its competitors' ride-hailing apps. Those fraudulent requests were not submitted by real passengers, but instead were directly submitted by Uber (or persons working under Uber's direction).  Uber intended for those campaigns to undermine its competition and raise their costs, including by (a) inundating competitors with

**SECOND AMENDED COMPLAINT**

fraudulent ride requests that were cancelled before the driver arrived; or (b) using fraudulently requested trips as an opportunity to convince drivers to work exclusively with Uber instead of its competitors.  According to Uber's founder and former CEO, Travis Kalanick, Uber targeted not only Lyft but also Sidecar and its drivers, as well as other competing ride-hailing apps.

14.     Those tactics violated the terms of service of the competitor apps and undermined the value of competing ride-hailing apps because they prevented drivers from being matched with legitimate ride requests.  Because drivers were matched with fraudulent requests, they would be frustrated with Sidecar; and real passengers who were looking for legitimate rides faced correspondingly longer wait times.  Long wait times were designed to cause drivers and passengers to switch to alternative apps.  That triggered a vicious cycle that undermined the ability of competitors to challenge Uber in the marketplace.

15.     Through its anticompetitive actions, which continued at least up through when Sidecar went of business, Uber stifled competition and obtained a monopoly position in the market for ride-hailing apps.

16.     Those same anticompetitive actions drove Sidecar out of business.  Sidecar brings this action to recover the damages it sustained when it went out of business as a result of Uber's anticompetitive tactics, which tilted the playing field in Uber's favor and irrevocably damaged the competitive process.

## THE PARTIES

17.     Between 2012 and 2015, Sidecar Technologies, Inc. licensed and operated a ride-hailing smartphone application in the United States.  Its principal place of business was 360 Pine Street, #7, San Francisco, CA 94104.

18.     SC Innovations, Inc. is a Delaware corporation with a principal place of business located at 912 Cole Street, #182, San Francisco, CA 94117.  In September 2018, Sidecar Technologies, Inc. assigned to SC Innovations, Inc. "any and all claims and causes of action" including those for "any violation of the . . . Sherman Antitrust Act [and] the California Unfair Practices Act."  For simplicity, when used in this Complaint, "Sidecar" refers to both SC Innovations and Sidecar Technologies, Inc.

McKool Smith Hennigan, P.C.
Los Angeles, CA

19.     Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business located at 1455 Market Street, San Francisco, CA 94103.  Uber licenses and operates a ride-hailing smartphone application in the United States.

20.     Defendant Rasier, LLC is a Delaware limited liability company with its principal place of business located at 1455 Market Street, San Francisco, CA 94103.  On information and belief, Rasier, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app.

21.     Defendant Rasier-CA, LLC is a Delaware limited liability company with its principal place of business located at 1455 Market Street, San Francisco, CA 94103.  On information and belief, Rasier-CA, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app in California.

22.     Defendant Rasier-PA, LLC is a Delaware limited liability company.  On information and belief, Rasier-PA, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app in Pennsylvania.

23.     Defendant Rasier-DC, LLC is a Delaware limited liability company.  On information and belief, Rasier-DC, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app in the District of Columbia.

24.     Defendant Rasier-NY, LLC is a Delaware limited liability company.  On information and belief, Rasier-NY, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that contracts with drivers using the Uber ride-hailing app in New York.

25.     Defendant Uber USA, LLC is a Delaware limited liability company.  On information and belief, Uber USA, LLC is a wholly-owned subsidiary of Defendant Uber Technologies, Inc. that licenses the Uber ride-hailing app to drivers and riders.

26.     When used in this Complaint, Uber refers to both Uber Technologies, Inc. and its wholly-owned subsidiaries, Rasier, LLC, Rasier,-CA, LLC, Rasier-PA, LLC, Rasier-DC, LLC, Rasier-NY, LLC, and Uber USA, LLC.  Uber undertook the actions described in this complaint directly and/or through its wholly-owned subsidiaries.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

**JURISDICTION**

27.     Sidecar brings federal antitrust claims against Uber under Section 4 of the Clayton Act (15 U.S.C. § 15), for damages caused by Uber's violations of Section 2 of the Sherman Act (15 U.S.C. § 2). This Court has federal question jurisdiction over those claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1337.

28.     This Court has supplemental jurisdiction over the claims brought by Sidecar under the California Unfair Practices Act pursuant to 28 U.S.C. § 1367.

**VENUE**

29.     Uber has a regular and established place of business in this District. Uber's corporate headquarters is located at 1455 Market Street, San Francisco, CA 94103.

30.     Uber committed or directed the anticompetitive acts described in this Complaint from within this District. Accordingly, venue is appropriate in the Northern District of California pursuant to 28 U.S.C. § 1391, 28 U.S.C. § 1404(a), and 15 U.S.C. § 22.

**INTRADISTRICT ASSIGNMENT**

31.     Pursuant to Civil Local Rule 3-2(c), this is an Antitrust action to be assigned on a district-wide basis.

**RIDE-HAILING APPS**

32.     Ride-hailing smartphone applications ("Ride-Hailing Apps") are software platforms that facilitate transactions between operators of cars ("Drivers") and individuals that are looking to obtain transportation ("Passengers").  Passengers use Ride-Hailing Apps on their smartphones to arrange transportation with Drivers that are using the same Ride-Hailing App.  The user interface of a Ride-Hailing App can be different for Passengers and Drivers, but Passengers and Drivers use the same software platform, which is remotely hosted and delivered over the internet.  The companies that license and operate Ride-Hailing Apps are commonly called transportation network companies ("TNCs").

33.     To use a Ride-Hailing App, a Passenger opens the App and enters the address of his or her destination. After the destination is entered, the App will provide estimated wait times for different types of cars (black cars, sedans, SUVs, etc.), the estimated time of arrival at the

Passenger's destination, and estimated total fare for the trip.  Once the Passenger confirms that he or she would like to request a ride, the GPS receiver in the Passenger's smartphone relays his or her location to Drivers using the same App.

34.     Drivers using the App near the Passenger's location will receive an alert and an invitation to accept the ride request.  The Ride-Hailing App then matches the Passenger with a Driver who has accepted the request, and the Passenger can track the Driver's route until he or she reaches the Passenger's location.  Upon arrival, the Driver picks up the Passenger and takes him or her to their selected destination.

35.     Following each ride, the Driver and Passenger are invited to "rank" each other.  A Driver's average rating is visible to Passengers in the App, and a Passenger's average rating is visible to Drivers.

36.     Before using a Ride-Hailing App, Passengers must download the App to their smartphone and create a profile that links a form of payment (e.g., a credit card) to the App.

37.     Drivers must also download the App to their smartphones.  Before they can accept ride requests and start transporting passengers, Drivers typically must submit an application that provides proof they are a licensed driver, registers their automobile with the App, and includes the information necessary for the completion of the TNC's background check.  Once a Driver's application is approved, he or she can start using the App.

38.     The following images demonstrate this process for users of the Sidecar app:

McKool Smith Hennigan, P.C.
Los Angeles, CA

Case No. 3:18-cv-07440-JCS                                                    **SECOND AMENDED COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McKool Smith Hennigan, P.C.
Los Angeles, CA



**Figure 1: Sidecar Passenger App Screenshots**



**Figure 2: Sidecar Driver App Screenshots**

-10-

**SECOND AMENDED COMPLAINT**

1        39.     Ride-Hailing Apps are free to download, but they are not free to use.  Passengers pay

a fee at the end of each ride (usually a fixed booking fee, plus a variable fee based on distance and

time traveled, subject to a prescribed minimum), the TNC normally retains a percentage of the

Passenger's fare (as a commission for facilitating the transaction), and the balance of the passenger's

payment is remitted to the Driver.  Payment is made electronically through the App, and the entire

transaction occurs automatically upon completion of each ride.

        40.     Ride-Hailing Apps have automated a number of functions to improve convenience

and efficiency in ride-hailing.  As a few examples, when using a Ride-Hailing App, Passengers can

easily and quickly split fares, tip drivers without cash or credit card, select trip details and desired

automobile features, and automate receipts and expense reports.

        41.     Ride-Hailing Apps also provide significant benefits and additional flexibility for

Drivers, including the ability to:

          a.     choose their own hours and work schedule; and

          b.     supplement their ordinary job with a second source of income from providing

               transportation services with their own personal cars.

## TRANSPORTATION NETWORK COMPANIES

        42.     Uber introduced its ride-hailing app in 2009.  At first, Uber's App only connected

Passengers to limousines and town cars operated by professional drivers.  Uber's App was

enormously successful, but the services were principally focused on airport trips and traditional

business car service customers.

        43.     In 2012, Sidecar introduced its Ride-Hailing App, which could be used by Passengers

to arrange rides with Drivers who were using their personal cars.  This new concept was called

"ridesharing."

        44.     Lyft, Inc., another TNC, launched a Ride-Hailing App focused on ridesharing that

same year.

        45.     In the years that followed, Sidecar continued to innovate and develop new, cutting-

edge features that offered additional functionality beyond that which was available in Uber's App.

McKool Smith Hennigan, P.C.
Los Angeles, CA

46.     Sidecar was the first company to allow Passengers to enter their destination before booking a ride, so that its App could display the estimated price for the ride, as well as the expected trip duration and arrival time.

47.     Sidecar also was the first TNC to roll out an automated carpooling feature to match Passengers heading in the same direction and allow them to share the same car (and split the fare).

48.     Sidecar also was the first Ride-Hailing App to provide several key features for Drivers, such as turn-by-turn directions within the App and the ability to link ride requests (known as "queueing"). Sidecar's Ride-Hailing App also allowed drivers in its network the ability to readily adjust the prices that they offered for their services, by, for example offering percentage discounts off the default ride price calculated by the Ride Hailing App.

49.     Uber and Lyft have since copied many of Sidecar's Ride-Hailing App features and implemented them in their own Ride-Hailing Apps, where they have become popular product features. Today, for example, "shared rides" account for more than 50% of Uber's trips in San Francisco.

50.     Between 2012 and 2015, Sidecar's Ride-Hailing App could be used by Passengers and Drivers in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington, DC, New York, Seattle, San Diego, San Jose, and Boston.

51.     At the peak of its operations, Sidecar's Ride-Hailing App was facilitating more than 35,000 rides per week, and it had obtained a meaningful share of the market in several U.S. cities. For example, as of late 2014, Sidecar estimated that it held between a 10% and 15% market share in the markets for Ride-Hailing Apps in San Francisco, Los Angeles, and Chicago.

52.     By mid-2014, Uber operated in all of the cities where Sidecar operated (San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston).

53.     From the moment Sidecar released its App, Uber recognized Sidecar as a real competitive threat. With the introduction of ridesharing, Sidecar offered safe, reliable rides to Passengers at a lower price point than Uber's luxury black car service. And Sidecar's App offered additional features and flexibility, including allowing Drivers to use their own personal vehicles to

McKool Smith Hennigan, P.C.
Los Angeles, CA

provide transportation.

54.     Uber's CEO, Travis Kalanick, was not happy with the prospect of competition from new Ride-Hailing Apps, "most notably Lyft and Sidecar, whose goal [was] to offer incredibly low-cost transportation." In a public "white paper," Kalanick announced that Uber would introduce its own ridesharing service in response to the new, "far cheaper product" offered by Sidecar and Lyft.

55.     By 2013, Uber launched its own ridesharing service, which it called UberX.

## RELEVANT PRODUCT MARKET

56.     Ride-Hailing Apps constitute a relevant antitrust product market. A hypothetical monopolist that was the only present and future supplier of all Ride-Hailing Apps likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") for each transaction completed through Ride-Hailing Apps. Because Ride Hailing Apps are a two-sided platform, that SSNIP could be imposed by raising the prices paid by Passengers, reducing the payments made to Drivers, or both.

57.     Not enough Passengers would respond to a SSNIP by switching to other means of hailing transportation to render such a price increase unprofitable. Ride-Hailing Apps are cheaper, more convenient, and offer different and greater functionality than other means of hailing transportation, such as hailing a taxi on a street corner or calling a taxi dispatcher. Ride-Hailing Apps have automated a number of functions to improve convenience and efficiency in hailing transportation. As a few examples, when using a Ride-Hailing App, Passengers can easily and quickly:

a.     split fares with friends in the same car without using cash;

b.     book carpool rides with strangers heading in the same direction;

c.     automatically pay and tip their drivers at the conclusion of a trip without using cash or credits;

d.     select a precise trip origin and destination from a map;

e.     determine the estimated cost of the ride and estimated time of arrival before booking the ride;

f.     select the exact size and features of their desired automobile;

McKool Smith Hennigan, P.C.
Los Angeles, CA

-13-

g.      rate the quality of their driver;

h.      share their location and estimated time of arrival with others;

i.      see the name, photograph, and license of their driver; and

j.      receive automatic receipts and create expense reports for business trips.

58.     Other means of hailing transportation, such as hailing a taxi on a street corner or calling a taxi dispatcher, are not reasonably close substitutes for Passengers using Ride-Hailing Apps because of these differences.

59.     Likewise, not enough Drivers would respond to a SSNIP by switching to other means of arranging transportation services to render such a price increase unprofitable. Anyone who has a license and passes the applicable background check can sign up as a Driver and use their personal car to fulfill rides booked through a Ride-Hailing App. Ride-Hailing Apps offer flexibility to Drivers, who can work wherever and whenever they want, for as long as they want. If Drivers wanted to provide transportation services outside of a Ride-Hailing App, their only real option would be to become a taxi or limousine driver. Becoming a taxi or limousine driver typically requires a much greater upfront investment than serving as a Driver on a Ride-Hailing App, does not offer the same degree of flexibility as that which is available through a Ride-Hailing App, and does not offer payment terms that are as favorable as those available through Ride-Hailing Apps.

60.     Other means of arranging transportation services are not reasonably close substitutes for Drivers using Ride-Hailing Apps because of these differences.

61.     Ride-Hailing Apps are technology—they do not compete with other modes of transportation or transportation companies, like taxi cab companies.  By Uber's own admission, its Ride-Hailing App does not compete with taxi cabs or other transportation providers:

a.      On January 28, 2013, Uber told the California Public Utilities Commission: "Uber is a software technology company with headquarters in San Francisco, California.  Uber is not a transportation company.  It does not own vehicles, does not employ drivers and ***does not compete with taxicab or livery companies in providing transportation services to the public.***" (Emphasis added).

-14-

McKool Smith Hennigan, P.C.
Los Angeles, CA

b. On May 13, 2013, Uber told the Maryland Public Service Commission: "Uber does not own, lease or charter vehicles or employ drivers.  ***Uber does not compete directly with transportation providers.***  Rather, the App is a tool available to the existing transportation infrastructure.  Thus, Uber views itself as positioned at a different level from the actual transportation companies or providers." (Emphasis added).

62. Taxi companies and TNCs are also subject to different government regulations.  For example:

a. In the District of Columbia, local regulations prohibit Drivers using a Ride-Hailing App from soliciting or accepting "street hails,"  D.C. CODE § 50–301.29e(a)(1), and impose different pricing regulations on taxis and TNCs, id. §§ 50–301.29f, 50-301.31(b)(1)-(2) (allowing ride-hailing companies to use method other than metered taxi rate to calculate fares); id. § 50–381(a) (requiring taxis to use meter system).

b. In New York, TNC Drivers "shall not solicit or accept street hails," NY VEH. & TRAF. LAW § 1692(7), and may not accept payment in cash, id. § 1692(8). Taxi drivers may do both.  *See id.* § 1691(1)(c)(i), (6)(b)(ii) (excluding taxis from TNC definitions and thus from street-hail, payment, and other regulations governing only TNCs).

c. In Pennsylvania, likewise, TNC Drivers may not solicit or accept street hails or phone calls requesting transportation.  53 Pa.C.S. § 57A16(b)(3). Taxi drivers may do both. *See id.* § 5701 (defining "taxicab service" as a "[l]ocal common carrier service for passengers, rendered on either an exclusive or nonexclusive basis, where the service is characterized by the fact that passengers normally hire the vehicle and its driver either by telephone call or by hail, or both. The term does not include transportation network service as defined in section 57A01").

  **SECOND AMENDED COMPLAINT**

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

63.     Other means of transportation besides taxi cabs also are not reasonable substitutes for Ride-Hailing Apps. In contrast to driving, Passengers do not need to own and be able to operate a vehicle to arrange transportation using a Ride-Hailing App. Unlike public transit, Ride-Hailing Apps allow Passengers to go anywhere they want without being limited by pre-set routes or schedules. And walking is not a reasonable substitute for rides arranged through Ride-Hailing Apps because it does not provide comparable speed or allow for transportation over comparable distances (e.g., walking five miles is not a reasonable substitute for riding in a car over the same distance).

64.     Given the differences between these other modes of transportation and transportation that can be booked through Ride-Hailing Apps, they are not reasonable substitutes for Ride-Hailing Apps.

## RELEVANT GEOGRAPHIC MARKETS

65.     The Sidecar App could be used in the following cities: San Francisco, Austin, greater Los Angeles (including Long Beach), Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

66.     At all relevant times, Uber's App could be used in those same cities. In fact, in terms of the number of riders, Washington, DC, New York, Chicago, Los Angeles, and San Francisco are Uber's largest markets in North America today.

67.     The cities of San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston each independently constitute a relevant geographic market for purposes of antitrust analysis. Passengers looking for a ride in each of those cities can only use a Ride-Hailing App that is used by nearby Drivers. Likewise, Drivers looking to use a Ride-Hailing App can only connect to nearby Passengers who are using the same App.

68.     A hypothetical monopolist that was the only present and future supplier of all Ride-Hailing Apps in each of those cities (San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston) would impose at least a SSNIP for each transaction completed through Ride-Hailing Apps. That SSNIP could be imposed by raising the prices paid by Passengers, reducing the payments made to Drivers, or both.  Not enough Passengers or Drivers would respond to a SSNIP by switching to other means of hailing

McKool Smith Hennigan, P.C.
Los Angeles, CA

transportation that are not available within the city limits to render such a price increase unprofitable.

## BARRIERS TO ENTRY

69. There are high barriers to entry in the market for Ride-Hailing Apps.

70. Ride-Hailing Apps connect two sets of consumers, Passengers and Drivers, and thus are two-sided platforms that exhibit network effects. Network effects exist where the value of the two-sided platform to one group of customers depends on how many members of a different group of customers participate.

71. In the case of Ride-Hailing Apps, the value of an App to Passengers depends on how many Drivers are using the same App near their location. As more Drivers use a particular Ride-Hailing App, the value of that platform increases for Passengers because it becomes more likely that they will be matched quickly with a nearby Driver when trying to book a ride. And as more Drivers join the platform, wait times decrease, making the Ride-Hailing App more valuable to Passengers.

72. The same principle applies to Drivers. The value of a Ride-Hailing App to Drivers depends on how many nearby Passengers are using the App. As more Passengers use a particular Ride-Hailing App, the value of that platform increases for Drivers because it becomes more likely that they will be matched quickly with a nearby Passenger looking for a ride. In other words, as more Passengers use a Ride-Hailing App, it becomes more valuable for Drivers because the amount of time Drivers spend waiting for ride requests declines and so does the distance to the pick-up point for their next ride.

73. Uber and its senior executives and officers recognized that these network effects were vital to its business and its strategy for marginalizing its competitors. In 2014, its former CEO and founder, Travis Kalanick, described "the network effects of [Uber's] business" this way:

> More cars and drivers mean better coverage and lower pickup times. Lower pickup times mean better economics for drivers, and thus more drivers and cars.

74. Bill Gurley, a general partner at Benchmark Capital (an early Uber investor), wrote a blog post in 2014, when he was a member of Uber's board of directors, that discussed the importance of network effects to Uber's business:

-17-

Eighteen years ago, Brian Arthur published a seminal economic paper in the Harvard Business Review titled, "Increasing Returns and the Two Worlds of Business." If you have not read it, I highly recommend that you do. His key point is that certain technology businesses, rather than being exposed to diminishing marginal returns like historical industrial businesses, are actually subject to a phenomenon called known as "increasing returns." Gaining market share puts them in a better position to gain more market share. Increasing returns are particularly powerful when a network effect is present. According to Wikipedia, a network effect is present when "… the value of a product or service is dependent on the number of others using it." In other words, the more people that use the product or service, the more valuable it is to each and every user.

So the right questions are, "is Uber exposed to some form of network effect where the marginal user sees higher utility precisely because of the number of previous customers that have chosen to use it, and would that lead to a market share well beyond the 10% postulated by Damodaran?"

There are three drivers of a network effect in the Uber model:

(1)   **Pick-up times**. As Uber expands in a market, and as demand and supply both grow, pickup times fall. Residents of San Francisco have seen this play out over many years. Shorter pickup times mean more reliability and more potential use cases. The more people that use Uber, the shorter the pick-up times in each region.

(2)   **Coverage Density**. As Uber grows in a city, the outer geographic range of supplier liquidity increases and increases. Once again, Uber started in San Francisco proper. Today there is coverage from South San Jose all the way up to Napa. The more people that use Uber, the greater the coverage.

(3)   **Utilization**. As Uber grows in any given city, utilization increases. Basically, the time that a driver has a paying ride per hour is constantly rising. This is simply a math problem – more demand and more supply make the economical traveling-salesman type problem easier to solve. Uber then uses the increased utilization to lower rates – which results in lower prices which once again leads to more use cases. The more people that use Uber, the lower the overall price will be for the consumer.

75.     These network effects create a formidable barrier to entry that insulates incumbent TNCs from new competition or expansion by smaller rivals. A new competitor trying to enter the market or an existing, smaller firm trying to expand will not be able to compete in a timely, likely, or sufficient way with incumbent firms that already have established large networks of Drivers and Passengers using their Ride-Hailing Apps. For example, without enough Drivers, a smaller rival will not be able to compete with the shorter wait times available on incumbent apps; and without enough Passengers, the upstart firm will not be able to attract Drivers to its platform. And that is the case even if the new competitor offers better commercial terms or features. The value of Ride-Hailing Apps is derived from the number of Drivers and Passengers, giving incumbent firms, especially a

1    monopolist like Uber, an inherent and insurmountable advantage.

2         76.    This chicken-or-egg problem has stifled new entrants and prevented competitors from

3    imposing a true competitive constraint on Uber since Sidecar wound down its operations at the end

4    of 2015. Significant new rivals have not emerged to challenge Uber's market dominance, which it

5    has maintained, with a weakened Lyft as its only significant competitor in the relevant geographic

6    markets.

7         77.    Economies of scale also are a major barrier to entry in the market for Ride Hailing

8    Apps. Uber's scale advantages are difficult, if not impossible, for a new entrant or smaller firm to

9    overcome because of the dominant market position Uber has obtained through its anticompetitive

10   actions.

11        78.    Uber now boasts a user base of over 40 million Passengers in cities around the United

12   States. When those Passengers travel to a new city, they can open their Uber App and know that they

13   will be able to book a ride within a few minutes. Likewise, Drivers know that if they relocate to

14   another city, they will be able to turn on their Uber App and be matched with Passengers within a

15   matter of minutes.

16        79.    These scale advantages have enabled Uber to expand more rapidly and effectively

17   than its competitors into new markets. Bill Gurley described Uber's scale advantages this way:

18            Uber also enjoys economies of scale that span across city borders. Many people who
             travel have experienced Uber for the first time in another city. When the company
19           enters a new city they have the stored data for users who have opened the application
             in that area to see if coverage is available. These "opens" represent eager unfulfilled
20           customers. They also have a list of residents who have already used the application in
             another city and have a registered credit card on file. This makes launching and
21           marketing in each additional city increasingly easier.

22        80.    Another barrier to entry created by Uber's scale relates to the volume of data that it

23   collects from transactions completed on its platform. (e.g., most popular destinations, busiest times

24   of day for ride requests, impacts of seasonality, traffic patterns, etc.). Uber can use this data to

25   improve its algorithms for matching Drivers and Passengers, allowing its App to more rapidly and

26   effectively improve its matching and scheduling functions than is possible for an upstart competitor.

27   As explained in more detail below, Uber's vast volume of data also allows Uber to price

28   discriminate now that it has begun the process of recouping its losses from predatory pricing. Uber

McKool Smith Hennigan, P.C.
Los Angeles, CA

-19-

can and does price significantly higher to obtain supra-competitive profits where the data it collects from its drivers and passengers indicates that it can.

81.     A new entrant or fringe competitor in the market for Ride-Hailing Apps cannot similarly leverage an existing customer base to effectively compete with Uber's scale.

82.     Uber did not have to overcome barriers to entry in the market for Ride-Hailing Apps that are created by network effects and economies of scale. When Uber embarked on its anticompetitive crusade to obtain its monopoly position, there were no incumbent TNCs with an established network of Drivers and Passengers. New firms competing with Uber today face substantial long-run costs that Uber did not need to incur to surmount the barriers to entry created by network effects and economies of scale.

83.     Other TNCs also recognize that network effects and scale are formidable barriers to entry that insulate incumbent providers from new competition. For example, one of Lyft's co-founders, John Zimmer, has publicly acknowledged "very strong network effects" in the market for Ride-Hailing Apps. Lyft is subject to the same constraints as other market entrants in trying to compete with Uber's vast network and the strong network effects created by Uber's dominance of drivers and riders.

84.     Uber's large network allowed it to collect data that potential entrants and smaller competitors do not have, thus putting them at a significant disadvantage. Uber's ability to collect and aggregate data from both sides of the market allowed it to engage in price discrimination from an early stage. Uber's initial effort at price discrimination, known as "surge pricing," allowed Uber to set intermittent and temporarily higher prices in situations where high demand could be expected (such as sporting events, concerts, or other mass gatherings), or where high demand was actually being detected in real-time by Uber through its access to and control over driver and customer data. This type of price discrimination makes it difficult, if not impossible, for any competitor to respond because the driver supply is limited at specifically those times, the time frames are short, and Uber can act in less than predictable ways to offset any competitive response. Indeed, one of the few ways to undercut Uber's ability to engage in price discrimination during such "surge pricing" conditions was Sidecar's unique approach to enable drivers to set their own prices, an approach to pricing that

**SECOND AMENDED COMPLAINT**

McKool Smith Hennigan, P.C.
Los Angeles, CA

Uber's only other significant competitor, Lyft, does not follow.

85.     Recent reports indicate that Uber has moved to a more sophisticated form of price discrimination through a pricing model known as "dynamic pricing," i.e., charging different customers different prices that are based on their ability to pay, their price sensitivity (e.g., determining price based on the income and demographics of the pick-up or drop-off location), and the constant stream of data that Uber collects on the number of drivers and customers in a very narrow geographic location. Uber is able to implement this sophisticated price discrimination strategy because of: Uber's monopoly power, the barriers to entry, Uber's vast network, its pricing controls over all of its drivers, and its elimination of competition such as Sidecar that threatened that strategy. Uber's only remaining significant competitor, Lyft, is unable to expand its ride offerings in the face of price discrimination because the network effects of Uber's vast driver pool render that impossible or ineffective. Further, the financial pressures on Lyft and its status as a public company with a need to recoup its own enormous financial losses, means that Lyft has no incentive to undercut Uber. In fact, in response to Uber's conduct, Lyft is itself implementing a similar dynamic pricing model, substantially reducing Lyft as a competitive constraint on Uber's unilateral ability to exercise monopoly power through recoupment and supra-competitive pricing. Lyft has a strong incentive to adopt such a dynamic pricing model because in order for Lyft to attract Drivers to Lyft's platform, Lyft cannot undercut the higher prices that the Drivers would otherwise obtain from customers if they were to drive for Uber instead of Lyft.

**MARKET PARTICIPANTS & MARKET SHARES - UBER'S MONOPOLY POWER**

86.     Due to the importance of network effects, the ride-hailing market today has only two remaining competitors with any material market share, Uber and Lyft.

87.     Uber and Lyft collectively account for nearly 100% of all rides booked through Ride-Hailing Apps in the United States. On a national level, Uber's market share in the United States is approximately 70% and has stayed in that range consistently for a number of years. Lyft's market share in the United States is approximately 30% and consistently has been in the range of 25-30% for several years.

88.     In local markets, Uber has monopoly power in each city where it competed with

Sidecar:

    a.    in San Francisco, at all times between 2014 and the present, Uber's market share has been at least 60%.

    b.    in Los Angeles, at all times between 2014 and the present, Uber's market share has been at least 60%.

    c.    in Chicago, at all times between 2014 and the present, Uber's market share has been at least 65%.

    d.    in Philadelphia, at all times between 2014 and the present, Uber's market share has been at least 70%.

    e.    in Washington, DC, at all times between 2014 and the present, Uber's market share has been at least 70%.

    f.    in New York, at all times between 2014 and the present, Uber's market share has been at least 75%.

    g.    in Seattle, at all times between 2014 and the present, Uber's market share has been at least 65%.

    h.    in San Diego, at all times between 2014 and the present, Uber's market share has been at least 65%.

    i.    in San Jose, at all times between 2014 and the present, Uber's market share has been at least 65%.

    j.    in Boston, at all times between 2014 and the present, Uber's market share has been at least 70%.

89.    As in many industries in which a dominant firm is able to obtain a monopoly share (over two-thirds of the market), Uber has eliminated most but not all competitors. Uber nonetheless has demonstrated its ability to dominate the market and eliminate competition wherever it chooses. A recent example occurred in Austin, Texas. In 2016, Uber and Lyft pulled out of the city after voters approved regulations on ride-hailing companies, including fingerprint background checks for drivers. Four competitors stepped in to offer ride-hailing in tech-savvy Austin, including two local companies. But the following year, Texas legislators passed a looser state law that superseded

-22-

        **SECOND AMENDED COMPLAINT**

Austin's local law, and both Uber and Lyft returned to the market, which Uber quickly dominated. Shortly after Uber returned, three of the competitors, Boston-based Fasten, locally owned GetMe and Phoenix-based Fare stopped operations, and the remaining one, nonprofit RideAustin, lost thousands of riders. "It was a matter of a couple months and those three companies were gone," said Chris Simek, an associate research scientist with the Texas A&M University Transportation Institute, who co-authored a study of Uber and Lyft's impact on ride-hailing in Austin.

90.     As a result of Uber's monopoly conduct (predatory pricing and tortious conduct), Lyft has become a less effective competitor. Lyft has incurred enormous losses and faces significant pressure to achieve profitability and recoup prior losses now that it is a public company with more of a need to focus on short term results. Given these factors, and because of (a) Uber's monopoly power arising from network and brand effects and economies of scale, and (b) Uber's use of its monopoly power to engage in price discrimination, Lyft has no ability to respond to Uber's imposition of monopoly pricing and no incentive to do so given its own urgent need for short term profits. Lyft also has been limited in its ability to capture market share with regard to the more profitable segments of the ride-hailing market (e.g., business users and the higher end rides designated as "premium" in Uber's platform, i.e., Uber Black and Uber Black SUV).

91.     The combination of these market factors and Uber's monopolization strategy demonstrate that there is no check on Uber's unilateral market power or Uber's ability to recoup monopoly profits from ride-hailing. The fact that Uber has successfully been able to engage in price discrimination is further evidence of its market power. (See, e.g., Richard Schmalensee, *Output and Welfare Implications of Monopolistic Third-Degree Price Discrimination*, 71 American Economic Review 242, 242 (1981)) Price discrimination is a means by which Uber can exact monopoly profits without reducing overall market output.

## UBER'S ANTICOMPETITIVE TACTICS

92.     The elimination of Sidecar has been a key component of Uber's strategy for market dominance. Sidecar was a "maverick" competitor critical to innovation and disruption of the market, and Uber knew that Sidecar must be eliminated. From its inception, Sidecar provided price pressure (on the customer side of the transaction) by offering ride-sharing app users a lower cost alternative to

McKool Smith Hennigan, P.C.
Los Angeles, CA

**SECOND AMENDED COMPLAINT**

Uber's black car service. Sidecar also allowed drivers to set their own prices, a critical innovation that would have undercut Uber's surge/dynamic pricing model. Uber's actions have harmed competition in the ride-hailing applications market by eliminating an innovative maverick in Sidecar and severely weakening Lyft. Given the enormous losses suffered by Lyft, it remains to be seen whether Lyft will remain a viable competitor in the market over the long term. Even if it remains, however, Lyft will not, and cannot, act as a check on the ability of Uber to charge supra-competitive prices, above the level that would have prevailed if Sidecar had been able to remain in the market, as a result of network effects, the two-sided nature of the market, Lyft's own financial losses which it must recoup, and Lyft's own adoption of dynamic pricing.

93.     Uber did not acquire and maintain its monopoly by offering a better product or competing on the merits. Instead, Uber's senior executives and officers directed a series of anticompetitive tactics that were specifically designed to thwart true competition and allow Uber to institute anticompetitive pricing strategies in the long-run.

94.     Through the anticompetitive actions described below, among others, Uber marginalized its competitors, raised barriers to entry, and insulated itself from meaningful competition.

**Uber Engaged in Predatory Pricing with the Intent to Increase Prices
After Competitors Exited the Market**

95.     With the introduction of UberX, Uber deployed a two-part predatory pricing strategy to build its network and push out the competition, including Sidecar.

96.     First, Uber offered sign-up bonuses and other subsidies to Drivers, allowing them to earn more on each ride than they would if Uber employed a profit-maximizing strategy. Second, it offered heavily subsidized rates to encourage Passengers to use its App, allowing them to pay less on each ride than they would if Uber employed a profit-maximizing strategy.

97.     In combination, these tactics caused Uber to incur substantial losses. On information and belief, Uber planned to incur near-term losses on transactions conducted through its App until it obtained a dominant market position, at which point it could start raising prices to supra-competitive levels to recoup its losses. The path to recoupment has not been as quick as Uber originally

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

1   envisioned, but Uber has continued to stay the course with the intention of recouping its losses

2   resulting from its predatory pricing. Despite the loss of billions of dollars, Uber investors still

3   believe that, once Uber benefits from its market dominance, the long-term financial rewards will be

4   sufficient to cover not only the accumulated losses in its ride-sharing business, but will in fact

5   deliver substantial returns to investors who are willing to stay the course. To be sure, Uber's

6   staggering losses are not all the result of predation. Uber's quest for global dominance has resulted

7   in losses outside the U.S., and its investment in other related businesses such as delivery and

8   autonomous vehicles are also the source of losses within the U.S. But, Uber reasonably and

9   confidently believed that its dominance aided by network effects and financial power would

10   ultimately return its losses from ride-hailing and more in the U.S. ride-hailing market.

11        98.    The example of another dominant platform company, Amazon, demonstrates both the

12   rationality of Uber's strategy and the financial rewards of predatory pricing in a platform economy.

13   Despite the derisive jeers of the analyst community that likened Amazon to a charitable institution

14   being run for the benefit of consumers as losses continued for quarter after quarter, the exact

15   opposite has proven to be the case. Amazon has had the last laugh as its now dominant platform has

16   delivered unfathomable riches to its owners. Amazon and other successful platform companies have

17   shown that the traditional skepticism towards predatory pricing is entirely misplaced, and both the

18   scholars that have expressed such skepticism, including the "Chicago School" and judicial decisions

19   echoing such views are simply outdated in the modern economy and certainly in the platform world.

20   See Lina M. Kahn, *Amazon's Antitrust Paradox*, 126 Yale L. J. 710 (2017). But, even classic legal

21   analysis of predatory pricing, uninformed by the special circumstances of the platform economy,

22   does not countenance the behavior of Uber. Where a company with substantial market power

23   protected by high barriers to entry prices below cost with the specific intent to drive out competitors

24   and with the dangerous probability of recoupment of such losses, that conduct violates the antitrust

25   laws and establishes that monopoly power has not been legally acquired or maintained.

26        99.    Uber has priced below the appropriate measure of cost under any relevant legal

27   standard. This includes pricing below total cost, pricing below marginal cost, and pricing below

28   average variable cost in the relevant markets. The variable costs associated with each transaction

-25-

**SECOND AMENDED COMPLAINT**

conducted through a Ride-Hailing App include at least the following categories of costs: (1) the payment made by the TNC to the Driver; (2) the subsidy or discount provided to the Passenger; (3) the marketing costs associated with attracting the Driver and Passenger to the App to complete the transaction; (4) customer service costs and direct operational costs related to rides in that specific city or area; (5) payment processing fees; (6) insurance; and (7) the cost of the computer servers necessary to run the software and process the transaction.

100.    Between 2013 and 2016, in the markets where Uber was competing with Sidecar, the average prices Uber charged Passengers were lower than Uber's average variable cost per transaction.  Uber's prices were so low that the commission it received from each transaction, on average, was lower than its average variable cost for the transaction (accounting for at least Driver payments and subsidies, Passenger subsidies and discounts, marketing costs, customer service costs, payment processing fees, and server costs).  In other words, on average, Uber lost money on most or all of the transaction completed through its Ride-Hailing App.

101.    On information and belief, in 2014, for example, Uber initiated a 20% price cut in major cities that subsidized the prices charged to Passengers for UberX rides. And by 2015, Passenger fees were only covering around 40% of Uber's costs for each transaction conducted through its App.

102.    Based on press reports, Uber has privately advised current and potential investors that Driver subsidies are responsible for the large losses it has historically recorded on its books.  As reported in Uber's S-1 connected with its recent public offering, Uber has lost more than $9 billion dollars.

**Uber has Begun Recouping its Predatory Losses and There is a
Dangerous Probability that it will Continue to Recoup Monopoly Profits.**

103.    Uber fully intends to recoup its predatory losses by raising prices to supra-competitive levels in the long-run. Uber's own strategy and actions provide the evidence of its ability and intentions. Unless Uber knew that it was capable of recouping its losses, Uber's stated strategy of pricing below marginal cost to later achieve increased margins could not have been profitable and would not have been undertaken. Uber has in fact raised prices several times since

**SECOND AMENDED COMPLAINT**

Sidecar ceased operations. Because Sidecar is no longer in the market exercising a competitive constraint on Uber, Uber is now free to steadily raise prices and extend its price discrimination in each market where it previously competed against Sidecar. Indeed, Uber's CEO, Dara Khosrowshahi, recently stated that Uber's rideshare business is turning profitable and is expected to become more profitable as it implements its new strategy. The elimination of a maverick competitor, Sidecar, makes the recoupment of lost profits both feasible and a dangerous probability.

104.    In fact, Uber has already imposed modest specific price increases in the markets where it previously competed against Sidecar since Sidecar exited the market in December 2015. The actual prices that Uber charges to riders are determined through a combination of pricing components including a minimum price, a base fare, a service fee, a cost per mile, a cost per minute, and other fees.  As demonstrated in the tables below, Uber has increased the rates associated with these pricing components, and therefore increased actual prices to riders, numerous times since Sidecar exited:

| UberX Fee Increases in San Francisco | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2016 | Minimum fare | $5.35 to $5.55 | 3.7% |
| February 2016 | Service fees | $1.35 to $1.55 | 14.8 |
| March 2016 | Minimum fare | $5.55 to $6.55 | 18.0% |
| February 2017 | Minimum fare | $6.55 to $6.75 | 18.3 |
| February 2017 | Service fee | $1.55 to $1.75 | 12.9% |
| July 2017 | Minimum fare | $6.75 to $7.00 | 3.7% |
| July 2017 | Service fee | $1.75 to $2.00 | 14.3% |
| September 2017 | Cost per mile | $1.15 to $1.21 | 5.2% |
| April 2018 | Base fare | $2.00 to $2.20 | 10.0% |
| April 2018 | Cost per mile | $1.21 to $1.33 | 9.9% |
| April 2018 | Service fee | $2.00 to $2.20 | 10.0% |

McKool Smith Hennigan, P.C.
Los Angeles, CA

| UberX Fee Increases in Los Angeles | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2017 | Service fees | $1.65 to $1.85 | 12.1% |
| February 2017 | Minimum fare | $5.15 to $5.35 | 3.9% |
| July 2017 | Minimum fare | $5.35 to $5.60 | 4.7% |
| July 2017 | Service fees | $1.85 to $2.10 | 13.5% |
| September 2017 | Cost per mile | $0.90 to $0.96 | 6.7% |
| April 2018 | Minimum fare | $5.60 to $5.80 | 3.6% |
| April 2018 | Cost per minute | $0.15 to $0.17 | 13.3% |
| April 2018 | Cost per mile | $0.96 to $1.06 | 10.4% |
| April 2018 | Service fees | $2.10 to $2.30 | 9.5% |
| September 2018 | Minimum fare | $5.80 to $7.30 | 25.9% |
| September 2018 | Cost per minute | $0.17 to $0.24 | 41.2% |

| UberX Fee Increases in Chicago | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2017 | Minimum fare | $4.20 to $4.40 | 4.8% |
| February 2017 | Service fees | $1.20 to $1.40 | 16.7% |
| May 2017 | Cost per mile | $0.90 to $0.95 | 5.6% |
| July 2017 | Minimum fare | $4.40 to $4.60 | 4.5% |
| July 2017 | Service fees | $1.40 to $1.60 | 14.3% |
| May 2018 | Base fare | $1.70 to $1.79 | 5.3% |
| May 2018 | Minimum fare | $4.60 to $4.85 | 5.4% |
| May 2018 | Cost per minute | $0.20 to $0.21 | 5.0% |
| May 2018 | Cost per mile | $0.95 to $1.00 | 5.3% |
| May 2018 | Service fees | $1.60 to $1.85 | 15.6% |
| October 2018 | Cost per minute | $0.21 to $0.28 | 33.3% |

**SECOND AMENDED COMPLAINT**

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

| UberX Fee Increases in Philadelphia | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| May 2016 | Minimum fare | $5.25 to $5.75 | 9.5% |
| February 2017 | Minimum fare | $5.75 to $5.95 | 3.5% |
| February 2017 | Service fees | $1.25 to $1.45 | 16.0% |
| May 2017 | Cost per mile | $1.10 to $1.15 | 4.5% |
| July 2017 | Minimum fare | $5.95 to $6.20 | 4.2% |
| July 2017 | Service fees | $1.45 to $1.70 | 17.2% |
| March 2018 | Base fare | $1.25 to $1.38 | 10.4% |
| March 2018 | Minimum fare | $6.20 to $6.50 | 4.8% |
| March 2018 | Cost per minute | $0.18 to $0.20 | 11.1% |
| March 2018 | Cost per mile | $1.15 to $1.27 | 10.4% |
| March 2018 | Service fees | $1.70 to $2.00 | 17.6% |
| October 2018 | Cost per minute | $0.20 to $0.32 | 60% |

| UberX Fee Increases in Washington, DC | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2017 | Minimum fare | $6.35 to $6.55 | 3.1% |
| February 2017 | Service fees | $1.35 to $1.55 | 14.8% |
| July 2017 | Cost per mile | $1.02 to $1.08 | 5.9% |
| July 2017 | Minimum fare | $6.55 to $6.80 | 3.8% |
| July 2017 | Service fees | $1.55 to $1.80 | 16.1% |
| July 2018 | Service fees | $1.80 to $2.00 | 11.1% |
| July 2018 | Cost per mile | $1.08 to $1.13 | 4.6% |
| July 2018 | Cost per minute | $0.17 to $0.18 | 5.9% |
| July 2018 | Minimum fare | $6.80 to $7.00 | 2.9% |
| July 2018 | Base fare | $1.15 to $1.21 | 5.2% |

Case No. 3:18-cv-07440-JCS                                    **SECOND AMENDED COMPLAINT**

McKool Smith Hennigan, P.C.
Los Angeles, CA

| UberX Fee Increases in Seattle | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2016 | Minimum fare | $4.20 to $4.30 | 2.4% |
| February 2016 | Service fees | $1.20 to $1.30 | 8.3% |
| February 2017 | Minimum fare | $4.80 to $5.15 | 7.3% |
| February 2017 | Service fees | $1.30 to $1.65 | 26.9% |
| July 2017 | Minimum fare | $5.15 to $5.45 | 5.8.% |
| July 2017 | Service fees | $1.65 to $1.95 | 18.2% |
| April 2018 | Cost per mile | $1.35 to $1.41 | 4.4% |
| March 2017 | Booking Fee | $1.30 to $1.65 | 26.9% |
| May 2018 | Base fare | $1.35 to $1.42 | 5.2% |
| May 2018 | Cost per minute | $0.24 to $0.25 | 4.2% |
| May 2018 | Cost per mile | $1.41 to $1.48 | 5.0% |

| UberX Fee Increases in San Jose | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2016 | Minimum fare | $5.35 to $5.55 | 3.7% |
| February 2016 | Service fees | $1.35 to $1.55 | 14.8% |
| March 2016 | Minimum fare | $5.55 to $6.55 | 18.0% |
| February 2017 | Minimum fare | $6.55 to $6.75 | 3.1% |
| February 2017 | Service fees | $1.55 to $1.75 | 12.9% |
| July 2017 | Minimum fare | $6.75 to $7.00 | 3.7% |
| July 2017 | Service fees | $1.75 to $2.00 | 14.3% |
| September 2017 | Cost per mile | $1.15 to $1.21 | 5.2% |
| April 2018 | Cost per minute | $0.22 to $0.24 | 9.1% |
| April 2018 | Cost per mile | $1.21 to $1.33 | 9.9% |
| April 2018 | Service fee | $2.00 to $2.20 | 10.0% |

Case No. 3:18-cv-07440-JCS

**SECOND AMENDED COMPLAINT**

McKool Smith Hennigan, P.C.
Los Angeles, CA

| UberX Fee Increases in Boston | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| August 2015 | Cost per mile | $1.20 to $1.24 | 3.3% |
| August 2015 | Cost per minute | $0.16 to $0.21 | 31.3% |
| October 2015 | Minimum fare | $5.00 to $5.15 | 3.0% |
| October 2015 | Service fees | $1.00 to $1.15 | 15.0% |
| November 2015 | Cost per minute | $0.16 to $0.20 | 25.0% |
| May 2016 | Minimum fare | $5.15 to $6.15 | 19.4% |
| February 2017 | Minimum fare | $6.15 to $6.35 | 3.3% |
| February 2017 | Service fees | $1.15 to $1.35 | 17.4% |
| May 2017 | Cost per mile | $1.24 to $1.29 | 4.0% |
| July 2017 | Minimum fare | $6.35 to $6.60 | 3.9% |
| July 2017 | Service fees | $1.35 to $1.60 | 18.5% |
| April 2018 | Base fare | $2.00 to $2.10 | 5.0% |
| April 2018 | Minimum fare | $6.60 to $6.85 | 3.8% |
| April 2018 | Cost per minute | $.20 to $0.21 | 5.0% |
| April 2018 | Cost per mile | $1.29 to $1.35 | 4.7% |
| April 2018 | Service fees | $1.60 to 1.85 | 15.6% |

| UberX Fee Increases in San Diego | | | |
|---|---|---|---|
| *Date* | *Fee* | *$ Change* | *% Increase* |
| February 2017 | Minimum fare | $5.75 to $5.95 | 3.5% |
| February 2017 | Service fees | $1.75 to $1.95 | 11.4% |
| July 2017 | Minimum fare | $5.95 to $6.25 | 5.0% |
| July 2017 | Service fees | $1.95 to $2.25 | 15.4% |
| September 2017 | Cost per mile | $1.10 to $1.16 | 5.5% |
| April 2018 | Minimum fare | $6.25 to $6.65 | 6.4% |

Case No. 3:18-cv-07440-JCS                                    **SECOND AMENDED COMPLAINT**

| April 2018 | Service fees | $2.25 to $2.65 | 17.8% |

| **UberX Fee Increases in New York** | | | |
| *Date* | *Fee* | *$ Change* | *% Increase* |
| May 2016 | Minimum fare | $7.00 to $8.00 | 14.3% |

105.    In addition to direct increases in the prices charged to Passengers, Uber intends to extract supra-competitive profits by reducing the payments it makes to Drivers.

106.    Indeed, in May 2015, Uber implemented a tiered pricing schedule for UberX Drivers in San Francisco and San Diego, increasing the base "commission" it charged Drivers to 30% (up from the 20% levels that prevailed in 2014).

107.    Also, in 2015, Uber raised the base commission it charged drivers in New York City and Boston from 20% to 25%.

108.    The primary way that Uber intends to charge supra-competitive profits is through its ongoing price discrimination. Uber, for example, has successfully used its pricing for differentiated services to steer customers towards a more profitable utilization. In Chicago, Uber raised prices sufficiently on lower-end/lower-priced rideshare services (e.g., Uber Pool) to drive customers to higher end/higher priced rideshare services (e.g., Uber Black, Uber Comfort and UberX), as part of its strategy to effectively raise prices now after pricing below cost previously.[2] As noted in the article about the Chicago study:

- "[A] law in Chicago requiring the companies to disclose fare data shines a light on how at least one of the former 'unicorns' is trying to turn a profit for the first time."

- "A Reuters analysis of the data shows fares for shared rides in the city have risen significantly over the past year, while fares for single riders have remained stable…Over this period of increased fares, carpool ridership fell."

---

[2]   See   https://www.businessinsider.com/ubers-carpool-pricing-strategy-revealed-by-chicago-fare-data-2019-11

McKool Smith Hennigan, P.C.
Los Angeles, CA

- "The fare changes in Chicago show an attempt to reduce discounts for customers in order to help convince investors that ride-hailing can be a profitable business model."

- "After reviewing the findings from the Chicago data, Uber said it has traditionally seen losses in its shared Pool rides segment. Earlier this month, Chief Executive Dara Khosrowshahi said Uber was 'losing significant sums' due to heavy discounts on those rides."

- "The Reuters analysis of more than one million Chicago rides between January and September 2019 - the only full quarters for which the city currently makes data available - found that fares per mile increased 13% for shared rides. But they remained unchanged for private rides. Shared rides fell to about a third of all rides in a group of the least affluent neighborhoods of Chicago in the third quarter from about half of rides in the first."

109.    Moreover, booking and other fees have increased Uber's effective commission rate (the percentage of Passenger payments retained by Uber) to more than the advertised base commission charged to Drivers. On information and belief, in San Francisco, in 2016, for example, median effective commission were as high as 39%; and in Austin, beginning in early 2018, effective commissions rose to over 30%. Since 2018, Uber has recorded positive EBITDA for its ride-sharing business, reflecting the various steps Uber has taken as it moves to the recoupment phase.

### The Elimination of Sidecar and the Barriers to Entry Have Facilitated Uber's Recoupment of Predatory Losses

110.    The elimination of Sidecar was critical to Uber's predatory scheme. Sidecar was the only competitor that permitted driver's autonomy in setting prices. Sidecar thus played an important, disruptive, innovator's role when it came to pricing in the marketplace. Sidecar's platform presented an opportunity for true price competition among drivers where, for example, Uber dictates its surge pricing (or, now, "dynamic pricing") to Riders. With Sidecar sidelined and a weakened Lyft unable to compete effectively against Uber, Uber is free to exercise its monopoly power and recoup supra-competitive prices since it controls pricing on both ends of the two-sided Ride Hailing App market. Without an innovative "maverick" in the marketplace Riders and Drivers lose. Indeed, Uber already

**SECOND AMENDED COMPLAINT**

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  has started retrenching on driver incentives and increasing prices. In the 2019 first quarter earnings

2  call, Uber's CEO specifically noted that competition would focus on "brand and product" versus

3  "incentives" which the CEO noted was a "healthy trend for the business."

4        111.    This shift in strategy responds to the importuning of analysts who believe that the

5  time has come for Uber to raise prices. The structure of the ride-hailing market and Uber's conduct

6  distinguishes it from the markets involved in *Brooke Group* and *Rebel Oil*. Unlike the Ride Hailing

7  App market, the relevant commodity markets in these cases were not two-sided platform markets

8  subject to barriers to entry and expansion through network effects. In *Brooke Group*, there were six

9  significant cigarette manufacturers and no single dominant competitor. The largest competitor in the

10  market was Philip Morris with only a 40% market share. Not only that, the alleged tacit collusion

11  theory for supra-competitive pricing was highly implausible because one of the most significant

12  competitors. RJ Reynolds was acting "without regard to the supposed benefits of oligopolistic

13  coordination" in the relevant time-frame, and the plaintiff's own witnesses denied that oligopolistic

14  coordination was occurring. In *Rebel Oil*, the alleged market encompassed self-serve retail gasoline

15  stations and defendant Arco allegedly controlled only 53 of 275 stations. Other major competitors

16  included Southland Corp which controlled 89 stations, Texaco which controlled 67 stations, Unocal

17  and Chevron. The Ninth Circuit held that even Arco's alleged market share of 44% based on a

18  narrowing of the type of stations included in the market was insufficient to show market power. The

19  Court also held that Arco could control neither the gasoline supply in Las Vegas nor the retail prices

20  because existing competitors could easily deliver more gasoline. The decisions in those cases

21  followed a 115-day trial in the case of *Brooke Group* and full discovery in the case of *Rebel Oil*.

22        112.    Uber's monopoly power in the ride-hailing market is demonstrated not only by its

23  dominant market share in an industry with significant barriers to entry, but also by its ability to

24  control prices, through unilateral price increases and price discrimination, and the ability to exclude

25  and weaken competition, i.e., its exclusion of a maverick competitor in Sidecar.

26

27

28

-34-

      **SECOND AMENDED COMPLAINT**

**Uber Intentionally and Tortiously Interfered with Sidecar's App and
Its Relationships with Passengers and Drivers**

113.   By mid-2014, Uber operated in all of the cities where Sidecar operated (San Francisco, Austin, greater Los Angeles (including Long Beach), Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston).

114.   On information and belief, from that point in time, continuing through the time that Sidecar wound down its operations, Uber carried out a covert campaign to undermine the performance of its competitors' Ride-Hailing Apps, including Sidecar's App.

115.   Uber's senior executives and officers devised programs, including "Project Hell" and "SLOG," to, among other things, submit fraudulent ride requests on competitors' Apps.  Those fraudulent requests were not submitted by real passengers, but instead were directly submitted by Uber (or persons working under Uber's direction).  These fraudulent requests were submitted with two goals in mind: (a) to undermine the value of competitive Ride-Hailing Apps, for both Passengers and Drivers; and (b) to recruit Drivers to work exclusively with Uber (instead of its competitors).

116.   The fraudulent requests undermined the value of competitive Apps for Drivers because Drivers were matched with fraudulent ride requests instead of real Passengers. Instead of earning money by completing rides, Drivers were sent on a wild goose chase or to pick up Uber contractors that were not true Passengers.

117.   The Passenger experience also was negatively impacted by this fraudulent activity. Because Drivers were busy chasing fraudulent ride requests, Passengers were met with longer wait times for rides.  The reduction in available Drivers on competitive Apps, and the corresponding longer wait times, greatly diminished the value of the competitive Apps for Passengers.

118.   Because of the presence of network effects, these fraudulent ride requests triggered a vicious downward cycle:  Drivers who were disappointed with the number of rides they were able to complete through competitors' Apps switched to Uber.  With fewer Drivers on the platform, Passengers faced longer wait times, and likewise turned to Uber.  And with fewer Passengers available on a competitive App, it became even less attractive to Drivers, which caused even more Drivers to leave the App and perpetuated a downward spiral.

**SECOND AMENDED COMPLAINT**

119.    According to Uber's founder and former CEO, Travis Kalanick, Uber targeted not only Lyft but also Sidecar and its drivers.  Those fraudulent ride requests expressly violated Sidecar's terms of service.

120.    Between 2012 and 2015, to download and use Sidecar's Ride-Hailing App, Passengers had to agree to Sidecar's standard terms of service, which prohibited anyone using the App from:

   a.    attempting to interfere with the performance of Sidecar's App, including through automated ride requests;

   b.    placing a disproportionate load on the infrastructure supporting the App;

   c.    using the App for commercial purposes; or

   d.    submitting fraudulent requests through the App.

121.    Uber's fraudulently submitted ride requests violated Sidecar's terms of service because, among other things, they interfered with the performance of the App, conducted fraud through the App, or used the App for commercial purposes.

122.    These fraudulent and tortious activities allowed Uber to acquire and maintain a monopoly position without having to compete with other Ride-Hailing Apps, including Sidecar's App, on the merits.

**ANTITRUST INJURY**

123.    Sidecar went out of business in December 2015 and sold its operating assets to GM. At that time, Sidecar wound down its operations and shut down its Ride-Hailing App.

124.    Markets where Sidecar had previously competed against Uber usually had three Ride-Hailing Apps (those licensed and operated by Uber, Lyft, and Sidecar).  With Sidecar's exit from the market, Passengers and Drivers in those markets were left with only two real alternatives—Uber with its monopoly position, and Lyft as the sole remaining competitor of any significance.

125.    Sidecar's exit therefore significantly reduced competition in each of those markets, harming the competitive process and the users of Ride-Hailing Apps (both Drivers and Passengers).

126.    Uber's anticompetitive and exclusionary acts also prevented Sidecar from expanding into additional geographic markets and competing with Uber in other cities.

McKool Smith Hennigan, P.C.
Los Angeles, CA

-36-

127.     But for Uber's anticompetitive conduct and abuse of its monopoly position, Sidecar would have remained a viable competitor and served as a check on Uber's anticompetitive price increases.

128.     Competition has been harmed in the market for Ride-Hailing Apps as a result of Sidecar's failure.  Passengers and Drivers have both been harmed because Passengers are now paying higher prices, Drivers are being paid less, and both have fewer choices available (Passengers and Drivers are left with only two real alternatives instead of three).  The removal of a disruptive innovator, with a different price paradigm that will facilitate robust price competition in the market, hurts Passengers and Drivers alike.  Passengers could obtain cheaper rides, and Drivers would provide more rides if Sidecar were still in business today.

129.     Sidecar also has suffered significant financial damages flowing from that harm to competition, including (at least) lost profits and/or the artificial suppression of the value of Sidecar's business.

## CAUSES OF ACTION

## COUNT 1: MONOPOLIZATION (15 U.S.C. § 2)

130.     Sidecar incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

131.     Uber possesses monopoly power in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, greater Los Angeles (including Long Beach), Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

132.     Uber has the power to raise prices and exclude competition in each of those relevant markets.

133.     In San Francisco, Uber's share of the relevant market is at least 60%.

134.     In Los Angeles, Uber's share of the relevant market is at least 60%.

135.     In Chicago, Uber's share of the relevant market is at least 65%.

136.     In Philadelphia, Uber's share of the relevant market is at least 70%.

137.     In Washington, DC, Uber's share of the relevant market is at least 70%.

138.     In New York, Uber's share of the relevant market is at least 75%.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

139.   In Seattle, Uber's share of the relevant market is at least 65%.

140.   In San Diego, Uber's share of the relevant market is at least 65%.

141.   In San Jose, Uber's share of the relevant market is at least 65%.

142.   In Boston, Uber's share of the relevant market is at least 70%.

143.   In Austin, Uber's share of the relevant market is at least 70%.

144.   Uber has willfully acquired and maintained monopoly power in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston through predatory pricing and other exclusionary, and anticompetitive conduct, as alleged herein.

145.   ***Predatory Pricing.***  Uber has excluded competition from the relevant market through a predatory pricing scheme.

146.   Between 2013 and 2016, on average, the prices for transactions conducted through Uber's Ride-Hailing App were below the average variable costs for those transactions.

147.   On average, Uber lost money on each transaction completed through its app.

148.   Sidecar was forced out of business by Uber's predatory pricing strategy.

149.   After Sidecar exited the market, Uber imposed price increases on Passengers and reduced the amount that it paid to Drivers.

150.   Through these price increases, Uber is likely to recoup the losses it sustained as a result of its predatory pricing strategy.

151.   ***Exclusionary Acts.***  Uber has reinforced its dominant market position through tortious conduct designed to undermine the functionality of Sidecar's Ride-Hailing App.

152.   Uber's tortious conduct included a systematic, pervasive, and sustained effort to submit fraudulent ride requests on Sidecar's Ride-Hailing App.

153.   These fraudulent ride requests were not a means of legitimate competition, but rather, were intended to and did undermine Sidecar's ability to effectively compete with Uber on the merits. As a result of the fraudulent ride requests, Sidecar's Ride-Hailing App became less attractive to Drivers and Passengers, and they moved off of Sidecar's platform.

154.   Uber's deceit enabled it to achieve and maintain monopoly power by undermining the

-38-

**SECOND AMENDED COMPLAINT**

functionality and value provided by Sidecar's App and steering Drivers and Passengers away from Sidecar's App and to Uber's App.

155.   Uber's conduct alleged above has had an anticompetitive effect in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

156.   Uber's conduct as alleged above has no legitimate business purpose or procompetitive effect.

157.   Uber's conduct as alleged above has had a substantial effect on interstate commerce.

158.   Sidecar was injured in its business or property as a result of Uber's conduct when it went out of business in December 2015.

159.   Sidecar has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Sidecar has been injured by the harm to competition as a result of Uber's conduct.

### COUNT 2: ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2)

160.   Sidecar incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

161.   Uber has engaged in predatory pricing and other exclusionary and anticompetitive conduct, as alleged herein in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

162.   Uber has engaged in that unlawful conduct with the specific intent of monopolizing the relevant markets.

163.   As a result of that unlawful conduct, competition has been harmed in each of those relevant markets, and Uber has a dangerous probability of monopolizing the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

164.   Uber's conduct alleged above has had an anticompetitive effect in the relevant markets for Ride-Hailing Apps in San Francisco, Austin, Los Angeles, Chicago, Philadelphia,

McKool Smith Hennigan, P.C.
Los Angeles, CA

Case No. 3:18-cv-07440-JCS                                                    **SECOND AMENDED COMPLAINT**

1 Washington DC, New York, Seattle, San Diego, San Jose, and Boston.

2      165.   Uber's conduct alleged above has no legitimate business purpose or procompetitive

3 effect.

4      166.   Uber's conduct has had a substantial effect on interstate commerce.

5      167.   Sidecar was injured in its business or property as a result of Uber's conduct when it

6 went out of business in December 2015.

7      168.   Sidecar has suffered and will suffer injury of the type that the antitrust laws were

8 intended to prevent.  Sidecar has been injured by the harm to competition as a result of Uber's

9 conduct.

10 **COUNT 3**

11 **CALIFORNIA UNFAIR PRACTICES ACT**

12      169.   Sidecar incorporates by reference the foregoing paragraphs of this Complaint as if

13 fully set forth herein.

14      170.   The California Unfair Practices Act makes it illegal for "any person engaged in

15 business within this State to sell any article or product at less than the cost thereof to such vendor, or

16 to give away any article or product, for the purpose of injuring competitors or destroying

17 competition."  CAL. BUS. & PROF. CODE § 17043.

18      171.   The California Unfair Practices Act also makes it illegal "to sell or use any article or

19 product as a 'loss leader,'" defined as a "product sold at less than cost . . . [w]here the effect is to

20 divert trade from or otherwise injure competitors."  CAL. BUS. & PROF. CODE §§ 17044, 17030.

21      172.   Uber was and is engaged in business in the state of California.

22      173.   Uber facilitated trips through its Ride-Hailing App by charging consumers less than

23 the price of facilitating the transaction.

24      174.   The purpose and effect of Uber's pricing scheme was and is to injure competitors,

25 including Sidecar, to gain greater market share and eventually raise prices.

26      175.   The Public Utilities Commission of this State has established no rates for any service,

27 article, or product sold by Uber.  Accordingly, no exemption from the California Unfair Practices

28 Act applies.

McKool Smith Hennigan, P.C.
Los Angeles, CA

-40-

**DEMAND FOR JURY TRIAL**

176.    Sidecar hereby demands a jury trial on all its claims.

**PRAYER FOR RELIEF**

177.    Sidecar respectfully prays for the following relief:

      a.    a judgment finding that Uber violated the Sherman Act and California Unfair Practices Act;

      b.    a judgment and order requiring Uber to pay Sidecar damages in an amount adequate to compensate Sidecar for Uber's violations of the Sherman Act and California Unfair Practices Act;

      c.    treble damages, costs, and attorneys' fees, pursuant to 15 U.S.C. § 15;

      d.    treble damages, costs, and attorneys' fees, pursuant to CAL. BUS. & PROF. CODE § 17082;

      e.    a judgment and order requiring Uber to pay pre-judgment interest and post-judgment interest to the full extent allowed under the law; and

      f.    any further relief the Court may deem just and proper.

DATED:  February 4, 2020                    **MCKOOL SMITH, P.C.**


By:    /s/ *Lewis T. LeClair*
        Lewis T. LeClair

        ***Attorneys for Plaintiff, SC Innovations, Inc.***