Lewis T. LeClair (SBN 77036)
lleclair@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Kirk D. Dillman (SBN 110486)
kdillman@mckoolsmithhennigan.com
**MCKOOL SMITH HENNIGAN, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Judith A. Zahid (SBN 215418)
jzahid@zelle.com
**ZELLE LLP**
44 Montgomery Street, Suite 3400
San Francisco, California 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770

James R. Martin (SBN 173329)
jmartin@zelle.com
**ZELLE LLP**
1775 Pennsylvania Ave. NW, Suite 375
Washington, D.C. 2006
Telephone: (202) 899-4100
Facsimile: (612) 336-9100

*Attorneys for Plaintiff, SC Innovations, Inc.*

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

SC INNOVATIONS, INC.,

Plaintiff,

v.

UBER TECHNOLOGIES, INC., RASIER, LLC, RASIER-CA, LLC, RASIER-PA, LLC, RASIER-DC, LLC, RASIER-NY, LLC, AND UBER USA, LLC,

Defendants.

Case No. 3:18-cv-07440-JCS

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

**Hearing:**
Date: April 3, 2020
Time: 9:30 a.m.
Place: Courtroom G, 450 Golden Gate Avenue, San Francisco, CA
Judge: Hon. Joseph C. Spero

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1
II. Factual Allegations .......... 1
III. Argument .......... 3
A. Sidecar Plausibly Alleges that Uber Has Monopoly Power .......... 3
1. Price Discrimination Indicates Market Power .......... 4
2. Sidecar Plausibly Alleges that Uber Increased Prices on Both Sides of the Two-Sided Market .......... 7
3. Sidecar Plausibly Alleges that Lyft Is Unable (Not Just Unwilling) to Restrain Uber .......... 8
B. Sidecar Plausibly Alleges a Dangerous Probability of Recoupment .......... 9
C. Uber's Tortious Activities to Stifle and Eliminate Competition Are Actionable Under the Antitrust Laws .......... 11
D. Uber's Tangential Reference to the CPUC Has no Bearing on the Motion to Dismiss .......... 14
E. Sidecar Did not Remove Its Unfair Practices Act Allegations Solely to Preserve Them for Appeal .......... 16
IV. CONCLUSION .......... 16

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

# TABLE OF AUTHORITIES

Page(s)

CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 3, 5

*Brooke Group v. Brown & Williamson Tobacco Corp.* 509 U.S. 209 (1993) .......... 10, 11

*Cal. Motor Transport Co. v. Trucking Unltd.*, 404 U.S. 508 (1972) .......... 12

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998) .......... 12

*Carlin v. DairyAmerica, Inc.*, 688 F.3d 1117 (9th Cir. 2012) .......... 15

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir. 1992) .......... 12

*City of Mishawaka, Ind. v. Am. Elec. Power Co.*, 616 F.2d 976 (7th Cir. 1980) .......... 12

*Coal Exporters Ass'n of the U.S., Inc. v. United States*, 745 F.2d 76 (D.C. Cir. 1984) .......... 4

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) .......... 11, 14

*Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) .......... 12, 14

*Covad Communc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005) .......... 12

*Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) .......... 6

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) .......... 4

*Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006) .......... 5

*Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ........ 9

*In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443 (C.D. Cal. 1988) ........ 6

*In re Apple iPhone Antitrust Litig.*, 2013 U.S. Dist. LEXIS 116245 (N.D. Cal. Aug. 15, 2013) ........ 16

*In re ATM Fee Antitrust Litig.*, 2010 U.S. Dist. LEXIS 61160 (N.D. Cal. June 21, 2010) ........ 10

*In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781 (7th Cir. 1999) ........ 4

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir. 1989) ........ 10, 11

*Lacey v. Maricopa Cty.*, 693 F.3d 906 (9th Cir. 2012) (en banc) ........ 16

*LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ........ 13

*MCI Telecommunc'ns Corp. v. AT&T Co.*, 512 U.S. 218 (1997) (Stevens, J., dissenting) ........ 4

*Metro Mobile CTS, Inc. v. Newvector Commc'ns, Inc.*, 661 F. Supp. 1504 (D. Ariz. 1987) ........ 15

*Momento, Inc. v. Seccion Amarilla USA*, 2009 U.S. Dist. LEXIS 85295 (N.D. Cal. Sept. 16, 2009) ........ 10

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ........ 12

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ........ 8

*Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088 (9th Cir. 1998) ........ 11

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ........ 4

*Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215 (8th Cir. 1987) ........ 4

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 980 (1984) ........ 16

*Sabry Lee, Inc. v. Genera Corp.*,
2009 U.S. Dist. LEXIS 135698 (C.D. Cal. Apr. 20, 2009) ....................10

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ....................3

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
7 F.3d 986 (11th Cir. 1993) ....................8

*Verizon Communc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)....................12

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
382 U.S. 172 (1965) (Sherman Act claim alleging enforcement of patent procured by fraud)....................12

*Weiss v. York Hosp.*,
745 F.2d 786 (3d Cir. 1984)....................8

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 8(a)(2) ....................3

Federal Rule of Civil Procedure Rule 12(b)(6)....................3

2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 517a ....................5

3A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 801a ....................6

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

Plaintiff SC Innovations, Inc. ("Sidecar") responds as follows to the Motion to Dismiss Second Amended Complaint filed by Defendants Uber Technologies, Inc., Raiser LLC, Raiser-PA LLC, Raiser-DC LLC, Raiser-NY LLC, and Uber USA LLC ("Defendants" or "Uber").

## I. INTRODUCTION

Uber's renewed motion to dismiss is substantially narrowed and, despite that narrowing, only confirms that Uber is making arguments that are inappropriate at the stage of a motion to dismiss. Time and again, Uber cites cases referencing a failure of "proof," but of course the only question before the court here is whether Sidecar has made plausible allegations of monopoly power and recoupment. In an effort to obscure Sidecar's allegations, Uber uses much of its brief to reference prior allegations rather than squarely address Sidecar's current allegations. Sidecar's actual allegations are more than sufficient to plead monopoly power. As carefully alleged in the Second Amended Complaint, the size of Uber's network and the massive amounts of data that Uber has collected as a result have allowed Uber to cement its market power in a way that competitors cannot effectively combat. And Uber has started to use its market power to increase its prices on the passenger side of the market *and* the commissions it charges to drivers on the other side of the two-sided market. Its price discrimination is by itself a significant indicator, but by no means the only indicator, of market power. Indirect network effects make it impossible for any competitor—including Lyft—to limit Uber's anticompetitive conduct.

Even where Uber has directly addressed Sidecar's allegations, Uber has chosen to quibble with those allegations in a way that, at best, raises factual disputes inappropriate for consideration on a motion to dismiss. Uber may disagree with Sidecar on a host of issues. But, at the motion to dismiss stage, Sidecar need only state a *plausible* claim. Sidecar fully accepts that the standard for a motion to dismiss has evolved under *Twombly* and *Iqbal*, but it remains a pleading standard, not a matter of proof, or a choice of Plaintiff's alleged facts versus Defendants' purported facts. Uber's complaints are for another day. The Court should deny the Motion to Dismiss.

## II. FACTUAL ALLEGATIONS

In 2009, Uber launched its ride-hailing smartphone app, allowing passengers to use

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

smartphones to arrange on-demand transportation in black cars and limousines driven by licensed chauffeurs. Sec. Am. Compl. ¶ 5. It was enormously successful, and Uber quickly accumulated significant capital from investors. *Id.* ¶ 8. In 2012, however, Sidecar launched its ridesharing app, a Ride-Hailing App that allows passengers to arrange on-demand transportation in a driver's personal vehicle. *Id.* ¶ 6. Lyft also introduced a Ride-Hailing App that year. *Id.* ¶ 44. Sidecar's entry threatened Uber's success. Sidecar's app was the first to offer many popular features, such as estimated fares and trip durations, carpools, and allowing drivers to set their own proposed fares. *Id.* ¶ 7. Additionally, Sidecar and Lyft offered a "far cheaper product," as Uber's own CEO, Travis Kalanick, acknowledged. *Id.* ¶ 54.

In the face of this new competition, Uber launched its own ridesharing offering, called UberX, in 2013. *Id.* ¶ 55. But Uber was not content to compete fairly. It wanted to destroy its competition. Given Uber's head start and the enormous war chest of capital it had collected, it started a price war with Sidecar and Lyft. First, Uber "overpaid" Drivers by offering sign-up bonuses and other subsidies that allowed Drivers to earn more than they would under normal competitive market conditions. *Id.* ¶ 96. Second, Uber heavily subsidized the rates it charged Passengers. *Id.* Because Uber intentionally charged Passengers less than its direct payments to Drivers, and certainly less than the average variable cost for its services, Uber incurred substantial losses. *Id.* ¶¶ 97-100. Uber's prices were so low, in fact, that "Uber lost money on most or all of the transactions completed through its Ride-Hailing App." *Id.* ¶ 100.

Uber acted unlawfully in other ways in an attempt to drive its new competitors out of the market. For example, high-level Uber executives devised "Project Hell" and "SLOG," schemes to submit fraudulent ride requests through competitors' apps. *Id.* ¶¶ 114-22. By submitting fraudulent requests, Uber prevented its competitors' Drivers from serving actual customers, thereby decreasing Drivers' earnings and increasing Passengers' wait times. *Id.* ¶¶ 116-18. Uber's actions diminished the viability and artificially increased the costs of its competitors, such as Sidecar and Lyft, who were trying to build a network. *See id.*

Because of the network effects characteristic of Ride-Hailing Apps—an app is more valuable

the more people who use it—Uber's actions started a vicious cycle that would cement Uber's monopoly power. Once Uber collected enough market power to create a tipping point, other Ride-Hailing Apps would be unable to compete effectively. *Id.* ¶ 10. That is exactly what happened. Sidecar was driven from the market, and other competitors, including Lyft, are no longer able to compete with Uber effectively given Uber's significant advantage with indirect network effects. Uber has "leverage[d] network effects to insulate itself from meaningful competition." *Id.*

Without any competitor as an effective check, Uber is able to reap supra-competitive profits and recoup the losses incurred through its predatory scheme. *Id.* Uber's actions harmed competition and consumers, as Passengers are paying more, and Drivers are being paid less. *Id.* ¶¶ 125, 128. Sidecar brought this action to hold Uber responsible for its harmful actions.

## III. ARGUMENT

Federal Rule of Civil Procedure 8(a)(2) requires that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint need contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of misconduct. *Id.* at 556. In assessing whether the alleged facts state a plausible claim for relief, the "court should assume the[] veracity" of all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Additionally, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### A. Sidecar Plausibly Alleges that Uber Has Monopoly Power

Monopoly power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supra-competitive prices, that is direct proof of the injury to competition

which a competitor with market power may inflict, and thus, of the actual exercise of market power. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433-34 (9th Cir. 1995); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986). But, "the more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434; *see also Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215, 1232 (8th Cir. 1987); *Ball Memorial Hosp.*, 784 F.2d 1325, 1335 (7th Cir. 1986). The Court already held that Sidecar's market definition was sufficient to overcome a motion to dismiss. Order at 10-11. The Second Amended Complaint adequately alleges market power by alleging Uber's dominant share of that market (over 60%) and its use of price discrimination. Additionally, the Second Amended Complaint plausibly alleges competitors' inability to restrain Uber's anticompetitive conduct due, in large part, to Uber's larger size and indirect network effects.

**1. Price Discrimination Indicates Market Power**

The Second Amended Complaint alleges that Uber is using price discrimination to reap supra-competitive profits and that its ability to do so is evidence of its monopoly power. *See* Sec. Am. Compl. ¶¶ 108, 112; *id.* ¶¶ 12, 80, 84-85, 90-91. "[I]t is well established that the ability of a firm to price discriminate is an indicator of significant monopoly power." *Coal Exporters Ass'n of the U.S., Inc. v. United States*, 745 F.2d 76, 91 (D.C. Cir. 1984); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 783 (7th Cir. 1999) ("Price discrimination implies market power, that is, the power to charge a price above cost . . . without losing so much business so fast to competitors that the price is unsustainable."). "The reason price discrimination implies market power is that assuming the lower of the discriminatory prices covers cost, the higher must exceed cost." *In re Brand Name Prescription Drugs*, 186 F.3d at 783; *see also MCI Telecommunc'ns Corp. v. AT&T Co.*, 512 U.S. 218, 239 (1997) (Stevens, J., dissenting) ("[A]n absence of market power will ordinarily preclude firms of any kind from engaging in price discrimination."); L. Sullivan, Law

of Antitrust 89 (1977) ("A firm will not discriminate unless it has market power."); 2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 517a (noting that "systematic price discrimination, as when a seller can identify two (or more) groups of customers with different demands and charge each group different prices even though its cost of serving each group is the same" indicates market power).

In *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006), the Supreme Court expressly acknowledged that "price discrimination may provide evidence of market power." *Id.* at 44-45. To be sure, the Court, in reviewing a summary judgment decision, held that such evidence "alone" did not give rise to a "presumption of market power." *Id.* But that is not this case. First, Sidecar's Second Amended Complaint alleges far more than price discrimination alone. Sidecar alleges that Uber holds at least 60-75% of the market in each city at issue. Sec. Am. Compl. ¶¶ 133-43. "[A]lthough market share does not alone determine monopoly power, market share is perhaps the most important factor to consider in determining the presence or absence of monopoly power." *Movie 1 & 2 United Artists Communc'ns, Inc.*, 909 F.2d 1245, 1254 (9th Cir. 1990).[1] Uber has maintained that significant market share for a lengthy period of time. *See id.* ¶ 87 ("Uber's market share in the United States is approximately 70% and has stayed in that range consistently for a number of years."). Sidecar also pleads additional factors that are indicative of monopoly power, including Uber's price discrimination and the high barriers to entry due to indirect network effects. *See* Sec. Am. Compl. ¶¶ 70, 73-75. Second, because this Court is deciding a motion to dismiss, not a motion for summary judgment, Sidecar need not establish a "presumption of market power," as in *Illinois Tool Works*; the standard is plausibility. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (explaining that the motion to dismiss standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery

---

[1] *See also U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 999 (11th Cir. 1993) ("The principal measure of actual monopoly power is market share . . . ."); *Weiss v. York Hosp.*, 745 F.2d 786, 827 (3d Cir. 1984) ("A primary criterion used to assess the existence of monopoly power is the defendant's market share."); Dep't of Justice, Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act 23 (2015) ("[A] high market share is one of the most important factors in the Department's examination of whether a firm has, or has a dangerous probability of obtaining, monopoly power.").



McKool Smith Hennigan, P.C.
Los Angeles, CA

will reveal evidence" of misconduct).

Uber does not make any real argument that price discrimination is not evidence of market power or that Sidecar has not adequately alleged price discrimination. Instead, it argues that "[t]o the extent that the 'ability to price discriminate' may entail *some* degree of market power," it does not show *monopoly* power.[2] Mot. at 4-5. Once a plaintiff sufficiently alleges market power, however, whether that power is *monopoly* power is largely a question of market share. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992). In *Eastman Kodak*, for example, the Supreme Court acknowledged that "[m]onopoly power under § 2 requires, of course, something greater than market power under § 1." *Id.* But it then explained that evidence of the defendant's large market share, "with no readily available substitutes" was "sufficient to survive summary judgment." *Id.* It then cited other cases in which the Court had held as little as two-thirds of the market was sufficient to prove monopoly power. *See id.* (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 112 (1984); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946)).

The critical point is that Sidecar does not rest solely on Uber's large market share, but alleges other indicia of market power as well. *See supra*. And "[w]hether the degree of market power rises to the level of monopoly power . . . is a detailed factual question which involves a weighing of the evidence." *In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1462 (C.D. Cal. 1988). "Precisely where market power becomes so great as to constitute what the law deems to be monopoly power is largely a matter of degree rather than one of kind." Dep't of Justice, Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act 20, Chapter 2 (2015). In these circumstances, Sidecar's allegations "establish a rebuttable presumption that the firm possesses monopoly power." *Id.* at 23; *see also* 1 Section of Antitrust Law, Am. Bar Ass'n, Antitrust Law Developments 231 (6th ed. 2007); 3A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 801a, at 319 (2d ed. 2002). Uber's possession of monopoly power is a question for

---

[2] Uber also ignores that monopoly power is a necessary element only for Sidecar's monopolization claim. For an attempted monopolization claim, Sidecar need only allege a dangerous probability of obtaining monopoly power, not *actual* monopoly power. *See* Order at 15 (explaining that attempted monopolization claim requires a "somewhat lower standard" for showing market power).

the jury.[3]

### 2. Sidecar Plausibly Alleges that Uber Increased Prices on Both Sides of the Two-Sided Market

Uber next asserts that Sidecar's Second Amended Complaint ignores one side of the two-sided market Sidecar alleges. But it is Uber that ignores Sidecar's allegations. The Second Amended Complaint alleges that Uber extracts supra-competitive profits not only by overcharging passengers, but also "by reducing the payments it makes to Drivers." Sec. Am. Compl. ¶ 105. For example, in May 2015, Uber increased the base "commission" it charges to Drivers from 20% to 30% in San Francisco and San Diego, and from 20% to 25% in New York City and Boston. *Id.* ¶¶ 106-07. Increases to booking and other fees has increased the median effective commission even farther—as high as 39% in San Francisco, and over 30% in Austin. *Id.* ¶ 109.

By taking into account Uber's changes to Driver payments, the Second Amended Complaint complies with the Supreme Court's instruction to analyze the market as a whole. *See, e.g.*, Sec. Am. Compl. ¶ 11 "The two-sided nature of the ride-hailing market provided Uber with the incentive and ability to engage in predation on both sides of the market: (i) paying initially high prices to drivers . . . , with reduced payments later as Uber moves to the recoupment phase, and (ii) charging low prices to customers early, and higher prices during the recoupment phase."). There is no "legitimate price competition" to protect when Uber is raising prices (and therefore its own profits) on *both* sides of the market simultaneously.

In fact, the Supreme Court's own example proves the point. It is true that, "[i]n a competitive market," indirect network effects *should* "limit the platform's ability to raise overall prices and

---

[3] Uber's motion makes much of the purported concession that Uber can price discriminate without reducing overall market output. But, the fact that the market is growing rapidly does not answer the question of market power. "[B]ecause price and output are inversely correlated," the allegation that Uber will charge supra-competitive prices "implies that marketwide output . . . has been lower than it would have been" absent anticompetitive conduct. *In re ATM Fee Antitrust Litig.*, 2010 U.S. Dist. LEXIS 61160 at *36 (N.D. Cal. June 21, 2010). *See also Brooke Group v. Brown & Williamson Tobacco Corp.* 509 U.S. 209, 234 (1993) ("While this evidence, tends to show that Brown & Williamson's participation in the economy segment did not restrict output, it is not dispositive. One could speculate, for example, that the rate of segment growth would have tripled, instead of doubled, without Brown & Williamson's alleged predation"). The impact of price discrimination in the context of the ride-sharing market is a quintessential factual issue unsuitable for resolution on a motion to dismiss.



McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

impose a check on its market power." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2281 n.1 (2018). But, as Sidecar alleges, this is not a competitive market. As the Supreme Court explained, "[i]n a competitive market, indirect network effects also encourage companies to take increased profits from a price increase on side A and spend them on side B to ensure more robust participation on that side and to stem the impact of indirect network effects. Indirect network effects thus limit the platform's ability to raise overall prices and impose a check on its market power." *Id.* Applied to this case, if the market were competitive, Uber would have used its increased profits from Passengers and spent them on increased payments to Drivers. But, as Sidecar has alleged, that is not what Uber did. Instead, it raised prices on *both* sides of the market yet continued to grow, providing strong evidence that it has market power.

**3. Sidecar Plausibly Alleges that Lyft Is Unable (Not Just Unwilling) to Restrain Uber**

Uber accuses Sidecar of continuing to rely on an "oligopoly" theory that Uber has "disciplined" Lyft to prevent it from restraining Uber's anticompetitive conduct. Not so. The Court faulted the previous complaint for "not alleg[ing] that Lyft lacks the ability to increase output." Order at 15. But the Court thought it possible that Sidecar could amend to allege "that Lyft could not respond by increasing its own output." *Id.* That is exactly what Sidecar did.

The Second Amended Complaint explains why Lyft *cannot* respond to Uber's anticompetitive acts, even if it wanted to do so. Sec. Am. Compl. ¶ 92 ("Lyft will not, *and cannot*, act as a check on the ability of Uber to charge supra-competitive Prices . . . ." (emphasis added)). Those reasons include "network effects, the two-sided nature of the market, Lyft's own financial losses which it must recoup, and Lyft's own adoption of dynamic pricing." *Id.*

Uber ignores most of those allegations, including, most importantly, allegations that network effects constrict Lyft just as much as they do any other competitor. "[N]etwork effects and scale are formidable barriers to entry that insulate incumbent providers from new competition." *Id.* ¶ 83. "Lyft is subject to the same constraints as other market entrants in trying to compete with Uber's vast network and the strong network effects created by Uber's dominance of drivers and riders." *Id.* Because Lyft is smaller, its network is not as extensive as Uber's and it does not have access to the

same level of data that Uber does. Lyft is unable to overcome Uber's "entrenched buyer preferences" and "economies of scale," which are exactly the kind of barriers to entry that are relevant to proving monopoly power (and therefore ability to unilaterally raise prices). *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997). Lyft's weakened state makes that task even more impossible, as it does not have sufficient resources to fight back effectively by expanding its "output" (*i.e.*, network). *See id.* (naming "superior resources" and "high capital entry costs" as common entry barriers).

Uber's size also gives it other advantages, including access to significantly more data than its competitors. *See* Sec. Am. Compl. ¶¶ 79-80. With that data, Uber can improve its algorithms and more effectively price discriminate in a way that its competitors cannot. *Id.*

Uber's assertion that competitors can fill any reduced output because "competitors would not need to build new productive assets or otherwise take a long time to supply customers' wants" misunderstands rideshare companies. Mot. at 8. It takes time and effort to build the networks that make services like Uber's valuable to consumers. *See* Sec. Am. Compl. ¶ 2. A competitor cannot instantly create a network sufficient to compete with Uber's. It also ignores the vast amounts of data that Uber has collected that enables Uber to price the way it does. *See id.* ¶¶ 79-80.

The Austin example described in Sidecar's Second Amended Complaint illustrates the significance of Uber's power and indirect network effects, even when faced with established competitors. When Uber and Lyft pulled out of Austin due to city regulations, four competitors filled that void. *Id.* ¶ 89. But when "Uber and Lyft returned to the market" the following year after the state superseded Austin's regulations, "Uber quickly dominated." *Id.* Three of the competitors closed entirely, and one lost thousands of riders. The fact that established companies could not survive when Uber reentered the market is strong evidence that Uber has surpassed a "network effects" tipping point after which smaller competitors—including Lyft—simply cannot effectively serve as a check on Uber's anticompetitive conduct.

**B. Sidecar Plausibly Alleges a Dangerous Probability of Recoupment**

Whether a defendant has a dangerous probability of recoupment is a highly fact-intensive



MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

inquiry, inappropriate for determination on a motion to dismiss. *See Sabry Lee, Inc. v. Genera Corp.*, 2009 U.S. Dist. LEXIS 135698, at *7-8 (C.D. Cal. Apr. 20, 2009) ("[T]he plausibility of [the plaintiff's] recoupment allegations is one that 'awaits factual development' . . . ."). "Determining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and condition of the relevant market." *Momento, Inc. v. Seccion Amarilla USA*, 2009 U.S. Dist. LEXIS 85295, at *16-18 (N.D. Cal. Sept. 16, 2009). Factors to consider include "a defendant's market share, whether defendant is a multi-market firm, the number and strength of other competitors, market trends, and entry barriers." *Id.* (quoting *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 63 F.3d 1540, 1554 (9th Cir. 1995)). Additionally, "the defendants [sic] financial strengths and ability to absorb losses are also relevant." *Id.* (quoting *Multistate Legal Studies*, 63 F.3d at 1554).

The Second Amended Complaint plausibly pleads that Uber has a dangerous probability of recouping its predatory losses by maintaining its monopoly power. Uber has a significant market share in each relevant market. *See* Sec. Am. Compl. ¶ 88. Uber has consistently maintained market share above 70% nationwide, despite its rising prices and commissions. *See id.* ¶ 70. Uber has begun raising both rider prices and driver commissions, and in fact has recorded positive EBITDA for its ride-sharing business since 2018. *Id.* ¶¶ 104-09. The high barriers to entry discussed above, including, most importantly, indirect network effects are likely to allow Uber to maintain its monopoly position despite its rising prices. *See Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1415 (7th Cir. 1989) (noting that high barriers to entry are particularly relevant to maintaining monopoly power). For the same reasons that Sidecar has sufficiently alleged monopoly power, it has alleged its ability to maintain that power long enough to recoup its losses.

Uber's only response is to retread its argument that Sidecar is improperly relying on a "disciplined oligopoly" theory. *See* Mot. at 11-12. As explained above, Uber's argument is based on a misunderstanding of Sidecar's allegations. Sidecar alleges that Lyft *cannot* restrain Uber by increasing output, not just that it is not willing to do so. The Court should reject Uber's effort to

McKool Smith Hennigan, P.C.
Los Angeles, CA

recast Sidecar's recoupment claim and to ignore the actual allegations of the Second Amended Complaint.

Uber also criticizes Sidecar for including allegations regarding Uber's intent. Intent may not be sufficient to overcome summary judgment or a motion for judgment as a matter of law, as in the cases that Uber cites. *See Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) (judgment as a matter of law after 115-day trial); *Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088 (9th Cir. 1998) (summary judgment); *Ind. Grocery*, 864 F.2d at 1420 (same). But the fact that Uber believed it would be able to recoup its losses is highly relevant to whether it is plausible that a dangerous probability of doing so exists. If Uber believed it was so likely that it would eventually be able to recoup its losses that it was willing to lose billions of dollars by pricing below cost, then the recoupment allegations are unquestionably plausible. But, the Court need not rely solely on intent, as even in the absence of Uber's intent, the facts alleged above suggest that a dangerous probability of recoupment is plausible given Uber's dominance of the network.

### C. Uber's Tortious Activities to Stifle and Eliminate Competition Are Actionable Under the Antitrust Laws

Uber again improperly attempts to isolate its anticompetitive activities, contending that its tortious activities to impede rivals, standing alone, cannot serve as the basis of an antitrust claim. This argument fails out of the gate because it is well settled that a monopolist's conduct must be considered as a whole. Uber's tortious activities—Projects "Hell," "SLOG," and any other tortious activities aimed at diminishing rival networks and raising their costs—must be considered in context as a complement to its predatory scheme. "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* (quoting *United States v. Patten*, 226 U.S. 525, 544 (1913)).[4] This is particularly true here where the predatory pricing and tortious

[4] While this quotation refers to "conspiracy," because it was quoting a conspiracy case, *Continental Ore* involved both conspiracy (Section 1) and monopolization (Section 2) claims. *Id.* at 693.



McKool Smith Hennigan, P.C.
Los Angeles, CA

conduct had synergistic effects. Uber's tortious conduct artificially increased its competitors' costs by flooding their systems with fraudulent ride requests, while at the same time engaging in predation that effectively capped its competitors' revenues. *See* Sec. Am. Compl. ¶¶ 115-17. Thus, Uber's tortious conduct cannot be considered in isolation; Uber's tortious bad acts must be analyzed together with and in the context of Uber's predatory pricing. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (explaining that it is "not [] proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect"); *see also New York ex rel. Schneiderman v. Actavis PLC,* 787 F.3d 638, 653, 654 (2d Cir. 2015) (considering "the overall effect" of a monopolist's conduct); *City of Mishawaka, Ind. v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980) (describing anticompetitive acts combined into a "monopoly broth" that produced an "unsavory flavor").

Anyway, tortious interference standing alone may be actionable. "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998). "[M]erely because a particular practice might be actionable under tort law does not preclude an action under the antitrust laws as well." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002). Courts have repeatedly allowed antitrust claims alleging fraud, misrepresentations, and misuse of processes. *See Caribbean Broad.*, 148 F.3d at 1087 (Sherman Act claim alleging fraudulent representations to customers); *Conwood*, 290 F.3d at 784 (Sherman Act claim alleging removal of display racks, misrepresentations to retailers, and exclusive agreements); *Cal. Motor Transport Co. v. Trucking Unltd.*, 404 U.S. 508 (1972) (Clayton Act claim alleging conspiracy to misuse state legal and regulatory processes); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965) (Sherman Act claim alleging enforcement of patent procured by fraud); *Verizon Communc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (explaining that the means of illegal exclusion are manifold); *Covad Communc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 672 (D.C. Cir. 2005) ("Whether a particular allegation states a [monopolization] claim under the Sherman Act depends entirely upon



MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

the competitive significance of the conduct alleged."); *LePage's, Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003).

And Uber's tortious conduct is actionable. "Uber's senior executives and officers devised programs, including 'Project Hell' and 'SLOG', to, among other things, submit fraudulent ride requests on competitors' Apps." Sec. Am. Compl. ¶ 115. Uber's actions were not isolated or temporary. These projects lasted from at least mid-2014 to December 2015—over a year. *Id.* ¶¶ 113-14. They were official company projects, devised at Uber's highest levels, and were later discovered and well-covered by the press. *Id.* ¶¶ 113-15. Moreover, Uber's actions expressly violated Sidecar's terms of service, including prohibitions on interfering with the performance of the App, conducting fraud through the App, and using the App for commercial purposes.[5] *Id.* ¶¶ 120-21.

Uber's actions undermined the value of Sidecar's App for both Drivers and Passengers. Drivers "were sent on a wild goose chase or to pick up Uber contractors" "[i]nstead of earning money by completing rides." *Id.* ¶ 116. Meanwhile, "Passengers were met with longer wait times for rides" as Drivers were pursuing fraudulent ride requests. *Id.* ¶ 117. Thus, Uber raised its rivals' costs and degraded their quality of service, precisely at the crucial juncture when the competitors were trying to build their networks. Because of the network effects described above, "these fraudulent ride requests triggered a vicious downward cycle," as both Drivers and Passengers fled to Uber. *Id.* ¶ 118. Uber targeted not only Sidecar, but also Lyft. *Id.* ¶ 119. By driving Sidecar out of the market and increasing Uber's market share of both Drivers and Passengers, Uber harmed competition through its tortious actions. *Id.* ¶ 122.[6]

Uber complains that Sidecar did not allege "the number of total ride requests involved," or "the timing or frequency of the alleged requests." Mot. at 14. To begin, it is unfair for Uber to make such criticisms given that these were secretive programs that it attempted to hide. In any event, the *Conwood* Court rejected a similar argument, explaining that the parties did not need "to investigate activity at specific retail establishments" because doing so "would have been so costly as to have

---

[5] This fact alone may not establish antitrust liability, but it is instructive regarding Uber's intent.

[6] While Uber's actions did not drive Lyft out of the market, they weakened Lyft, thereby cementing Uber's monopoly position. *See* Sec. Am. Compl. ¶¶ 11, 76, 92, 110, 119.



McKool Smith Hennigan, P.C.
Los Angeles, CA

effectively ended this suit, despite substantial evidence of anti-competitive activity." 290 F.3d at 784. Similarly here, Sidecar need not identify specific fraudulent ride requests (especially at the pleading stage). It is enough that Sidecar named and alleged the existence of Uber's secretive, fraudulent projects designed to tortiously interfere with competitors, including Sidecar. High-level company executives do not generally create codename projects for conduct that is "isolated" or "occasional."

Finally, Uber justifies its tortious conduct by arguing that it simply recruited Drivers to work exclusively with Uber, which is a legitimate business justification. Mot. at 14-15. The problem with Uber's argument is twofold. First, it ignores the allegation that another purpose of Uber's actions was "to undermine the value of competitive Ride-Hailing Apps, for both Passengers and Drivers." Sec. Am. Compl. ¶ 114. Second, it ignores the later effects of Uber's anticompetitive, tortious conduct. After Uber drove its competition—like Sidecar—out of the market, Uber used its monopoly power to "reduce[] the amount that it paid to Drivers." *Id.* ¶ 149. Sidecar's exclusion was particularly pernicious given that it was the only App that allowed "private drivers to set their own proposed fare rates, competing with one another." *Id.* ¶ 7. Recruiting Drivers from Sidecar to Uber therefore had a negative effect on the market, both by removing the Drivers' ability to set their own fares, and by ultimately giving Uber the power to reduce the amount it paid to Drivers and the price it charged Passengers.

**D. Uber's Tangential Reference to the CPUC Has no Bearing on the Motion to Dismiss**

Uber asserts in a footnote that SCI has failed to "address the Court's holding regarding the significance of CPUC regulation" as to market power, and insinuates that because the CPUC could regulate Uber's rates in the future, Uber cannot be deemed to have market power such that it can raise its rates and collect monopoly profits. (Mot. at p. 4 n. 3). However, neither the Court's prior ruling nor the case cited by Uber stand for the proposition that regulated industries are not subject to antitrust law.

As an initial matter, the Court's prior ruling considered the CPUC's regulatory authority only in connection with Plaintiff's UPA claim and the statute's exemption for rates that are set under the jurisdiction of the CPUC, even though the CPUC has not actually set rates for Uber. (Dkt. 71 at pp. 18-21). Indeed, the language that Uber cites appears in a footnote explaining why the CPUC might rationally elect not to set rates until the future.

Nor does *Metro Mobile CTS, Inc. v. Newvector Commc'ns, Inc.*, 661 F. Supp. 1504 (D. Ariz. 1987) support Uber's argument. In *Metro Mobile*, the District Court addressed whether the state action immunity doctrine applied to shield the defendant from antitrust scrutiny. *Id.* at 1508 ("[A]bsent clear Congressional intent to nullify a state's control over commerce within the state, principles of federalism and state sovereignty shield state officers and agents from antitrust liability for carrying out the laws of the state . . . . [as well as] suits against private parties acting pursuant to state law.") (internal citations omitted). The Court found that the exemption applied because the "challenged restraint [was] clearly articulated and affirmatively expressed as state policy, and that the policy is actively supervised by the state." *Id.* In reaching this conclusion, the Court determined that the Arizona Corporation Commission actively considered the alleged anti-competitive conduct as part of its rate-setting process. *Id.* at 1511 ("In addition, the record shows that the ACC did in fact consider the effect of the wholesale tariff on the retail market, including the question of insufficient margin between wholesale costs and retail prices as it applied to resellers."). Thus, in *Metro Mobile*, the Court found that active rate-setting proceedings would in fact preclude defendant from exercising control over prices. Here, by contrast, the CPUC has not exercised its authority to set rates for Uber and there is no basis for exempting Uber from antitrust scrutiny because of the mere possibility that it may do so someday. *Cf. Carlin v. DairyAmerica, Inc.*, 688 F.3d 1117, 1135 n.15 (9th Cir. 2012) ("Under the Keogh or "filed rate" doctrine, a public utility subject to regulation is not subject to antitrust liability to its customers for rates or services provided under tariffs

approved by the appropriate regulatory agency.") (internal quotation marks and alterations omitted); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 980, 999 (1984) ("The Supreme Court has repeatedly noted that 'repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions.'") (quoting *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372 (1973).

### E. Sidecar Did not Remove Its Unfair Practices Act Allegations Solely to Preserve Them for Appeal

Sidecar acknowledges that the court dismissed its Unfair Practices Act claim without leave to amend and that this claim remains dismissed. Solely in order to preserve its right to appeal, however, Sidecar did not remove its Unfair Practices Act allegations from the Second Amended Complaint. *See In re Apple iPhone Antitrust Litig.*, 2013 U.S. Dist. LEXIS 116245, at *24-25 (N.D. Cal. Aug. 15, 2013) ("Plaintiffs concede in the *Apple II* Amended Complaint that the third claim 'remain[s] dismissed' and was retained in the complaint 'solely and exclusively to preserve' the right of appeal."). Sidecar did not want to risk any allegation that it had "voluntarily dismissed" those claims, so it included them to avoid any doubt. *See Lacey v. Maricopa Cty.*, 693 F.3d 906, 928 (9th Cir. 2012) (en banc).

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Uber's Motion to Dismiss.

DATED: March 3, 2020

**MCKOOL SMITH, P.C.**

By: /s/ Lewis T. LeClair

Lewis T. LeClair (SBN 77036)
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Kirk D. Dillman (SBN 110486)
kdillman@mckoolsmithhennigan.com
**MCKOOL SMITH HENNIGAN, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071

Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Judith A. Zahid (SBN 215418)
jzahid@zelle.com
**ZELLE LLP**
44 Montgomery Street, Suite 3400
San Francisco, California 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770

James R. Martin (SBN 173329)
jmartin@zelle.com
**ZELLE LLP**
1775 Pennsylvania Ave. NW, Suite 375
Washington, D.C. 2006
Telephone: (202) 899-4100
Facsimile: (612) 336-9100

***Attorneys for Plaintiff, SC Innovations, Inc.***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Civil L.R. 5.4, and will be served upon all counsel of record for the parties who have consented to electronic service in accordance with Civil L.R. 5-5 via the Court's ECF system.

Dated: March 3, 2020

By: */s/ Lewis T. LeClair*
Lewis T. LeClair