THEODORE J. BOUTROUS JR., SBN 132099
　tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
　dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

CYNTHIA E. RICHMAN, (D.C. Bar No. 492089; appearance pro hac vice)
　crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 11101
Telephone: 202.955.8500
Facsimile: 202.467.0539

Attorneys for Uber Technologies, Inc, Rasier LLC, Rasier-CA LLC, Rasier-PA LLC, Rasier-DC LLC, Rasier-NY LLC, Uber-USA LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SC Innovations, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Uber Technologies, Inc; Rasier LLC; Rasier-CA LLC; Rasier-PA LLC; Rasier-DC LLC; Rasier-NY LLC; Uber-USA LLC, <br><br> Defendants. | CASE NO. 3:18-CV-07440-JCS <br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br><br> **Hearing:** <br> Date: April 3, 2020 <br> Time: 9:30 a.m. <br> Place: Courtroom G, 450 Golden Gate Avenue, San Francisco, CA <br> Judge: Honorable Joseph C. Spero |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................. 1

II. SCI FAILS TO PLEAD A CLAIM UNDER SHERMAN ACT § 2 ....................................... 1

    A. SCI Fails to Plead That Uber Has The Unilateral Market Power Required To State A Section 2 Claim ................................................................................................ 1

        1. SCI's Amendments Do Not Cure Its Failure to Plead That Uber Can Raise Overall Market Prices by Restricting Output ........................................... 2

        2. SCI's Amendments Do Not Cure Its Failure To Plead Lyft's Lack of Capacity to Increase Output in Response to Monopoly Pricing ....................... 7

    B. SCI Fails to Plead a Cognizable Probability of Recoupment ..................................... 10

    C. SCI Fails to Plead an Antitrust Claim for Tortious Interference ................................ 11

    D. SCI's Unfair Practices Act Claim Should Be Stricken .............................................. 14

III. CONCLUSION .................................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AD/SAT v. Associated Press*,
   181 F.3d 216 (2d Cir. 1999) ................................................................................................... 5

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,
   108 F.3d 1147 (9th Cir. 1997) ............................................................................................... 7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................................... 9

*Atl. Richfield Co. v. USA Petroleum, Inc.*,
   495 U.S. 328 (1990) ............................................................................................................. 11

*Axiom Advisers & Consultants, Inc. v. Sch. Innovations and Advocacy, Inc.*,
   NO. CIV. 2:05-CV-02395-FCD-PAN, 2006 U.S. Dist. LEXIS 11404 (E.D. Cal. Mar. 20, 2006) ........................................................................................................................ 7

*Bacchus Industries, Inc. v. Arvin Industries, Inc.*,
   939 F.2d 887 (10th Cir. 1991) ............................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................... 1

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   186 F.3d 781 (7th Cir. 1999) ................................................................................................. 5

*Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ............................................................................................................... 4

*Coal Exporters Ass'n of the U.S., Inc. v. U.S.*,
   745 F.2d 76 (D.C. Cir. 1984) ................................................................................................ 5

*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*,
   885 F.2d 683 (10th Cir. 1989) ............................................................................................... 6

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ......................................................................................... 12, 13

*Eastman Kodak Co. v. Image Tech. Servs.*,
   504 U.S. 452 (1992) ........................................................................................................... 5, 6

*Elecs. For Imaging, Inc. v. Coyle*,
   No. C 01-4853MJJ, C 05-0619 MJJ, 2005 WL 1661958 (N.D. Cal. July 14, 2005) .................. 7

*Energy Conversion v. Trina Solar Ltd.*,
   833 F.3d 680 (6th Cir. 2016) ............................................................................................... 11

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
   547 U.S. 28 (2006) ...................................................................................................................5

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
   864 F.2d 1409 (7th Cir. 1989) ..................................................................................................8

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ................................................................................................12

*Kolon Indus. v. E.I. DuPont de Nemours & Co.*,
   748 F.3d 160 (4th Cir. 2014) ....................................................................................................5

*McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc.*,
   No. 08-00080 JMS/BMK, 2008 WL 2437739 (D. Haw. June 17, 2008) .................................7

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
   No. 18-cv-02054-MMC, 2019 WL 1767335, at *7 (N.D. Cal. April 22, 2019) ......................7

*Metro Mobile CTS, Inc. v. NewVector Communications, Inc.*,
   892 F.2d 62 (9th Cir. 1989) ......................................................................................................6

*Mount Hamilton Partners LLC v. Groupon, Inc.*,
   No. C 12–1700 SI, 2014 WL 1047408 (N.D. Cal. March 14, 2014) .......................................5

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ..............................................................................................12

*nSight, Inc. v. Peoplesoft, Inc.*,
   No. C-04-3836 MMC, 2005 U.S. Dist. LEXIS 24847 (N.D. Cal. Aug. 5, 2005),
   *aff'd* 296 Fed. Appx. 555 (9th Cir. 2008) ................................................................................7

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988) ..................................................................................................13

*Ohio v. American Express Co.*,
   138 S. Ct. 2274 (2018) ....................................................................................................2, 3, 4, 9

*Pac. Bell Tele. Co. v. Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009) ................................................................................................................11

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
   146 F.3d 1088 (9th Cir. 1998) .....................................................................................5, 10, 11

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................................................ *passim*

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Somers v. Apple, Inc.*,
　729 F.3d 953 (9th Cir. 2013) ..................................................................................................... 1

*Townshend v. Rockwell Int'l Corp.*,
　No. C 99-0400 SBA, 2000 U.S. Dist. LEXIS 5070 (N.D. Cal. Mar. 28, 2000) ........................ 7

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
　964 F.2d 186 (2d Cir. 1992) .................................................................................................... 13

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
　914 F.2d 1256 (9th Cir. 1990) ................................................................................................. 13

*Valassis Commc'ns, Inc. v. News Corp.*,
　No. 17-cv-7378 (PKC), 2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) ..................................... 11

**Other Authorities**

Hovenkamp, FEDERAL ANTITRUST POLICY (5th ed. 2016) ............................................................ 5

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

SCI seeks to avoid dismissal by characterizing the parties' disagreements regarding the sufficiency of its Second Amended Complaint ("SAC," dkt. 73) as factual disputes. But this is not a summary judgment motion. For the purpose of its motion to dismiss, Uber assumes, as the Court and the parties must, that SCI's factual allegations are true. But pleading "requires more than labels and conclusions," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and SCI has introduced few truly new facts in its latest amended complaint. Moreover, those facts do not make any material change to the picture painted by SCI's prior complaints. Instead, the SAC relies on conclusions (*i.e*, Lyft "cannot" compete) and theories (*i.e.*, Uber has the power to price discriminate) and buzz words ("network effects," "data") that cannot cure the deficiencies in SCI's prior complaints.

In dismissing the prior complaint, this Court provided a detailed roadmap of what SCI needed to do in order to plead a viable Section 2 case. The SAC altogether misses the mark. SCI has now had three full and fair chances to plead the *facts* that would be required to state a claim under the governing law here. "As the Supreme Court has emphasized, its insistence on specificity of facts is warranted before permitting a case to proceed into costly and protracted discovery in an antitrust case, especially where, as here, the potential expense of discovery is obviously great." *Somers v. Apple, Inc.*, 729 F.3d 953, 966 (9th Cir. 2013) (citing *Twombly*, 550 U.S. at 557-59). Even under Rule 12(b)(6)'s generous standard, which stacks the deck in SCI's favor, its claims are deficient as a matter of law. The SAC should be dismissed with prejudice.

## II. SCI FAILS TO PLEAD A CLAIM UNDER SHERMAN ACT § 2

### A. SCI Fails to Plead That Uber Has The Unilateral Market Power Required To State A Section 2 Claim

In order to state a claim under Section 2, a critical element that SCI must plead is Uber's possession of monopoly power or a dangerous probability thereof. Order Granting Mot. to Dismiss [First] Am. Compl. ("Order," dkt. 71) at 12, 15. Specifically, SCI must plausibly allege that Uber "controls enough of the market that 'by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices.'" Order at 12 (quoting *Rebel Oil Co., Inc. v. Atl. Richfield*

*Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)).  SCI's prior complaint, however, did not plead that Uber could increase marketwide prices by restricting marketwide output.  Order at 13-14.  Based on SCI's representations that it could cure this failing, the Court granted leave to amend to allow SCI to attempt to "allege that Uber has market power because it can raise prices by restricting output and that Lyft could not respond by increasing its own output."  Order at 15; *see also id*. at 14.  But SCI has been unable to deliver on its assurances on either count.  As discussed below, the SAC should be dismissed with prejudice.

> **1.   SCI's Amendments Do Not Cure Its Failure to Plead That Uber Can Raise Overall Market Prices by Restricting Output**

SCI did not amend its complaint to allege any means by which Uber could achieve (or come dangerously close to achieving) marketwide monopoly pricing by restricting overall output.  Instead, SCI espoused a new theory of market power, pleading that Uber has "from an early stage" possessed the power to "engage in price discrimination."[1]  SAC ¶ 84.  According to the SAC, "price discrimination" is the "primary" means for Uber to achieve "supra-competitive" prices and profits.  *Id*. ¶ 108.  By amending to add allegations regarding Uber's "use of price discrimination," SCI contends that its complaint now "adequately alleges market power."  Pl.'s Opp. to Defs.' Mot. to Dismiss Second Am. Compl. ("Opp." dkt 77) at 4.  On its face, however, SCI's "power to price discriminate" theory does not address the relevant legal question of whether Uber has the means to raise *marketwide* prices by restricting *overall* market output.  Further, SCI's theory cannot be reconciled with directly controlling authority from the Supreme Court and the Ninth Circuit.

To start with, price discrimination is simply not the same as *marketwide* monopoly pricing— and the divergence between the two is particularly pronounced when the alleged relevant market has two sides.  While SCI pays lip service to "the Supreme Court's instruction [in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) (hereafter "*Amex*")] to analyze the [relevant two-sided] market as a whole," Opp. at 7, its price discrimination theory is a piecemeal theory about limited power to affect only *some* prices on *one side* of the market.  SCI's theory of supracompetitive pricing is that some "*passengers*

---

[1]  SCI alleges that Uber's access to "data" facilitates this price discrimination.  SAC ¶¶ 80, 84-85.

must endure discriminatory pricing tactics," SAC ¶ 12 (emphasis added), but passengers account for just a single side of the alleged relevant market. *Amex*, 138 S. Ct. at 2287 ("As an initial matter, the plaintiffs' argument … wrongly focuses on only one side of the two-sided credit-card market"). Since even a uniform "price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power," *Amex*, 138 S. Ct. at 2287, SCI's one-sided theory of *fluctuating* passenger prices necessarily falls short of pleading monopoly power. SCI alleges only that Uber can charge *transient* "surge" prices or otherwise can raise prices only *selectively* for *some* passengers at *some* times in *some* locations in *some* circumstances. SAC ¶¶ 84-85. Moreover, the factors that SCI identifies as governing Uber's "dynamic" pricing in any individual case—"ability to pay," "price sensitivity" and demand-supply balance, *id*. ¶ 85—are plainly capable of generating *lower* as well as higher prices. Even viewing the passenger side in isolation, this fails to plead the requisite "power to increase [marketwide] prices above competitive levels, and sustain them for an extended period." *Rebel Oil*, 51 F.3d 1434.

      This defect alone discredits SCI's allegation of Section 2 market power, but SCI's error is further compounded by its failure to account for the effect of price discrimination on *drivers' compensation* on the "other" side of the market. A monopoly price in a two-sided transaction market cannot be determined by "looking at only one side of the platform in isolation." *Amex*, 138 S. Ct. at 2287. Raising the price on side A of a two-sided market can "decrease[] the value of the platform to side B," leading to a risk that "participants on side B leave due to this loss in value." *Id.* at 2281. Accordingly, a price increase on one side (*e.g.*, passengers) may be balanced by additional compensation to the other side (*e.g.*, drivers). The SAC ignores that this is exactly what happens under surge or "dynamic" pricing since drivers receive the *bulk* of any higher passenger price.[2] Striking such an "optimal balance of the prices charged on each side of the platform" is not monopoly pricing but

---

[2] SCI contends it has accounted for the drivers' side of the market by means of allegations (carried over from its last complaint) that Uber has increased commission rates in some locations. Opp. at 7 (citing SAC ¶¶ 105, 106-07, 109). But the SAC relies on discriminatory increases in *passenger* prices as the "primary" means of monopoly pricing, *id*. ¶ 108, and raising passenger prices *automatically raises compensation for drivers*. *Id.* ¶ 39 ("the balance of the passenger's payment is remitted to the Driver" after the TNC subtracts "a percentage of the Passenger's fare").

1  rather "is essential for two-sided platforms … to compete with their rivals." *Amex*, 138 S. Ct. at 2281.
2  SCI thus proves too much when it asserts that "if the market were competitive, Uber would have used
3  its increased profits from Passengers and spent them on increased payment to Drivers," Opp. at 8, since
4  sharing the returns from higher passenger prices with drivers is exactly what is accomplished by the
5  "price discrimination" that SCI challenges.  In short, SCI's passenger price discrimination theory
6  comprehensively fails to identify any ability to impose overall monopoly pricing on either side (much
7  less both sides) of the relevant market and so fails to plead the requisite market power under Section 2.

8       If any possible doubt remained, it would be extinguished by the unequivocal direction from the
9  Ninth Circuit and the Supreme Court that "[s]upracompetitive pricing entails a restriction in output."
10 *Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993); *Amex*, 138 S. Ct.
11 at 2288 ("Market power is the ability to raise price profitably *by restricting output*" (original emphasis;
12 internal quotation marks omitted)); *Rebel Oil*, 51 F.3d at 1434 ("A predator has sufficient market power
13 when, by restricting its own output, it can restrict marketwide output and, hence, increase marketwide
14 prices").  This Court required SCI to amend its complaint to address this specific issue.  But the *only*
15 reference to overall market output in the SAC is the allegation that "[p]rice discrimination is a means
16 by which Uber can exact monopoly profits *without reducing overall market output*."  SAC ¶ 91
17 (emphasis added).  This says it all.  Now regretting its candor, SCI seeks to evade this admission by
18 branding it as a "purported concession," Op. at 7 n.3, but this is deeply disingenuous.[3]  In any event,
19 the fact that SCI's discrimination theory eschews any marketwide price effect means that it likewise
20 dispenses with any need for overall output restriction.  The law does not permit such an approach.

---

22  [3] To the extent that SCI now argues that the ride-hailing market's robust growth will mask any output restriction, Op. at 7 n.3, it merely echoes the dissent in *Amex*, 138 S. Ct. at 2302 ("because the relevant question is a comparison between reality and a hypothetical state of affairs, to require actual proof of reduced output is often to require the impossible—tantamount to saying that the Sherman Act does not apply at all"), and confirms the fatal shortcomings in its case.  Alleging that a defendant merely has the power to raise prices when market output is *growing* does *not* suffice to plead market power.  A price increase cannot give rise to a "rational inference" of "supracompetitive pricing" when "output is expanding at the same time prices are increasing, [since] rising prices are equally consistent with growing product demand." *Brooke Grp.,* 509 U.S. at 237; *accord Amex*, 138 S. Ct. at 2288-89.  That is true even if "[o]ne could speculate, for example, that the rate of segment growth would have tripled, instead of doubled" absent the price increase. *Brooke Grp.,* 509 U.S. at 234.

SCI attempts an end run around the glaring legal defects in its theory by claiming that merely alleging the power to price discriminate is enough to plead the market power required for a section 2 claim. Opp. at 5-6. SCI is wrong as a matter of settled law and sound antitrust policy.[4] It is black letter law that "antitrust law is concerned only with 'substantial' market power." *AD/SAT v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 786-87 (7th Cir. 1999) ("market power is found in many highly competitive markets"); *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 894 (10th Cir. 1991) ("Monopoly power is … commonly thought of as substantial market power"). Even if it is assumed that the "ability to price discriminate" may show *some* market power, a "showing of [defendant's] 'market power' is not itself sufficient to prove that [defendant] possesses 'monopoly power.'" *Kolon Indus. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014). The decisions that SCI cites, Opp. at 4, do not hold to the contrary and do not even address price discrimination or market power under Section 2 of the Sherman Act.[5] On this point, the Ninth Circuit has spoken clearly. Proof of the degree of market power needed to engage in price discrimination "does not prove … the degree of market power to raise the concerns of the Sherman Act." *Rebel Oil*, 51 F.3d at 1442 ("[plaintiff's] evidence cannot, as a matter of law, be the basis for inferring market power in its attempted monopolization claim"); *see also Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 146 F.3d 1088, 1091 (9th Cir. 1998)

---

[4] Moreover, to rule otherwise would impose antitrust regulation on a multitude of industries using "dynamic" pricing to fill perishable seats—a "time-honored business strategy," *Mount Hamilton Partners LLC v. Groupon, Inc.*, No. C 12–1700 SI, 2014 WL 1047408 at *2 (N.D. Cal. March 14, 2014). "For example, even tiny airlines in intense competition with larger rivals price discriminate in filling their seats." Hovenkamp, FEDERAL ANTITRUST POLICY (5th ed. 2016) § 16.2 at 767 (for price discrimination to occur, "the amount of market power need not be great").

[5] In *Coal Exporters Ass'n of the U.S., Inc. v. U.S.*, 745 F.2d 76 (D.C. Cir. 1984), the D.C. Circuit was not construing antitrust law but rather addressing the propriety of a regulatory exemption under the Interstate Commerce Act. *Id*. at 92 n.20 (discussion of price discrimination and antitrust law texts "not meant to imply" conformance to antitrust standards). In SCI's second case, the Seventh Circuit dealt with a claim of collusion under Section 1 of the Sherman Act, *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d at 783, which requires a lesser showing of market power than under Section 2, as SCI admits. *See* Opp. at 6 (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 452, 481 (1992)). Even under Section 1, no presumption of market power arises from price discrimination since "it is generally recognized that [price discrimination] also occurs in fully competitive markets." *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 44-45 (2006).

("Although [plaintiff] had not shown that [defendant] had sufficient market power for an attempted monopolization claim, for price discrimination [plaintiff] needed only to prove that [defendant] possessed a level of market power to threaten oligopolization"). As this Court has recognized, it "is not free to depart from the Ninth Circuit's holding." Order at 14.

This leaves SCI back where it was with its last complaint—arguing that alleged barriers to entry and an ostensibly high market share suffice to plead substantial market power. Opp. at 5-7. But the Court found these same allegations insufficient when dismissing the First Amended Complaint ("FAC," dkt. 60). Order at 3-5, 12. No different result is called for now. *See Rebel Oil*, 51 F.3d at 1441 ("Market power cannot be inferred solely from the existence of entry barriers and a dominant market share"). SCI argues that "evidence of the defendant's large market share, 'with no readily available substitutes' was 'sufficient to survive summary judgment'" in *Kodak* (Opp. at 6, citing 504 U.S. at 481) but SCI has conceded the existence of a readily available substitute here: Lyft. Courts "ought … to decline to find sufficient market power to satisfy the requirement for the monopolization offense" when "an alleged monopolist faces substantial competition from a *known competitor*." *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 885 F.2d 683, 696 n.23 (10th Cir. 1989) (citation omitted). That is what the Ninth Circuit held in *Metro Mobile CTS, Inc. v. NewVector Communications, Inc.*, 892 F.2d 62, 63 (9th Cir. 1989), ruling that the defendant there "lacked the requisite monopoly power to support a section two claim" even though it controlled 100% of the market because it could not exclude a competitor with a guaranteed foothold in a growing market. This conclusion was reinforced by the existence of state price regulation which "further precluded [defendant] from having the power to control prices."[6] *Id*. That factor is present here as well, as this Court has already held. Order at 21 n.9.

---

[6] SCI argues that this holding was based on the state action immunity doctrine, citing the opinion of the district court in *Metro Mobile*, *see* Opp. at 15, but that is incorrect. The Ninth Circuit did "not rely on that portion of the [district court's] opinion" and found it "unnecessary to reach the issue of state action immunity" because "the record is clear that [defendant] lacked the requisite monopoly power to support a section two claim." 892 F.2d at 63-64.

In sum, SCI has staked its Section 2 case on the theory that Uber has the power to engage in passenger-side price discrimination. That theory cannot save the day for SCI without disregarding directly binding authority. That authority compels dismissal with prejudice.

### 2. SCI's Amendments Do Not Cure Its Failure To Plead Lyft's Lack of Capacity to Increase Output in Response to Monopoly Pricing

Uber's inability to raise marketwide prices makes it immaterial whether "Lyft could not respond [to monopoly pricing] by increasing its own output." Order at 15. But SCI's amended allegations do not cure the defects in its prior complaint and this failure is an additional (and independent) ground for dismissal. Under *Rebel Oil*, the critical legal question is whether Lyft is "unable to expand [its] output in response to supracompetitive pricing." 51 F.3d at 1438; *see also id*. at 1439 ("plaintiff must show that … existing competitors lack the capacity to expand their output to challenge the predator's high price"); *accord Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997). In other words, SCI must plead that plausible "barriers to expansion" would exist in an environment of monopoly pricing.[7] *Id*. at 1441. SCI has not done so.

In the first place, SCI has focused on the wrong issue: barriers to *entry* rather than barriers to *expansion*. *See* Opp. at 8-9 ("'[N]etwork effects and scale are formidable barriers to entry'"; "Uber's 'entrenched buyer preferences' and 'economies of scale' … are exactly the kind of barriers to entry that are relevant"). Allegations of barriers to *entry* do not suffice to show market power when it comes to incumbent rivals like Lyft. *Rebel Oil*, 51 F.3d at 1441 ("Market power cannot be inferred solely from the existence of entry barriers"); *see also id*. at 1439 ("In evaluating entry barriers, we focus on their ability to constrain *not 'those already in the market*, but . . . those who would enter but are prevented from doing so.'" (emphasis added; citation omitted)). When barriers to expansion are

---

[7] This is a burden that must be met at the pleading stage. *See, e.g., Med Vets Inc. v. VIP Petcare Holdings, Inc.*, No. 18-cv-02054-MMC, 2019 WL 1767335, at *7 (N.D. Cal. April 22, 2019); *McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc.*, No. 08-00080 JMS/BMK, 2008 WL 2437739, at *9 (D. Haw. June 17, 2008); *Axiom Advisers & Consultants, Inc. v. Sch. Innovations and Advocacy, Inc.*, NO. CIV. 2:05-CV-02395-FCD-PAN, 2006 U.S. Dist. LEXIS 11404, at *21-22 (E.D. Cal. Mar. 20, 2006); *nSight, Inc. v. Peoplesoft, Inc.*, No. C-04-3836 MMC, 2005 U.S. Dist. LEXIS 24847, at *3-4 (N.D. Cal. Aug. 5, 2005), *aff'd* 296 Fed. Appx. 555, 557-58 (9th Cir. 2008); *Elecs. For Imaging, Inc. v. Coyle*, No. C 01-4853MJJ, C 05-0619 MJJ, 2005 WL 1661958, at *5 (N.D. Cal. July 14, 2005); *Townshend v. Rockwell Int'l Corp.*, No. C 99-0400 SBA, 2000 U.S. Dist. LEXIS 5070, at *35-36 (N.D. Cal. Mar. 28, 2000).

lacking, "'it matters little that high barriers to entry exist to help that firm maintain a monopoly power it could never achieve.'" *Id.* at 1441 (quoting *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1415 (7th Cir. 1989)). The SAC shows no cognizable barriers to expansion by Lyft.

"Prior expansion by competitors would suggest that the defendant during that expansion lacked the market power to control marketwide output in the first place." *Rebel Oil*, 51 F.3d at 1441 (an absence of barriers to expansion can be shown by "undisputed evidence indicating that competitors have expanded output in the recent past"). That is exactly what the SAC pleads. The "recent example" from Austin, SAC ¶ 89, vividly illustrates Lyft's ability to expand output since, after voluntarily exiting for regulatory reasons, "Lyft returned to the market" and—starting over from a zero base—quickly recaptured a 30% market share. SAC ¶¶ 89, 143. Nationally, Lyft started from a zero position in 2012 and obtained an aggregate share of at least 25% (SAC ¶ 87) within a few short years—"about the time [defendant] is supposed to have acquired market power." *Rebel Oil*, 51 F.3d at 1442. That national share is now "approximately 30%" and in the majority of the eleven alleged geographic "markets" in the SAC, Lyft has as much as a 35-40% market share.[8] *Id.* ¶¶ 87-88, 133-43 (alleging that "Uber and Lyft collectively account for nearly 100% of all rides booked" and identifying six geographic markets where non-Uber market share is 35-40%). This reflects substantial expansion in Lyft's market share but market share figures greatly understate the extent to which Lyft has constantly been expanding output given that the total size of the market has exploded since the advent of ride hailing. Even holding a constant slice of the pie involves a continuous expansion of output when the size of the pie is growing by leaps and bounds. SCI offers no plausible reason for its *conclusory assertion* that Lyft would be

---

[8] SCI pleads that Sidecar, with a mere 10-15% share in a few markets, SAC ¶ 51, "served as a check on Uber's anticompetitive price increases." *Id.* ¶ 127. [9] SCI reliance on "'Lyft's own financial losses which it must recoup,'" Opp. at 8 (citing SAC ¶ 92), is (again) unavailing since undercutting a monopoly price with a competitive price does not yield losses but rather achieves both profits and valuable gains in market share (which, as discussed below, generate further gains due to network effects).

unable to continue to expand its output in response to output contraction and supracompetitive pricing by Uber.[9]

SCI's core position is that "most importantly … network effects constrict Lyft." Opp. at 8. But as already noted, SCI deems network effects to be (for these purposes, irrelevant) barriers to *entry* that "*insulate incumbent providers*" like Lyft. SAC ¶ 83 (emphasis added). Consistent with the concession of SCI's counsel that "Lyft could increase output 'in theory,'" Order at 15, network effects operate *by definition* to *reward* output expansion by incumbents. "In other words, the value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases." *Amex*, 138 S. Ct. at 2281. That is exactly what the SAC pleads. Thus, if Uber were to reduce output, it would lose the benefit of network effects, *see, e.g.*, SAC ¶¶ 73-75, while Lyft would gain those benefits by expanding output. Because of such network effects, "[g]aining market share puts [Lyft] in a better position to gain more market share." *Id.* ¶ 74 (internal quotation marks omitted). Similarly, the benefits of greater share enable an incumbent "to expand more rapidly and effectively" into new cities. *Id.* ¶ 79. Properly accounting for such network effects is a mandatory aspect of analyzing a two-sided transaction market "as a whole." *Amex*, 138 S. Ct. at 2287. "Any other analysis would lead to mistaken inferences of the kind that could chill the very conduct the antitrust laws are designed to protect." *Id.* (cleaned up).

Stripped of the unsupported *conclusion* that Lyft cannot expand output, SCI's position boils down to the assertion that "Lyft *will not* … act as a check on the ability of Uber to charge supra-competitive prices." SAC ¶ 92 (emphasis added); *see also id.* ¶ 12 ("Lyft has *not been willing* … to respond to Uber's price discrimination strategy by expanding its output" (emphasis added)). But alleging that "the existing competition, while it may be *able* to challenge [the defendant], lacks the will to do so" simply "cannot support a claim of monopolization under the Sherman Act." *Rebel Oil*, 51

---

[9] SCI reliance on "'Lyft's own financial losses which it must recoup,'" Opp. at 8 (citing SAC ¶ 92), is (again) unavailing since undercutting a monopoly price with a competitive price does not yield losses but rather achieves both profits and valuable gains in market share (which, as discussed below, generate further gains due to network effects).

F.3d at 1448 (original emphasis). This is yet another independent basis for dismissing SCI's case with prejudice.

### B. SCI Fails to Plead a Cognizable Probability of Recoupment

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As this Court has noted, courts bring "skepticism" to analyzing predatory pricing claims. Order at 10. Such common-sense skepticism is warranted when the context involves an allegation that a defendant is dangerously likely to recoup billions in predatory losses when it has not yet turned a profit after supposedly pricing below average variable cost since 2013.[10] Regardless, SCI's SAC continues to perpetuate the same untenable theory of oligopoly recoupment on which its prior complaint foundered. Order at 14-16.

SCI's theory of recoupment is still one that involves "coordinated action by an oligopoly of two dominant firms." Order at 15. There is certainly no question that SCI's complaint continues to paint the definitional picture of an oligopoly. "An oligopoly is '[a] market condition in which sellers are so few that the actions of any one of them will materially affect price and hence have a measurable impact upon competitors.'" *Rebel Oil*, 146 F.3d at 1091 (citation omitted). Previously, SCI alleged that "Lyft will follow Uber in setting supracompetitive prices because Lyft, like Uber, has sustained massive losses from below-cost pricing that it must now recoup." Order at 15. While SCI's principal theory of recouping monopoly profits is now based on passenger-side price discrimination ("dynamic pricing"), SAC ¶¶ 85, 108, its new complaint still hinges on oligopoly coordination since it pleads that recoupment will succeed because *Lyft will follow Uber* in adopting such discriminatory pricing. Specifically, the SAC alleges that "*in response to Uber's conduct*, Lyft is itself implementing a similar dynamic [discriminatory] pricing model," SAC ¶ 85 (emphasis added), and that "Lyft's own adoption

---

[10] SCI asserts that "Uber has recorded positive EBITDA" since 2018, Opp. at 10, but "positive EBITDA" is not profit (much less monopoly profit) and SCI alleges "[t]here is no dispute that Uber has and continues to price below cost, however cost may be measured." SAC ¶ 9. As the Court previously noted, SCI's "failure to allege that Uber has in fact set prices at profitable and supracompetitive levels … might call into question the plausibility of allegations that Uber currently has the power to do so." Order at 14 n.6.

of dynamic pricing" and "Lyft's own financial losses which it must recoup" remove it as "a check on the ability of Uber to charge supra-competitive prices." *Id.* ¶ 92. If this does not allege oligopoly coordination, nothing could.

These are SCI's own words, not an "effort to recast Sidecar's recoupment claim and to ignore the actual allegations of the Second Amended Complaint." Opp. at 11. In truth, it is SCI that is ignoring its own allegations and its counsel's representation to the Court that SCI could amend to allege that Lyft would follow any monopoly price hike for fear of "devastating retaliation from Uber." Order at 15-16. But the premise that a defendant can raise prices in an oligopoly "by making it too painful for its existing competitors" not to follow is untenable under Section 2. *Rebel Oil*, 51 F.3d at 1448. Such a theory rests on oligopoly coordination and ignores the critical "distinction between oligopolistic and monopolistic practices" and thus fails as a matter of law. *Id.*

Finally, little need be said about SCI's fallacious argument that its legally invalid theory of recoupment can be cured by allegations of supposed intent. The Ninth Circuit has held that "intent cannot substitute for the required element of recoupment." *Rebel Oil*, 146 F.3d at 1097. This is hardly a rule limited to summary judgment or trial, as SCI suggests. Opp. at 11. "If proof of recoupment is required to succeed on the claim, allegations of recoupment must appear *in the complaint* to show an entitlement to relief." *Energy Conversion v. Trina Solar Ltd.*, 833 F.3d 680, 688 (6th Cir. 2016) (original emphasis). SCI's complaint fails to plead a dangerous probability of recoupment as a matter of law. Its predatory pricing claim should be dismissed with prejudice.

### C. SCI Fails to Plead an Antitrust Claim for Tortious Interference

SCI's failure to plead market power or recoupment under Section 2 equally dooms SCI's antitrust claim for alleged "tortious interference," but the claim suffers from independent defects as well. First, SCI cannot rescue an invalid "tortious interference" theory by combining it with an unsound predatory pricing claim. Opp. at 11-12 ("Uber's tortious activities … must be considered in context as a complement to its predatory scheme."). "Two wrong claims do not make one that is right." *Pac. Bell Tele. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) ("low prices are only actionable under the Sherman Act when the prices are below cost and there is a dangerous probability that the

predator will be able to recoup the profits it loses from the low prices"). A "synergistic" effect cannot be traced to nonpredatory low prices since a "firm complaining about the harm it suffers from nonpredatory price competition 'is really claiming that it [is] unable to raise prices,'" which "is not *antitrust* injury." *Atl. Richfield Co. v. USA Petroleum, Inc.*, 495 U.S. 328, 337-38 (1990) (original emphasis; citation omitted) ; *see also, e.g.*, *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-cv-7378 (PKC), 2019 WL 802093 at *9-10 (S.D.N.Y. Feb. 21, 2019) (no synergistic effect between invalid predatory pricing claim and other alleged anticompetitive conduct).

Second, SCI does not acknowledge, much less dispel, the legal presumption that such alleged conduct has a *de minimis* effect on competition. *See* Mot. to Dismiss Second Amended Complaint ("Mot." dkt. 76) at 13-14. Even the authorities that SCI cites, Opp. at 12-13, recognize that "[b]usiness torts will be violative of § 2 only in 'rare gross cases.'" *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) (citation omitted). This is not such a case. SCI's contention that it "need not identify specific fraudulent ride requests" is a straw man. Opp. at 14. The issue is not identifying any (much less every) particular request, but rather plausibly pleading a factual basis for showing that the alleged requests "are so widespread and longstanding and practically incapable of refutation that they are capable of injuring both consumers and competitors." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079-80 (10th Cir. 2013). SCI's complaint does no such thing, despite having had multiple opportunities to amend to address this very issue. It devotes just six paragraphs in the SAC to pleading unsubstantiated conclusions upon "information and belief."[11] *See* SAC ¶¶ 114-119. It refuses to allege which (if more than one) geographic markets were affected. It remains silent as to the percentage of total ride requests involved, and provides no non-conclusory allegation regarding the timing or frequency of the alleged requests. It merely claims the "projects" lasted "over a year," Opp. at 13, but this is a far cry from the nearly-decade-long campaign of widespread tortious conduct at issue in *Conwood*. *See* 290 F.3d at 784-85 (defendant "continuously removed and discarded Conwood POS and racks after 1990" and "as much as 50 percent of [plaintiff's] employees' time was being spent on

---

[11] The complaint also includes two paragraphs regarding Sidecar's terms of service, *id*. ¶¶ 120-121, which do not bear on antitrust liability as even SCI concedes. *See* Opp. at 13 n.5; Mot. at 15 n.13.

repairing damaged or discarded racks," with "as many as 20,000 racks a month being replaced"). SCI does not even claim that the alleged requests excluded any rival from the market. *See* Opp. at 13 n.6 ("Uber's actions did not drive Lyft out of the market"); SAC ¶ 148 ("Sidecar was forced out of business by Uber's … pricing strategy"). SCI objects that it is "unfair" to ask it to plead the "necessary evidentiary facts," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008), because "these were secretive programs that [Uber] attempted to hide." Opp. at 13. Yet SCI also avers that these "secret" projects were "discovered and well-covered by the press." *Id*. SCI cannot have it both ways and, regardless, it cannot evade its burden under F.R.C.P. 9(b) of pleading fraud with particularity. *See* Mot. at 13 n.11.

Beyond these failings, SCI's complaint fails to state a claim given its concession that the alleged requests "were submitted" with the "goal[] in mind" of "recruit[ing] Drivers to work exclusively with Uber (instead of its competitors)." SAC ¶ 115; *see* Mot. at 14-15. SCI has now twice admitted that this "is a legitimate business justification." Opp. at 14; Pl.'s Opp. to Defs.' Mot. to Dismiss [First] Am. Compl. (dkt. 67) at 17-18; *compare Conwood*, 290 F.3d at 795 ("Conwood presented sufficient evidence that [defendant's] conduct rose above isolated tortious activity and was exclusionary *without a legitimate business justification*." (emphasis added)). It is black letter law that in a Section 2 case, an "antitrust defendant's conduct is redeemed by a legitimate business purpose." *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990); *see also*, *e.g.*, *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 189 (2d Cir. 1992) ("legitimate business justifications … prevent a rational trier of fact from finding § 2 liability") (Marshall, J.). SCI alleges that Uber had "another purpose" for the alleged requests but even "the desire to maintain market power—even a monopolist's market power—cannot create antitrust liability if there was a legitimate business justification." *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 368-69 (9th Cir. 1988).

In short, SCI's Sherman Act Section 2 claims are comprehensively defective and fully warrant dismissal with prejudice at this time.

**D.   SCI's Unfair Practices Act Claim Should Be Stricken**

SCI concedes that its Unfair Practices Act claim "remains dismissed." Opp. at 16. It should accordingly be stricken.

**III.   CONCLUSION**

For the reasons set forth herein and in its opening motion, Uber respectfully submits that SCI's Second Amended Complaint should be dismissed with prejudice.

Dated: March 10, 2020

THEODORE J. BOUTROUS JR.
DANIEL G. SWANSON
CYNTHIA E. RICHMAN
GIBSON, DUNN & CRUTCHER LLP


By:   */s/ Daniel G. Swanson*
            Theodore J. Boutrous Jr.
            Daniel G. Swanson
            Cynthia E. Richman

Attorneys for Uber Technologies, Inc, Rasier LLC, Rasier-CA LLC, Rasier-PA LLC, Rasier-DC LLC, Rasier-NY LLC, Uber-USA LLC