1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   SC INNOVATIONS, INC.,                  Case No.  18-cv-07440-JCS

8              Plaintiff,
                                           **ORDER REGARDING MOTION TO**
9        v.                                **DISMISS SECOND AMENDED**
                                           **COMPLAINT**
10  UBER TECHNOLOGIES, INC., et al.,       Re: Dkt. No. 76

11             Defendants.

12  **I.      INTRODUCTION**

13          Plaintiff SC Innovations, Inc. ("Sidecar") is a defunct "transportation network company"

14  that offered services matching passengers with drivers for on-demand transportation, also known

15  as "ride-hailing," through a smartphone app.  Sidecar claims that it was driven out of business by

16  Defendants, Uber Technologies, Inc. and a number of its subsidiaries (collectively, "Uber").[1]  The

17  Court previously dismissed Sidecar's first amended complaint with leave to amend its Sherman

18  Act claim, and with prejudice as to its claim under California' Unfair Practices Act.  Sidecar filed

19  a second amended complaint, and Uber now moves once again to dismiss.  The Court held a

20  public hearing by videoconference on April 24, 2020.  For the reasons discussed below, Uber's

21  motion is DENIED, except as to the Unfair Practices Act claim previously dismissed with

22  prejudice, which is STRICKEN from the second amended complaint.[2]

23          A case management conference will occur on July 31, 2020 at 2:00 PM.  The parties shall

24  file a joint case management statement no later than July 24, 2020.

25

26  ---
    [1] The remaining defendants are Rasier, LLC; Rasier-CA, LLC; Rasier-PA, LLC; Rasier-DC, LLC;
27  Rasier-NY, LLC; and Uber USA, LLC. The parties do not suggest that there is any distinction
    among the various defendants relevant to the present motion.
28  [2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all
    purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    Procedural History and Previous Order

Sidecar filed this action on December 11, 2018.  On May 2, 2019, the Court granted a motion to disqualify Sidecar's previous counsel based on a conflict of interest.  *See* Order Re Mot. to Disqualify Counsel (dkt. 41).[3]  Uber moved to dismiss Sidecar's initial complaint on July 10, 2019 (dkt. 57), Sidecar elected to file its first amended complaint (dkt. 60) rather than oppose the motion, and the Court denied that first motion to dismiss as moot on September 25, 2019 (dkt. 63). On January 21, 2020, the Court granted Uber's motion to dismiss the first amended complaint, dismissing Sidecar's Sherman Act claims with leave to amend and its Unfair Practices Act claim with prejudice.  *See generally* Order Granting Mot. to Dismiss Am. Compl. ("Order re FAC," dkt. 71).[4]

The Court held that Sidecar's allegation of a relevant market—app-based ride-hailing services, excluding taxis—was sufficiently plausible to survive a motion to dismiss.  *Id.* at 10–11. The Court also rejected suggestions by Uber that Sidecar had not alleged below-cost pricing, *id.* at 12, as well as arguments that Uber's delayed entry to the non-limousine ride-hailing market and asserted pro-competitive purposes were sufficient for dismissal at the pleading stage, *id.* at 16–18. The Court nevertheless dismissed Sidecar's Sherman Act claims for failure to provide sufficient allegations of market power, particularly its failure to allege "that Uber has the power to raise market prices above competitive levels simply by reducing its own output, or that Lyft"— allegedly Uber's only remaining competitor—"could not respond to such a reduction by increasing its own output."  *Id.* at 12–14.  Absent such allegations, the Court held that Sidecar alleged no more than a "disciplined oligopoly," which the Ninth Circuit has held insufficient to state a claim for either monopolization or attempted monopolization, due to "a gap in the Sherman Act that allows oligopolies to slip past its prohibitions," in *Rebel Oil v. Atlantic Richfield Co.*, 51

---

[3] *SC Innovations, Inc. v. Uber Techs., Inc.*, No. 18-cv-07440-JCS, 2019 WL 1959493 (N.D. Cal. May 2, 2019).

[4] *SC Innovations, Inc. v. Uber Techs., Inc.*, No. 18-cv-07440-JCS, __ F. Supp. 3d __, 2020 WL 353543 (N.D. Cal. Jan. 21, 2020).  Citations herein to the Court's previous order refer to page numbers of the version filed in the Court's ECF docket.

United States District Court
Northern District of California

1    F.3d 1421 (9th Cir. 1995).  *See* Order re FAC at 12–16.

2        The Court dismissed Sidecar's Unfair Practices Act claim with prejudice, holding that

3    Uber fell within an exemption from that statute for products and services for which rates are set

4    under the jurisdiction of the California Public Utilities Commission ("CPUC"), following a line of

5    cases construing that exemption as based on the scope of the CPUC's authority, not based on

6    whether the CPUC had in fact acted to set rates for a particular product or service.  *Id.* at 18–21.

7        **B.    Allegations of the Second Amended Complaint**

8        Because a plaintiff's factual allegations are generally taken as true in resolving a motion

9    under Rule 12(b)(6), this section summarizes the allegations of Sidecar's second amended

10   complaint as if true.  Nothing in this order should be construed as resolving any issue of fact that

11   might be disputed at a later stage of the case.  Moreover, this summary is intended only as

12   background to the issues in dispute in the present motion, and is not a comprehensive recitation of

13   Sidecar's allegations.

14       Uber launched its smartphone app in 2009, offering a service for passengers to arrange for

15   transportation in limousines driven by licensed chauffeurs.  2d Am. Compl. ("SAC," dkt. 73) ¶¶ 5,

16   42.  Sidecar launched its own ride-hailing app in 2012, allowing passengers to hail drivers who

17   used their own personal vehicles, and pioneering a number of features including estimated fares

18   before booking and carpool rides for multiple passengers traveling in the same direction.  *Id.* ¶¶ 6–

19   7, 43, 45–47.  Lyft—which is now Uber's only remaining competitor in the ride-hailing market—

20   introduced a similar service the same year.  *Id.* ¶ 44.  Sidecar's app also allowed drivers to set their

21   own proposed fares and compete against one another.  *Id.* ¶ 7.  Over the course of its existence,

22   Sidecar operated in San Francisco, Austin, Los Angeles, Chicago, Philadelphia, New York,

23   Seattle, San Diego, San Jose, Boston, and Washington, DC, obtaining market share of between

24   10% and 15% in some of those cities.  *Id.* ¶¶ 50–51.  Uber, which at the time was rapidly growing,

25   accumulating significant investment capital, and becoming the dominant ride-hailing platform in

26   the United States, debuted its "UberX" product in 2013, following Sidecar's lead in allowing

27   drivers to use their personal, non-limousine vehicles, and directly competing with Sidecar and

28   Lyft, which Uber recognized as threats to its business model.  *Id.* ¶¶ 8, 53–55.  Uber operated in

United States District Court
Northern District of California

3

all of the same cities as Sidecar by mid-2014, *id.* ¶ 113, and now has a market share of between 60% and 75% in each of those cities, *id.* ¶¶ 133–43.

Ride-hailing apps allow participating passengers to request rides and drivers to accept those requests. *See id.* ¶¶ 32–34. The passenger pays a fare for the ride, of which a portion is retained by the ride-hailing company and the balance is paid to the driver. *Id.* ¶ 39. Sidecar alleges that Uber has, since its inception, consistently set its prices below cost in an effort to achieve a "winner takes all" outcome due to the ride-hailing market's barriers to entry—in particular, network effects caused by passengers preferring a platform with a large supply of drivers and drivers preferring a platform with a large supply of passengers, because a larger supply of both means drivers will make more money by spending less time waiting for passengers and passengers will obtain a more convenient service if they do not need to wait as long for rides. *See id.* ¶¶ 2–3, 69–74. The market also includes other barriers and economies of scale, including the benefits to customers of knowing they will be able to use the same app in multiple cities, and the benefits to the ride-sharing company of collecting data on how large numbers of customers and drivers use the service. *Id.* ¶¶ 78–80.

Uber has engaged in predatory pricing on each of the two "sides" of the ride-hailing market, offering above-market incentive payments to drivers, and offering below-market fares to passengers. *Id.* ¶¶ 11, 96. Uber has in at least some circumstances priced its rides below the costs that it pays drivers, and has lost billions of dollars in the process. *Id.* ¶¶ 9, 102. According to Sidecar, Uber's strategy is premised on the goal of establishing a monopoly and reaping the reward of supracompetitive monopolist pricing in order to recoup early losses. *Id.* ¶ 4. Uber would recoup the losses it has accrued by lowering payments to drivers and raising fares for passengers. *Id.* ¶ 11.

Uber has also engaged in what Sidecar characterizes as price discrimination, initially by using "surge pricing" to set higher prices at times of high demand, and later by using "dynamic pricing" to set different prices for different users based on factors including the users' perceived price sensitivity and ability to pay. *Id.* ¶¶ 84–85.

In addition to Uber's pricing strategies, Sidecar contends that Uber has sought to

monopolize the ride-hailing market by interfering with its competitors Lyft and Sidecar, engaging

in "clandestine campaigns"—with names like "Project Hell" and "SLOG"—to either submit

fraudulent requests for rides on competitors' platforms and cancel before the drivers arrived, or

have Uber representative request rides in order to start a conversation with Sidecar and Lyft

drivers and convince them to work exclusively for Uber. *Id.* ¶ 13.  Those tactics violated

Sidecar's terms of service and increased wait times for both drivers and passengers to obtain

legitimate rides, causing them to become frustrated with Sidecar. *Id.* ¶¶ 14, 116–17.  As a result of

network effects, reduced numbers of passengers and drivers created a vicious cycle of declining

usage. *Id.* ¶ 118.  Unable to compete with Uber's predatory pricing, Sidecar exited the ride-

hailing market in December of 2015. *Id.* ¶¶ 8, 123.

Uber has begun to increase its prices since Sidecar ceased operations, including in the

particular geographic markets where Sidecar formerly competed. *Id.* ¶¶ 103–04.  Uber has also

reduced payments to drivers by increasing the "commission" percentage of each fare that it keeps

for itself in cities including San Francisco, San Diego, and New York, and "effective"

commissions have risen in other cities due to booking fees and other charges. *Id.* ¶¶ 105–07, 109.

Uber's ride-hailing business became profitable by at least one measure ("positive EBITDA") in

2018. *Id.* ¶ 109.

Lyft's ability to act as a check on unilateral supply constriction and price increases by Uber

is of particular importance to the parties' arguments on the present motion.  Sidecar's allegations

relevant to that issue include the following:

> . . . In addition, because of the network effects resulting from Uber's
> size and dominance on both the customer and driver side, and because
> of and because of [sic] Uber's discriminatory pricing, Lyft is unable
> to respond effectively or to increase its own share of rides as a
> restraint on Uber's pricing. Further, Lyft's current status as a public
> company requires it to recoup its own massive losses through higher
> prices. Thus, Lyft has not been willing, even if it were able to do so,
> to respond to Uber's price discrimination strategy by expanding its
> output or seizing significant additional market share through price
> competition. Uber now is able to impose its will on both passengers
> and drivers in the form of higher, supra-competitive prices. Indeed,
> drivers are now receiving reduced compensation; and passengers
> must endure discriminatory pricing tactics, such as surge pricing, and
> more recently, "dynamic pricing." Uber has begun to reap supra-
> competitive profits in ways that have become increasingly difficult

for any competitor or customer to address or constrain Uber's monopoly power.

*Id.* ¶ 12.

. . . Uber's only remaining significant competitor, Lyft, is unable to expand its ride offerings in the face of price discrimination because the network effects of Uber's vast driver pool render that impossible or ineffective. Further, the financial pressures on Lyft and its status as a public company with a need to recoup its own enormous financial losses, means that Lyft has no incentive to undercut Uber. In fact, in response to Uber's conduct, Lyft is itself implementing a similar dynamic pricing model, substantially reducing Lyft as a competitive constraint on Uber's unilateral ability to exercise monopoly power through recoupment and supra-competitive pricing. Lyft has a strong incentive to adopt such a dynamic pricing model because in order for Lyft to attract Drivers to Lyft's platform, Lyft cannot undercut the higher prices that the Drivers would otherwise obtain from customers if they were to drive for Uber instead of Lyft

*Id.* ¶ 85.

As a result of Uber's monopoly conduct (predatory pricing and tortious conduct), Lyft has become a less effective competitor. Lyft has incurred enormous losses and faces significant pressure to achieve profitability and recoup prior losses now that it is a public company with more of a need to focus on short term results. Given these factors, and because of (a) Uber's monopoly power arising from network and brand effects and economies of scale, and (b) Uber's use of its monopoly power to engage in price discrimination, Lyft has no ability to respond to Uber's imposition of monopoly pricing and no incentive to do so given its own urgent need for short term profits. Lyft also has been limited in its ability to capture market share with regard to the more profitable segments of the ride-hailing market (e.g., business users and the higher end rides designated as "premium" in Uber's platform, i.e., Uber Black and Uber Black SUV).

*Id.* ¶ 90.

Uber's actions have harmed competition in the ride-hailing applications market by eliminating an innovative maverick in Sidecar and severely weakening Lyft. Given the enormous losses suffered by Lyft, it remains to be seen whether Lyft will remain a viable competitor in the market over the long term. Even if it remains, however, Lyft will not, and cannot, act as a check on the ability of Uber to charge supra-competitive prices, above the level that would have prevailed if Sidecar had been able to remain in the market, as a result of network effects, the two-sided nature of the market, Lyft's own financial losses which it must recoup, and Lyft's own adoption of dynamic pricing

*Id.* ¶ 92; *see also id.* ¶ 76 ("Significant new rivals have not emerged to challenge Uber's market dominance, which it has maintained, with a weakened Lyft as its only significant competitor in the relevant geographic markets."); *id.* ¶ 83 ("Lyft is subject to the same constraints as other market

6

1   entrants in trying to compete with Uber's vast network and the strong network effects created by

2   Uber's dominance of drivers and riders.").

3        Sidecar asserts the following claims for relief: (1) monopolization in violation section 2 of

4   the Sherman Act, based both on predatory pricing and on exclusionary tortious conduct, *id.*

5   ¶¶ 130–59; (2) attempted monopolization in violation of section 2 of the Sherman Act, *id.* ¶¶ 160–

6   68; and (3) violation of the California Unfair Practices Act, *id.* ¶¶ 169–75, despite the Court

7   having previously dismissed that claim with prejudice, *see* Order re FAC at 18–21.

8       **C.**    **The Parties' Arguments**

9        Uber argues that Sidecar has not cured its previous failure to allege market power because

10  Sidecar still does not allege that Uber has the unilateral power to raise market prices by reducing

11  its own output. Mot. (dkt. 76) at 3–4. According to Uber, Sidecar's new allegations of price

12  discrimination cannot substitute for the ability to restrict output. *Id.* at 4–5. Uber also argues that

13  Sidecar has not sufficiently addressed both parts of the "two-sided transaction market" for ride-

14  hailing platforms, instead focusing on passengers and neglecting the effect of the symbiotic market

15  for drivers. *Id.* at 5–8. Uber relies on the Supreme Court's decision in *Ohio v. American Express*

16  *Co.*, 138 S. Ct. 2274 (2018), which held, in the context of terms imposed on merchants by a credit

17  card company, that courts should analyze two-sided markets as a whole because network effects

18  can cause a reduction of supply in one side of the market to reduce demand in the other. *See* Mot.

19  at 5–8. In Uber's view, Sidecar's complaint still ultimately relies on an oligopoly theory of

20  market power of the type the Ninth Circuit rejected in *Rebel Oil*. *Id.* at 8–10. Uber contends that

21  Sidecar's theory of likely recoupment through an oligopoly with Lyft is similarly not cognizable.

22  *Id.* at 10–12. Uber argues that Sidecar's claim for tortious interference under the Sherman Act

23  also must be dismissed, not only because Sidecar has not alleged cognizable market power, but

24  also because Sidecar's allegations that the purported tortious conduct harmed competition are

25  speculative at best. *Id.* at 12–15. Finally, Uber asks the Court to strike Sidecar's claim under the

26  Unfair Protection Act, which Sidecar includes once again in its current complaint despite the

27  Court having previously dismissed that claim with prejudice. *Id.* at 15.

28       Sidecar acknowledges that to make a circumstantial showing of monopoly power, it must

United States District Court
Northern District of California

United States District Court
Northern District of California

1   "'(1) define the relevant market, (2) show that the defendant owns a dominant share of that

2   market, and (3) show that there are significant barriers to entry and show that existing competitors

3   lack the capacity to increase their output in the short run.'"  Opp'n (dkt. 77) at 4 (quoting *Rebel*

4   *Oil*, 51 F.3d at 1434).  Sidecar argues, however, that its allegations of price discrimination, in

5   conjunction with Uber's large market share and the ride-hailing market's inherent barriers to entry,

6   are sufficient to imply market power and monopoly power.  *Id.* at 4–6.  Sidecar also contends that,

7   contrary to Uber's argument that it failed to address both sides of the relevant market, its

8   allegations cover both payments to drivers and fares charged to passengers, including allegations

9   that Uber has increased its commission rates and thus reduced the share of passengers' fares that it

10  pays to drivers.  *Id.* at 6.  According to Sidecar, the lack of correlation between fares charged to

11  passengers and rates paid to drivers demonstrates that the market is not behaving as a competitive

12  two-sided market should.  *Id.* at 6–7.

13         Sidecar argues that its allegations go beyond mere oligopoly by alleging that Lyft cannot—

14  as opposed to merely will not—check anticompetitive conduct by Uber, because Lyft trails Uber

15  in the same network effects and other barriers that prevent new entrants from competing

16  effectively in the market.  *Id.* at 8–9.  Sidecar contends that it has plausibly alleged a dangerous

17  probability of recoupment based on Uber's market share and the market's barriers to entry, and

18  that Uber's intent, while not sufficient in itself to support an antitrust claim, is relevant to whether

19  Sidecar's allegations are plausible.  *Id.* at 9–11.  Sidecar also alleges that its Sherman Act claim

20  based on tortious interference should proceed, whether viewed independently or in conjunction

21  with its predatory pricing claim, *id.* at 11–14, and that the Court should not dismiss its antitrust

22  claims based on a footnote in Uber's motion discussing the CPUC's regulatory authority, *id.* at

23  14–16.  Sidecar acknowledges that the Court dismissed its Unfair Practices Act claim with

24  prejudice, and states that it repleaded the claim only in an abundance of caution to avoid waiving it

25  on appeal.  *Id.* at 16.

26         Uber argues again in its reply that Sidecar has neither alleged that Uber can raise prices by

27  restricting its own output nor sufficiently addressed the two-sided nature of the ride-hailing

28  market, and that other allegations, such as purported price discrimination in the passenger market,

cannot substitute for either of those requirements.  Reply (dkt. 78) at 1–9.  Uber also argues that Sidecar's own allegations indicate that its theory of recoupment is premised on an oligopoly between Uber and Lyft, which the Ninth Circuit has held is not sufficient to support a claim for actual or attempted monopolization.  *Id.* at 10–11.  Uber argues that Sidecar's tortious interference claims are subject to dismissal because Uber had a legitimate business purpose of recruiting drivers, and because Sidecar has not alleged that Uber's conduct was sufficiently pervasive to have more than a de minimis effect on competition.  *Id.* at 11–13.

## III.   ANALYSIS

### A.   Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a claimant's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a

complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

## B.   Sherman Act Claims

Section 2 of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.  Under the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor," and may recover treble damages.  15 U.S.C. § 15(a).  "Simply possessing monopoly power and charging monopoly prices does not violate § 2; rather, the statute targets 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

> In order to state a claim for monopolization under [section 2 of the Sherman Act], a plaintiff must prove that: (1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury. *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (citations omitted).
>
> In order to state a claim for attempted monopolization, a plaintiff must prove: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury. *Id.* (citations omitted).

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949–50 (9th Cir. 1996) (footnote omitted; line break added).

One means of monopolization recognized by the courts—albeit with skepticism—is predatory pricing, in which an aspiring monopolist sets "below-cost prices that drive rivals out of the market and allow the monopolist to raise its prices later and recoup its losses."  *Pac. Bell*, 555 U.S. at 448; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589 (1986)

United States District Court
Northern District of California

United States District Court
Northern District of California

("[T]here is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful.").  Such a claim requires the plaintiff to show both pricing below costs and a probability of recoupment:

> "[C]utting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). In cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are "especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Ibid.*; see also *Brooke Group* [*Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993)]; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 121–122, n. 17 (1986). To avoid chilling aggressive price competition, we have carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low. Specifically, to prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) "the prices complained of are below an appropriate measure of its rival's costs"; and (2) there is a "dangerous probability" that the defendant will be able to recoup its "investment" in below-cost prices. *Brooke Group*, *supra*, at 222–224. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990).

*Pac. Bell*, 555 U.S. at 451.  "That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for 'the protection of *competition,* not *competitors*.'"  *Brooke Grp.*, 509 U.S. at 224 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

Uber argues that Sidecar's Sherman Act claims are subject to dismissal for failure to allege market power, a dangerous probability of recouping losses due to predatory pricing, or sufficient injury to competition from Uber's alleged tortious interference.  *See* Mot. at 2–15.

### 1.    Market Power

In order to state a claim for monopolization, Sidecar must plausibly allege monopoly power, which "the Supreme Court has defined . . . as the power to 'control prices or exclude competition.'"  *Cost Mgmt. Servs.*, 99 F.3d at 950 (quoting *Grinnell Corp.*, 384 U.S. at 571).  "Whether monopoly power exists depends on a variety of factors," with market share relevant to that analysis but not the only factor; depending on market conditions, courts have found both market power and a lack of market power when a defendant's market share is in the sixty to seventy percent range.  *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir.

United States District Court
Northern District of California

1    1980).  The typical way in which an incomplete monopolist—a defendant with less than full

2    control of the market—can nevertheless exert monopoly power is when that party controls enough

3    of the market that "by restricting its own output, it can restrict marketwide output and, hence,

4    increase marketwide prices."  *Rebel Oil*, 51 F.3d at 1434; *see also Am. Express*, 138 S. Ct. at 2288

5    ("'Market power is the ability to raise price profitably *by restricting output*.'" (quoting a treatise;

6    emphasis added in *Am. Express*)).  "Prices increase marketwide in response to the reduced output

7    because consumers bid more in competing against one another to obtain the smaller quantity

8    available."  *Rebel Oil*, 51 F.3d at 1434.

9          As this Court previously held, Sidecar cannot base its Sherman Act claims on a theory that

10   Uber has market power through a "disciplined oligopoly" with Lyft.  Order re FAC at 12–16.  The

11   Ninth Circuit has held that any anticompetitive effects of oligopolies constitute a "gap in the

12   Sherman Act" that must "slip past its prohibitions" unless Congress alters the scope of the statute.

13   *Rebel Oil*, 51 F.3d at 1443.  Accordingly, Sidecar's allegations that Lyft merely *will* not constrain

14   Uber's ability to reduce market output and collect supracompetitive prices are not sufficient to

15   support cognizable market power.  *See, e.g.*, SAC ¶ 85 (alleging that "financial pressures on Lyft

16   and its status as a public company with a need to recoup its own enormous financial losses, means

17   that Lyft has no incentive to undercut Uber").

18         Unlike Sidecar's previous complaint, however, the second amended complaint now also

19   alleges that "Lyft is *unable* to respond effectively or to increase its own share of rides as a restraint

20   on Uber's pricing," in part due to the network effects of Uber's market dominance.  *Id.* ¶ 12

21   (emphasis added); *see also id.* ¶ 85.  Uber argues that this assertion is implausible because

22   network effects serve as a barrier to entry, not expansion, and that network effects in fact "operate

23   *by definition* to *reward* output expansion by incumbents."  Reply at 9.  While Uber is correct that

24   the alleged network effects reward increasing output *if a ride-hailing company is able to*, the same

25   effects could also prevent a smaller competitor from doing so, in much the same way as they

26   would prevent a new entrant from gaining a foothold.  As an example, Sidecar alleges that Uber's

27   campaign of hailing and canceling rides on Sidecar caused both drivers and passengers to become

28   frustrated with the platform due to its reduced efficiency, resulting in downward spiral of

12

decreasing efficiency as Sidecar had fewer drivers and passengers available to match with each other.  *See* SAC ¶¶ 14, 118; *cf. Am. Express*, 138 S. Ct. at 2287 ("A credit-card company that processed transactions for merchants, but that had no cardholders willing to use its card, could not compete with Amex.").  Although Sidecar was at the time an established ride-hailing company, it lacked the ability to increase output to counteract that decline; to the contrary, network effects rendered its relatively small user base compared to Uber a competitive disadvantage.  Similarly, in geographic markets where Lyft has a smaller market share than Uber—as Sidecar alleges is the case in all of the markets at issue here—Lyft would be expected to offer a less efficient matches between drivers and passengers than Uber, and some portion of drivers and passengers might not view Lyft as an acceptable substitute for Uber.  Thus, with a sufficient disparity of market share, network effects could—as Sidecar alleges—prevent rather than enable Lyft increasing its output to counteract a reduction by Uber.[5]

As a practical matter, Sidecar is of course more likely to succeed in proving such market power where the gap between Uber and Lyft's market share is large in cities like New York, where Uber allegedly controls at least 75% of the ride-hailing market and Lyft therefore controls no more than 25%, *see* SAC ¶ 88(f), than in cities where it Lyft is more competitive like San Francisco, where Sidecar alleges only a 60% market share for Uber and Lyft presumably controls the remaining 40%, *see id.* ¶ 88(a).  On the pleadings, however, the Court has no basis to draw a line for what degree of disparity is necessary to state a plausible claim.  So long as Uber does not restrict its output below Lyft's, it is plausible that network effects might prevent Lyft from overtaking Uber and claiming for itself a relative advantage from those effects, or from otherwise increasing its own output sufficiently to maintain overall market output and prices at a competitive equilibrium.  Whether that dynamic in fact describes any of the geographic markets at issue is a

---

[5] Uber's argument that no ride-sharing company could curtail market output because such companies do not control "the underlying productive assets in the business"—drivers and cars—wholly neglects the barriers to entry and expansion allegedly caused by network effects.  *See* Mot. at 7–8 (citing *Rebel Oil*, 51 F.3d at 1442, and *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989), neither of which involved two-sided markets with significant network effects).  Whether Uber "employs drivers or provides transportation," as it argues here that it does not, *id.* at 8, is an issue hotly litigated in other cases that this Court has no occasion to address on the present motion.

fact question to be resolved at a later stage of the case, with the benefit of evidence.

Along the same lines, Uber's argument that the prospect of reducing its own benefit from network effects would dissuade it from reducing output, *see* Mot. at 6, Reply at 9, is a factor that must be balanced on the merits, *see Am. Express*, 138 S. Ct. at 2280–81 & n.1, but no more precludes a theory of monopolization than any other monopolist's loss in volume of sales prevents it from benefiting, on balance, from a supracompetitive price in an artificially restricted market. So long as Uber is able to maintain a higher market share than its only remaining competitor, network effects will redound to its relative advantage. The effect of a potential reduction in the degree of that advantage is not amenable to resolution on the pleadings.

Uber argues that Sidecar's claim must be dismissed for failure to address sufficiently both "sides" of the two-sided market for ride-hailing, as required by *American Express*. Mot. at 6–7. That case was decided after a lengthy trial, not on the pleadings, and certainly did not hold that market power cannot be established in a two-sided market. *See Am. Express*, 138 S. Ct. at 2283, 2287. The *American Express* Court instead held only that the government plaintiffs failed to prove such power and anticompetitive effect where they addressed only the interaction between credit card companies and merchants, and not the interaction between credit card companies and cardholders. *See id.* at 2285–87. Unlike in that case, where the "plaintiffs stake[d] their *entire* case on proving that Amex's agreements increase merchant fees," *id.* at 2287 (emphasis added), Sidecar alleges that Uber has increased the commissions it withholds from driver compensation in some of the markets at issue, SAC ¶¶ 106–07, and more generally that "Uber intends to extract supra-competitive profits by reducing the payments it makes to drivers," *id.* ¶ 105.[6] Uber

---

[6] Sidecar does not specifically allege, word for word, that Uber can restrict market output by restricting its own output. At the hearing, Sidecar's counsel argued that a news article cited in the complaint describes a reduction of output in Chicago, but the article in fact describes only a reduction in the percentage of all ride-hailing rides that are shared rides, which is merely a distinction of types of rides within the relevant market alleged here. *See* Tina Bellon (Reuters), *A New Chicago Ride-Hailing Law Reveals for the First Time What Uber and Lyft Really Charge*, Business Insider, Nov. 26, 2019, https://www.businessinsider.com/ubers-carpool-pricing-strategy-revealed-by-chicago-fare-data-2019-11; SAC ¶ 108 n.2 (citing that article). Even so, it is reasonable to infer from Sidecar's allegations that Uber can raise both passenger fares and driver commissions, and that Lyft cannot respond effectively by increasing its market share, that some reduction in market output would result from that unanswered increase in price. *See Parks Sch. of Bus.*, 51 F.3d at 1484 (requiring courts reviewing a plaintiffs allegations under Rule 12(b)(6) to

United States District Court
Northern District of California

United States District Court
Northern District of California

1    addresses those allegations only in a footnote, arguing that they are insufficient because Sidecar

2    has alleged that passenger price discrimination is Uber's "primary" means of extracting

3    supracompetitive profits and that the majority of passengers' fares are remitted to drivers.  Reply

4    at 3 n.2.  The fact remains that Sidecar has addressed both sides of the market, as opposed to "only

5    one side of the platform in isolation," *cf. Am. Express*, 138 S. Ct. at 2287, and has plausibly

6    suggested a mechanism—the same network effects addressed in *American Express*—by which

7    Uber can leverage its dominant market share to raise both passenger fares and commissions

8    withheld from drivers without a rival increasing output to restore competitive equilibrium.  The

9    fact that drivers would also benefit from increased passenger fares, at least absent further increases

10   in Uber's commissions, does not render fare increases inherently procompetitive, but instead

11   presents a fact-intensive issue to be resolved on an evidentiary record.

12          Uber suggests in a footnote of its motion, and argued at the hearing, that the CPUC's

13   regulatory authority over ride-hailing prices precludes a finding of market power.  *See* Mot. at 4

14   n.3 (citing *Metro Mobile CTS, Inc. v. NewVector Commc'ns, Inc.*, 892 F.2d 62, 63 (9th Cir.

15   1989)).  Unlike California's Unfair Practices Act, the Sherman Act contains no express exception

16   for industries that fall within the CPUC's rate-setting authority.  *Cf.* Order re FAC at 18–21

17   (dismissing Sidecar's claim under the Unfair Practices Act).  Because the CPUC has not exercised

18   that authority, this case does not fall within the "filed rate doctrine," which exempts rates set

19   pursuant to regulation from antitrust scrutiny.  *Cf. Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 870

20   (9th Cir. 2013) (holding the doctrine applicable where "Congress has given the USDA authority to

21   set rates under 7 U.S.C. § 608c(5) and the USDA *has exercised* that authority" (emphasis added)).

22   Nor is this case analogous to *Metro Mobile*, where the Ninth Circuit affirmed summary judgment

23   (rather than dismissal on the pleadings) based in part on the fact that the market at issue was

24   "heavily regulated," including "price regulation" that "constrained" the defendant's ability to

25   control prices.  *See* 892 F.2d at 63.  Here, the possibility of regulation by the CPUC is speculative.

26   Moreover, even if the CPUC's mere jurisdiction to regulate prices were sufficient to preclude

27

28   "construe them in the light most favorable to the non-moving party").

1    showing market power—which it is not—Uber has not suggested that the CPUC has such

2    jurisdiction with respect to most of the geographic markets at issue, which are outside of

3    California.

4         At this stage, the Court finds Sidecar's allegations of market power to be sufficiently

5    plausible to avoid dismissal.  The Court need not reach the parties' arguments regarding price

6    discrimination, including whether allegations of price discrimination can in themselves support a

7    plausible inference of market power.  The Court notes, however, that if the "'reason price

8    discrimination implies market power is that assuming the lower of the discriminatory prices covers

9    cost, the higher must exceed cost,'" Opp'n at 4 (quoting *In re Brand Name Prescription Drugs*

10   *Antitrust Litig.,* 186 F.3d 781, 783 (7th Cir. 1999)), it is not clear that such an assumption would

11   hold true in a market where below-cost pricing has been employed since the birth of the industry.

12   *See* SAC ¶ 2 (alleging that Uber "has pursued since its inception [a strategy] of predatorily pricing

13   below its costs").  The Court also notes that while Sidecar's allegations regarding Uber's more

14   recent "dynamic pricing" based on passengers' individual price sensitivity generally resembles a

15   traditional model of price discrimination that might implicate antitrust concerns, *see* SAC ¶ 85, its

16   earlier use of "surge pricing" could arguably be considered no more than a competitive response to

17   increased market demand, *see id.* ¶ 84.

18                    **2.      Probability of Recoupment**

19        Uber's arguments that Sidecar has not sufficiently alleged a dangerous probability of

20   recoupment, as required by the Supreme Court's decision in *Matsushita*, boils down to the same

21   issues—because, in Uber's view, Sidecar has alleged market power only through a "disciplined

22   oligopoly" with Lyft, Uber contends that any risk of recoupment is not cognizable in light of *Rebel*

23   *Oil* and this Court's previous order.  *See* Mot. at 10–12; Reply at 10–11.  As discussed above, the

24   Court concludes that Sidecar has plausibly alleged that Uber could unilaterally raise the "price"

25   that it keeps for itself from ride-hailing transactions to supracompetitive levels—through fare

26   increases not fully passed on to drivers, commission increases reducing drivers' pay not offset by

27   discounts for passengers, or a combination of two—while insulated by network effects from Lyft

28   or a new market entrant usurping Uber's market share.  In addition to showing market power, that

United States District Court
Northern District of California

provides a plausible means for Uber to recoup its losses from alleged predatory pricing.  The fact that Sidecar still also alleges that Lyft has no incentive to compete on price against Uber does not negate Sidecar's new allegations that Lyft could not do so even if it wanted to.  *See, e.g.*, SAC ¶¶ 12, 85, 90, 92.

### 3.    Tortious Interference

While the antitrust laws "do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce,'" *Brooke Grp.*, 509 U.S. at 225 (quoting *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945)), "'[a]nticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties," *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998).  Sidecar seeks to base its Sherman Act claims in part on Uber's alleged campaigns to disrupt rivals (including Sidecar) by submitting requests for rides through rivals' platforms and either canceling the requests before the drivers arrived—frustrating drivers and wasting their time, and causing delays for real passengers waiting to be matched with drivers—or having Uber representatives actually ride with rival ride-hailing companies' drivers and attempt to convince them to drive exclusively for Uber.  SAC ¶¶ 13, 114–22.

Uber contends that Sidecar "must overcome a presumption that such alleged [tortious] conduct has a *de minimis* effect on competition," Mot. at 13, but the case that it cites for that standard describes it as applicable specifically to claims based on "false and misleading advertising," *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997), and the Second Circuit case on which the Ninth Circuit in turn relied cites reasons specific to false advertising claims, such as the "'prevalence of arguably improper utterance,'" *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988) (quoting a leading antitrust treatise).  Uber cites no case applying this presumption of de minimis effect outside of the context of false advertising, much less at the pleading stage.

While Sidecar must of course show injury to competition and not just to itself, its

United States District Court
Northern District of California

allegations that the campaigns continued from mid-2014 through Sidecar exiting the market in 2015, that Uber conducted the campaigns specifically to harm its only two significant competitors, that both drivers and passengers were harmed by Uber's "fraudulent" ride requests, that network effects amplified the harm to Sidecar and caused a "downward spiral" ending with one of only three participants exiting the market, and that Uber used those campaigns to obtain and consolidate monopoly power are sufficient at the pleading stage—in conjunction with the allegations of market power discussed above—to plausibly allege harm to competition. *See* SAC ¶¶ 114–22. The Court declines to resolve Uber's argument that the requests through which it sought to recruit competitors' drivers are "'redeemed by a legitimate business purpose,'" *see* Reply at 13 (quoting *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990)), because Uber offers no legitimate purposed for the requests it allegedly canceled before drivers arrived. *See* SAC ¶ 13 (alleging that Uber "inundate[ed] competitors with fraudulent ride requests that were cancelled before the driver arrived"); *id.* ¶ 116 (alleging that "[d]rivers were sent on a wild goose chase").

\* \* \*

For the reasons discussed above, Uber's motion to dismiss is DENIED as to Sidecar's Sherman Act claims for monopolization and attempted monopolization, with respect to both Sidecar's theory of predatory pricing and its theory of tortious interference.

### C.   Unfair Practices Act Claim

Uber asks the Court to strike Sidecar's complaint under the Unfair Practices Act, which the Court previously dismissed with prejudice. Although the Court understands that Sidecar realleged that claim solely to preserve its right to appeal its dismissal, the Ninth Circuit no longer requires a plaintiff to do so. *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal."); *see also* Opp'n at 16 (acknowledging that decision). As discussed in *Lacey*, repleading claims previously dismissed with prejudice causes confusion and inefficiency, with no practical benefit. Uber's motion to strike the Unfair Practices Act claim is GRANTED, and Uber need not respond to paragraphs 169

through 175 of the second amended complaint.

**IV.      CONCLUSION**

For the reasons discussed above, Uber's motion to dismiss is DENIED, except as to the previously-dismissed Unfair Practices Act claim, which is STRICKEN from the second amended complaint.

**IT IS SO ORDERED.**

Dated: May 1, 2020

_____

JOSEPH C. SPERO
Chief Magistrate Judge