SUMMARY OF DISCOVERY DISPUTES

**Custodians**

**SCI's Position:** Uber has failed to tender a sufficient custodian list for ESI searches. Despite SCI's repeated requests, Uber has refused to provide basic information concerning custodians, hit counts or other details to support any claim of burden or disproportionality. Uber's unsubstantiated assertions that it has agreed to a "massive" production, consisting of "millions of pages," and "terabytes" of data, do not satisfy its obligation to provide specific facts demonstrating the nature and extent of any claimed burden. See Nelson v. Capital One Bank, No. C-01-0079 PJH (EMC), 2001 U.S. Dist. LEXIS 23141, at *9 (N.D. Cal. Dec. 17, 2001) ("The responding party must explain with specificity the nature and extent of the burden imposed by each discovery request to which it is objecting.").

A list of the custodians to which Uber has agreed is attached as Exhibit C. Of these, only Travis Kalanick, Uber's former CEO, and Rachel Holt, Uber's then-general manager for its east coast operation, served in Uber's upper management between 2012-2015 when Sidecar operated. The majority served in their current role for two years or less, and not when Sidecar was in business. Uber has refused to identify those persons who had the responsibilities of its proposed custodians when Sidecar was in business, claiming that it would be too burdensome because it does not maintain "traditional" organizational charts. But Uber is obligated to identify custodians likely to have responsive documents, regardless of how it tracks its hierarchy.

Uber has rejected six proposed custodians without providing hit counts as to any of them. Four (Mat Henley, Nicholas Gicinto, Edward Russo, and Jacob Nocon) have, according to public reports, first-hand knowledge of "potentially criminal initiatives against competitors," anticompetitive conduct relevant whether during or after Sidecar's demise. https://www.ndtv.com/world-news/in-uber-troubling-practices-exist-allege-mat-henley-nicholas-gicinto-edward-russo-jacob-nocon-4-form-1957453. Uber's argument that these custodians were not with Uber when Sidecar was in business is entirely inconsistent with its position with respect to the majority of custodians it proposes who fall into the same category. The other two custodians (Jonathan Hall and John List) were Uber's co-Chief Economists during Sidecar's operations and beyond. https://qz.com/1367800/ubernomics-is-ubers-semi-secret-internal-economics-department/. Uber does not contend that its in-house economic group did not review and analyze issues relating to Uber's business and competition. Instead it speculates that such analyses "will almost certainly" be captured in its custodians' documents. There is every reason to believe that Uber's in-house economics team would have important documents for this case. SCI requests an order requiring Uber to include each of these additional six custodians.

**Uber's Position:** SCI, before ever laying eyes on Uber's documents, ignores the extensive discovery that Uber has agreed to collect: terabytes of email and shared network files for 9 custodians, amounting to millions of pages of documents, plus transactional, trip-by-trip pricing data for billions of Uber rides taken in the geographic markets alleged during the relevant period.[1]

SCI downplays the caliber of the agreed-upon, nine-member custodian list, which includes executives well-known for hands-on leadership. Uber's former CEO, Travis Kalanick, did not merely "serve in upper management," but co-founded Uber and was comprehensively involved in

---

[1] Uber recognizes the significance of hit counts, and has shared certain approximate figures with SCI where proportionality is an issue—orally and in writing—with as much specificity as possible bearing in mind that search terms have remained in flux and that each new run requires additional, manual collection and review.

SUMMARY OF DISCOVERY DISPUTES

all aspects of its business, including while Sidecar operated. Producing Mr. Kalanick's ESI alone is a massive undertaking—the number of documents hitting on search terms proposed by either party more than doubled when he was added as a custodian. Moreover, Uber's 8 additional custodians include key operational employees with decision-making responsibilities regarding strategy and pricing. For example, Ms. Holt was responsible for launching, building, and running Uber's east coast operation and ultimately led the U.S. and Canada team. Mr. Maredia, who served as a lieutenant to Ms. Holt and whose tenure spans nearly 7 years of the relevant period, is far more likely to possess relevant pricing documents than any of SCI's proposed custodians.[2]

No reason exists to add these 6 custodians. Focused on quantity over quality, SCI seeks to add 4 custodians who it now says (based on rumors in the press) have information about "potentially criminal initiatives against competitors." But in meeting and conferring, SCI has consistently argued that these custodians "go to the heart" of its tortious interference claim, which relates to alleged "fraudulent ride requests" occurring from "mid-2014" through "the time Sidecar wound down its operations" in December 2015. ECF 73 ¶¶ 13, 113-14, 123. Three of the four custodians, however, joined Uber only *after* Sidecar went out of business in 2015 (and the fourth, Mr. Henley, joined in the summer of 2015). And any such conduct would be captured by the custodians already offered by Uber directed specifically to these tortious interference allegations. As for the two research economists (Dr. Hall and Dr. List), the media report that SCI cites shows that their "think tank" work ("gathering facts from quants and data scientists and synthesizing them to arm the lobbyists and policy folks who fight some of Uber's biggest battles") has no connection to alleged anticompetitive conduct or strategic pricing decisions. To the extent any economic analyses resulted in relevant business decisions, they will almost certainly be captured in the documents of Uber's executive and operational custodians.

### Date Ranges

**SCI's Position:** Only *after* the final meet-and-confer did Uber agree as to a host of Requests to produce documents through the present, April 30, 2020. (To the extent that Uber contends that April 30, 2020 is an appropriate cutoff, as opposed to a proxy for the present, it has offered no reason to support such an arbitrary date.) A number of issues remain. First, Uber has not agreed, as it is required, to supplement its production of these documents (*e.g.*, strategic plans and data (No. 4), financial statements (No. 5), and competition, market share, driver incentives and earnings (Nos. 3, 24, 32)), through the close of discovery. Fed. R. Civ. Proc. 26(e)(2). Second, Uber still imposes an end-date of September 9, 2019 for documents concerning driver incentives and bookings (No. 32) and an even earlier end-date—December 31, 2015 when Sidecar ceased operations—with respect to pricing strategies for riders (No. 22). There is no basis for this arbitrary discovery line-drawing where, as here, Uber's market power and recoupment of monopoly prices are contested. Finally, SCI has requested all documents related to Projects SLOG and Hell (Nos. 19, 20) and, more generally, to ride requests or cancellations submitted to other Ride-Hailing Apps (No. 31). Uber has limited its response to the dates SCI alleged in its Amended Pleading that these Projects commenced (July 1, 2014) through the date of Sidecar's demise (December 31, 2015). Uber, not SCI, knows the details of these clandestine Projects. These documents should be produced without a temporal limitation based upon information SCI has

---

[2] Uber has not "refused to identify" certain employees. Uber, like many tech companies, does not maintain "traditional" org charts, but has undertaken to reconstruct reasonably available employment information for SCI. SCI disregards, *first*, the fluidity of titles and responsibilities at Uber during a period of high growth, and *second*, the departures of many Uber employees during the years-long delay in filing this case.

managed to unearth in the public domain. At a minimum, Uber should be required to search for and produce documents germane to the "Hell" and "SLOG" campaigns that pre-date and post-date the alleged dates of these campaigns by six months.

**Uber's Position:** Uber will provide document discovery for the period from January 1, 2012 through April 30, 2020—a more than eight year period, including 16 months after the filing of the case—for the requests at issue save for Nos. 1, 19-20, 22, 33.[3] Using a reasonable end-date for document productions (as opposed to an open-ended "to the present" approach) is fully appropriate, *see Lauris v. Novartis AG*, 2016 WL 7178602, at *5 (E.D. Cal. Dec. 8, 2016), and coexists with the obligation to "supplement" discovery where any party "learns that in some material respect [a prior] disclosure or response is incomplete or incorrect" or when "ordered by the court." Fed. R. Civ. Proc. 26(e)(2).

### Search Terms

**SCI's Position:** A list of the search terms to which the parties have agreed is attached as Exhibit D. A list of those terms Uber rejected or sought to modify in ways unacceptable to SCI is attached as Exhibit E. As noted above, Uber steadfastly has refused to provide hit counts for nearly all of the terms proposed by SCI and nearly all of Uber's counterproposals. Uber complains about producing documents that hit on the keyword Lyft, but it does not explain how Uber's discussions of its competitor—who it apparently is basing its core claims and defenses upon—are not relevant to this case. Given its multi-faceted importance to the case (also discussed below), Uber documents referencing competitors are indeed key discovery. A detailed discussion of the specific search term disputes is beyond the scope of a 5-page joint letter that includes multiple other issues. SCI is prepared to address search term issues in more detail as the Court may direct, at a hearing and/or in a supplemental letter. To highlight some of the issues involved:

- Uber has rejected the term "COIN"—the acronym for Uber's Competitive Intelligence Group (https://gizmodo.com/ubers-massive-scraping-program-collected-data-about-com-1820887947)—and terms used to describe anticompetitive conduct or its impacts, such as such as "squeeze*", "strangl*", "hemorrhage*" and "punish*" because "they do not appear in SCI's complaint and have no relationship to the specific claims in SCI's complaint." Search terms, of course, are not limited to the text of the complaint. Nor has Uber provided any hit counts to suggest that reviewing terms that reasonably would be used to describe its strategy to squeeze out rivals, cause them to hemorrhage cash, strangle their ability to compete, and punish them would create undue burden.

- Uber refuses to run the names of its competitors, *e.g.*, Lyft, except in conjunction with limiting terms, despite making it clear it intends to rely upon Lyft extensively to defend against SCI's claims. All of Uber's internal discussions, analyses, and interactions concerning competitors such as Lyft are potentially relevant to SCI's claims, and Uber has not cited any non-relevant classes of hits that would be generated by running competitor names without limiting terms. Indeed, they should be run even if they generate substantial hit counts. This is key discovery in the case.

---

[3] Uber has agreed to a time frame for Nos. 19-20 & 31 (related to alleged tortious interference) up to Sidecar's December 2015 exit, after which Uber could not have interfered with Sidecar's business. Nos. 1, 22, and 33 also warrant specific, more limited date ranges, as explained to SCI in a letter dated April 3, 2020. With respect to No. 22 (pricing strategies for riders), Uber's position is that *actual* transactional data through April 30, 2020—including the prices charged for each of the billions of individual rides—will give SCI full information on Uber's pricing strategies.

SUMMARY OF DISCOVERY DISPUTES

- For many searches, Uber has insisted upon unreasonably compressed connectors that will result in the exclusion of potentially relevant documents. Thus, for example, for the search term "pric* within 25 of (cost* or complain* or rais* OR reduc*), Uber has demanded of connector of only "within 3." Requiring these terms to be within 3 of "price" would, for example, exclude documents containing such relevant (hypothetical) analyses as "Complaints from the Los Angeles market about pricing" assuming they contained no other responsive terms.

- Uber has rejected the terms "Global Intelligence" (another Uber internal group that conducted data scraping and monitoring of competitors) and "category position" (Uber's internal code name for "market share") without providing any reason, only conclusory assertions.

**Uber's Position:** Across ten meet-and-confer sessions,[4] Uber has repeatedly engaged with SCI regarding appropriate search terms. SCI focuses here on the terms that Uber has revised or rejected but ignores the 40 search terms, resulting in millions of pages of documents, that Uber has *already* agreed to. (Ex. D). On April 16, Uber sent SCI a comprehensive counterproposal (*see* Ex. F), including numerous concessions and proposed revised terms that incorporated many of SCI's (then) 31 "disputed" terms. SCI failed to provide any response for over a month and recently added another two *new* search terms ("global intelligence" and "category position"). With respect to those new terms, "global intelligence" (like "COIN") is a sideshow effort based on rumors SCI has not connected to Sidecar or alleged predatory pricing, and "category position" is almost certainly overbroad without a limitation to a "category." Nor has SCI made any showing that its ever-expanding requests are proportional to the needs of the case. As noted above, Uber has made efforts to provide information on rolling hit counts, but testing new search terms requires time and consumes significant resources. SCI's asymmetrical demands ignore Uber's good faith efforts to reach a negotiated agreement, pushing beyond what is reasonable.

As for search terms specifically raised by SCI: **First**, certain terms are overbroad because they have not been tailored to SCI's allegations and yield a vastly disproportionate number of documents. SCI's demand that Uber review every document that hits on the standalone name of six competitors is unreasonably overbroad (e.g., "Lyft," yields nearly 100,000 emails for Uber's nine custodians). Uber does not dispute the relevance of competition by Lyft or other competitors, but the mere appearance of a competitor's name in a document (e.g., a press clipping) does not evidence an antitrust violation, and SCI has not sought to tie these names through *any* limiters to *any* conduct or context. By contrast, Uber's list of revised terms (*see* Ex. F) proposes search strings that are tailored to SCI's allegations. **Second**, SCI has arbitrarily proposed expanding the limiters for a number of search terms, such as changing pric* *within 3* of (cost* or complain* or rais* OR reduc*) to "*within 25*," without adequately explaining why such a major expansion is warranted, leading to inflated hit counts and undue review burden.[5] The reason to have keywords appear in close proximity is not to artificially cabin the searches but to prevent Uber (and SCI) from having to scour excessive numbers of irrelevant documents. **Finally**, several standalone terms are wholly speculative and unconnected to Sidecar (*e.g.*, squeeze*, strangl*, hemorrhage* and punish*).

---

[4] The Parties are separately meeting and conferring regarding the discovery Uber has propounded to SCI.

[5] SCI's own example proves this point: if a document with the heading "Complaints from the Los Angeles market about pricing" contains "no other responsive terms"—*i.e.*, does not contain "price" within a few words of "cost" or any variant of "complain" or "raise" or "reduce" and further excludes *any* of the 16 agreed terms that includes "market"—then it is highly unlikely to be relevant to a predatory pricing case.

SUMMARY OF DISCOVERY DISPUTES

SCI's expansive, premature search term demands should be put on hold until it begins reviewing the trove of documents already offered by Uber. In sum, Uber's proposed terms (*see* Ex. F) should be adopted, or SCI should be required to provide a good faith counterproposal that does not simply ignore Uber's attempts to reach agreement.

### Other Litigation Documents

**SCI's Position:** SCI seeks non-public filings, deposition transcripts, and expert reports in three litigations that involve related antitrust and/or unfair competition claims against Uber (No. 21). Uber has agreed to produce deposition transcripts and accompanying exhibits of its own witnesses. Uber refuses to produce anything else. SCI asks that the Court order Uber to produce all non-public filings, deposition transcripts (including exhibits), and expert reports in these matters. They are potentially relevant to the competition issues here, and there is no meaningful burden to their production. To the extent that there are confidentiality orders governing the disclosure and use of materials in other litigations, SCI, as it has repeatedly advised Uber, stands ready to work with Uber to address those orders.

**Uber's Position:** Uber has already agreed to produce deposition transcripts for its own witnesses (and accompanying exhibits) from the above-mentioned litigations, including expert depositions and appended reports. However, in all cases Uber must comply with binding protective orders and agreements pursuant to which non-Uber parties may object to the production of their confidential information after receiving notice (which Uber is in process of providing). Uber is thus not free to produce the non-public documents or information of the latter parties (including when cited or incorporated in non-public filings by Uber). SCI has substantiated no need for further materials from these cases, especially since the *Meyer* litigation and arbitration involved a Section 1 claim challenging Uber's business model as *price fixing* that yielded *above-competitive* prices, not (as SCI alleges) below-cost predatory prices, and *Anoush* related to Uber's alleged violation of local ordinances.

### Documents Provided to Regulators

**SCI's Position:** Uber refuses to produce non-public documents provided to regulators concerning competition and pricing for its Ride Hailing App (No. 23). It does not assert that submissions to regulatory agencies regarding competition and pricing are privileged, irrelevant or not proportional. Instead, it contends that the SCI has failed to further identify the specific U.S. agencies involved or to exempt public filings. But only Uber knows the regulatory agencies to which it made submissions; and the burden to Uber of locating and producing these documents is *de minimis*. SCI asks the Court to order Uber to produce all documents submitted to U.S. regulatory agencies concerning competition and pricing.

**Uber's Position**: With respect to SCI's request for regulatory filings, SCI has refused to indicate any reasonable limitation on its request or even identify any specific agencies (other than *any* agency in the United States). Due to its highly localized business, Uber operates under the auspices of a very large number of state and local authorities. The burden of determining to which agencies Uber has made submissions, much less whether they relate to "competition" and "pricing," is far from *de minimis*. SCI asserts that Uber is obligated to produce both non-public and public documents but has not provided even a single example of any public regulatory filing (which are equally available to SCI) that bear on the allegations in this case to justify its request and the associated burden. The request is unreasonably unbounded.