Lewis T. LeClair (SBN 77036)
lleclair@mckoolsmith.com
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone:     (214) 978-4000
Facsimile:     (214) 978-4044

Kirk D. Dillman (SBN 110486)
kdillman@mckoolsmithhennigan.com
MCKOOL SMITH HENNIGAN, P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:     (213) 694-1200
Facsimile:     (213) 694-1234

John C. Briody (pro hac vice)
jbriody@mckoolsmith.com
MCKOOL SMITH, P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001-8603
Telephone:     (212) 402-9438

Judith A. Zahid (SBN 215418)
jzahid@zelle.com
ZELLE LLP
44 Montgomery Street, Suite 3400
San Francisco, California 94104
Telephone:     (415) 693-0700

Attorneys for Plaintiff, SC Innovations, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| SC INNOVATIONS, INC.,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>UBER TECHNOLOGIES, INC., RASIER, LLC, RASIER-CA, LLC, RASIER-PA, LLC, RASIER-DC, LLC, RASIER-NY, LLC, AND UBER USA, LLC,<br><br>　　　　Defendants. | CASE NO. 3:18-cv-07440-JCS<br><br>**UPDATED JOINT CASE MANAGEMENT STATEMENT AND [PROPOSED] ORDER**<br><br>Hearing Date: October 23, 2020<br>Time:　　　　2:00 p.m.<br>Location:　　Video |

Pursuant to Civil Local Rule 16-9, Plaintiff SC Innovations, Inc., ("SCI") and Defendants Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC, Rasier-PA, LLC, Rasier-DC, LLC, Rasier-NY, LLC, and Uber USA, LLC (collectively, "Uber") respectfully submit this Updated Joint Case Management Statement setting forth only changes in information from the Joint Case Management Statement submitted on January 10, 2020 [ECF 69], April 17, 2020 [ECF 82], and July 24, 2020 [ECF 104]. For ease of reference, the parties have kept the same numbering as set forth in the Standing Order for All Judges of the Northern District of California – Contents of Joint Case Management Statement.

**4. Motions**

The parties agree that it is too early to determine whether and what motions they may file in the case.

**5. Amendment of Pleadings**

The parties do not currently intend to amend the pleadings.

**7. Disclosures**

The parties exchanged initial disclosures on July 31, 2020.

**8. Discovery**

Document production is underway. SCI has produced 965,846 documents and substantially completed its document production. SCI also has produced all of its transaction data. Uber has made several rolling document productions, totaling 27,559 documents, and continues to review and produce additional material. Uber has not yet produced any transaction data but anticipates producing per-trip transactional data by the date of the Case Management Conference on October 23, 2020.

The parties have differing views on the pace of document production, in particular with respect to Uber's production of transaction data. The parties also have differing views concerning SCI's requests for additional information in connection with Uber's transaction data disclosure. Finally, the parties disagree with respect to the scope of the Court's permitted discovery for SCI's request for regulatory submissions. These issues, and the parties' respective positions concerning them, are set forth below.

The parties are discussing deposition scheduling.  SCI believes that additional depositions and perhaps additional interrogatories may be necessary beyond the limits set in the Federal Rules of Civil Procedure.  The parties will confer about those limitations and will seek relief as necessary.

### A. Transaction Data

**Plaintiff's Position**:

As of the date of this submission, Uber has not yet produced any transaction data—which is key discovery in a predation case.  Notably, producing transaction data does not implicate the ESI search and review concerns that led this Court to issue its rolling production order and set a final production deadline of December 15, 2020.  Generating transaction data requires crafting queries to extract data in certain fields from a database or databases.  Collection and production would require the same amount of work, whether fifty rows or two billion rows are extracted.  There is no justification for Uber's delay and failure to produce any transaction data to date.

Although previously stating that it expected to produce transaction in late October, on the literal eve of the submission of this status report, Uber confirmed for the first time that it would be producing per-trip transaction data some time before the October 23 conference.[1]  SCI eagerly awaits that production.  It remained unclear, however, if that production would complete Uber's initial production of promised transactional data.  Uber clarified for the first time at 6:30 PM on the day this submission is due that it "anticipates being able to produce "additional data not stored on a per trip basis by the end of October."  Accordingly, subject to receipt of Uber's production, at the October 23 Conference, SCI expects to respectfully request that the Court order Uber to indeed complete its initial production of transaction data by October 31.

---

[1] SCI notes that this is not the first time (or as set forth below, the only issue) that the parties have engaged in months-long discussions and negotiations on, and Uber has changed its position or only made a disclosure shortly before a conference before the Court, or in connection with the exchanged drafts of this joint status report.  For example, before October 14, 2020, Uber had produced only 3,016 documents.  Two days before the deadline to submit this Case Management Statement, Uber produced an additional 24,543 documents.  While SCI is pleased to receive these documents, Uber should have produced them (and many more) long ago regardless of any impending conference before the Court.

To be clear, even assuming Uber makes its production of per-trip transactional data as promised ahead of the October 23 conference, there remain outstanding data that Uber will not have produced in advance of the conference. For example, during the parties' dialogue concerning transaction data, Uber has referenced a need to also produce (i) bulk incentive data for drivers (promised on July 28, 2020), (ii) aggregate adjustment data (concerning, per Uber, credits and adjustments for riders or garnishments or appeasements for drivers), (iii) variable service fee data (concerning Uber commissions), and (iv) "shapefile data" (concerning the geographic location of trips). Until 6:30 PM on the date of this submission, it was unclear if this information would be produced by the October 23 Conference. Now it is clear that it will not be produced and the best Uber can say is that it "anticipates being able to produced [it] by the end of October."

To put this issue in context, SCI needs Uber's transaction data urgently so that its experts can assess the sufficiency of the data, understand the sources used to create it, and determine what additional data, if any, is needed. In that regard, the parties' history of discussions concerning transaction data merits attention. In order to move matters along, SCI agreed that Uber could select the data fields Uber believed aligned with SCI's data requests, produce them, and then the parties could assess whether and what, if any, additional data was necessary/SCI believed ought to be produced. As part of that process, Uber initially identified the data fields (but did not produce them) to SCI, and permitted SCI to comment and inquire about the data Uber proposed to provide. The objective was to identify up front glaring holes, and SCI's operating premise and understanding all along has been that, given the disparity in knowledge concerning what data Uber keeps and where, the parties should start with an initial set of data and then reevaluate. The parties' dialogue led to Uber needing "to add numerous data fields in response to [SCI's] comments," even though Uber had identified its initial proposed set of fields as "a list of data fields and descriptions in response to SCI's discovery requests regarding transactional data." SCI expected that, at least the initial set of the data Uber proposed to produce would be produced long ago—by September 15 at the latest—and the parties could then discuss what information may be missing. That did not happen.

Uber's failure to make any data production until an unidentified date just prior to the October 23 Conference is unacceptable. Uber proposed its initial set of data fields approximately 6 months ago. It does not take 6 months to write a query to extract data, and modifying it to include additional fields or information should similarly not be a multi-month process. Uber has cited the size of its database as a basis for its delay, but, as set forth above, if (as Uber has said) the data is housed in a database or databases, pulling the set of responsive data should, for the most part, be a matter of crafting a discrete program to extract it.

Uber's refusal to provide SCI information concerning the nature and scope of data fields and databases that Uber has not proposed to initially produce amplifies the need for prompt transaction data production. During meet and confer discussions, Uber has refused to provide SCI basic information, such as a data dictionary or list of all of the fields contained in Uber's transaction data system (*i.e.*, the system or systems that Uber is accessing to create the transaction data it plans on producing). Uber has also refused to identify (apart from the fields it agrees to produce) any additional data fields, or databases that are responsive to any of SCI's document requests.[2]

Uber has labeled SCI's good faith requests concerning the nature of Uber's data fields and databases as purportedly impermissible "discovery on discovery," and takes the position that SCI is not entitled to this information because Uber is producing "the transactional data that are responsive to SCI's requests" and is not "withholding, *responsive* transactional data, whether based on burden or any other grounds." But it is unclear what this statement actually means (e.g., is Uber producing all of "the" data that it deems responsive but not similar data from other repositories?). Moreover, as set forth above, there is good reason and need for SCI to understand (and question, if appropriate): (i) what Uber is withholding within the databases where the agreed-

---

[2] Uber's claims about a supposed "double standard" and accusations about the information that SCI has provided concerning its data are an ungrounded misdirection. SCI has produced all of its transaction data so there was no need for any dialogue concerning data being withheld. In addition SCI has stood ready and responded to all of Uber's particularized questions concerning its data and produced data dictionaries to Uber. There is no double standard here, SCI would not need the information it inquired about if Uber produced its transaction data and databases without withholding information contained within them.

upon data fields are located, and (ii) what other, if any, databases contain similar information, but that Uber has determined, based upon an undisclosed rationale, are not responsive. Given that, after preliminary comments to SCI's proposed initial data set, Uber was required to "add numerous data fields," And Uber's assertions concerning the challenges with producing data, it makes sense that Uber would disclose this information to SCI now so the parties can promptly and efficiently address what may be missing. To be clear, SCI is not seeking specific, substantive contents.

Nevertheless, SCI will await Uber's assured productions before pursuing disclosure of this information further with the Court.[3] With Uber's complete transaction data in hand, SCI can at least begin to make progress in determining what additional data, if any, SCI may need. Accordingly, SCI submits to the Court that, pending Uber's forthcoming production, SCI may request at the conference that the Court issue an order directing Uber to do what it "anticipates" being able to do by October 31: complete production of Uber's promised proposed initial set of transaction data, including the already promised data fields and trip data as well as (i) bulk incentive data for drivers; (ii) aggregate adjustment data; (iii) variable service fee data; and (iv) shapefile data.

**Defendants' Position**:

There is no need for an Order requiring production of transactional data. Uber anticipates that it will have produced more than 3 billion rows of per-trip transactional data by the date of the Case Management Conference on October 23, 2020, and certain additional data not stored on a

---

[3] This additional information is not, as Uber contends, impermissible "discovery on discovery." It is part of managing a party's discovery obligations, and good faith discussions concerning the nature and scope of production where there are potentially relevant repositories and sources of data that one party does not intend to produce. *See*, *e.g.*, *Handloser v. HCL Am., Inc.*, No. 19-cv-01242, 2020 U.S. Dist. LEXIS 152304, at *18 (N.D. Cal. Aug. 21, 2020) (recognizing "Rule 34's requirement that a party state with specificity its grounds for objecting to a request and identify any documents withheld based on such objection" (emphasis added)); *cf.* Stip. & Order Regarding Prod. of ESI at 2, Dkt. No. 66 ("If a party objects to producing data based on burden, the objecting party shall identify and describe such data with reasonable particularity, and the parties agree to confer in good faith about whether the burden or expense of the proposed discovery outweighs its likely benefit"). But in any case, given Uber's latest representations concerning its forthcoming production, SCI does not raise this issue now.

per-trip basis by the end of October. This data set will cover billions of ridesharing transactions over 9 years for the 11 geographic markets alleged by SCI.

SCI's assertions regarding the timeliness of Uber's production are misplaced given the scale and complexity of the collection of transactional data reflecting every ride taken in the alleged geographic markets during the course of Uber's history. Moreover, SCI's assertion that Uber has refused to identify "basic information" about its data is misleading and inaccurate. Uber provided SCI with substantial information about its data, how such data is kept and organized, and what portion of that data is responsive to SCI's discovery requests. Now SCI *further* demands that Uber provide information about "all fields contained in Uber's transaction data system," regardless of whether or not such fields to are responsive or potentially relevant to the claims or defenses in this action. Uber has agreed to produce—and by the time of the CMC will have produced—a massive amount of detailed transactional data that will provide SCI with far more information than is required to assess a predatory pricing allegation, which requires (as one threshold test) a comparison of the revenues flowing from defendant's pricing in a given relevant market with incremental or variable costs of producing that output. *See, e.g.*, *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 , 318-319 (2007); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008).

Regarding the timing of the production, Uber has repeatedly emphasized to SCI that the scale and historical nature of SCI's request—one of the largest data collections that Uber has ever conducted—makes this production especially difficult, complex and time-consuming from a technical standpoint. SCI's portrayal of a simple "push a button" collection and production process for a data set of this magnitude is inaccurate and misleading. As Uber has discussed with SCI on several occasions, collecting Uber's transactional data is not a simple task and has taken months to complete—Uber's data engineers wrote new code specifically tailored to collect the vast amount of data requested, and have been required to implement procedures to ensure that Uber is collecting and producing a coherent and quality data set. SCI's suggestion that Uber should have proceeded with a piecemeal collection process or the production of an unspecified "initial set of data" is neither practical nor efficient. Finally, SCI's grievances about the

anticipated date of Uber's production are perplexing because Uber has satisfied its promises. Uber previously indicated that it anticipated producing transactional data by the end of October. Of course, Uber's production of transactional data *prior* to October 23 is consistent with that expectation and does not prejudice SCI—quite the opposite.[4]

Nor is it "unclear what other data will be contained within [Uber's productions]." From the outset, Uber has confirmed that it will produce per-trip transactional data fields relevant to the transactions and issues implicated by SCI's requests and the pleadings in this case, and has identified such fields after extensive discussions with SCI over the last several months. Uber has also informed SCI that it will produce certain additional data—such as bulk incentive data for drivers and aggregate data for credits and adjustments—that are not stored on a per-trip basis, which it anticipates being able to produce by the end of October.[5]

Far from "refus[ing] to provide SCI basic information," Uber has gone to great lengths to respond to SCI's informal questions regarding Uber's data fields. Uber shared its proposed set of data fields with SCI in April of this year and heard nothing until June. SCI then responded with around 10 detailed queries and follow-up queries which Uber worked diligently to answer in July and August. Indeed, information identifying and explaining Uber's responsive data fields, as well as information on how to use the data fields to calculate certain metrics, has already been provided to SCI. But SCI is now requesting even more detailed information and data which go far beyond the "informal discovery" that would customarily be shared as a courtesy. A "data dictionary" or list of "all fields contained in Uber's transaction data system," in addition to being difficult to compile in its own right, goes far beyond what is required or contemplated under the Federal

---

[4] The same holds true with respect to SCI's complaint that Uber produced tens of thousands of custodial documents on October 14, having promised a further rolling production during the week of October 12.

[5] That is considerably more information than SCI has provided about Sidecar's data. Indeed, in light of the passage of time since Sidecar ceased its operations and the subsequent sale to General Motors ("GM"), Uber requested information about Sidecar's data as well as a list of data fields. During a meet and confer on July 8, SCI would only confirm that it intended to produce "a snapshot" of Sidecar's data "as it existed at the time of Sidecar's sale to GM," and subsequently produced a hard drive containing Sidecar's data absent any list of data fields or other descriptions. SCI is attempting to hold Uber to an exacting, unreasonable double standard that it has not and cannot satisfy with respect to Sidecar's data.

1  Rules of Civil Procedure.  In any event, no "data dictionary" of "all fields contained in Uber's
2  transaction data system" exists.  SCI argues that Uber "has not identified what other information is
3  in Uber's possession that may be otherwise relevant and responsive to SCI requests," refers to
4  "potentially relevant repositories and sources of data that one party does not intend to produce,"
5  and questions whether Uber is producing "data that it deems responsive but not similar data from
6  other repositories." These vague and unsupported accusations provide no basis to impugn Uber's
7  compliance with its discovery obligations in this case.

8       To repeat, Uber has identified, and plans to produce imminently, the transactional data that
9  are responsive to SCI's requests, as described in detail to SCI well in advance.  Uber has not
10 objected to the production of, and is not withholding, *responsive* transactional data, whether based
11 on burden or any other grounds.  If, *after* reviewing the vast amount of transactional data produced
12 by Uber, SCI has follow up questions or concerns, Uber will consider them in good faith.  But at
13 this stage, there is simply no reason for the Court to issue any additional order regarding
14 discovery.

### B. Documents Provided to Regulators

**Plaintiff's Position:**

After 9PM on the eve of this submission, Uber advised SCI for the first time that it did not intend to search for and produce any responsive submissions to United States federal regulators concerning competition and pricing.  Uber only advised SCI of this position after SCI noticed and inquired about October 5 Uber correspondence in which Uber advised SCI that it was purportedly not withholding "any responsive regulatory documents," but only referenced searching for and producing municipal and state regulator materials. It was only after SCI specifically inquired on October 13 about the absence of any reference to federal materials that Uber (after waiting two days until the eve of the submission of this statement) advised SCI it would not be producing any federal materials, citing the allegations contained in SCI's Amended Complaint and the Court's statements at the June 22 Conference.  Uber's eleventh hour change in position and belated objection should be rejected.  It is waived, not supported by the Court's directives, and without

1  merit.[6]

2  Not once before the June 22 conference did Uber contend that documents concerning
3  issues like markets, competitors, entry barriers or pricing that were submitted to federal antitrust
4  enforcers like the Federal Trade Commission ("FTC") or Department of Justice ("DOJ") were not
5  discoverable.  For good reason.  Uber's statements concerning, for example, the types of
6  competition it faces and its pricing behavior submitted to federal regulators are relevant to the
7  same issues that are in play for each of the specific geographic regions identified by SCI in its
8  amended complaint.  Uber's objection that was raised before the Court and litigated in June was
9  predicated upon Uber contending that it needed more limitations and specificity as to what sorts of
10 submissions SCI was looking for, not any objection about federal versus state or municipality
11 narrowing.  The Court instructed the parties to meet and confer concerning these issues, which
12 they did.  June 22, 2020 Conf. Tr. at 9:17-10:7.  But the Court's overarching directive was that
13 Uber's responsive regulator submissions should be produced.  *Id.* at 10:1-3 ("On the other hand,
14 within some reasonable limitations, it's got to be produced.").

15 In connection with Uber and SCI's meet and confer discussions following that conference,
16 SCI reiterated, both verbally and in writing, its specific request for FTC and DOJ submissions
17 germane to pricing and competition issues.  Uber responded to SCI's correspondence without ever

---

[6] Uber's claim that SCI "manufactured" this dispute to "revive . . . overly broad requests" is legal sophistry grounded in falsehood.  The dialogue between the parties where Uber never suggested in any way that federal regulator materials were objectionable, and expressed its intention to produce responsive federal regulator materials is clear and not disputed by Uber. The true facts are that Uber waited until after 9PM the day before this submission was due to first advise SCI of its position; until that moment, Uber had, all the while represented that nothing was amiss and it would be searching for and producing responsive federal regulatory submissions.  Indeed, if Uber intended to assert this objection, it could have at least told SCI on Tuesday (October 13) when SCI noted the absence of any reference to federal regulatory submissions in Uber's production correspondence. Putting aside Uber's inexcusable failure—for months—to advise SCI of its new objection and argument, Uber decided to wait until late in the evening Thursday (when it supplied its portion of the Case Management statement) to advise SCI of its objection.  This dispute was not "manufactured" by SCI; it was foisted upon SCI on the day the Case Management Report was due.  Accordingly Uber's complaints about only receiving SCI's submission concerning this issue on the morning the submission is due, and assertions about the need "for additional briefing" are, to say the least, not credible.  They are a transparent attempt to re-litigate issues that were already resolved, and renege on what Uber led SCI it was already doing (for months).

---

JOINT CASE MANAGEMENT STATEMENT         -9-                  CASE NO. 3:18-cv-07440-JCS

raising the objection it now asserts. In fact, on August 18, 2020—two months after the Court conference—Uber (in response to an email specifically identifying requested FTC or DOJ materials) assured SCI that "we are actively interviewing Uber regulatory attorneys across various jurisdictions to identify responsive regulatory submissions, and we are in the process of collecting non-custodial documents and transactional data responsive to your RFPs."

Accordingly, SCI has understood for the past two months that Uber was working on its production of regulatory submissions materials, both state and federal, consistent with the Court's discoverability ruling. Only after SCI sought clarification in response to Uber's October 5 discovery letter, and late in the evening before the day this submission, did Uber suddenly advise SCI that it had no intention of searching for and producing *any* submissions to federal regulatory agencies—including leading U.S. competition authorities, the FTC and DOJ Antitrust Division. Uber advised "We have agreed to produce relevant materials submitted to regulators in the geographic markets alleged in your complaint. But you have not alleged a national market, and there is no federal agency that regulates ridesharing. We have therefore not searched for materials submitted to federal regulators, which would not be proportional to the needs of the case. We believe this is consistent with Judge Spero's comment at the last CMC with respect to regulators that there are 'only a limited number of jurisdictions that are relevant in this antitrust case, I mean geographical locations.'"

The Court should order Uber to produce these materials immediately for several reasons. First, statements to federal regulators, in particular the FTC or DOJ, concerning matters such as competition, entry barriers and pricing conduct for the relevant product markets are relevant for each of the areas identified in SCI's Complaint. Indeed, the regions are at a minimum subsumed within them, and Uber's statements and reasoning presented to national regulators on topics like competition and pricing will have application at the state and municipal level as well. Second, the notion that this sort of hair-splitting, and new objection was endorsed by this Court's June directives is baseless. The Court was never confronted with an objection concerning whether Uber's submissions to federal regulators were required to be produced, and the Court evidently was referring on the record to parsing out filings with local level state and municipal authorities

that are not the focus of the claims here.[7]  Indeed, Uber's own conduct following the hearing shows that it did not interpret the Court's ruling as authorizing what it is purporting it to have done now.  Two months after the June 22 Hearing, Uber assured SCI without objection that it was searching for and would be producing responsive materials from the FTC and DOJ.

Finally, if Uber was going to raise this "federal vs. state" sort of objection, it needed to raise it before the June 22 Conference.  *See Sun v. Ikea US W., Inc.*, No. 15-CV-01146, 2015 WL 6734480, at *2 (N.D. Cal. Nov. 4, 2015) ("It is well established that a failure to object to discovery requests within the time required constitutes a waiver of any objection." (citation and internal quotation marks omitted)); *see also Uschold v. Carriage Servs., Inc.*, No. 17-CV-04424, 2019 WL 3282961, at *2 (N.D. Cal. Jan. 17, 2019) (same).  Any objection on this ground is thus forfeited and Uber should not be permitted a second attempt to litigate this issue again.

**Defendants' Position**:

Uber's position on regulatory submissions has remained consistent throughout the discovery process in this case.  Uber has always objected to the scope of SCI's overbroad request for regulatory submissions, and pursuant to the Court's guidance at the last hearing, Uber has worked diligently to produce regulatory materials responsive to SCI's requests pertaining to the geographic jurisdictions alleged in SCI's complaint.

SCI has manufactured this "dispute" at the eleventh hour in an attempt to revive its overly-broad request for regulatory submissions that the Court rejected and significantly narrowed at the last hearing.  And SCI would have the Court do this all without the benefit of full briefing—indeed, SCI presented Uber with a new section of this joint statement raising these regulatory issues on the morning that the statement was due.  There is no reason for the Court to revisit the topic of regulatory submissions, but if the Court is inclined to make any further orders on this topic, the Court should do so after full briefing on a motion to compel—instead of on the basis of a stray section of a joint statement that SCI is attempting to force Uber to respond to in less than a day.

---

[7] If anything, Uber's conduct runs afoul of the Court's directive at the June 22 Conference that responsive regulator materials should be produced.

Uber has been consistent in its objections since day one. When SCI first served its extremely broad request—for production of regulatory materials concerning pricing and competition submitted anywhere in the country over roughly a decade—Uber objected on numerous grounds, including that "the Request seeks information that is not relevant to any party's claim or defense or proportional to the needs of the case." (Uber's Responses and Objections to SCI's First Set of Requests for Production.) Uber later specifically objected to SCI's overbroad regulatory submission request in the parties' joint-submission to the court prior to the June 22 hearing, stating "SCI has refused to indicate any reasonable limitation on its request or even identify any specific agencies (other than any agency in the United States)." Far from waiving any objection, Uber's position was (and is) that SCI's request for submissions to all governmental agencies within the U.S. is overbroad and disproportionate.

At the hearing, the Court agreed with Uber, noting that SCI's request for regulatory submissions was "too unbounded." (Transcript of June 22, 2020 Hearing at 9–10.) The Court then narrowed the scope of relevant regulatory submissions to the "limited number of jurisdictions . . . I mean geographical locations" alleged in SCI's Complaint, going on to note that "[w]ithin those geographical areas, Uber will know what the relevant – what regulators they submitted what kind of things to so you should be able to figure that out." (*Id.*) The Court went on to discuss the reach of "California regulators" and made no mention of submissions to federal agencies. Nor did SCI's counsel raise this jurisdictional point for the Court's consideration. This makes sense, given that SCI has not alleged a national market, and there is no federal regulatory framework for Uber's very localized ridesharing business (in contrast to the many state and municipal regulators).

Uber thus reasonably concluded this issue had been put to bed, and that its obligation with respect to regulatory submissions is to produce relevant materials submitted to regulators in the eleven geographic markets alleged in SCI's complaint. Indeed, in an email to SCI dated July 15, Uber noted that it was "investigating Uber's regulatory submissions in line with Judge Spero's guidance, namely across the limited geographical jurisdictions that are relevant in this case, and with respect to the limited number of regulators that have relevant oversight." And to date, Uber has gone to great lengths to comply with this obligation. Uber's outside counsel has consulted

with 11 different in-house attorneys at Uber responsible for regulatory compliance in the alleged geographic markets identified in SCI's complaint, in an effort to locate relevant submissions to state and local regulators. Uber has already produced all relevant submissions—located after a diligent search, and to the extent they exist—to regulators in Austin, Boston, Chicago, Washington, D.C. (including Maryland and Virginia), and Seattle. Uber will produce shortly all such relevant submissions for New York and Philadelphia, and Uber is in the final stages of collecting such relevant submissions for the California alleged markets.

Uber is diligently complying with its discovery obligations with respect to regulatory materials pursuant to the Court's instructions at the last hearing, and production of regulatory submissions is proceeding apace. Accordingly, there is no reason for the Court to re-visit this issue.

### 9. Scheduling

Following the July 31, 2020 Case Management Conference and upon stipulation of the parties, the Court set the following pretrial dates. ECF 107:

| Event | Date |
|---|---|
| First rolling production deadline | September 15, 2020 |
| Completion of rolling document production | December 15, 2020 |
| Discovery cutoff | April 21, 2021 |
| Expert disclosure by party with burden of proof | May 3, 2021 |
| Expert rebuttal | June 2, 2021 |
| Expert discovery cutoff | July 15, 2021 |
| Deadline to file dispositive and *Daubert* motions | July 29, 2021 |
| Opposition to dispositive and *Daubert* motions | August 26, 2021 |
| Reply to dispositive and *Daubert* motions | September 9, 2021 |
| Hearing on dispositive motions and *Daubert* motions | October 8, 2021 at 9:30 a.m. |
| Pretrial conference | January 27, 2022 at 2:00 p.m. |
| Trial | January 24, 2022 at 8:30 a.m. for approximately 10 days (jury) |

### 21. Other Matters

1   The parties are not aware of any other matters requiring the Court's attention at this time.

2   DATED: October 16, 2020                Respectfully submitted,

By:   /s/ *Lewis T. LeClair*
      Lewis T. LeClair
      McKool Smith
      300 Crescent Ct., Suite 1500
      Dallas, Texas 75220
      lleclair@mckoolsmith.com

*Attorneys for Plaintiff SC Innovations, Inc.*

By:   /s/ *Cynthia E. Richman*
      Theodore J. Boutrous Jr.
      Daniel G. Swanson
      Cynthia E. Richman
      GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Defendants Uber Technologies, Inc. Rasier, LLC, Raiser-CA LLC, Rasier-PA LLC, Rasier-DC, LLC, Rasier-NY, LLC, and Uber USA, LLC*

**[PROPOSED] CASE MANAGEMENT ORDER**

The above UPDATED JOINT CASE MANAGEMENT STATEMENT & PROPOSED ORDER is approved as the Case Management Order for this case and all parties shall comply with its provisions. [In addition, the Court makes the further orders stated below:]

IT IS SO ORDERED.

Dated: _____

The Hon. Joseph C. Spero
UNITED STATES MAGISTRATE JUDGE