# McKool Smith Hennigan

Kirk D. Dillman
Direct Dial: (213) 694-1101
kdillman@mckoolsmithhennigan.com

300 South Grand Avenue
Suite 2900
Los Angeles, CA 90071

Telephone: (213) 694-1200
Telecopier: (213) 694-1234

April 12, 2021

Hon. Joseph Spero
San Francisco Courthouse, Courtroom F
450 Golden Gate Avenue
San Francisco, CA 94102

    Re:    SC Innovations Inc. v. Uber Technologies Inc., 3:18-cv-07440-JCS

Dear Judge Spero:

Pursuant to the Court's Standing Order, the parties submit the attached Joint Summary of Disputes regarding the scheduling of a Rule 30(b)(6) deposition of Uber concerning financial matters and document discovery issues. The Rule 30(b)(6) notice and a narrowed list of the topics presently at issue are attached, respectively, as Exhibits A and B. Certain additional documents pertinent to the dispute are also attached as exhibits.

The final meet-and-confer leading up to this submission took place on Friday, April 2, 2021.

Respectfully submitted,

By   /s/ *Kirk D. Dillman*
    Lewis T. LeClair
    Kirk D. Dillman
    John C. Briody
    Robert J. King
    MCKOOL SMITH, P.C.
*Attorneys for Plaintiff SC Innovations, Inc.*

   /s/ *Cynthia E. Richman*
    Theodore J. Boutrous Jr.
    Daniel G. Swanson
    Cynthia E. Richman
    Frances Waldmann
    GIBSON, DUNN & CRUTCHER LLP
*Attorneys for Defendants Uber Technologies, Inc., Rasier, LLC, Raiser-CA LLC, Rasier-PA LLC, Rasier-DC, LLC, Rasier-NY, LLC, and Uber USA, LLC*

SUMMARY OF DISCOVERY DISPUTES

### Rule 30(b)(6) Deposition on Financial Topics

**SCI's Position:**  Following Uber's production of financial and transactional data, SCI sought to gain necessary details to understand the discovery in order to conduct its predation analysis.  SCI obtained some details through written correspondence, but other information will require a corporate deposition; for example, understanding the precise nature of line item expenses under the category "Promos" or "Employee Expense" in Uber's financial data.  Such information is critical to the work of SCI's expert economists.  The parties agreed that depositions would be the sensible way to address this type of discovery, and this was reflected in the January 2021 joint case management submission. Dkt. 115 at 2.

SCI tendered a 30(b)(6) notice to Uber on February 13,[1] and sought a meet and confer to address logistics to focus on only certain discrete financial topics.  The meeting, however, did not take place until March 3.  During the teleconference, SCI addressed Uber's concerns about specificity and the burden of preparing a witness.  SCI reiterated the urgent need for the financial deposition to avoid further delay to the work of its experts.  SCI identified its focus within the already-narrowed set of topics—some of which were unanswered questions from a November 2020 letter to Uber (Exh. F)—and discussed SCI's expectations concerning preparedness.  SCI made clear that it was not seeking a witness who could testify about every line of the financial data and spreadsheets that Uber produced, but someone capable of explaining the basic nature of the data and financial information and how they relates to each other.  SCI identified examples of specific spreadsheets and data for many of its noticed topics and provided further insight to the topics and categories it intends to ask about.  SCI expressed its hope and expectation the deposition could take place within thirty days.  The following week, however, Uber served written objections, asserting, among other things, that SCI was seeking discovery concerning the details of millions of rows of data, and that Uber would not present a prepared witness on a topic unless SCI first identified each of the documents and data about which it sought to question the witness.  SCI promptly responded to Uber's letter, (Exh. E), and called for a final meet and confer.

The final meet and confer occurred on April 2.  Uber asked SCI to defer involving the Court until Uber sent another letter sometime the next week.  SCI explained that, in light of Uber's positions, further delays were neither warranted nor acceptable.  SCI nonetheless was amenable to continuing the dialogue if Uber committed to providing a witness on agreed-upon financial topics within three weeks (by April 30).  Uber refused, necessitating this submission.  Expert analysis of Uber's financial information is not viable without a sufficient understanding of what it is and how data relates to one another.  *See, e.g.*, *William Inglis & Sons Baking Co. v. Itt Cont'l Baking Co.*, 668 F.2d 1014, 1034-35 (9th Cir. 1981) (discussing the significance of average total cost and average variable cost in predatory pricing analysis). SCI needs a witness promptly to conduct its financial analysis.  Accordingly, SCI seeks an order directing Uber to present a witness with respect to the matters set forth in Exhibit B no later than April 30.

**Uber's Position:** Contrary to SCI's characterization, Uber has been engaging in good faith and productive discussions on the scope of a 30(b)(6) deposition on financial and accounting topics, pursuant to the requirement to confer under Fed. R. Civ. P. 30(b)(6).  Given the breadth

---

[1] The Notice is attached as Exhibit A, and includes comprehensive topics that are not at issue now because SCI seeks in near term only the deposition on financial topics.  Those near term topics are set forth in Exhibit B.

SUMMARY OF DISCOVERY DISPUTES

and disproportionate burden the topics pose, Uber is unable to designate and adequately prepare a witness or witnesses until the parties agree on the scope of the topics. Indeed, the parties' ongoing progress is reflected by narrowing the original 30(b)(6) Notice, which sought testimony from one witness on sixty disparate data-heavy topics spanning nearly a decade. The correspondence attached as Exhibit C demonstrates that Uber has sought to bring precision to some of the vague and overbroad language reflected in Exhibit B, and to prune irrelevant or disproportionately burdensome topics, so that a witness or witnesses can be prepared to testify. Uber believes the parties are nearing agreement, which will allow dates for the deposition to be set promptly. Thus no Court intervention is required at this time.

### Uber Eats Discovery

**SCI's Position:** SCI seeks deposition testimony from Uber concerning its Uber Eats business line. Uber Eats discovery is relevant to SCI's damages and predation analyses. Before Uber forced SideCar to exit the market, SideCar expanded into food delivery, and SCI seeks to recover from Uber "financial damages flowing from that harm to competition, including (at least) lost profits and/or the artificial suppression of the value of Sidecar's business." Dkt. 73 ¶ 129.



SCI should be permitted to explore with Uber witnesses Eats financial information and the nature of Uber's expansion into food delivery.[2] SCI is entitled to investigate, for example, how costs and revenues are allocated in Uber's financials to account for its different product lines (e.g., UberX, Uber Black, UberPool and Uber Eats), and obtain testimony concerning the complementary profits Uber generates through its Eats business. Uber argues that Eats is not relevant to this case, and asserts that, because there has not been targeted document discovery regarding Uber Eats, testimony on the topic should be precluded. SCI previously agreed to defer its document requests relating to Uber Eats pending Uber's production of documents focused on its ride hailing business. Those documents confirm the important linkage between the two business lines and the appropriateness of SCI's narrow deposition topics on Eats.

**Uber's Position:** Discovery regarding Uber Eats is outside the scope of this lawsuit, which focuses solely on the Ridesharing segment of Uber's business. SCI's belated attempt to shoehorn Uber Eats into this litigation is undermined by the fact that Uber Eats (or food delivery generally) appears nowhere in SCI's complaint, which defines the relevant market as the "market for Ride-Hailing Apps," *e.g.*, SAC ¶ 13.1. Indeed, this Court has previously recognized that Uber Eats is not part of "the same Uber operations at issue in this case—the provision or facilitation of ride-hailing for passenger transportation," Order re Mot. to Disqualify Counsel (ECF No. 40). Likewise, SCI's sought-after damages claim for "harm to competition" cannot extend to events taking place outside the alleged relevant markets outlined in its Complaint. SCI attempts impermissibly to expand the scope of this litigation by pointing to documents that Uber produced, which incidentally mention Uber Eats. But these documents undermine SCI's argument.

---

[2] The specific topics on which SCI presently seeks examination are set forth in Exhibit B.

SUMMARY OF DISCOVERY DISPUTES



Relevance aside, it would be wholly disproportionate to open the door for SCI to seek burdensome discovery on any aspect of Uber's business on the theory that it might somehow be "complementary" to Uber's Ridesharing business.

### Uber Cost Information

**SCI's Position**: Uber refuses to produce key discovery concerning costs that is necessary for SCI's predation analysis. As this Court is aware, predation analysis involves comparisons between prices and costs. Experts analyze various measures of prices and costs under different assumptions, allocation rules, accounting policies, and other factors. Complete and accurate data on revenues and costs is thus essential.

Here, Uber has produced revenue and cost data for 2012-2014 that includes certain unallocated cost categories—such as Sales and Marketing expense and General and Administrative Expense—that plainly apply to its operations in that period. This cost information is relevant to SCI's predation analysis. Uber, however, has not provided this information for January 2015 forward. Consistent measurement and comparison of Uber's prices and costs over time is critical for SCI's predation analysis and for evaluating the extent and duration of the alleged conduct. The lack of certain cost categories may also give a misleading picture of Uber's profitability: if certain costs are excluded, then Uber's prices may appear to be above cost when in fact they were not. Uber refuses to produce cost information after December 2014, contending that the pre-2015 data would not have been produced at all, but for the fact that it was contained in an excel spreadsheet with other responsive data. It also cites its transactional data as containing all relevant information.

Uber cannot pick and choose what costs SCI has access to in order to formulate its predation analysis. This is discovery, not summary judgment, and it is premature for Uber to deny SCI discovery based on what costs Uber believes should and should not be included in a predation analysis. SCI is entitled to obtain discovery concerning all potentially relevant costs. To the extent that Uber argues it is not required to create discovery (i.e., to provide a separate document containing the same cost information for the relevant period), Uber already has done so, curating datasets of financial information that it purports to rely upon. Moreover, given Uber's positioning, the cost information likely does exist, but Uber is withholding it under a misplaced claim that it is not discoverable. The Court should require Uber to produce post-December 2014 cost information that it already has produced for earlier periods.

**Uber's Position**: With respect to the cost data that SCI has requested for the 2015–2020 period, Uber agrees that "complete and accurate data" regarding costs and revenues is essential to conducting a predation analysis, but only insofar as it is relevant to SCI's allegations and the relevant geographic markets.

Uber has provided all relevant documents and data regarding the costs and revenue of Uber's operations in the eleven discrete geographic markets alleged in SCI's Complaint, including for the 2015–2020 period. It is simply not true that "Uber refuses to produce cost information after

December 2014"—Uber produced detailed cost information at the city-level for the alleged relevant markets from 2012 through 2020. *See* UBER-00160424; UBER-00160425 (Uber city-level profit and loss statements for 2012-2020). SCI's complaint is that Uber has not produced irrelevant corporate overhead cost information for the period after 2015—which Uber only *incidentally* produced for the earlier period because at that time the corporate segment information was kept alongside the relevant city-level profit and loss data in the ordinary course of business.

In other words, SCI's argument is that it is entitled to every conceivable piece of financial data that Uber has ever maintained, even if entirely unrelated to ridesharing in the alleged geographic markets, in order to conduct its predation analysis. But that is incorrect as a matter of law. In its Complaint, SCI asserts that "Uber has and continues to price below cost, *however cost may be measured*." SAC ¶ 9. Only variable costs—those costs that vary with output in the respective relevant markets—are the costs relevant to determine whether Uber priced below an "appropriate measure of cost" in the Ninth Circuit. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 909–910 (9th Cir. 2008); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088, 1093-94 (9th Cir. 1998). A cost standard that includes or allocates *fixed* costs is, as a matter of law, *not* an appropriate measure of cost. *See, e.g., United States v. AMR Corp.*, 335 F.3d 1109, 1117 (10th Cir. 2003) (holding that a proposed standard measuring costs "that [were] not, in large part, variable" and that included "many fixed costs" was "invalid as a matter of law, fatally flawed in [its] application, and fundamentally unreliable."). SCI therefore cannot rely on its apparent desire to "allocate" fixed corporate overhead costs to obtain more data from Uber. SCI appears to suggest that Uber may be hiding "potentially relevant costs" in irrelevant corporate overhead cost data. But Uber produced the data that SCI wants for the 2012–2014 period—almost the entire period of relevance when Sidecar was in operation, when SCI must show that Uber priced below cost—and yet SCI has not presented any evidence of "hidden" costs beyond a conclusory (and confused) statement that general categories in the corporate segment data "plainly apply to [Uber]'s operations." This is not a factual (much less legal) basis for seeking corporate overhead data from 2015–2020—a time period that almost entirely post-dates Sidecar's December 2015 exit.

The fact is that Uber has already produced detailed financial data from 2012 to 2020, including city-level cost data for each alleged geographic market, transactional data for every trip conducted in those markets, and bulk incentive data for the relevant period and markets. This transactional and financial data production is one of the largest that Uber has ever conducted, involving billions of rows of data. Contrary to SCI's suggestion that Uber has "curat[ed] datasets of financial information," Uber has produced relevant financial and cost data for each of the 11 alleged relevant markets in the manner in which it was kept in the ordinary course of business—data that both sides will need to conduct the price/cost analysis.

### Uber Dashboard & Financial Reporting Discovery

**SCI's Position:** SCI has long requested that Uber produce profit and loss statements by geography and by segment (e.g., Uber Black, UberX) that Uber maintains in the ordinary course. This information is important because it provides insight on a granular basis on how Uber assesses profitability. Uber has repeatedly asserted that it does not maintain such reports and that any examples of this reporting found in Uber's production are merely *ad hoc* creations.

However, former Uber Product Manager Jahan Khanna (also identified as a witness with knowledge in Uber's Initial Disclosures) testified that Uber has tracked the requested information

for some time.[3]  When SCI pointed to Mr. Khanna's testimony and renewed its request, Uber dismissed his credibility, and asserted that Mr. Khanna's testimony concerned a dynamic dashboard that uses a formula and draws upon internal data.  So, SCI requested that Uber produce the formula and data that Uber uses to create these reports, as well as the reports, if Uber has them.

Uber refused, asserting that these were new requests.  But the documents fall well within SCI's requests 5 and 28 (seeking profit and loss statements and documents reflecting Uber's analysis of revenues versus costs). The request for Uber's formula and underlying data for P&L assessments is not new simply because SCI is now able to more specifically identify its contours.

**Uber's Position:**  Based on a single comment made by Mr. Khanna—a product manager at Uber between 2016 and 2019, who was never involved in Uber's finance and accounting operations, and not in a position to know what financial documents Uber created in the ordinary course of business, as evidenced by his equivocation on this subject at his deposition (*e.g.*, Exhibit D, Deposition of Jahan Khanna at 90:19–24, 91:8–92:8, 128:18–129:4)—SCI has launched vague and burdensome new requests for data outside of formal discovery.  In response to SCI's requests for production Nos. 5 and 28, Uber produced detailed financial cost data in city-level profit and loss statements from 2012 through 2020.  But Uber has consistently explained to SCI that it does not maintain city-level profit and loss statements broken down (or "segmented") by product (e.g., Uber Black, UberX, UberPool) in the ordinary course of business.  SCI now requests (for the first time in an informal discovery letter on March 24, 2021, Exhibit E) a "formula" and "underlying data" concerning profit and loss calculations visualized in a "dashboard" that Mr. Khanna mentioned in his deposition.

As Uber has explained to SCI, a "dashboard" is simply shorthand for a tool used to query an underlying dataset and then present data visually.  Accordingly, it is likely that at any given time, Uber produced thousands of "dashboards" on a range of different subjects, on an ad hoc basis, depending on the needs of the company.  Uber does not keep in the ordinary course of business "reports" from any such dashboards reflecting the information that SCI seeks.  And if any such reports were ever saved or emailed by any of the custodians, they almost certainly would have hit on the parties' agreed-upon search terms and appeared in Uber's custodial production. Uber is not currently aware of any dashboard at Uber that visualizes profit and loss data broken down by product in the way that SCI describes (a topic which SCI is free to explore at the upcoming Rule 30(b)(6) deposition).  Even Mr. Khanna was not "able to recall" "what specific information was available on [the] dashboard" he used.  *Id.* at  92:25–93:12.  In any case, if such a dashboard existed during Mr. Khanna's tenure at Uber, it would have queried the exact data that Uber has already produced.  That data is more than sufficient for SCI's experts to conduct their own analyses of Uber's profitability.  Uber does not possess universal formulas or tools for conducting such profitability calculations, but in any case, Uber is not required to do the job of SCI's experts by creating formulas, calculations, or interpretations of its datasets.

Discovery into data visualization tools based on unreliable testimony from a witness lacking personal knowledge of financial reporting is an unnecessary, burdensome distraction that wholly ignores Uber's production of the relevant, underlying raw financial data SCI needs to conduct its analysis. The Court should reject SCI's request.

---

[3] Deposition of Jahan Khanna at 105:12-19 (Q: How often were city P&Ls generated, if you know?  A: Well, I mean, city P&Ls were generated in realtime nearly, but probably a weekly report was sent.  Q: And is it the case that in general, the city P&Ls were broken down by product lines?  A: Yes.")